UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
                                 :

DODONA I, LLC, on Behalf of Itself     :
and All Others Similarly Situated,     :
                                 :
        Plaintiff,               :
                                 :
v.                                :
                                 :
GOLDMAN, SACHS & CO., THE     :
GOLDMAN SACHS GROUP, INC.,     :
HUDSON MEZZANINE FUNDING     :
2006-1, LTD., HUDSON MEZZANINE   :
FUNDING 2006-1, CORP., HUDSON    :
MEZZANINE FUNDING 2006-2, LTD.,  :
HUDSON MEZZANINE FUNDING     :
2006-2, CORP., PETER L. OSTREM and :
DARRYL K. HERRICK,          :
                                 :
        Defendants.          :
------------------------------------------------------x

10 CIV 7497

CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL
SECURITIES LAWS AND NEW YORK
COMMON LAW

RECEIVED
SEP 30 2010
U.S.D.C. S.D. N.Y.
CASHIERS

JURY TRIAL DEMANDED

       Plaintiff Dodona I, LLC ("Dodona" or "Plaintiff"), individually and on behalf of a class

of similarly situated investors, alleges the following based upon information and belief except

those allegations concerning itself, which are based upon personal knowledge. Plaintiff's

information and belief is based on the investigation conducted by its attorneys which included,

among other things, review and analysis of: United States Securities and Exchange Commission

("SEC") filings; public statements, news articles, and other reports disseminated by, or

concerning, defendant The Goldman Sachs Group, Inc. ("Goldman") and others; internal

Goldman documents publicly released by, and testimony of Goldman employees and others

before, the U.S. Senate Permanent Subcommittee on Investigations ("Senate Subcommittee")

and other government and regulatory bodies; pleadings and other documents from other

proceedings involving Goldman and others; and other publicly available information. Many of

the facts supporting the allegations contained herein are known only to the defendants, or are within their control. In addition, Plaintiff is continuing its investigation via its counsel, and believes that substantial additional evidentiary support will exist for its allegations after it is afforded a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of investors in two Goldman-led offerings of collateralized debt obligations ("CDOs"). The first CDO comprised a $837 million offering of securities co-issued by Hudson Mezzanine Funding 2006-1, Ltd. ("Hudson 1 Ltd.") and Hudson Mezzanine Funding 2006-1, Corp. ("Hudson 1 Corp.") as to all tranches except for the Class E and Income Note tranches, the latter two of which were issued solely by Hudson 1 Ltd., as well as a senior swap transaction with an initial notional amount of $1.2 billion (the "Hudson 1 CDO"). The Hudson 1 CDO was issued on or about December 5, 2006. The second CDO was a $407.9 million offering of securities co-issued by Hudson Mezzanine Funding 2006-2, Ltd. ("Hudson 2 Ltd.") and Hudson Mezzanine Funding 2006-2, Corp. ("Hudson 2 Corp.") as to all tranches except for the Class E and Income Note tranches, the latter two of which were issued solely by Hudson 2 Ltd. (the "Hudson 2 CDO"). The Hudson 2 CDO was issued on or about February 8, 2007. Collectively, the Hudson 1 CDO and Hudson 2 CDO are referred to here as the "Hudson CDO Securities."

2.      In a classic case of "heads we win, tails you lose," the defendants failed to disclose to investors *both* that the CDOs were structured by defendants such that they were doomed to lose value, and that Goldman would profit enormously from proprietary short positions when the CDOs did lose value. The defendants include Goldman, Goldman's broker-dealer subsidiary, Goldman, Sachs & Co. ("GS&Co"), which underwrote, offered and sold to

2

investors the Hudson CDO Securities, the four Hudson entities which issued the CDOs, and two senior Goldman officials that helped lead in structuring and selling the CDOs. By the fall of 2007, both CDOs had, in fact, declined in value significantly, saddling Plaintiff and other investors with enormous losses.

3.     Following massive losses in the Hudson CDO Securities and other similar mortgage-related asset-backed financial instruments structured and sold by the defendants, Goldman has been engulfed in multiple regulatory proceedings and/or criminal investigations by both the U.S. Department of Justice and the United Kingdom-based Financial Services Authority ("FSA"); GS&Co and a Goldman employee, Fabrice Tourre ("Tourre"), were named as defendants in a civil enforcement action by the SEC alleging *fraud* in connection with another, similar CDO called Abacus 2007-AC1 issued in April of 2007; GS&Co settled the SEC enforcement action on July 15, 2010 by agreeing to pay $550 million and by adopting certain reforms regarding future offerings of mortgage-backed securities (while the SEC's case against Tourre continues); and Goldman and several key employees have been embroiled in Congressional and other investigations and proceedings, including before the Senate Subcommittee, relating to the firm's mortgage securities practices.

4.     Plaintiff alleges claims under the Securities Exchange Act of 1934 (the "Exchange Act") and New York common law on behalf of those persons and entities who purchased or otherwise acquired the Hudson CDO Securities, and were damaged thereby.

**JURISDICTION AND VENUE**

5.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331, 1337 and 1367.

3

6. Plaintiff's claims arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a); SEC Rule 10b-5, 17 C.F.R. § 240.10b-5; and New York common law.

7. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b) and (c). Substantial acts in furtherance of the wrongdoing alleged and its effects occurred in this District. Additionally, Goldman and GS&Co have their principal places of business in this District.

8. In connection with the omissions complained of herein, the defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail and interstate telephone communications.

### THE PARTIES

9. Plaintiff purchased in the United States securities issued by each of the Hudson CDOs and incurred losses in connection therewith, as described in its attached certification. More specifically, and also as described in its attached certification, Plaintiff acquired its securities in the Hudson 1 CDO on or about February 6, 2007 from Colonial Fund, LLC which, in turn, purchased such Hudson 1 CDO securities directly from GS&Co on or about January 4, 2007; and Plaintiff acquired its securities in the Hudson 2 CDO directly from GS&Co on or about January 24, 2007.

10. Defendant Goldman is a global investment banking, securities trading and investment management firm. It provides a wide range of financial services to corporations, financial institutions, governments and individuals. As of December 31, 2009, Goldman had $871 billion in assets under management; operated in 30 countries; and employed approximately

32,500 people. Goldman is a corporation organized under the laws of Delaware with its principal executive offices located at 200 West Street, New York, New York 10282.

11. Defendant GS&Co is a limited partnership organized under the laws of New York with its principal executive offices located at 200 West Street, New York, New York 10282. GS&Co is a securities broker-dealer registered with the SEC. GS&Co underwrote, offered and sold the Hudson CDO Securities to Plaintiff and other investors in the United States; reportedly purchased from the four Hudson issuers or co-issuers all of the Hudson CDO Securities to, in turn, sell them to Plaintiff and other investors; was responsible for selecting the collateral backing at least the Hudson 1 CDO securities; served as structuring and placement agent for the Hudson 1 CDO; and served as the liquidation agent for the Hudson 1 CDO and the Hudson 2 CDO. GS&Co sold tranches of the Hudson CDO Securities directly to Plaintiff and other investors.

12. Defendant Hudson 1 Ltd. is incorporated under the laws of the Cayman Islands. It was reportedly formed in September 2006. Hudson 1 Ltd. was formed and managed by Goldman or its affiliates, to issue and sell Hudson 1 CDO securities. Hudson 1 Ltd.'s registered office is located at the office of Maples Finance Limited, P.O. Box 1093GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands.

13. Defendant Hudson 1 Corp. was a corporation organized under the laws of Delaware. It was reportedly formed in November 2006. Hudson 1 Corp. was formed and managed by Goldman or its affiliates, to issue and sell Hudson 1 CDO securities. Hudson 1 Corp. was reportedly dissolved on or about October 27, 2009. Its registered office is or was located at Puglisi & Associates, 850 Library Avenue, Suite 204, Newark, Delaware 19711.

5

14.     Defendant Hudson 2 Ltd. is incorporated under the laws of the Cayman Islands. It was reportedly formed in December 2006. Hudson 2 Ltd. was formed and managed by Goldman or its affiliates, to issue and sell Hudson 2 CDO securities. Hudson 2 Ltd.'s registered office is located at the office of Maples Finance Limited, P.O. Box 1093GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands.

15.     Defendant Hudson 2 Corp. is a corporation organized under the laws of Delaware. It was reportedly formed in December 2006. Hudson 2 Corp. was formed and managed by Goldman or its affiliates, to issue and sell Hudson 2 CDO securities. Its registered office is located at Puglisi & Associates, 850 Library Avenue, Suite 204, Newark, Delaware 19711.

16.     Defendant Peter L. Ostrem ("Ostrem") helped to lead in structuring, marketing and selling to investors the Hudson CDO Securities. Ostrem is a former Goldman managing director and was a vice president in Goldman's structured products CDO group from at least 2006 through 2007. Ostrem is reportedly no longer employed by Goldman.

17.     Defendant Darryl K. Herrick ("Herrick") also helped to lead in structuring, marketing and selling to investors the Hudson CDO Securities. Herrick was a vice president in Goldman's structured products CDO group from at least 2006 into 2007. Herrick joined Goldman in May 2000 and reportedly resigned in July 2007.

## CLASS ACTION ALLEGATIONS

18.     Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rule of Civil Procedure on behalf of the following two classes (collectively, the "Classes"):

a.     those who, from the initial offering through the date of this Complaint, purchased or otherwise acquired Hudson 1 CDO securities and were damaged thereby; and

6

    b.  those who, from the initial offering through the date of this Complaint, purchased or otherwise acquired Hudson 2 CDO securities and were damaged thereby.

   19.  Excluded from the Classes are the defendants; the members of the individual defendants' immediate families; the legal representatives, heirs, successors and assigns of any excluded person or entity; and any entity in which defendants have or had a controlling interest.

   20.  Plaintiff believes that the members of the Classes are so numerous that joinder of all members is impracticable, and that they are geographically dispersed. Record owners and other members of the Classes may be identified from records maintained by Goldman, GS&Co or their affiliates, and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

   21.  Plaintiff's claims are typical of the claims of the members of the Classes as all are similarly affected by defendants' wrongful conduct in violation of federal and state law as alleged herein.

   22.  Plaintiff will fairly and adequately protect the interests of the members and has retained counsel competent and experienced in class and securities litigation.

   23.  Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting individual members of the Classes. The questions of law and fact common to the members of the Classes include, among others:

    a.  whether the federal securities laws and state law were violated by defendants' acts as alleged herein;

    b.  whether defendants participated in and pursued the course of conduct complained of herein;

c.     whether defendants acted wrongfully in omitting material facts regarding the Hudson CDO Securities;

d.     whether the prices paid by members of the Classes for the Hudson CDO Securities were artificially inflated due to the misconduct complained of herein; and

e.     whether the members of the Classes sustained damages.

24.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Classes is impracticable. Furthermore, as the damages suffered by individual members of the Classes may be relatively small, the expense and burden of individual litigation make it impossible for members of the Classes to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## ADDITIONAL FACTUAL ALLEGATIONS

**A.     Background on Subprime Mortgages, Residential Mortgage- Backed Securities and CDOs**

25.     "Subprime" mortgages are generally defined as loans secured by residential real estate made to borrowers with FICO (Fair Isaac Corp.) scores of 660 or less. A FICO score of 660 or less indicates that a borrower has previously had difficulty repaying debt. Additionally, subprime mortgages frequently have certain other risky characteristics such as high loan-to-value ratios; interest-only or negative amortizing loans; low initial interest rates followed by higher variable rates; and/or limited or stated documentation regarding the borrower's financial status and income.

26.     Residential mortgage-backed securities ("RMBS") are debt securities that are backed by pools of residential mortgages. The mortgages are held by a special purpose entity

8

("SPE"), typically a trust, that issues debt securities to investors. The investors, in turn, are entitled to returns derived from the cash flows generated by the underlying mortgages. RMBS are divided into prioritized tiers, also known as tranches. The lowest tranche offers investors the highest interest rate but also carries the greatest risk, since it bears a proportionately greater share of any initial losses up to a certain percent of the value of the RMBS. Similarly, the next lowest tranche offers the next highest interest rate but bears the next highest level of risk and losses. This pattern continues all the way to the most senior tranche of the RMBS, which offers lower interest but is the least risky. Each tranche is generally given a credit rating by one or more of Wall Street's main credit rating agencies, namely Moody's, Standard & Poor's and Fitch. Naturally, the senior tranches are given higher credit ratings than the more junior tranches.

27.     For RMBS created in and around 2005 and 2006, typically some 80% of the tranches were given ratings of AAA. The "mezzanine", or BBB/Baa2-rated, tranches for such RMBS were typically the lowest investment grade tranches of the RMBS because they were among the first tranches to suffer loses when the performance of the underlying mortgage portfolio deteriorated.

28.     CDOs are primarily debt securities that are typically backed by a portfolio of fixed income assets, such as RMBS or other types of asset-backed securities ("ABS"). As with RMBS, the assets are packaged and held by a SPE -- such as the issuers of the Hudson CDO Securities -- which, in turn, issues securities to investors. The securities are divided into tranches and given credit ratings by one or more of Wall Street's main credit rating agencies, again depending on their perceived risk level just as with RMBS. The investors, in turn, are entitled to returns derived from the cash flows generated by the underlying assets. These types of CDOs are generally called cash CDOs.

29.     In contrast to cash CDOs, "synthetic CDOs" do not actually own a portfolio of fixed income assets (except a small amount of securities to meet payment obligations). Instead, the CDO enters into credit default swap agreements ("CDS") which reference a portfolio of assets, such as multiple issues of RMBS or other ABS. Accordingly, while synthetic CDOs are likewise typically issued by SPEs, the performance of the securities is tied not to specific fixed income assets backing the CDO, but instead to the performance of the underlying assets referenced in the CDS.

30.     A CDS is a type of credit insurance between two or more parties regarding certain referenced assets. One party to the CDS -- the credit protection *seller* -- promises to pay the other certain contingent amounts in the event that the referenced assets experience a negative credit event, such as a ratings downgrade or payment default. In exchange, the other party to the CDS -- known as the credit protection *buyer* -- pays periodic premiums for the life of the CDS. Accordingly, the credit protection seller essentially bets that the referenced assets will perform well -- *i.e.*, that the referenced assets will not experience a negative credit event -- while the credit protection buyer essentially bets that the referenced assets will perform poorly, *i.e.*, that the assets will experience a negative credit event the effect of which will outweigh the cost of the buyer's premium payments.

31.     In synthetic CDOs, the buyer of the CDO takes the position of credit protection seller. Therefore, synthetic CDO securities offer investors the ability to bet that the referenced assets will perform well.

32.     Many synthetic CDOs in 2006 and 2007 -- such as the Hudson CDOs, as described more fully below -- were backed at least in significant part by CDS referencing one or more of the RMBS issues comprising the ABX indices. CDS referencing one or more RMBS

10

issues are referred to as "single-name" CDS. The ABX is a group of indices that were created in January 2006 by Goldman and other Wall Street banks, in conjunction with Markit Group Ltd., in part to measure the performance of select groups of subprime RMBS. For example, the ABX 2006-1 and ABX 2006-2 are each a series of indices whose value is derived from the prices of CDS referencing 20 subprime-related RMBS issued, respectively, in the third and fourth quarters of 2005, and the first and second quarters of 2006. Both the ABX 2006-1 and ABX 2006-2 are comprised of five separate indices segregated by the initial credit ratings of the underlying RMBS: AAA, AA, A, BBB, and BBB-. As the price of the CDS referencing the RMBS increases -- indicating a bearish view on the underlying assets (as it costs more to buy protection against a decline in the value of the RMBS) -- the ABX index declines. Investors can bet on (*i.e.*, go "long") or against (*i.e.*, go "short") the ABX indices by entering, among other things, into CDS with a counterparty.

33.    Many synthetic CDOs were "static." That is, the collateral referenced in a static synthetic CDO could only be modified, sold or otherwise transferred in limited circumstances. For example, the underlying collateral might be modified if it experienced a significant ratings downgrade.

> **B.    Goldman Was Involved In**
> **Both Mortgage Origination and**
> **Funding on the "Front End," and**
> **Securitization on the "Back End"**

34.    Goldman and its affiliates were intimately involved in virtually all aspects of the subprime mortgage market beginning by at least 2004, and extending through and beyond 2007. Goldman's activities were divided into two segments:  1) residential mortgage loans; and 2)

trading and principal investments which included, among other things, packaging and structuring RMBS, CDOs and other ABS, as well as other mortgage-related transactions such as CDS.

35.     Within the residential mortgage loan division, Goldman purchased subprime loans on a bulk basis; extended credit lines to mortgage originators to fund mortgage loans; provided direct loan servicing through its Avelo platform by at least October 2005; originated subprime mortgages through Senderra Funding, LLC, a subprime mortgage originator Goldman acquired in March of 2007; and structured, underwrote and distributed RMBS. Among other mortgage originators, Goldman had a close relationship with Washington Mutual Inc. ("WaMu") and that firm's subprime-lending unit, Long Beach Mortgage Co. ("Long Beach"). Mortgages originated by WaMu and Long Beach reportedly backed some $77 billion of mortgage securities. Mortgages originated by Long Beach ended up being among the worst-performing in the subprime-related sector. By 2005, Long Beach was in financial trouble and had to buy back from investors some $875 million in non-performing loans resulting from increased foreclosures and delinquencies. Other notorious subprime lenders with whom Goldman did substantial business were Fremont and New Century, for whom Goldman also securitized billions of dollars in mortgage securities.

36.     Goldman's trading and principal investments division created and traded RMBS and specific tranches of mortgage securitizations; traded and used credit derivatives such as CDS that referenced the subprime residential mortgage securities market; underwrote CDOs backed by RMBS; advised clients on the acquisition and sales of mortgage platforms, such as National City/First Franklin, Centex and H&R Block/Option One; and invested as a principal in mortgage-related securities and transactions. Additionally, GS&Co established a structured

product correlation trading desk in or around late 2004 or early 2005 that, among other things, structured and marketed synthetic CDOs collateralized by subprime mortgage-related assets.

37.     In 2005, Goldman underwrote at least 15 CDOs backed by RMBS and/or other subprime mortgage-related assets. In 2006 and 2007, Goldman and its affiliates underwrote approximately 86 separate issues of RMBS and 27 CDOs backed by RMBS assets, aggregating billions of dollars in face value. In just the first half of 2007, Goldman and its affiliates underwrote 12 CDOs aggregating $8.3 billion in face value.

38.     According to Goldman's 2009 Annual Report, "[t]hrough the end of 2006, Goldman Sachs generally was long in exposure to residential mortgages and mortgage-related products, such as [RMBS], CDOs backed by residential mortgages and [CDS] referencing residential mortgage products."

### C.     Goldman Sought to Reduce its Exposure to, and also Profit from, Certain Subprime Mortgage-Related Assets No Later Than November 2005

39.     Goldman reportedly sought to reduce the firm's exposure to, and also to profit from, shorting at least some subprime mortgage-related assets by November 2005. For example, by late 2005 and into 2006, Goldman mortgage traders Jonathan M. Egol ("Egol") and Tourre, reportedly took short positions on behalf of Goldman in a series of Goldman-led synthetic CDOs within the Abacus series which, like the Hudson CDOs, were backed by subprime mortgage-related assets. Rather than recommending that certain Goldman customers take negative bets on the Abacus CDOs, Egol retained for Goldman a significant amount of the short positions, according to certain former Goldman employees who spoke on the condition of anonymity. Additionally, Egol reportedly structured certain Abacus deals to allow short investors like

Goldman and certain of its favored clients to bet up to six or seven times the face value amount of the CDOs. By 2007 and 2008, these short positions reportedly provided huge profits to Goldman when the value of the collateral deteriorated. Commenting on Goldman's shorting of subprime mortgage assets, a former Goldman employee reportedly stated that "Egol and Fabrice [Tourre] were way ahead of their time ... [t]hey saw the writing on the wall in this market as early as 2005." Goldman's conduct in structuring and selling one of the Abacus CDO offerings formed the basis of the civil enforcement action for *fraud* that the SEC brought against GS&Co and Tourre in April 2010.

40.     Goldman reportedly also began shorting certain subprime mortgage assets in 2005 by trading as a principal. For example, a Goldman saleswoman, Veronica Grinstein ("Grinstein"), reportedly called Michael Burry ("Burry"), principal of hedge fund Scion Capital, on or around November 7, 2005, seeking to purchase on behalf of Goldman $25 million worth of short exposure to certain subprime-related CDS, which Goldman had previously sold to Scion Capital. Goldman reportedly sought to reduce its long position because it had realized that the mortgages backing the applicable subprime RMBS were quickly deteriorating. Grinstein reportedly told Burry that "I'd like a special favor," and that "[m]anagement is concerned" specifically about Goldman's financial exposures to those subprime mortgage-related assets.

41.     By 2006 and into 2007, Goldman increased its short positions on mortgage securities and related financial instruments, particularly subprime and other non-prime mortgage securities. Goldman did so based on its belief, shared by several officials internally within the firm, that such securities would decline in value. For example, among the internal Goldman documents released by the Senate Subcommittee was a presentation on March 26, 2007 to Goldman's board of directors concerning the firm's subprime mortgage business which indicates

14

that, between the third quarter of 2006 and the first quarter of 2007, Goldman: "scales back purchasing of riskier loans"; "reduces CDO activity"; and "reverses long market position through purchases of single name CDS and reductions of ABX."[1]

42.    Additional internal Goldman documents released by the Senate Subcommittee indicate that the firm ramped up its short positions on certain subprime mortgage-related assets, specifically CDOs, by 2006.  For example, Michael J. Swenson ("Swenson"), a managing director and co-manager of Goldman's structured products trading group ("SPG Trading") in 2006 and 2007 when the Hudson CDO Securities were structured and sold to Plaintiff and other investors, stated in his self-performance review for 2007, among other things, that:  (i) "during the early summer of 2006 it was clear that the market fundamentals in subprime and the highly levered nature of CDOs was going to have a very unhappy ending" and that he therefore directed "the ABS desk to enter into a $1.8bb short in ABS CDOs that realized approx. $1.0bb of p & l to date"; and (ii) "We started out the fiscal 2007 year down (we were long) as the market began to grow concerned with early poor performance of the 2006 subprime vintage.  We were long and needed to reduce risk in a situation where there were few opportunities to shed the ABX indices we were long.  The CDO managers, had not grown concerned by that time.  I recognized the enormous opportunity the CDO market presented us and took advantage of the Index to single-name basis.  In November and December of 2006, we agressively [sic] capitalized on the franchise to enter into efficient shorts in both the RMBS and CDO space."  Swenson also stated that "[t]he beauty of the CDO short was that it allowed for a very efficient method for capturing the value in the ABX to single-name basis from the short side."  As Swenson summarized in his self-performance review:

_____

[1]    Significantly, Goldman's third quarter of 2006 began on May 27, 2006, and its fiscal year for 2006 ended on November 24, 2006.  Its first quarter of 2007 began on November 25, 2006 and ended on February 23, 2007.

"It should not be a surprise to anyone that the 2007 year is the one that I am most proud of to date. I can take credit for recognizing the enormous opportunity for the ABS synthetics business 2 years ago. I recognized the need to assemble an outstanding team of traders and was able to lead that group to build a number one franchise that was able to achieve extraordinary profits (nearly $3bb to date).

Commercial Contribution

Though this extraordinary year is attributable to a total team effort, my commercial contributions over the past year are numerous. The contributions to the $3bb of SPG Trading profits and $2bb of ABS trading p & l are spread out across various trades and strategies. As the architect of the leading franchise in ABS CDO (Risk Magazine Survey 6/07), I was able to identify key market dislocations that led to tremendous profits."

Swenson was also one of seven Goldman officials who, on April 27, 2010, testified before the Senate Subcommittee regarding Goldman's subprime mortgage-related activities.

43.     Similarly, on October 26, 2006, Arbind Jha ("Jha") reported in an email to numerous Goldman executives, including CEO Lloyd Blankfein ("Blankfein"), President and COO Gary D. Cohn ("Cohn"), former head of the mortgage department Daniel L. Sparks ("Sparks"), Ostrem, Herrick and others, that "[r]isk reduction is primarily due to pricing of $2bn Hudson Mez synthetic CDO deal (SPG Secondary desk bought $325k/bp BBB and $350k/bp BBB- RMBS Subprime protection)[.]" That same day, Jha also reported in an email to Jonathan Sobel that was copied to Josh Birnbaum ("Birnbaum"), formerly Goldman managing director of Goldman's structured products group, Swenson and others, that Goldman had reduced its exposure to mezzanine subprime mortgage-related assets as follows: "[p]er Mike S., we sold $1bn of ABX BBB- and bought $1bn protection on single-name BBB- CDS. This is estimated to reduce the scenario risk by approx. $90mm."

16

44.     Birnbaum indicated in his self-performance review for 2007 that, between December 2006 and February 2007, "[t]he fundamentals for mortgage credit were undeniably deteriorating." He stated that "[g]iven how much ABX we had purchased through the broker market in 2006, the world would think [Goldman] was very long for the foreseeable future ... [w]e could use that fear to our advantage if we could flip our risk" and "concluded that [Goldman] should not only get flat, but VERY short." Birnbaum identified CDOs as ideal instruments for Goldman to profit enormously (and/or avoid large losses) by shorting subprime mortgage-related assets, and was a key part of Goldman's efforts to implement that plan in 2006. By February 2007, he stated in his review, "our very profitable year was underway."

45.     On February 14, 2007, Sparks summarized Goldman's "risk reduction program" to Goldman's CFO David A. Viniar ("Viniar"), COO Cohn, Goldman President Jon Winkelried ("Winkelried"), and Goldman's then head of sales and trading, Thomas Montag ("Montag"), among others, as follows:

> "Over the last few months, our risk reduction
> program consisted of:
> (1) selling index outright
> (2) buying single name protection
> (3) buying protection on super-senior portions of
> the BBB/BBB- index (40-100% of the index). We
> thought that the correlation of tranches on the very
> thin BBB- index was higher than where the market
> implied. We sold around $3 billion in the mid-30's
> bp range."

46.     According to Swenson's testimony before the Senate Subcommittee, Viniar convened a meeting "to go over the mortgage department's positions and risk" on December 14, 2006. This meeting reportedly followed at least several days of losses by Goldman's mortgage traders. Invited to the meeting were several Goldman senior bankers, Sparks, Swenson and

several others. Swenson stated that the mortgage department was told to reduce risk. Blankfein

reportedly approved personally Goldman's switch by late 2006 to shorting increasing amounts of

subprime mortgage assets. Further, according to a memorandum prepared by Senators Carl

Levin and Tom Coburn (who were, respectively, Chairman of the Senate Subcommittee and

Ranking Member), entitled *Wall Street and the Financial Crisis: The Role of Investment Banks*,

dated April 26, 2010 (the "Levin Memorandum"):

> "Goldman Sachs senior management closely
> monitored the holdings and the profit and loss
> performance of its mortgage department. In late
> 2006, when high risk mortgages began showing
> record delinquency rates, and the value of RMBS
> and CDO securities began falling generally,
> Goldman Sachs Chief Financial Officer David
> Viniar convened a meeting on December 14, 2006,
> to examine the data and consider how to respond."

47.     In another internal Goldman email to Montag the day after the internal meeting of

December 14, 2006, Viniar directed that Goldman be "aggressive distributing" subprime

mortgage-related assets, among other things, in view of the "very good opportunities as the

market goes into what is likely to be even greater distress and we want to be in position to take

advantage of them."

48.     A December 15, 2006 email from Birnbaum to Lorin Radtke that was copied to

Swenson and others stated that "we've had good traction moving risk through our franchise on a

variety of fronts: ABX, single names, super-senior, Hudson 2." Similarly, in a December 18,

2006 email to Egol and others regarding certain of Goldman's CDO positions, Tourre stated:

"[w]e have a big short on and we can stay short ...." A December 20, 2006 email from Stacey

Bash-Polley to Swenson, Ostrem, Birnbaum and others stated that "[w]hile we have made great

progress moving the tail risks - ssr and equity - we think it is critical to focus on the mezz risk

18

that has been built up over the past few months. Both through sequential abacus ssr/equ trades and the hudson deals (current and prior)."

49.     By January 2007, GS&Co and Tourre were working with subprime mortgage short seller Paulson & Co. ("Paulson") to structure and issue to investors the Abacus 2007-AC1 CDO securities. The Abacus CDO was a synthetic CDO backed by CDS which referenced various mezzanine subprime RMBS, and which Paulson intended to short. The Abacus CDO formed the basis of the SEC's civil enforcement action against GS&Co and Tourre.

50.     According to a January 23, 2007 email from Tourre, who the SEC alleged was "principally responsible" for creating the Abacus series of CDOs: "The whole building is about to collapse at anytime now. Only potential survivor, the fabulous Fab ... standing in the middle of all these highly complex, highly leveraged, exotic trades he created without necessarily understanding all of the implications of those monstruosities [sic]!!!"

51.     Additional internal emails confirm that Goldman determined to reverse course and short increasing amounts of mortgage assets around the time it created the Hudson CDOs. For example, on January 26, 2007, Sparks stated in an email to Montag concerning two Goldman bankers (Ostrem and Herrick) who had closed a transaction in which Goldman reportedly shorted mortgage assets: "They structured like mad and travelled [sic] the world, and worked their tails off to make some lemonade from some big old lemons." Similarly, on February 11, 2007, Blankfein stated in an email to Montag regarding Goldman's mortgage positions: "Could/should we have cleaned up these books before and are we doing enough right now to sell off cats and dogs in other books throughout the division [?]"

52.     On February 21, 2007, Egol sent an email to Sparks that was copied to Swenson, Birnbaum, David A. Lehman ("Lehman") and others concerning certain short positions on

19

mortgage securities. Sparks responded to Birnbaum, Swenson and Lehman the following day as
follows: "You called the trade right, now monetize a lot of it."

53.     In an email on February 25, 2007, Sparks told Montag that the prior week "the
trading desks" had covered certain mezzanine subprime RMBS short trades via the ABX and
entered into others:

> "Cover[ed] around $1.5 billion single name
> subprime BBB- CDS and around $700mm single
> name subprime BBB CDS. The desk also net sold
> over $400mm BBB- ABX index. Desk is net short,
> but less than before. Shorts are in senior tranches of
> indexes sold and in single names. Plan is to
> continue to trade from short side, cover more single
> names and sell BBB- index outright."

54.     In a March 9, 2007 email to Viniar, Sheara Fredman, Vice President of
Goldman's Finance Division, reported, among other things, that the $266 million in revenue
generated by Goldman's mortgage business in the first quarter of 2007 was "primarily driven"
by, among other things, "synthetic short positions concentrated in BBB/BBB- sub prime
exposure …."

55.     A March 10, 2007 email from Michael Dinias ("Dinias") to Sparks regarding an
upcoming mortgage presentation to Goldman's board of directors stated that during the first
quarter of 2007, Goldman had built up $10 billion notional in short exposure to the ABX BBB-
index and bought $60 million worth of equity put options on subprime mortgage originators (*i.e.*,
betting they would decline). Regarding the ABX BBB- index, the presentation represented
specifically as follows according to Dinias: "in the synthetics space, the desk started the quarter
with long $6.0bn notional ABX BBB- risk and shifted the position to net short $10bn notional by
reducing the longs in ABX BBB- and increasing shorts in single name CDS." Sparks stated in

an email to Dinias earlier that same day that the board presentation should include the point that Goldman, among other things, "g[ot] short CDS on RMBS and CDOs, g[ot] short the super-senior BBB- and BBB index, and g[ot] short AAA index as overall protection. The puts have also been good."

56.     In a letter to the SEC dated November 7, 2007, Goldman Controller and Chief Accounting Officer Sarah Smith ("Smith") stated that between November 24, 2006 and August 31, 2007, Goldman reduced its exposure to "subprime mortgage loans" and "subprime mortgage backed securities" from, respectively, $7.8 billion to $462 million, and $7.2 billion to $2.4 billion. Additionally, Smith stated "[d]uring most of 2007, we maintained a net short subprime position with the use of derivatives, including ABX index contracts and single name CDS which hedged this long cash exposure."

### D.     Hudson CDOs

#### 1.     Hudson 1 CDO

57.     The Hudson 1 CDO is a static synthetic CDO that was structured and began to be marketed by Goldman in or around late 2006. The actual offering of the Hudson 1 CDO securities commenced on or about December 5, 2006, and was led by Ostrem and Herrick. The Hudson 1 CDO offering comprised $837 million (par, or principal amount) of notes, consisting of eight separately rated tranches, as well as a senior swap transaction with an initial notional amount of $1.2 billion (which, at least initially, was not offered for sale to investors, but instead entered into by Hudson 1 Ltd. and Goldman Sachs International ("GSI"), a London-based affiliate of Goldman, as explained more fully below), specifically as follows:

| Security | Par | % of Par |
| --- | --- | --- |
| Senior Swap | $1,200.0 million | -0- |
| Class S | $37.0 million | 4.4% |

| | | |
|---|---|---|
| Class A-f | $110.0 million | 13.1% |
| Class A-b | $120.0 million | 14.3% |
| Class B | $230.0 million | 27.5% |
| Class C | $170.0 million | 20.3% |
| Class D | $84.0 million | 10% |
| Class E | $26.0 million | 3.1% |
| Income Notes | $60.0 million | 7.1%. |

58. According to the Confidential Offering Circular dated December 3, 2006 (the "Hudson 1 Offering Circular"), the Hudson 1 CDO securities referenced 140 subprime-related and other RMBS via CDS having an aggregate notional amount of approximately $2 billion (although p. 97 of the Hudson 1 Offering Circular stated that the referenced portfolio "will consist of 100 issues" of RMBS). According to the "pitch book" dated October 2006 for the Hudson 1 CDO (the "Hudson 1 Pitch Book"), $1.2 billion of the value of the CDS were "single name CDS on all 40 obligors in ABX 2006-1 and ABX 2006-2", and $800 million were "[s]ingle name CDS on 2005 and 2006 vintage RMBS." The Hudson 1 Offering Circular also stated the laws of the State of New York govern the securities issued by the Hudson 1 CDO, among other things.

59. Goldman began structuring the Hudson 1 CDO in the latter half of September 2006. In an email dated September 19, 2006, Ostrem informed Goldman's structured products CDO group that they "ha[d] been asked to do a CDO of $2bln for the ABS desk" and "need[ed] to execute" the trade "for the desk over the next 4-6 weeks" because it was "[o]bviously important to [the] overall SP [structured products] floor and [Jonathan] Sobel and Sparks [were] focused on this happening ...." Specifically, Ostrem's September 19 email stated in full:

> "From:        Ostrem, Peter L.
> Sent:         Tuesday, September 19, 2006 8:16 PM
> To:           FICC-SPCDOGROUP
> Subject:      Hudson Mezz - new

We have been asked to do a CDO of $2bln for the ABS desk.
Approx. $1.2bln will be CDS off single-names referenced from the
ABS index 06-1 and 06-2. This is a trade we need to execute for
the desk over the next 4-6 weeks and involves selling half the
equity (at least 30mm to sell) and the seniors and the mezz (at least
half the BBBs to get true sale). I would like everyone to work
together on this one. We expect to charge ongoing 10bp
liquidation agent fees and 1-1.5pts upfront. Equity will be offered
around 22% no-loss yield. Obviously important to overall SP floor
and Sobel and Sparks are focused on this happening ...."

By October 16, 2006, Ostrem told Sparks that another Goldman client was "upset" that their deal

was delayed because of the Hudson 1 CDO. On October 30, 2006, Ostrem stated in an email to

Swenson, Herrick, Birnbaum, Montag and others that the Hudson 1 CDO was the "[f]astest

execution of a SP [structured products] CDO done at Goldman (4 weeks from inception to

pricing)[.]"

60.     The Hudson 1 Pitch Book stated that "Goldman Sachs developed the Hudson

CDO program in 2006 to create a consistent, programmatic approach to invest in attractive

relative value opportunities in the RMBS and structured product market." The Hudson 1 CDO

was a "continuation of the program using mezzanine Baa2/Baa3 quality RMBS."

61.     According to the Hudson 1 Offering Circular, the Preliminary Termsheet dated

October 20, 2006 (the "Hudson 1 Termsheet") and the Hudson 1 Pitch Book, the Hudson 1 CDO

had the following additional characteristics:

a.     of the RMBS referenced by the CDS, 54% were expected to be midprime
RMBS, 41.35% were expected to be subprime RMBS and 4.65% were
expected to be prime RMBS;

b.     GS&Co selected the RMBS-related assets for the CDO, and served as the
CDO's structuring, placement and liquidation agent and warehoused the
portfolio prior to closing;

c.     three credit events triggered certain payments by the credit protection
seller under the CDS: (i) failure to pay principal, (ii) writedowns in value

23

of the referenced mortgage-related assets, or (iii) distressed ratings downgrade; and

d.    the notes issued by the Hudson 1 CDO were given the following initial ratings by Standard & Poor's and Moody's respectively: approximately 32% were rated AAA/Aaa, approximately 27% were rated AA/Aa2, approximately 20% were rated A/A2, approximately 10% were rated BBB/Baa2, approximately 3% were rated BB+/Ba1 and approximately 7% were not given any rating.

62.    According to the Hudson 1 Offering Circular, the initial credit protection buyer of the CDS backing the Hudson 1 CDO notes was Goldman Sachs International ("GSI"), a London-based affiliate of Goldman; GSI was also the initial swap counterparty for the $1.2 billion notional amount of the senior swap; and Goldman agreed to "guarantee the obligations" of GSI under the CDS.

63.    The Hudson 1 Pitch Book stated that "Goldman Sachs has aligned incentives with the Hudson program by investing in a portion of equity and playing the ongoing role of Liquidation Agent." Significantly, moreover, both the Hudson 1 Pitch Book and the Hudson 1 Termsheet also stated that Goldman would invest in a portion of the Income Notes issued by the Hudson 1 CDO. However, these representations omitted the highly material facts that the defendants knew or recklessly disregarded that they had structured the Hudson 1 CDO to lose value and that, as a result, Goldman would profit enormously thereby, all as alleged more fully below.

64.    According to an October 30, 2006 email from Ostrem to more than 20 Goldman officials, "Goldman was the sole buyer of protection on the entire $2.0 billion of assets"; Goldman planned to underwrite additional Hudson CDO transactions in 2007; and Goldman earned $8.5 million fees underwriting the Hudson 1 CDO and expected to earn approximately $18 million more through both GS&Co's role as liquidation agent and by selling certain retained

positions. According to that email: "Goldman is currently mandated on **$40+ bln of additional CDOs and CLOs** [collateralized loan obligations] for next 12 months. Increasing velocity on debt and equity placement of our upcoming transactions will be key to our success in 2007. Let's do it again." (emphasis as in original). In addition, Ostrem also commended certain Goldman salespeople for selling to investors significant portions of the Hudson 1 CDO -- albeit, without telling investors that the defendants had created the Hudson 1 CDO so that it would lose value and Goldman could thereby profit by shorting it. Specifically, Ostrem's email stated that "[o]ver half of the equity [was] sold by **Andy Davilman**"; there was "[e]xcellent super senior execution on top 60% of the transaction at 20bp (unfunded). Super senior note ($1.2bln in size) was executed in the first week of the transaction and was a key driver of this deal[']s success (covered by **Nicole Martin**)"; and "[o]ther large and key orders in stack sold by **Bridget Fraser/Lira Lee, George Maltezos, Darren Reinstein, Dick Loggins, and Abigail Matthias**" (emphasis as in original).

## 2.    Hudson 2 CDO

65.    The Hudson 2 CDO is a static synthetic CDO that was structured and began to be marketed by Goldman in or around late 2006. The actual offering of the Hudson 2 CDO securities commenced on or about February 8, 2007, and was also led by Ostrem and Herrick. The Hudson 2 CDO issued $407.9 million (par, or principal amount) of notes, consisting of eight separately rated tranches specifically as follows:

| Security | Par | % of Par |
|---|---|---|
| Class S | $7.9 million | 1.9% |
| Class A-1 | $240.0 million | 58.8% |
| Class A-2 | $46.0 million | 11.3% |
| Class B | $56.0 million | 13.7% |
| Class C | $20.0 million | 4.9% |
| Class D | $18.0 million | 4.4% |

25

| | | |
|---|---|---|
| Class E | $4.0 million | 1% |
| Income Notes | $16.0 million | 3.9%. |

66.     According to the Confidential Offering Circular dated February 6, 2007 (the "Hudson 2 Offering Circular"), the Hudson 2 CDO notes referenced 80 subprime-related and other RMBS via CDS having an aggregate notional amount of approximately $400 million. Specifically, according to the Preliminary Termsheet dated December 15, 2006 (the "Hudson 2 Termsheet"), "[t]he CDS referenced 80 total RMBS through equal parts exposure to the ABX 2006-1 BBB series; ABX 2006-1 BBB- series; ABX 2006-2 BBB series; and ABX 2006-2 BBB- series." The Hudson 2 Offering Circular also stated the laws of the State of New York govern the securities issued by the Hudson 2 CDO, among other things.

67.     According to the Hudson 2 Offering Circular and the Hudson 2 Termsheet, the Hudson 2 CDO had the following additional characteristics:

a.      of the RMBS referenced by the CDS, 62.5% were expected to be midprime RMBS and 37.5% were expected to be subprime RMBS;

b.      three credit events triggered certain contingent payments under the CDS: (i) failure to pay principal, (ii) writedowns in value of the referenced mortgage-related assets, or (iii) distressed ratings downgrade; and

c.      the notes issued by the Hudson 2 CDO were given the following initial ratings by Standard & Poor's and Moody's respectively:  approximately 72% were rated AAA/Aaa, approximately 14% were rated AA+/Aa2, approximately 5% were rated A+/A2, approximately 4% were rated BBB+/Baa1, approximately 1% were rated BBB-/Baa3 and approximately 4% were not given any rating; and

d.      GS&Co would serve as the liquidation agent.

68.     According to the Hudson 2 Offering Circular, the initial credit protection buyer of the CDS backing the Hudson 2 CDO notes was GSI. Goldman was also the swap guarantor of the CDS, whereby Goldman would "guarantee the obligations" of GSI under the CDS.

69.     According to the Hudson 2 Termsheet, Goldman would "invest in a portion of the Income Notes at closing." Again, however, this omitted the highly material facts that the defendants knew or recklessly disregarded that they had structured the Hudson 2 CDO so that it would lose value and that, as a result, Goldman could profit enormously thereby.

### E.     Defendants Structured and Sold the Hudson CDO Securities Without Disclosing That They Would Lose Value

70.     As described above, Goldman had not only been reducing its financial exposures to certain subprime mortgage-related assets, including specifically certain subprime-related RMBS, around the time that it issued the Hudson CDO Securities, but actually increasing its bet that certain subprime-related RMBS and other mezzanine subprime assets would similarly decline in value. Although not disclosed to Plaintiff and other investors, the Hudson CDO Securities were issued by Goldman to further these goals, and to reduce its financial exposure, particularly to subprime-related mezzanine RMBS assets, and also to profit from both the decline in value of mortgage securities generally, and the inevitable decline in value of the Hudson CDO Securities more specifically.

71.     In particular, the defendants knew that the Hudson CDO Securities would quickly deteriorate in value given the specific financial assets they selected to back these Securities, and for which GS&Co served as underwriter, liquidation agent and seller. In particular, the Hudson CDO Securities were backed (via CDS) in significant part by highly risky subprime-related RMBS, many of which were sponsored specifically by notorious subprime mortgage lenders such as Long Beach, New Century, Fremont, Countrywide, Lehman Brothers and Bear Stearns. Significantly, moreover, many of the RMBS underlying the Hudson CDO Securities were rated by Standard and Poor's and Moody's, respectively, BBB/Baa2, which typically were the lowest

27

investment grade ratings. As summarized by Senator Carl Levin during testimony before

Congress on May 24, 2010 (156 Cong. Rec. S 4110) regarding proposed reforms of Wall Street:

> "Goldman constructed this $2 billion CDO to reflect the value of
> subprime mortgage securities similar to those that Goldman held in
> its own inventory. Goldman's sales force was told that Hudson
> Mezzanine was a top priority and it worked aggressively to sell
> Hudson securities to clients around the world. Internal e-mails
> released by our Permanent Subcommittee on Investigations
> showed that one Goldman client was unhappy that the firm was
> spending so much time on Hudson and not on a deal the client
> wanted to make. In the documents Goldman used to sell Hudson
> Mezzanine to clients, the firm even suggested to investors that
> Goldman stood to benefit if the investment performed well, telling
> those customers: 'Goldman Sachs has aligned incentives with the
> Hudson project by investing in a portion of the equity.'
>
> In fact, that was not true. Goldman Sachs' interests were not
> aligned with its customers. They were in conflict. Goldman was
> the sole counterparty in the Hudson CDO and made a $2 billion
> bet; that is, a $2 billion bet, that the assets referenced in the CDO
> would fall in value. Goldman won that bet big time. The CDO,
> filled with toxic subprime assets that Goldman had selected,
> assembled, and sold, began losing value. When Goldman first sold
> the securities to its clients, more than 70 percent of Hudson
> Mezzanine had AAA ratings, but within 9 months those AAA
> ratings were downgraded, and within 18 months Hudson was
> downgraded to junk status, and Goldman cashed in at the expense
> of its clients."

72.     The documents, testimony and findings released by the Senate Subcommittee

provide further evidence that defendants created the Hudson CDO Securities knowing or

disregarding that they would lose value. For example, the Senate Subcommittee reported that

Goldman executives admitted that the firm "was trying to remove BBB assets from the company

books during" the time it issued the Hudson 1 CDO. According to the findings of the Senate

Subcommittee (emphasis in italics added):

> "**Conflict Between Proprietary and Client
> Trading.** After Goldman Sachs decided to reduce

its mortgage holdings, the sales force was instructed
to try to sell some of its mortgage related assets, and
the risks associated with them, to Goldman Sachs
clients.  In response, Goldman Sachs personnel
issued and sold to clients RMBS and CDO
securities containing or referencing high risk assets
that Goldman Sachs wanted to get off its books.
Three examples demonstrate how Goldman Sachs
continued to sell mortgage related products to its
clients, while profiting from the decline of the
mortgage market.

*****

*The $2-billion Hudson synthetic CDO:  Goldman
Sachs was the sole protection buyer on this CDO
with a $2-billion short.  In other words, they were
betting against it.  A Goldman salesperson
described it as junk -- not to the buyer, of course,
but inside.  The CDO imploded within two years.
Your clients lost; Goldman profited."*

Levin Memorandum, p. 8; Statement of Senator Carl Levin, Chairman of the Senate

Subcommittee, "Wall Street and the Financial Crisis:  The Role of Investment Banks," April 27,

2010.

73.    Three former Goldman employees also reportedly admitted to *The New York*

*Times* that the firm took a large net short position on the Hudson 1 CDO to profit from that

CDO's decline.  A Goldman salesman reportedly noted, "[h]ere we are selling this, but we think

the market is going the other way."

74.    Internal Goldman documents also demonstrate that the firm knew or recklessly

disregarded that the Hudson CDO Securities would lose value and that Goldman had planned,

from the outset, to profit therefrom.  For example, an internal email sent to Herrick by Tetsuya

Ishikawa on October 11, 2006 regarding the Hudson 1 CDO showed that Goldman saleswoman

Sarah Lawlor had stated that another Goldman client, Allied Irish Bank, was "too smart to buy this kind of junk."

77. 75.    An email on October 19, 2006 from Mitchell Resnick to Herrick and Egol that was copied to David J. Rosenblum (and also subsequently forwarded to Ostrem, Swenson, Birnbaum) similarly raised issues regarding what Goldman's sales force should tell clients about the lower rated mezzanine RMBS underlying the Hudson 1 CDO and another deal:

> "do we have anything talking about how great the BBB sector of RMBS is at this point in time... a common response I am hearing on both Hudson & HGS1 is a concern about the housing market and BBB in particular?
>
> We need to arm sales with a bit more - do we have anything?"

76.    Similarly and as noted above, on October 26, 2006, Jha sent an email to Blankfein, Cohn, Sparks, Ostrem, Herrick and others that stated that "[r]isk reduction is primarily due to pricing of $2bn Hudson Mez synthetic CDO ...."

77.    The Hudson CDO Securities performed as defendants -- at least internally within the firm, but unbeknownst to Plaintiff and other investors -- had expected. For example, by July 2007, Standard & Poor's reportedly placed the Hudson 1 CDO on a credit watch for a potential ratings downgrade. By September 2007, the Hudson 1 CDO notes reportedly suffered their first ratings downgrade; according to a report by Moody's on September 12, 2007, "the rating actions are the result of deterioration in the credit quality of the transaction's underlying collateral pool, which consists primarily of structured finance securities." By the end of 2007, at least $280 million worth of the Hudson 1 CDO notes had been downgraded. By at least mid-2008, the Hudson 1 CDO AAA-rated notes had been downgraded to junk status.

78.     By April and May of 2009, certain of the principal amounts of the Hudson 1 CDO notes were reportedly paid off -- many at large losses.  In particular, according to *Bloomberg*, the Hudson 1 CDO tranches were reportedly paid off in April or May 2009 specifically as follows:

| Security | Par | Principal Paid |
|---|---|---|
| Class S | $37,000,000.00 | $15,605,634.26 |
| Class A-f | $110,000,000.00 | $1,419,385.36 |
| Class A-b | $120,000,000.00 | - 0 - |
| Class B | $230,000,000.00 | - 0 - |
| Class C | $170,000,000.00 | $170,000,000.00 |
| Class D | $84,000,000.00 | $84,000,000.00 |
| Class E | $26,000,000.00 | $26,000,000.00 |
| Income Notes | $60,000,000.00 | $60,000,000.00 |
| | | |
| Total | $837,000,000.00 | $357,025,019.62. |

Accordingly, an aggregate of over $479.9 million of the $837 million original principal amount of the Hudson 1 CDO securities was apparently written off and, in any event, remains unpaid to investors.  Further, as part of that reported pay off, the original $60 million principal amount of the Income Note tranche -- in which Goldman (or its affiliates) represented it would invest in a manner that purportedly "aligns" its interests with those of Plaintiff and the Classes -- was paid off although other investors, including Plaintiff and other members of the Classes, lost millions of dollars.

79.     Similarly, by the end of 2007, at least $144 million of the $407.9 million worth of notes issued as part of the Hudson 2 CDO had been downgraded.  On August 20, 2008, $286 million of the Hudson 2 CDO notes were downgraded by Standard and Poor's.  Hudson 2 CDO Class A-1 notes -- comprising $240 million of the total issuance -- were then downgraded to CCC from BB- and were put on review for further negative action.  The A-2 notes were downgraded to CC from B-.  Unlike the Hudson 1 CDO which received partial payment of principal, the Hudson 2 CDO has apparently not yet been paid off.

80.     The Levin Memorandum issued as part of the Senate Subcommittee investigation

summarized the performance of the Hudson 1 CDO as follows:

> "Less than 18 months [after it was issued], the AAA
> securities had been downgraded to junk status.
> Goldman Sachs as the sole short investor would
> have been compensated for these losses, and
> investors who purchased the Hudson securities
> would have lost an equivalent amount.  Goldman
> Sachs profited from the loss in value of the very
> CDO securities it had sold to its clients."

81.     Goldman also admitted in internal emails that it profited from the massive losses

on certain of the firm's subprime-related CDOs and other transactions, and that certain of

Goldman's clients complained concerning certain trades.  For example, an email from Yusuf

Aliredha to Sparks on October 12, 2007 stated as follows:

> "Real bad feeling across European sales about some
> of the trades we did with clients.  The damage this
> has done to our franchise is very significant.
> Aggregate loss for our clients on just these 5 trades
> alone is 1bln+.  In addition team feels that
> recognition (sales credits and otherwise) they
> received for getting this business done was not
> consistent at all with money it ended making/saving
> the firm."

82.     An email to Blankfein on September 26, 2007 from Peter Kraus claimed that

Goldman's clients would be even more attached to the firm via its reputation for financial

success due to the massive profits it generated in 2007 from shorting subprime mortgage-related

assets, as follows:

> "I met with 10+ individual prospects and clients
> (and 5 institutional clients) since earnings were
> announced.  The institutions don't and I wouldn't
> expect them to, make any comments like ur [sic]
> good at making money for urself [sic] but not us.
> The individuals do sometimes, but while it requires

> the utmost humility from us in response I feel very
> strongly it binds clients even closer to the firm,
> because the alternative of take ur [sic] money to a
> firm who is an under performer and not the best,
> just isn't reasonable. Client's ultimately believe
> association with the best is good for them in the
> long run."

83.     Goldman also continued to short certain subprime mortgage-related assets after issuing the Hudson CDO Securities. For example, a March 2, 2007 email from Patrick Welch to Craig Broderick, Goldman's Chief Risk Officer ("Broderick") and others stated that "my understanding is that desk is no longer buying subprime. (We are low balling on bids.)" Notes of an internal meeting of Goldman's risk committee on March 7, 2007 state that the firm's mortgage division was then "closing down every subprime exposure possible."

84.     Goldman also created around this time at least two other CDOs similarly destined to lose value, specifically Anderson Mezzanine Funding 2007-1 (the "Anderson CDO") and Timberwolf 2007-1 (the "Timberwolf CDO"). The offering of the Anderson CDO securities began on or about March 20, 2007. The Anderson CDO was reportedly backed by $300 million worth of mezzanine subprime RMBS; most of the underlying mortgages were originated by notorious subprime lender New Century; Goldman took a $140 million short position on the Anderson CDO; and certain of Goldman's senior managers directed their sales force to sell to investors the Anderson securities as quickly as possible. Seven months after it was issued, the Anderson CDO securities were reportedly downgraded to junk status.

85.     The offering of the Timberwolf CDO securities began on or about March 27, 2007. It was a hybrid cash/synthetic CDO primarily backed by securities of other CDOs, many of which Goldman also had reportedly taken short positions against. The Timberwolf CDO securities reportedly lost approximately 80% of their value by the end of August 2007, and the

33

CDO was liquidated in 2008. In an email on June 22, 2007 to Sparks, Montag referred to the deal internally as "one shitty deal." Another email regarding Timberwolf sent by Donald Mullen ("Mullen") on May 11, 2007 to Sparks that was copied to Montag and Harvey Schwartz stated that one Goldman salesman was "concerned about the representations we may be making to clients as well as how we will price assets once we sell them to clients."

86.     Other internal Goldman emails also demonstrate that the firm had been obtaining huge profits by shorting other mortgage assets around the time of the Hudson CDOs. For example, a May 17, 2007 email refers to the "wipeout" of one Long Beach mortgage security (LBMLT 2006-A) and the "imminent" collapse of another. Because of $10 million in protection Goldman held on certain of the tranches, however, Goldman would profit by $5 million on the collapse of the lower tranches. According to the May 17, 2007 email from Deeb Salem to Swenson: "bad news ... wipes out the m6s and makes a wipeout on the m5 imminent ... good news ... we own 10mm protection on the m6 marked at $50 ... we make $5mm[.]"

87.     Similarly, commenting on Goldman's shorting of subprime mortgage assets, Viniar stated in a July 25, 2007 email to Cohn: "Tells you what might be happening to people who don't have the big short." Further, a July 29, 2007 email from Sparks to Montag that was copied to Swenson and others stated as follows:

> "Department-wide P&L for the week was $375mm
> (this is after adjusting for the $100mm discussed
> today)
> Correlation P&L on the week was $234mm, with
> CMBS, CDOs, and RMBS/ABX shorts all
> contributing
> Rest of department is net short RMBS and CDOs,
> net long cmbs."

88.     On October 11, 2007, Moody's downgraded some $32 billion of mortgage securities. However, because of Goldman's participation shorting the Hudson CDO Securities and other CDOs and its placement of CDS protection on these CDOs, the firm had also been profiting from these downgrades. As Mullen stated in an email to Swenson that same day: "Sounds like we will make some serious money" on the Moody's downgrades. Swenson responded less than one hour later: "Yes we are well positioned[.]"

89.     Goldman's short position on subprime mortgage-related assets were extremely profitable for the firm. On November 18, 2007, Blankfein wrote in an email to Lucas van Praag that was copied to several senior Goldman officials: "Of course we didn't dodge the mortgage mess. We lost money, then made more than we lost because of shorts. Also, it's not over, so who knows how it will turn out ultimately." Indeed, while other financial institutions had been failing around this time, Goldman reportedly earned $3.69 billion in profit in 2007 via its SPG Trading group -- fueled in significant part by the firm's shorting of many of the very mortgage securities it had *both* created and been selling to its customers and others, including the Hudson CDO Securities.

### F.     The Fallout

90.     On December 24, 2009, *The New York Times* published an article entitled "Banks Bundled Debt, Bet Against It and Won," which reported that the SEC, the Financial Industry Regulatory Authority ("FINRA") and others, were investigating certain synthetic CDOs backed by subprime mortgage-related assets issued by Goldman and others. Specifically, the article stated that "authorities appear to be looking at whether securities laws or rules of fair dealing were violated by firms that created and sold these mortgage-linked debt instruments and then bet against the clients who purchased them, people briefed on the matter say."

91.     On April 16, 2010, the SEC filed a securities fraud action against GS&Co and

Tourre, captioned *SEC v. Goldman Sachs & Co.,* No. 10-cv-3229-BSJ (S.D.N.Y.), as noted

above. The action alleged that defendants committed fraud in violation of section 10(b) of the

Exchange Act and violated section 17(a) of the Securities Act of 1933 by structuring and

marketing the Abacus 2007-AC1 CDO without disclosing that another Goldman client, Paulson,

betting on the CDO's decline, helped select some of the RMBS assets backing the CDO.

92.     On April 19, 2010, it was reported that the FSA, the regulator of the financial

services industry in the United Kingdom, had opened a formal investigation of GSI related to the

SEC's fraud action regarding the Abacus CDO.

93.     The Senate Subcommittee also investigated Goldman's subprime mortgage-

related activities, and released publicly hundreds of pages of internal emails and other documents

Goldman had produced in connection therewith.  According to the Senate Subcommittee's press

releases issued, respectively, on April 24, 2010 and April 26, 2010 (emphasis in italics added):

> "Investment banks such as Goldman Sachs were not
> simply market-makers, they were self-interested
> promoters of risky and complicated financial
> schemes that helped trigger the crisis ... They
> bundled toxic mortgages into complex financial
> instruments, got the credit rating agencies to label
> them as AAA securities, and sold them to investors,
> magnifying and spreading risk throughout the
> financial system, and all too often betting against
> the instruments they sold and profiting at the
> expense of their clients ... The 2009 Goldman
> Sachs annual report stated that the firm 'did not
> generate enormous net revenues by betting against
> residential related products' ... These e-mails show
> that, in fact, Goldman made a lot of money by
> betting against the mortgage market."

*****

36

> *"The Subcommittee's nearly 18-month investigation*
> *found evidence that Goldman Sachs, contrary to the*
> *repeated public statements of the firm's executives,*
> *made and held significant bets against the mortgage*
> *market – 'short positions' in Wall Street terms –*
> *and that at times those bets were not just against the*
> *mortgage market in general, but against securities*
> *that Goldman Sachs had assembled and marketed*
> *to its customers."*

94.    The Senate Subcommittee's investigation reportedly began in November 2008.

After completing a "wide-ranging inquiry" consisting of "more than one hundred interviews and

depositions, collecting and reviewing millions of pages of documents, and consulting with

dozens of government, academic, and private sector experts on banking, securities, financial, and

legal issues", the Senate Subcommittee held a hearing on April 27, 2010, entitled *Wall Street and*

*the Financial Crisis: The Role of Investment Banks.* The hearing featured over 10 hours of

testimony by seven Goldman officials, including Chairman and CEO Blankfein, CFO Viniar,

Swenson, Birnbaum, Sparks, Tourre and Broderick.

95.    Based on its review of the evidence, the Senate Subcommittee concluded that

Goldman profited from shorting subprime mortgage-related assets, in some cases to the

detriment of its clients. The Senate Subcommittee cited specifically the Hudson, Abacus,

Timberwolf and Anderson CDOs. In a reply to Viniar during the hearing, Senator Levin stated:

"You call it reducing risk. I call it making billions."

96.    After the markets closed on April 29, 2010, it was reported that the U.S.

Department of Justice had commenced a criminal investigation into Goldman relating to

Goldman's mortgage-related activities. According to *The Washington Post* on May 1, 2001, the

Department of Justice's criminal investigation began *before* the SEC filed its civil enforcement

action related to the Abacus CDO. Additionally, on May 27, 2010, it was reported that prosecutors in the Southern District of New York were investigating the Timberwolf CDO.

97. On June 4, 2010, the Financial Crisis Inquiry Commission ("FCIC") reportedly subpoenaed Goldman regarding certain of its mortgage-related CDOs and related transactions. The FCIC also obtained testimony on June 30, 2010 and July 1, 2010 from Goldman officials, including Cohn, Broderick, Lehman and Viniar, and publicly released additional internal Goldman documents relating to the firm's mortgage-related activities.

98. On June 9, 2010, *The Wall Street Journal* and other news sources reported that the SEC had been investigating the Hudson 1 CDO.

99. Also on June 9, 2010, a lawsuit was filed against Goldman, GS&Co and others captioned *Basis Yield Alpha Fund (Master) v. Goldman Sachs Group, Inc., et al.*, No. 10 CV 4537 (S.D.N.Y. filed June 9, 2010), concerning the Timberwolf CDO. The plaintiff, a hedge fund, alleges that the defendants violated section 10(b) of the Exchange Act and New York common law by failing to disclose that Goldman issued the Timberwolf CDO in order to "dump[] its inventory of toxic securities on customers while simultaneously providing a vehicle for Goldman to profit from the decline in value of such securities."

100. On July 15, 2010, GS&Co and the SEC announced that they had reached a settlement regarding the SEC's Abacus action. As part of the settlement, GS&Co: a) agreed to disgorge $15 million and pay a $535 million civil penalty -- reportedly one of the largest ever by a Wall Street firm -- consisting of payments of $150 million and $100 million, respectively, to Abacus CDO investors, and $300 million to the U.S. Treasury. In connection with the settlement, Goldman admitted that "it was a mistake for the Goldman [Abacus CDO] marketing materials to state that the reference portfolio was 'selected by' ACA Management LLC without

38

disclosing the role of Paulson & Co. Inc. in the portfolio selection process and that Paulson's economic interests were adverse to CDO investors." As part of the settlement, Goldman also agreed to reform and institute certain internal processes involving future offerings of mortgage securities for a term of three years. The court approved the parties' settlement and entered a final judgment against GS&Co on July 20, 2010.

101. Tourre is not a party to the settlement, and the SEC's case against him reportedly continues. On July 19, 2010, Tourre filed an answer to the SEC's complaint. He alleged, among other things, that he "reasonably relied on Goldman Sachs' institutional process to ensure adequate legal review and disclosure of material information, and cannot be held liable for any alleged failings of that process."

102. Goldman's Form 10-Q report for the second quarter of 2010 stated that "[i]nvestigations of GS&Co by FINRA and of GSI by the U.K. Financial Services Authority (FSA) concerning the ABACUS 2007-AC1 transaction and related matters (including the time of notice to FINRA and the FSA relating to the SEC investigation) continue."

103. On September 9, 2010, the FSA imposed a fine of 17.5 million pounds (or some $27 million). The FSA claimed that GSI failed to timely disclose that Tourre was the subject of an SEC investigation relating to the Abacus CDO.

### G. Defendants' Misconduct Caused Damage to Plaintiff and the Classes

104. The defendants' unlawful conduct alleged in this Complaint directly and proximately caused damage to Plaintiff and the members of the Classes in connection with their purchases of the Hudson CDO Securities. At the time Plaintiff and the members of the Classes purchased their Hudson CDO Securities, the prices of the Hudson CDO Securities were

artificially inflated as a result of defendants' misconduct. In particular, the defendants' misconduct consisted of structuring, offering and selling the Hudson CDO Securities to benefit Goldman at the expense of Plaintiff and other members of the Classes, and omitting to timely disclose the truth concerning the financial prospects of the Hudson CDO Securities, all as alleged more fully above. Accordingly, the damages incurred by Plaintiff and the members of the Classes in investing in Hudson CDO Securities were not caused by any general decline in the value of real estate, the U.S. housing markets, the structured finance markets, or any other sector of the economy, but instead directly as a result of the misconduct of the defendants alleged in this Complaint.

105. Plaintiff's own transactions demonstrate how defendants' misconduct directly and proximately caused damage to investors. In particular, Plaintiff acquired $4 million (principal amount) of the Hudson CDO Securities, consisting of $1 million (principal amount) of the Hudson 1 CDO, and $3 million (principal amount) of the Hudson 2 CDO on, respectively, February 6, 2007 and January 24, 2007 at, respectively, $95.00/per $100 principal and $100/per $100 principal, as reflected in its attached certification. Following ratings downgrades beginning in September 2007 as alleged more fully above, Plaintiff sold all such securities on October 9, 2007 at $2.50/per $100 principal.

106. By April 2010, Plaintiff and other investors began to learn the truth regarding the Hudson CDO Securities and Goldman's own financial interests in connection therewith, when the SEC filed its civil enforcement action relating to the Abacus CDO and the Senate Subcommittee released its findings concerning certain of Goldman's mortgage-related practices and disclosed publicly hundreds of pages of internal Goldman communications and other documents relating to the Hudson CDOs and other mortgage-related transactions, all as alleged

more fully above. It was entirely foreseeable to the defendants that concealing from Plaintiff and other investors the true financial prospects of the Hudson CDO Securities, would inflate artificially the price of the Hudson CDO Securities. As a direct and proximate consequence of defendants' misconduct in structuring, offering and selling to Plaintiff and the members of the Classes the Hudson CDO Securities at artificially inflated prices, Plaintiff and the members of the Classes were damaged.

### COUNT I

**For Violation Of Section 10(b) Of The Exchange Act And
SEC Rules 10b-5(a) And (c) Against All Defendants**

107.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

108.    This Count is brought by Plaintiff individually and on behalf of the Classes pursuant to section 10(b) of the Exchange Act and SEC Rule 10b-5 against all defendants.

109.    All of the defendants knowingly or recklessly employed a manipulative and deceptive device, scheme or artifice to defraud in violation of SEC Rule 10b-5(a), and/or engaged in an act, practice or course of business which operated as a fraud or deceit in violation of SEC Rule 10b-5(c), in connection with the issuance and sale of the Hudson CDO Securities to Plaintiff and the members of the Classes. Defendants' manipulative and deceptive devices and practices involved structuring the Hudson CDO Securities so that they would lose value and Goldman could profit thereby, all as alleged more fully above.

110.    As a result of the manipulative and deceptive devices and practices alleged above, Plaintiff and other members of the Classes purchased the Hudson CDO Securities. Plaintiff and

other members of the Classes who acquired such securities were injured as a direct and proximate result of defendants' manipulative and deceptive devices and practices.

111.    In connection with their manipulative and deceptive devices and practices alleged above, defendants used the means or instrumentalities of interstate commerce and the mails.

112.    By virtue of the foregoing, defendants have violated section 10(b) of the Exchange Act and Rule 10b-5(a) and (c).

113.    As a direct and proximate result of the wrongful conduct of defendants, Plaintiff and the other members of the Classes incurred damages in an amount to be proven at trial.

114.    This Count is brought solely under SEC Rules 10b-5(a) and (c).  Accordingly, in connection with this Count Plaintiff need not allege, nor prove, that any of the defendants made any misrepresentation or omission of material fact or otherwise for which these defendants may also be liable under SEC Rule 10b-5(b), New York common law and/or any other provision of law.  Likewise, and for that same reason, the statutory safe harbor for certain forward-looking statements does not apply to this Count in any respect, as no false or misleading statements are alleged in this Count.

115.    This Count is brought within the time permitted by law.

## COUNT II

### For Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5(b) Against Defendants GS&Co, Hudson 1 Ltd., Hudson 1 Corp., Hudson 2 Ltd. and Hudson 2 Corp.

116.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

117.    This Count is brought by Plaintiff individually and on behalf of the Classes pursuant to section 10(b) of the Exchange Act and Rule 10b-5(b) against only defendants

42

GS&Co, Hudson 1 Ltd., Hudson 1 Corp., Hudson 2 Ltd. and Hudson 2 Corp. (collectively, the "Issuer Defendants"). In particular, this Count is brought against Hudson 1 Ltd. and Hudson 2 Ltd. because they co-issued all of the tranches of notes sold as part of both Hudson CDOs except the Class E and Income Note tranches, as to which they were sole issuer; Hudson 1 Corp. and Hudson 2 Corp. because they co-issued all of the tranches of notes sold as part of both Hudson CDOs except for the Class E and Income Note tranches; and GS&Co because it was the underwriter, offeror and seller of both CDOs, the liquidation agent for both CDOs, and the structuring and placement agent for the Hudson 1 CDO (and may have also served in the latter capacities for the Hudson 2 CDO).

118.    The Issuer Defendants named in this Count omitted to state material facts necessary to make statements made not misleading in selling the Hudson CDO Securities to Plaintiff and other members of the Classes in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5(b). In particular, the Issuer Defendants knowingly or recklessly failed to disclose to Plaintiff and other investors that the Hudson CDOs were structured so that they would lose value, and Goldman could profit thereby. Along these lines, the Hudson 1 Offering Circular and the Hudson 2 Offering Circular stated, respectively, only that "GSI will be the initial Credit Protection Buyer and the initial Senior Swap Counterparty" and that "[t]he initial Credit Protection Buyer under the Credit Default Swap will be [GSI]" -- without disclosing the highly material facts that the CDOs were designed to lose value so that Goldman could profit from its short position. Similarly, and also along these lines, the Hudson 1 Pitch Book also stated that "Goldman Sachs has aligned incentives with the Hudson program by investing in a portion of equity and playing the ongoing role of Liquidation Agent" -- again without disclosing that this CDO was designed to lose value so that Goldman could profit thereby.

119.    The Issuer Defendants had actual knowledge of the omissions of material fact set forth herein, or acted with reckless disregard for the truth in that they failed to disclose such facts, even though such facts were available to them and were highly material to Plaintiff and other investors.

120.    As a result of the Issuer Defendants' failure to disclose material facts as set forth above, Plaintiff and other members of the Classes were ignorant of the fact the Hudson CDO Securities were structured so that they would lose value, and that the Issuer Defendants and Goldman would profit thereby. By relying directly or indirectly on the absence of material adverse information that was known or was recklessly disregarded by the Issuer Defendants but not disclosed to investors, Plaintiff and other members of the Classes purchased the Hudson CDO Securities at artificially inflated prices, and were damaged thereby.

121.    Had Plaintiff and the other members of the Classes known of the truth regarding the Hudson CDO Securities, they would not have purchased such Securities or, if they had purchased such Securities, would not have done so at the artificially inflated prices which they paid.

122.    By reason of the foregoing, the Issuer Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5(b), and are liable to Plaintiff and other members of the Classes for damages which they suffered in connection with their purchases of the Hudson CDO Securities.

123.    This Count is brought within the time permitted by law.

## COUNT III

### For Violations Of Section 20(a) Of The Exchange
### Act Against Defendants Goldman, Ostrem and Herrick

124.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

125.    This Count is brought by Plaintiff individually and on behalf of the Classes pursuant to section 20(a) of the Exchange Act against Goldman, as well as individual defendants Ostrem and Herrick.

126.    Defendant Goldman, by virtue of its specific acts alleged above, including in particular structuring and managing the issuers of the Hudson CDOs to permit Goldman to profit thereby, was, at the time of the wrongs alleged herein, a controlling person of the Issuer Defendants within the meaning of section 20(a) of the Exchange Act. Defendants Ostrem and Herrick helped manage Goldman's mortgage-related positions and transactions and also led in structuring, marketing and selling the Hudson CDO Securities and, as such, were controlling persons of the Issuer Defendants within the meaning of section 20 of the Exchange Act.

127.    Goldman, Ostrem and Herrick had the power and influence, and exercised the same, to cause the defendants to engage in the illegal conduct and practices complained of herein. Each of the three defendants named in this Count controlled the Issuer Defendants and the issuance of the Hudson CDO Securities because it/he helped lead in structuring the Issuer Defendants and/or helped structure, market and sell the securities the Issuer Defendants issued via the Hudson CDOs to Plaintiff and the members of the Classes.

128.   Due to their relationships with the Issuer Defendants and the Hudson CDO Securities, each of the defendants named in this Count had a duty to disseminate accurate and truthful information regarding the Hudson CDO Securities.

129.   Because of their positions and access to material non-public information, all of the defendants named in this Count knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, Plaintiff and the other members of the Classes.

130.   By reason of the conduct alleged herein, each defendant named in this Count is liable for the aforesaid wrongful conduct, and is liable to Plaintiff and other members of the Classes for the damages which such investors suffered in connection with their purchases of securities issued by the Issuer Defendants as part of the Hudson CDOs.

131.   This Count is brought within the time permitted by law.

## COUNT IV

### Common Law Fraud Under
### New York Law Against All Defendants

132.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

133.   This Count is brought by Plaintiff individually and on behalf of the Classes against all defendants for fraud under New York law.

134.   Defendants' course of conduct and material omissions detailed above regarding the Hudson CDO Securities constitute fraud under New York common law.

135.   The structuring of the Hudson CDO Securities so that they would lose value and Goldman would profit, and the material omissions by defendants as alleged above, were

undertaken intentionally or recklessly, to induce reliance thereon by Plaintiff and the Classes in soliciting purchases of the Hudson CDO Securities.

136. Plaintiff and the Classes reasonably relied on defendants' course of conduct in structuring the Hudson CDO Securities, and material omissions when deciding to purchase the Hudson CDO Securities.

137. At the time the Hudson CDO Securities were purchased by Plaintiff and other members of the Classes, Plaintiff and the Classes did not know the truth concerning the Hudson CDO Securities, including Goldman's own proprietary financial interests and material omissions in connection therewith.

138. As a direct and proximate result of the fraud of defendants, Plaintiff and the Classes suffered damages in connection with their purchases of the Hudson CDO Securities.

139. The fraud and deceit committed by defendants was intentional and/or involved conscious acts that willfully and wantonly or recklessly disregarded the rights of Plaintiff and the Classes.

140. Plaintiff and the Classes are entitled to recover punitive damages in an amount to be proved at trial in connection with this Count to the full extent permitted by the laws of New York.

141. Defendants are jointly and severally liable for any and all amounts owing to each member of the Classes for each investment made by each member of the Classes.

142. This Count is brought within the time permitted by law.

## COUNT V

### Aiding And Abetting Fraud Under New York Law
### Against Defendants Goldman, Hudson 1 Ltd., Hudson 1 Corp.,
### Hudson 2 Ltd., Hudson 2 Corp., Ostrem and Herrick

143.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

144.    This Count is brought by Plaintiff individually and on behalf of the Classes against Goldman, Hudson 1 Ltd., Hudson 1 Corp., Hudson 2 Ltd., Hudson 2 Corp., Ostrem and Herrick for aiding and abetting fraud under New York law.

145.    As alleged more fully above, a fraud was perpetrated on Plaintiff and the Classes.

146.    Goldman, Hudson 1 Ltd., Hudson 1 Corp., Hudson 2 Ltd., Hudson 2 Corp., Ostrem and Herrick had actual knowledge of, and substantially assisted in, the fraudulent scheme to issue and sell the Hudson CDO Securities to Plaintiff and the Classes without disclosing the truth concerning the value of those Securities and Goldman's own financial interests in connection therewith, all as alleged more fully above.

147.    Goldman controlled the Hudson CDO Securities because it created the four Hudson entities and GS&Co and because its representatives structured, marketed and sold the Hudson CDO Securities and issued statements to investors in connection therewith.  The four Hudson entities issued and sold the Hudson CDO Securities, and defendants Ostrem and Herrick helped lead in structuring and selling the Hudson CDO Securities.  Each defendant named in this Count knew that the Hudson CDO Securities were being sold to Plaintiff and the Classes without disclosing that these Hudson CDO Securities were doomed to lose value and that Goldman would profit therefrom, or recklessly disregarded these highly material facts.

48

148. Each defendant named in this Count substantially assisted in the fraud perpetrated on Plaintiff and the Classes by means of the actions alleged above. GS&Co could not have perpetrated its fraud without the substantial assistance of Goldman, the four Hudson entities which served as the issuers or co-issuers of the Hudson CDO Securities, and defendants Ostrem and Herrick, all as alleged more fully above.

149. As a direct and foreseeable result of the misconduct of the defendants named in this Count in aiding and abetting GS&Co's fraudulent scheme alleged herein, Plaintiff and the Classes have suffered millions of dollars of damages.

150. This Count is brought within the time permitted by law.

## COUNT VI

### Fraudulent Concealment Under
### New York Law Against All Defendants

151. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

152. This Count is brought by Plaintiff individually and on behalf of the Classes against all of the defendants for fraudulent concealment under New York law.

153. Defendants failed to disclose to, and concealed from, Plaintiff and the Classes the financial weaknesses of the Hudson CDO Securities and that Goldman had structured and sold them to profit for its own proprietary accounts.

154. Defendants had a duty of disclosure to Plaintiff and the Classes due to their superior knowledge and unique position of control over the information concerning both the prospects for the Hudson CDO Securities and Goldman's financial interests in connection therewith; and in view of the statements made to Plaintiff and the Classes in the Hudson 1

49

Offering Circular, the Hudson 2 Offering Circular and other documents used in connection with marketing the Hudson CDO Securities to Plaintiff and the Classes, including the Hudson 1 Pitch Book and the Hudson 1 Preliminary Term Sheet and Hudson 2 Preliminary Term Sheet. Defendants knew that Plaintiff and the Classes would rely on the information that defendants provided in connection with the Hudson CDO Securities, and that the defendants knowingly or recklessly failed to disclose material facts in connection therewith, all as alleged more fully above.

155.   Defendants intentionally or recklessly concealed that the Hudson CDO Securities would lose substantial value, which was information that would have been clearly material to Plaintiff and the Classes in deciding whether to purchase the Hudson CDO Securities. Defendants concealed this highly material fact so that Plaintiff and the Classes would thereby be induced to purchase the Hudson CDO Securities, and defendants could profit therefrom.

156.   Due to their reasonable reliance on the obligation of the defendants to provide full and accurate information, Plaintiff and the Classes were induced to, and in fact did, purchase Hudson CDO Securities.

157.   Plaintiff and the Classes suffered millions of dollars of damages as a direct and proximate result of their reliance on the defendants' concealment of the truth in connection with the Hudson CDO Securities.

158.   By April 2010, Plaintiff and other investors began to learn the truth regarding the Hudson CDO Securities and Goldman's own financial interests in connection therewith, all as alleged more fully above.

159.   This Count is brought within the time permitted by law.

## COUNT VII

### Unjust Enrichment Under
### New York Law Against Goldman and GS&Co

160.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

161.    This Count is brought by Plaintiff individually and on behalf of the Classes against defendants Goldman and GS&Co only.

162.    As a direct and proximate result of their wrongful conduct described more fully above, defendants Goldman and GS&Co were unjustly enriched.  Defendants Goldman and GS&Co were unjustly enriched by receiving fees, profits (and loss avoidance) and other compensation to which they would not have been entitled absent their fraudulent and other wrongful conduct in structuring, offering and selling the Hudson CDO Securities to Plaintiff and the Classes without disclosing the true facts concerning those Securities and Goldman's own financial interests in connection therewith, all as alleged more fully above.

163.    Defendants Goldman and GS&Co unjustly obtained fees, profits (and loss avoidance) and other compensation to which they were not entitled in connection with the Hudson CDO Securities at the expense of Plaintiff and the members of the Classes, again as alleged more fully above.

164.    Equity and good conscience require that defendants Goldman and GS&Co be directed to make restitution to Plaintiff and the members of the Classes of all such fees, profits (and loss avoidance) and other compensation that these defendants obtained in connection with their fraudulent and other misconduct alleged herein, in an amount to be proven at trial.

165.    Defendants Goldman and GS&Co fraudulently concealed the truth concerning the Hudson CDO Securities from Plaintiff and the members of the Classes, all as alleged more fully above.  Also as alleged more fully above, Plaintiff and other investors began to learn the truth regarding the Hudson CDO Securities and Goldman's own financial interests in connection therewith, in April 2010.

166.    This Count is brought within the time permitted by law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory, punitive and other damages, as well as restitution, to the full extent permitted by law in favor of Plaintiff and the other members of the Classes against defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Classes their reasonable costs and expenses incurred in this action, including counsel fees and expert fees to the full extent permitted by law; and

D.      Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 30, 2010
      New York, NY

Respectfully submitted,

**FRYDMAN, LLC**

/s/  David S. Frydman
David S. Frydman, Esq. - DF 8095
Frydman, LLC
18 East 48th Street – 10th Floor
New York, New York 10017
Tel.:  (212) 355-9100
Fax:  (212) 355-8988
Email: dfrydman@frydmanllc.com

*Local Counsel for Plaintiff Dodona I, LLC and
the Proposed Classes*

**BERGER & MONTAGUE, P.C.**

Lawrence J. Lederer
Robin Switzenbaum
Arthur Stock
Steven L. Bloch
Josh M. Rubens
1622 Locust Street
Philadelphia, PA 19103
Tel:  (215) 875-3000
Fax:  (215) 875-4604
Email: llederer@bm.net
          rswitzenbaum@bm.net
          astock@bm.net
          sbloch@bm.net
          jrubens@bm.net

*Lead Counsel for Plaintiff Dodona I, LLC and
the Proposed Classes*

531710

**CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS
RELATING TO HUDSON MEZZANINE/GOLDMAN, SACHS & CO. CDOs**

Alan Brody, the sole Managing Member of BrodyCo, LLC, the sole Managing Member of plaintiff Dodona I, LLC ("Plaintiff"), hereby duly swears and says, as to the claims asserted under the federal securities laws, that:

1.     Plaintiff has reviewed the complaint against Goldman, Sachs & Co. ("GS&Co"), Hudson Mezzanine Funding 2006-1, Ltd., Hudson Mezzanine Funding 2006-2, Ltd. and other defendants, and approves of its contents and authorizes its selected counsel, Berger & Montague, P.C. and any other counsel with whom or which Berger & Montague, P.C. may associate, to represent it in this action, including filing the complaint and a lead plaintiff petition on Plaintiff's behalf.

2.     As noted above, I am the sole Managing Member of BrodyCo, LLC. BrodyCo, LLC is, in turn, the sole Managing Member of Plaintiff. I am authorized to act on behalf of Plaintiff in connection with all matters in this litigation, including without limitation, all matters set forth in this Certification.

3.     Plaintiff did not purchase the securities that are the subject of the complaint at the direction of its counsel or in order to participate in this private action.

4.     Plaintiff is willing to serve as representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

5.     Plaintiff acquired $1 million (principal amount) of Income Notes of Hudson Mezzanine Funding 2006-1, Ltd. on or about February 6, 2007 at a price of $95.00/per $100.00 principal from Colonial Fund, LLC which, in turn, acquired such securities on or about January 4, 2007 directly from GS&Co. Plaintiff acquired $3 million (principal amount) of Income Notes of Hudson Mezzanine Funding 2006-2, Ltd. on or about January 24, 2007 at a price of $100.00/per $100.00 principal directly from GS&Co. Plaintiff sold back directly to GS&Co all such Income Notes on October 9, 2007 at a price of $2.50/per $100.00 principal.

6.     Plaintiff has not sought to serve or served as a representative party on behalf of a class under the United States federal securities laws during the three (3) years preceding the date on which this certification is signed.

7.     Plaintiff has not accepted and will not accept any payment for serving as representative party on behalf of the class beyond its *pro rata* share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I, Alan Brody, declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 28 day of September, 2010.

By:     _____
Alan Brody, for and on behalf of
Dodona I, LLC