UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------x
DODONA I, LLC, on Behalf of Itself and  :
All Others Similarly Situated,          :
                                        :
                    Plaintiff,          :
                                        :
        v.                              :        10 Civ. 7497 (VM)
                                        :
GOLDMAN, SACHS & CO., THE               :
GOLDMAN SACHS GROUP, INC.,              :
HUDSON MEZZANINE FUNDING 2006-          :
1, LTD., HUDSON MEZZANINE               :        JURY TRIAL DEMANDED
FUNDING 2006-1, CORP., HUDSON           :
MEZZANINE FUNDING 2006-2, LTD.          :
HUDSON MEZZANINE FUNDING 2006-          :
2, CORP., PETER L. OSTREM and           :
DARRYL K. HERRICK,                      :
                                        :
                    Defendants.         :
--------------------------------------------------x


### AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS AND NEW YORK COMMON LAW

*"The doctrine of bespeaks caution provides no protection
to someone who warns his hiking companion to walk
slowly because there might be a ditch ahead
when he knows with near certainty that the
Grand Canyon lies one foot away."*[1]

Court appointed lead plaintiff Dodona I, LLC ("Dodona" or "Plaintiff"), on behalf of itself and two proposed classes of similarly situated investors, alleges the following for its amended complaint against the defendants.

## NATURE OF THE ACTION

1.        This is a securities class action on behalf of investors in two offerings of collateralized debt obligations ("CDOs") led by The Goldman Sachs Group, Inc. ("Goldman"). The first CDO comprised a $837 million offering of securities co-issued by Hudson Mezzanine Funding 2006-1, Ltd. ("Hudson 1 Ltd.") and Hudson Mezzanine Funding 2006-1, Corp. ("Hudson 1 Corp.") as to all tranches except the Class E and Income Note tranches, the latter two of which were issued solely by Hudson 1 Ltd., as well as a senior swap transaction with an initial notional amount of $1.2 billion (the "Hudson 1 CDO"). The Hudson 1 CDO was issued on or about December 5, 2006. The second CDO was a $407.9 million offering of securities co-issued by Hudson Mezzanine Funding 2006-2, Ltd. ("Hudson 2 Ltd.") and Hudson Mezzanine Funding 2006-2, Corp. ("Hudson 2 Corp.") as to all tranches except the Class E and Income Note tranches, the latter two of which were issued solely by Hudson 2 Ltd. (the "Hudson 2 CDO"). The Hudson 2 CDO was issued on or about February 8, 2007. Collectively, the securities issued by the Hudson 1 CDO and Hudson 2 CDO are referred to as the "Hudson CDO Securities."

---

[1]        *In re Prudential Securities Inc. Limited Partnerships Litigation*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) (Pollack, J.) (emphasis added).

1

2.     In a classic case of "heads we win, tails you lose," the defendants structured, marketed and sold the Hudson CDO Securities to Plaintiff and other investors so that Goldman could decrease its overall long exposures to subprime mortgage-related assets via short positions on the Securities, and thereby also profit enormously when the Securities -- as the defendants expected -- did lose value.  Along these lines, the Hudson CDOs were a vehicle for Goldman to diversify the manner in which it was decreasing its long exposures to subprime mortgage-related assets between at least late 2006 and into 2007.  Specifically, the Hudson CDOs allowed Goldman to short subprime mortgage-related assets through offerings of CDO securities sold to Plaintiff and other investors rather than through privately-negotiated derivative transactions such as a swap, as alleged more fully below.  While the two methods were designed to achieve the same economic purpose for Goldman, the offerings of Hudson CDO Securities sold to investors also required that the defendants timely and properly disclose to Plaintiff and other investors all material facts of which they were then aware regarding the offerings.

3.     The defendants are Goldman; Goldman's broker-dealer subsidiary, Goldman, Sachs & Co. ("GS&Co"), which underwrote, offered and sold to investors the Hudson CDO Securities; the four Hudson entities which issued the CDOs; and the two Goldman officials that helped lead in issuing the CDOs.  By the fall of 2007, both CDOs had, in fact, declined in value significantly, saddling Plaintiff and other investors with enormous losses.

4.     Following massive losses in the Hudson CDO Securities and other mortgage-related asset-backed financial instruments structured and sold by the defendants, Goldman has been engulfed in multiple regulatory and criminal proceedings by the U.S. Department of Justice, the U.S. Senate Permanent Subcommittee on Investigations (the "Senate Subcommittee"), the U.S. Financial Crisis Inquiry Commission (the "FCIC") and the United Kingdom-based

2

Financial Services Authority ("FSA"), among other regulators; GS&Co and a Goldman employee, Fabrice Tourre ("Tourre"), were named as defendants in a civil enforcement action by the U.S. Securities and Exchange Commission ("SEC") alleging *fraud* concerning another, similar CDO called Abacus 2007-AC1 that GS&Co issued in April of 2007; GS&Co settled the SEC enforcement action on July 15, 2010 by agreeing to pay $550 million and by adopting certain reforms regarding future offerings of mortgage-backed securities (while the SEC's case against Tourre continues); and Goldman and several key employees have been embroiled in Congressional and other investigations and proceedings, including before the Senate Subcommittee, relating to the firm's mortgage securities practices.

5.      Plaintiff alleges claims under the Securities Exchange Act of 1934 (the "Exchange Act") and New York common law on behalf of persons and entities who purchased or otherwise acquired the Hudson CDO Securities and were damaged thereby.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331, 1337 and 1367.

7.      Plaintiff's claims arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a); SEC Rule 10b-5, 17 C.F.R. § 240.10b-5; and New York common law.

8.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b) and (c).  Substantial acts in furtherance of the wrongdoing alleged and its effects occurred in this District.  Additionally, Goldman and GS&Co have their principal places of business in this District.

9.     In connection with the omissions complained of herein, the defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail and interstate telephone communications.

## THE PARTIES

10.     Plaintiff purchased in the United States securities issued by each of the Hudson CDOs and incurred losses in connection therewith, as described in its attached certification. More specifically, and also as described in its attached certification, Plaintiff acquired its securities in the Hudson 1 CDO on or about February 6, 2007 from Colonial Fund, LLC which, in turn, purchased such Hudson 1 CDO securities directly from GS&Co on or about January 4, 2007; and Plaintiff acquired its securities in the Hudson 2 CDO directly from GS&Co on or about January 24, 2007.

11.     Defendant Goldman is a global investment banking, securities trading and investment management firm.  It provides a wide range of financial services to corporations, financial institutions, governments and individuals.  As of December 31, 2009, Goldman had $871 billion in assets under management, operated in 30 countries and employed approximately 32,500 people.  Goldman is a corporation organized under the laws of Delaware with its principal executive offices located at 200 West Street, New York, New York 10282.

12.     Defendant GS&Co is a limited partnership organized under the laws of New York with its principal executive offices located at 200 West Street, New York, New York 10282. GS&Co is a securities broker-dealer registered with the SEC.  GS&Co underwrote, offered and sold the Hudson CDO Securities to Plaintiff and other investors in the United States; reportedly purchased the Hudson CDO Securities from the four Hudson issuers or co-issuers to, in turn, sell them to Plaintiff and other investors; was responsible for selecting the collateral for the Hudson

CDO Securities; served as structuring and placement agent for the Hudson 1 CDO; and served as the liquidation agent for the Hudson 1 CDO and the Hudson 2 CDO.  GS&Co sold tranches of the Hudson CDO Securities directly to Plaintiff and other investors.

13.     Defendant Hudson 1 Ltd. was reportedly formed in September 2006 under the laws of the Cayman Islands.  Hudson 1 Ltd. was formed by Goldman or its affiliates to issue and sell Hudson 1 CDO securities.  Hudson 1 Ltd. was reportedly put into liquidation on October 29, 2009.  Hudson 1 Ltd.'s registered office is or was located at the office of Maples Finance Limited, P.O. Box 1093GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands.

14.     Defendant Hudson 1 Corp. was a corporation organized under the laws of Delaware.  It was reportedly formed in November 2006.  Hudson 1 Corp. was formed by Goldman or its affiliates to issue and sell Hudson 1 CDO securities.  Hudson 1 Corp. reportedly filed for dissolution on or about October 27, 2009.  Hudson 1 Corp.'s registered office is or was located at Puglisi & Associates, 850 Library Avenue, Suite 204, Newark, Delaware 19711.

15.     Defendant Hudson 2 Ltd. is incorporated under the laws of the Cayman Islands. It was reportedly formed in December 2006.  Hudson 2 Ltd. was formed by Goldman or its affiliates to issue and sell Hudson 2 CDO securities.  Hudson 2 Ltd.'s registered office is located at the office of Maples Finance Limited, P.O. Box 1093GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands.

16.     Defendant Hudson 2 Corp. is a corporation organized under the laws of Delaware. It was reportedly formed in December 2006.  Hudson 2 Corp. was formed by Goldman or its affiliates to issue and sell Hudson 2 CDO securities.  Its registered office is located at Puglisi & Associates, 850 Library Avenue, Suite 204, Newark, Delaware 19711.

17.     Defendant Peter L. Ostrem ("Ostrem") helped to lead in structuring, marketing and selling to investors the Hudson CDO Securities.  Ostrem is a former Goldman managing director and was a vice president in Goldman's structured products trading group ("SPG Trading") from at least 2006 through 2007.  Ostrem is reportedly no longer employed by Goldman.

18.     Defendant Darryl K. Herrick ("Herrick") also helped to lead in structuring, marketing and selling to investors the Hudson CDO Securities.  Herrick was a vice president in SPG Trading from at least 2006 into 2007.  Herrick joined Goldman in May 2000 and reportedly resigned in July 2007.

## CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rule of Civil Procedure on behalf of the following two classes (collectively, the "Classes"):

a.      those who, from the initial offering through April 27, 2010, purchased or otherwise acquired Hudson 1 CDO securities in the United States and were damaged thereby; and

b.      those who, from the initial offering also through April 27, 2010, purchased or otherwise acquired Hudson 2 CDO securities in the United States and were damaged thereby.

20.     Excluded from the Classes are the defendants; the members of the individual defendants' immediate families; the legal representatives, heirs, successors and assigns of any excluded person or entity; and any entity in which defendants have or had a controlling interest.

21.     Plaintiff believes that the members of the Classes are so numerous that joinder of all members is impracticable, and that they are geographically dispersed.  Record owners and

other members of the Classes may be identified from records maintained by Goldman, GS&Co

or their affiliates, and may be notified of the pendency of this action by mail, using a form of

notice similar to that customarily used in securities class actions.

22.     Plaintiff's claims are typical of the claims of the members of the Classes as all are

similarly affected by defendants' wrongful conduct in violation of federal and state law as

alleged herein.

23.     Plaintiff will fairly and adequately protect the interests of the members of the

proposed Classes and has retained counsel competent and experienced in class and securities

litigation.

24.     Common questions of law and fact exist as to all members of the Classes and

predominate over any questions affecting individual members of the Classes.  The questions of

law and fact common to the members of the Classes include, among others:

a.      whether the federal securities laws and state law were violated by

defendants' acts as alleged herein;

b.      whether defendants participated in and pursued the course of conduct

complained of herein;

c.      whether defendants acted wrongfully in structuring, marketing and selling

the Hudson CDO Securities;

d.      whether defendants omitted material facts regarding the Hudson CDO

Securities;

e.      whether the prices paid by members of the Classes for the Hudson CDO

Securities were artificially inflated due to the misconduct complained of herein; and

7

f.      whether the members of the Classes sustained damages and the proper

measure of such damages.

25.      A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members of the Classes is impracticable.

Furthermore, as the damages suffered by individual members of the Classes may be relatively

small, the expense and burden of individual litigation may render it impractical for members of

the Classes to individually redress the wrongs done to them.  There will be no difficulty in the

management of this action as a class action.

## ADDITIONAL FACTUAL ALLEGATIONS

A.      **Background on Subprime**
**Mortgages, Residential Mortgage-**
**Backed Securities and CDOs**

26.      "Subprime" mortgages are generally defined as mortgage loans secured by

residential real estate made to borrowers with FICO (Fair Isaac Corp.) scores of 660 or less (out

of 850).  A FICO score of 660 or less indicates, among other things, that a borrower has

previously had difficulty repaying debt.  Additionally, many subprime mortgages have certain

other risky characteristics such as high interest rates and loan-to-value ratios; interest-only or

negative amortizing loans; low initial interest rates followed by higher variable rates; substantial

prepayment penalties; and/or limited or stated documentation regarding the borrower's financial

status and income.

27.      According to Congressional testimony by an official of the Federal Deposit

Insurance Corporation (the "FDIC") in March 2007, the number of subprime mortgage loan

originations increased from $173.3 billion in 2001, to over $620 billion in 2005 and

approximately $600 billion in 2006.

8

28.     Residential mortgage-backed securities ("RMBS") are securities that are backed by pools of residential mortgages.  The mortgages are held by a special purpose entity ("SPE"), typically a trust, that issues securities to investors.  The investors, in turn, are entitled to returns derived from the cash flows generated by the underlying mortgages.  RMBS are divided into prioritized tiers, also known as tranches.  The lowest tranche offers investors the highest rate of return but also carries the greatest risk, since it bears a proportionately greater share of any initial losses up to a certain percent of the value of the RMBS.  Similarly, the next lowest tranche offers the next highest rate of return but bears the next highest level of risk and losses.  This pattern continues all the way to the most senior tranche of the RMBS, which offers a lower rate of return but is the least risky.  Each tranche is generally given a credit rating by one or more of Wall Street's main credit rating agencies, namely Moody's, Standard & Poor's ("S&P") and Fitch. The senior tranches are given higher credit ratings than the more junior tranches.

29.     For RMBS created in and around 2005 and 2006, typically some 80% of the tranches were given ratings of AAA.  The "mezzanine", or BBB/Baa2-rated, tranches for such RMBS were subordinate to the AAA tranches because they would suffer losses prior to the more senior tranches when the performance of the underlying mortgage portfolio deteriorated.

30.     CDOs are securities that are typically backed by a portfolio of fixed income assets, such as mortgage-backed securities ("MBS"), RMBS, corporate loans or other types of asset-backed securities ("ABS").  As with RMBS, the assets are packaged and held by a SPE -- such as the issuers of the Hudson CDO Securities -- which, in turn, issues securities to investors. Also like RMBS, the securities are divided into tranches and given credit ratings by one or more of the three main credit rating agencies, again depending on their perceived risk level.  The

investors, in turn, are entitled to returns derived from the cash flows generated by the underlying assets. These types of CDOs are generally called cash CDOs.

31.     In contrast to cash CDOs, "synthetic CDOs" do not actually own a portfolio of cash assets (except a small amount of securities to meet payment obligations). Instead, a synthetic CDO references a portfolio of assets, such as multiple issues of RMBS or other ABS, without actually owning those assets, usually via a credit default swap ("CDS") or multiple CDS. The CDS "synthetically" represents the related cash asset by attempting to mimic its cashflows and risk profile. Accordingly, while synthetic CDOs are also typically issued by SPEs, the performance of the securities is tied not to specific fixed income assets "owned" by the CDO, but instead to the performance of the specific underlying assets referenced in the CDS.

32.     A CDS is a type of credit insurance between two or more parties regarding certain referenced assets. One party to the CDS -- the credit protection *seller* -- promises to pay the other certain contingent amounts in the event that the referenced assets experience a negative credit event, such as a ratings downgrade or payment default. In exchange, the other party to the CDS -- known as the credit protection *buyer* -- pays periodic premiums for the life of the CDS. Accordingly, the credit protection seller essentially bets that the referenced assets will perform well -- *i.e.*, that the referenced assets will not experience a negative credit event -- while the credit protection buyer essentially bets that the referenced assets will perform poorly, *i.e.*, that the assets will experience a negative credit event the effect of which will outweigh the cost of the buyer's premium payments. This negative credit event can often be measured by a widening of the spread or price required to buy protection under an equivalent CDS.

33.     In synthetic CDOs, the buyer of the CDO takes the position of credit protection seller. Therefore, synthetic CDO securities offer investors the ability to bet that the referenced

assets will perform well.  In the case of both Hudson CDOs, Goldman (via its subsidiary, Goldman Sachs International ("GSI")) was the sole credit protection buyer of the CDS, as described more fully below.

34.     Many synthetic CDOs in 2006 and 2007 -- such as the Hudson CDOs, as described more fully below -- were backed in significant part by CDS referencing RMBS; certain of those RMBS, in turn, were also included in ABX indices.  CDS referencing a single asset such as a specific issue of RMBS or a specific issue of other ABS are referred to as "single-name" CDS.  The ABX is a group of indices that were created in January 2006 by Markit Group Ltd. in conjunction with Goldman and other Wall Street banks, in part to measure the performance of select groups of subprime RMBS.

35.     For example, the ABX 2006-1 and ABX 2006-2 are each a series of indices whose value is derived from the prices of CDS referencing 20 subprime-related RMBS issued, respectively, in the third and fourth quarters of 2005 and the first and second quarters of 2006.  Both the ABX 2006-1 and ABX 2006-2 are comprised of five separate indices segregated by the initial credit ratings of the underlying RMBS:  AAA, AA, A, BBB, and BBB-.  As the price of the CDS referencing the RMBS increases -- indicating a bearish view on the underlying assets (as it costs more to buy protection against a decline in the value of the RMBS) -- the ABX index declines.  This inverse relationship is due to the fact that the ABX index is spread-based -- meaning that, as prices move down on the underlying referenced securities, the related spread moves up, again reflecting greater risk.  In other words, the premium for purchasing credit protection increases as the perceived risk increases.  Investors can bet on (*i.e.*, go "long") or against (*i.e.*, go "short") the ABX indices by entering, among other things, into CDS with a

counterparty.  Investors also frequently used single name CDS to place directional bets on RMBS.

36.     Goldman traded in both ABX indices and single name CDS.  Goldman also diversified its subprime mortgage-related structured finance transactions in an effort to both obfuscate its true market intentions and financial positions, and to have as minimal an impact as possible on market prices for protection against movements in the value of RMBS, among other things.  As summarized in the Conclusions (the "Conclusions") accompanying the Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States (the "FCIC Report") issued in January 2011:

> "… CDS were essential to the creation of synthetic CDOs.  These synthetic CDOs were merely bets on the performance of real mortgage-related securities.  They amplified the losses from the collapse of the housing bubble by allowing multiple bets on the same securities and helped spread them throughout the financial system.  Goldman Sachs alone packaged and sold $73 billion in synthetic CDOs from July 1, 2004, to May 31, 2007.  Synthetic CDOs created by Goldman referenced more than 3,400 mortgage securities, and 610 of them were referenced at least twice.  This is apart from how many times these securities may have been referenced in synthetic CDOs created by other firms."

37.     Many synthetic CDOs were "static."  That is, the collateral referenced in a static synthetic CDO could only be modified, sold or otherwise transferred in limited circumstances; this also was the case with the Hudson CDO Securities, as described more fully below.  In general, for example, the underlying collateral in a static CDO might be modified if it experienced a significant ratings downgrade.  This is in contrast to a managed CDO, where the

portfolio manager could make changes to the collateral or referenced portfolio during the life of the CDO.

38.     According to one estimate, subprime-related MBS comprised approximately $100 billion of the $375 billion in total CDOs sold in the U.S. in 2006.

> **B.     Goldman Was Involved in Both Mortgage Origination and Funding on the "Front End" and Securitization on the "Back End"**

39.     Goldman and its affiliates were intimately involved in virtually all aspects of the subprime mortgage market through 2006 and 2007.  Goldman's activities were divided into two segments:  1) residential mortgage loans; and 2) trading and principal investments which included, among other things, packaging and structuring RMBS, CDOs and other ABS, trading and selling RMBS, CDOs and other ABS, and engaging in other transactions such as mortgage-related CDS.

40.     Within the residential mortgage loan division, Goldman purchased subprime loans on a bulk basis, generally in pools greater than $50 million; extended credit lines to mortgage originators to fund mortgage loans (called warehouse lending); provided direct loan servicing through its Avelo platform by at least October 2005; originated subprime mortgages through Senderra Funding, LLC, a subprime mortgage originator Goldman acquired in March of 2007; and structured, underwrote and distributed RMBS, CDOs and other ABS.  Among other mortgage originators, Goldman had a relationship with Washington Mutual Inc. ("WaMu") and that firm's subprime-lending unit, Long Beach Mortgage Co. ("Long Beach").  Mortgages originated by WaMu and Long Beach reportedly backed some $77 billion of mortgage securities. Mortgages originated by Long Beach ended up being among the worst-performing in the

subprime-related sector.  By 2005, Long Beach was in financial trouble and had to buy back

from investors some $875 million in non-performing loans resulting from increased foreclosures

and delinquencies.  Other notorious subprime lenders with whom Goldman did substantial

business were Countrywide, Fremont and New Century, for whom Goldman also securitized

billions of dollars in mortgage securities.

41.     Goldman's trading and principal investments division created and traded RMBS

and specific tranches of mortgage securitizations; traded and used credit derivatives such as CDS

that referenced subprime-related residential mortgage securities and other assets; underwrote

CDOs backed by RMBS; advised clients on the acquisition and sale of mortgage platforms, such

as National City/First Franklin, Centex and H&R Block/Option One; and invested as a principal

in mortgage-related securities and transactions.  Additionally, GS&Co established a structured

product correlation trading desk in or around late 2004 or early 2005 that, among other things,

structured and marketed synthetic CDOs collateralized by subprime mortgage-related assets.

42.     In 2005, Goldman reportedly underwrote at least 15 CDOs backed by RMBS

and/or other subprime mortgage-related assets aggregating over $8.3 billion.  By 2006, Goldman

reportedly underwrote 19 such CDOs aggregating over $15.8 billion.  Also in 2006 and 2007,

Goldman and its affiliates underwrote approximately 86 separate issues of RMBS and 27 CDOs

backed by RMBS assets, also aggregating many billions of dollars in face value.  In just the first

half of 2007, Goldman and its affiliates underwrote 12 CDOs aggregating $8.3 billion in face

value.  By 2007, according to *The New York Times,* Goldman's mortgage division was reportedly

split into 11 subgroups, each with a specialty, although "[a]t the heart of all this is the mortgage

trading unit that, at its peak, employed several hundred people."

43.     According to a November 1, 2009 report by *McClatchy*, Goldman issued at least $135 billion in mortgage-related securities from 2001-2007; sold to investors and other third parties approximately $39 billion of its own mortgage-related securities; and marketed at least $17 billion more in mortgage-related securities for other issuers in 2006 and 2007.

44.     Goldman was also a leader in creating and sponsoring CDOs via offshore entities. For example, the November 1, 2009 report in *McClatchy* stated that Goldman "also was the lead firm in marketing about $83 billion in complex securities, many of them backed by subprime mortgages, via the Caymans and other offshore sites, according to an analysis of unpublished industry data by Gary Kopff, a securitization expert."  Similarly, according to a December 30, 2009 *Knight Ridder* report titled "Goldman's offshore deals deepened global financial crisis":

> "These Cayman Islands deals, which Goldman assembled through the British territory in the Caribbean, a haven from U.S. taxes and regulation, became key links in a chain of exotic insurance-like bets called credit-default swaps that worsened the global economic collapse by enabling major financial institutions to take bigger and bigger risks without counting them on their balance sheets.
>
> \* \* \*
>
> In 2006 and 2007, as the housing market peaked, Goldman underwrote $51 billion of deals in what mushroomed into an under-the-radar, $500 billion offshore frenzy, according to data from the financial services firm Dealogic.  At least 31 Goldman deals in that period involved mortgages and other consumer loans and are still sheltered by the Caymans' opaque regulatory apparatus.
>
> \* \* \*
>
> Goldman's activities in the Caymans helped it unload some of its subprime-related risks on others and also amass tens of billions of dollars in

15

> protection against a U.S. housing crash that ultimately occurred. These deals have accounted for a sizeable share of the firm's $103 billion in revenues and more than $25 billion in profits since Jan. 1, 2007. At the end of 2009, Goldman had set aside more than $16 billion in cash and stock bonuses for its employees."

45.     The December 30, 2009 *Knight Ridder* report concluded that Goldman's offshore

CDOs "were riddled with potential conflicts of interest" and were used "to coax investors into

covering its bets on a housing downturn" as follows:

> "One Wall Street market participant who watched the disaster unravel said that the bankers and traders who packaged subprime mortgage-related deals in the Caymans deals got paid based on volume and would 'jam the stuff anywhere they had to close the deal.'
>
> This individual, who declined to be identified for fear it would hurt his career, said the swaps gave the banks an unlimited supply of cash and the mistaken belief that they had an 'infinite return on investment.'
>
> The insurance unit of ACA Capital Holdings Inc. wrote $65 billion in swaps coverage, mostly on the Cayman deals called collateralized debt obligations, or CDOs, before it folded and turned nearly all its assets over to the banks that had thought ACA would backstop them.
>
> The documents obtained by McClatchy also reveal that:
>
> - Goldman's Caymans deals were riddled with potential conflicts of interest, which Goldman disclosed deep in prospectuses that typically ran 200 pages or more. Goldman created the companies that oversaw the deals, selected many of the securities to be peddled, including mortgages it had securitized, and in several instances placed huge bets against similar loans.

16

- Despite Goldman's assertion that its top
executives didn't decide to exit the risky mortgage
securities market until December 2006, the
documents indicate that Goldman secretly bet on a
sharp housing downturn much earlier than that.

- Goldman pegged at least 11 of its Caymans deals
in 2006 and 2007 on swaps tied in some cases to the
performance of a bundle of securities that it neither
owned nor sold, but used as markers to coax
investors into covering its bets on a housing
downturn."

C.   **Goldman Increasingly Began to
Reduce its Long Exposures by
Shorting Subprime-Related
Mortgage Assets by 2006**

46.     Goldman reportedly sought to reduce the firm's exposure to, and also to profit

from shorting, at least some subprime-related mortgage assets by at least 2006.  By that time,

Goldman officials began noticing that there was a significant increase in early payment defaults

("EPDs"), "kickouts" and repurchase claims in pools of loans Goldman acquired from

Countrywide, New Century and Fremont, particularly on subprime and other non-prime

mortgages.  In general, an EPD occurs where the borrower defaults within 60 or 90 days from

when the mortgage was issued.  Originators and wholesalers sell pools of mortgages to

securitizers such as Goldman typically with a warranty that the purchaser will not suffer a loss

due to an EPD.  A kickout occurs where a loan purchaser refuses to purchase certain loans

because of defects such as EPDs; in that case, the loans are literally "kicked-out" to the seller

under the loan purchase agreement.

47.     Goldman knew of increasing EPDs, kickouts and repurchase demands from the

due diligence it performed when it bought pools of loans.  Goldman used both an in-house group

17

of individuals who were experienced in valuing mortgages and related products, as well as outside firms such as Clayton Holdings, Inc. ("Clayton"), among the largest national mortgage appraisal firms.  Goldman was reportedly among Clayton's largest clients by 2006.

48.     Goldman stated in an April 23, 2010 report to regulators titled "Goldman Sachs: Risk Management and the Residential Mortgage Market" that, when it structured or underwrote RMBS, it "engaged in a due diligence process to determine (i) the counterparty, (ii) loan level credit, (iii) compliance and (iv) property valuation."  Goldman also stated there that, "[i]n connection with our underwriting of residential mortgage-related securities, Goldman Sachs had a process to examine the management, relevant policies and procedures, underwriting standards, creditworthiness and other aspects of each mortgage originator before the firm began purchasing loans for securitization"; and that "[t]he firm also employed internal and third-party resources to conduct due diligence on the individual loans in the pools backing the securities in our RMBS offerings, including reviewing selected loan files, verifying compliance with state and federal lending statutes, and selective review of property appraisals against comparable values."

49.     In January 2008, Clayton entered into an agreement with the Office of the New York Attorney General (the "NYAG").  The NYAG had previously issued a subpoena to Clayton "to produce due diligence reports on various pools of loans that we have reviewed for issuers of mortgage-backed securities," according to then Clayton Chief Executive Officer Frank Filipps.  The agreement gave Clayton certain immunity from civil and criminal prosecution by the NYAG in exchange for providing documents, testimony and other cooperation in the NYAG's investigation of mortgage lending and financing practices.

50.     According to a report in *The New York Times* on January 27, 2008, "Clayton has told the prosecutors that starting in 2005, it saw a significant deterioration of lending standards

and a parallel jump in lending exceptions."  Lending "exceptions" are loans that are funded

despite having failed to meet certain lending standards.  Similarly, according to a report in *The*

*Los Angeles Times* on March 17, 2008, employees of Clayton and other mortgage appraisal firms

reportedly "raised plenty of red flags about flaws so serious that mortgages should have been

rejected outright -- such as borrowers' incomes that seemed inflated or documents that looked

fake -- but the problems were glossed over, ignored or stricken from reports."  According to that

article:

> "The biggest problems, the reviewers said, were appraisals that looked inflated and 'liar's loans,' so nicknamed because borrowers weren't required to prove they earned enough to make their payments.
>
> 'You can't tell me a Kmart or a Wal-Mart or a Target floor worker is making $5,000 a month, or a house cleaner is making $10,000,' said former loan reviewer Irma Aninger of Palm Desert, a 40-year financial services industry veteran.
>
> Aninger, who did work for Clayton and Bohan [Group, another large mortgage appraisal firm], said she tried repeatedly to have such loans marked as unacceptable but was overruled by supervisors, who were known as project leads.  'The lead would say, 'You can't do that.  You can't call these people liars,' Aninger said.
>
> Aninger said one such supervisor was Clayton's Ed Peek.  He denied discouraging the rejection of 'stated income' loans, 'Many, many, many stated income loans were rejected,' he said, but the loan buyers often bought the rejected mortgages anyway.
>
> From his perch, Peek said, he could see the deterioration of overall standards.
>
> 'I had been looking at sub-prime mortgages since the beginning,' he said.  'When it started, you

couldn't get a sub-prime loan for over 80%' of a
property's value.

'But the guidelines loosen, and the investors would
still buy,' Peek said.  'They loosen up some more,
and investors still buy,' until highly risky loans for
100% of a home's value were pushed through."

51.     Documents Clayton produced to the FCIC also evidence Goldman's awareness of

a deterioration in mortgage lending standards by 2006 and early 2007.  For example, of the

16,993 total loans that Clayton reportedly reviewed for Goldman in the first quarter of 2006

alone, Clayton identified 3,705, or approximately 22% , as initial "rejects."  By the first quarter

of 2007 when Clayton reportedly reviewed for Goldman a total of 15,972 loans, the number of

initial rejects Clayton found had increased to 4,079, or over 25.5%.  According to the testimony

before the FCIC on September 23, 2010 by Vicki Beal, Senior Vice President of Clayton,

Clayton graded loans using several criteria called "exception tracking", with its lowest category

reserved for "[l]oans that do not meet guidelines and have insufficient compensating factors[.]"

Significantly, Clayton's reports were confidential and available to Goldman as part of the due

diligence process that Goldman told regulators in April 2010 it undertook before issuing RMBS

and CDOs, but were not available to investors like Plaintiff and other similarly situated investors

to whom these securities were ultimately marketed.

52.     Goldman was also aware of increased risks in subprime lending by 2006 from its

own direct dealings with mortgage originators.  For example, Goldman was reportedly New

Century's largest creditor when, on April 2, 2007, New Century declared bankruptcy.  *In re New

Century TRS Holdings, Inc.*, Chapter 11 Case No. 07-10416 (KJC) (Bankr. D. Del.).  According

to the February 29, 2008 report of the independent examiner appointed by the bankruptcy court

pursuant to 11 U.S.C. § 1104(c)(2), EPDs on loans New Century originated increased from

6.58% in April 2005 to 9.24% by December 2005, while kick-outs increased from 5.64% in January 2005 to 8.77% in December 2005 -- amounting to nearly $2.3 billion in loans.  In fact, the examiner concluded that "Senior [New Century] Management turned a blind eye to the increasing risks of New Century's loan originations and did not take appropriate steps to manage those risks"; that "Senior Management was aware of an alarming and steady increase in early payment defaults ('EPD') on loans originated by New Century, beginning no later than mid-2004"; that "Senior Management similarly gave inadequate attention to the increasing amounts of investor 'kickouts'"; and that, "[b]etween 2004 and the end of 2006, investors rejected approximately $800 million in loans simply due to missing documents, and billions of dollars of loans for other reasons."

53.    Consequently, Goldman determined by 2006 to reduce its financial exposures to subprime and other residential mortgage-related securities and other assets.  As part of that plan, Goldman began by 2006 to create a series of CDOs through which it would profit by shorting subprime mortgage-related assets.  For example, by 2006 Goldman mortgage traders Jonathan M. Egol ("Egol") and Tourre reportedly took short positions on behalf of Goldman in a series of synthetic CDOs Goldman led and sponsored within the Abacus series which, like the Hudson CDOs, referenced subprime mortgage-related assets.  Rather than recommending that certain Goldman customers take negative bets on the Abacus CDOs, Egol reportedly retained for Goldman a significant amount of the short positions.  Additionally, Egol reportedly structured certain Abacus deals to allow short investors like Goldman and certain of its favored clients to bet up to six or seven times the face value amount of the CDOs.

54.    Goldman also sought to lower its exposure to certain subprime mortgage assets by trading as a principal.  For example, a Goldman saleswoman, Veronica Grinstein ("Grinstein"),

reportedly called Michael Burry ("Burry"), principal of hedge fund Scion Capital, on or around November 7, 2005, seeking to repurchase on behalf of Goldman $25 million worth of short exposure to certain subprime-related CDS, which Goldman had previously sold to Scion Capital. Goldman reportedly sought to reduce its long position because it had realized that the mortgages backing the applicable subprime RMBS posed increasing credit risks.  Grinstein reportedly told Burry that "I'd like a special favor," and that "[m]anagement is concerned" specifically about Goldman's financial exposures to those subprime mortgage-related assets.

55.    Goldman's decision in 2006 to "get flat" and increase its short positions on mortgage securities and related financial instruments, particularly subprime and other non-prime mortgage securities, was based on its belief, shared by several officials internally within the firm, that such securities would decline in value.[2]  For example, Michael J. Swenson ("Swenson"), a managing director and co-manager of SPG Trading in 2006 and 2007 when the Hudson CDO Securities were structured and sold to Plaintiff and other investors, stated in his self-performance review for 2007, among other things, that:  "during the early summer of 2006 it was clear that the market fundamentals in subprime and the highly levered nature of CDOs was going to have a very unhappy ending"; that he therefore directed "the ABS desk to enter into a $1.8bb short in ABS CDOs that realized approx. $1.0bb of p & l to date"; and that "[w]e started out the fiscal 2007 year down (we were long) as the market began to grow concerned with early poor performance of the 2006 subprime vintage.  We were long and needed to reduce risk in a situation where there were few opportunities to shed the ABX indices we were long.  The CDO managers had not grown concerned by that time.  I recognized the enormous opportunity the CDO market presented us and took advantage of the Index to single-name basis.  In November

---

[2]      Significantly, Goldman's third quarter of 2006 began on May 27, 2006, and its fiscal year for 2006 ended on November 24, 2006.  Its first quarter of 2007 began on November 25, 2006 and ended on February 23, 2007.

and December of 2006, we aggressively [sic] capitalized on the franchise to enter into efficient

shorts in both the RMBS and CDO space."  Swenson also stated in that review that "[t]he beauty

of the CDO short was that it allowed for a very efficient method for capturing the value in the

ABX to single-name basis from the short side."  As Swenson summarized in that review:

> "It should not be a surprise to anyone that the 2007
> year is the one that I am most proud of to date.  I
> can take credit for recognizing the enormous
> opportunity for the ABS synthetics business 2 years
> ago.  I recognized the need to assemble an
> outstanding team of traders and was able to lead
> that group to build a number one franchise that was
> able to achieve extraordinary profits (nearly $3bb to
> date).
>
> Commercial Contribution
>
> Though this extraordinary year is attributable to a
> total team effort, my commercial contributions over
> the past year are numerous.  The contributions to
> the $3bb of SPG Trading profits and $2bb of ABS
> trading p & l are spread out across various trades
> and strategies.  As the architect of the leading
> franchise in ABS CDO (Risk Magazine Survey
> 6/07), I was able to identify key market dislocations
> that led to tremendous profits."

Swenson was also one of seven Goldman officials who, on April 27, 2010, testified before the

Senate Subcommittee regarding Goldman's subprime mortgage-related activities.

    56.    Similarly, on October 26, 2006, Arbind Jha ("Jha") reported in an email to

numerous Goldman executives, including CEO Lloyd Blankfein ("Blankfein"), President and

COO Gary D. Cohn ("Cohn"), Dan Sparks ("Sparks"), then head of Goldman's mortgage

department, Ostrem, Herrick and others, that "[r]isk reduction is primarily due to pricing of $2bn

Hudson Mez synthetic CDO deal (SPG Secondary desk bought $325k/bp BBB and $350k/bp

BBB- RMBS Subprime protection)[.]"  That same day, Jha also stated in an email to Jonathan

Sobel that was copied to Josh Birnbaum ("Birnbaum"), formerly Goldman managing director of SPG Trading, Swenson and others, that Goldman had hedged certain of its exposure to mezzanine subprime mortgage-related assets as follows:  "[p]er Mike S., we sold $1bn of ABX BBB- and bought $1bn protection on single-name BBB- CDS.  This is estimated to reduce the scenario risk by approx. $90mm."

57.     Birnbaum indicated in his self-performance review for 2007 that, between December 2006 and February 2007, "[t]he fundamentals for mortgage credit were undeniably deteriorating."  He stated that, "[g]iven how much ABX we had purchased through the broker market in 2006, the world would think [Goldman] was very long for the foreseeable future ... [w]e could use that fear to our advantage if we could flip our risk" and "concluded that [Goldman] should not only get flat, but get VERY short."  Birnbaum identified subprime mortgage-related CDOs as ideal instruments through which Goldman could profit (and/or avoid losses) by taking short positions.  Birnbaum was also a key part of Goldman's efforts to implement that plan in 2006.  By February 2007, he stated in his review, "our very profitable year was underway."

58.     Another Goldman mortgage securities trader who reported to Swenson and Birnbaum, Deeb A. Salem ("Salem"), similarly stated in his 2007 self-performance review (dated September 6, 2007) as follows (capitalized emphasis in original):

> "In May, while we were remained as negative as
> ever on the fundamentals in sub-prime, the market
> was trading VERY SHORT, and was susceptible to
> a squeeze.  We began to encourage this squeeze,
> with plans of getting very short again, after the short
> squeezed caused capitulation of these shorts.  The
> strategy seemed do-able and brilliant, but once the
> negative fundamental news kept coming in at a
> tremendous rate, we stopped waiting for the shorts

24

> to capitulate, and instead just reinitiated shorts
> ourselves immediately.  I also respect liquidity
> tremendously.  When the desk needs to add or
> reduce a position, I focus more on optimizing the
> likelihood of getting desired size of the trade and
> less on optimizing the price of each individual
> trade."

59.     Sparks summarized Goldman's purported "risk reduction program" in a February

14, 2007 email to Goldman's CFO, David Viniar ("Viniar"), COO Cohn, President Jon

Winkelried ("Winkelried"), and then head of sales and trading, Thomas Montag ("Montag"),

among others, that stated as follows:

> "Over the last few months, our risk reduction
> program consisted of:
> (1) selling index outright
> (2) buying single name protection
> (3) buying protection on super-senior portions of
> the BBB/BBB- index (40-100% of the index).  We
> thought that the correlation of tranches on the very
> thin BBB- index was higher than where the market
> implied.  We sold around $3 billion in the mid-30's
> bp range."

60.     On December 5, 2006 -- the day of the offering of Hudson 1 CDO Securities --

Sparks stated in an email to Montag, Bill McMahon ("McMahon") and Richard Ruzika

("Ruzika") that "[s]tructured exits are the way to reduce risk.  Our prior structured trade closes

today [presumably referring to the Hudson 1 CDO].  We are focusing on ways to do it again

much faster."  Of particular significance is Sparks' presumed reference to the Hudson 1 CDO as

a "trade"; in fact, although Sparks apparently deemed it akin to a privately-negotiated derivatives

swap or other similarly limited derivatives trade, the Hudson 1 CDO involved the marketing,

offering and selling of the Hudson 1 CDO Securities more broadly to Plaintiff and other

investors to whom the defendants owed a duty of timely disclosure of all material facts

25

concerning these Securities of which they were then aware, among other things.  According to

that email (quoted in full):

> "From:        Sparks, Daniel L
> Sent:         Tuesday, December 05, 2006 11:55
>               AM
> To:           Montag, Tom; McMahon, Bill;
>               Ruzika, Richard
> Subject:      Down today
>
> Subprime market getting hit hard – hedge funds
> hitting street, wall street journal article.
>
> At this point we are down $20mm today.
>
> Structured exits are the way to reduce risk.  Our
> prior structured trade closes today.  We are focusing
> on ways to do it again much faster."

61.    On December 13, 2006, Michael Dinias ("Dinias") sent an email to Viniar and

Craig Broderick ("Broderick"), Goldman's Chief Risk Officer, that attached a document entitled

"mortgage drilldown.pdf" which was an "analysis of the major risks in the mortgage business."

Dinias also stated there that the "[t]he specific desks that are long subprime risk are 'Residential

Credit', 'ABX & Single Name CDS', and 'CDO'.  We have reviewed this risk analysis with

Dan, Bill and Armen and we would be happy to walk you through the details."

62.    On December 14, 2006, Viniar convened a meeting of the firm's senior mortgage

traders and risk managers.  Swenson stated in his testimony before the Senate Subcommittee that

Viniar wanted "to go over the mortgage department's positions and risk."  This meeting

reportedly followed at least several days of losses by Goldman's mortgage traders.  Sparks,

Swenson and several other senior Goldman bankers were invited to this meeting.  While

Swenson testified before the Senate Subcommittee that the mortgage department was told only to

reduce risk, documents Goldman prepared for that Subcommittee indicate that Viniar directed

the department to reduce its overall positions in the subprime market.  Senior Goldman officials reportedly approved Goldman's strategy by late 2006 to reduce the firm's financial exposures to subprime mortgage-related assets.  According to a memorandum prepared by Senators Carl Levin and Tom Coburn (who then were, respectively, Chairman of the Senate Subcommittee and Ranking Member), entitled *Wall Street and the Financial Crisis: The Role of Investment Banks*, dated April 26, 2010 (the "Levin Memorandum"):

> "Goldman Sachs senior management closely monitored the holdings and the profit and loss performance of its mortgage department.  In late 2006, when high risk mortgages began showing record delinquency rates, and the value of RMBS and CDO securities began falling generally, Goldman Sachs Chief Financial Officer David Viniar convened a meeting on December 14, 2006, to examine the data and consider how to respond."

63.     In another internal Goldman email to Montag on December 15, 2006 that summarized the preceding day's internal meeting, Viniar said that "my basic message was let's be aggressive distributing" subprime mortgage-related assets "because there will be very good opportunities as the market goes into what is likely to be even greater distress and we want to be in position to take advantage of them.  Let me know if you want to catch up live."

64.     A December 15, 2006 email from Birnbaum to Lorin Radtke ("Radtke") that was copied to Swenson and others explicitly referred to the Hudson 2 CDO as part of the firm's strategy to "mov[e] risk", and stated as follows:  "we've had good traction moving risk through our franchise on a variety of fronts: ABX, single names, super-senior, Hudson 2."

65.     Other internal emails confirm that Goldman had determined to decrease its long exposures to subprime mortgage-related assets by the time it sponsored the Hudson CDOs.  For example, in a December 17, 2006 email to Montag and others the subject of which was

"Subprime Update", Sparks stated that "[w]e made progress last week, but still more work to do. First focus on 2006 BBB- and then on reducing index vs single names basis." In another email on December 18, 2006 to Egol and others regarding certain of Goldman's CDO positions, Tourre stated:  "[w]e have a big short on and we can stay short ...."

66.     Similarly, a December 20, 2006 email from Stacey Bash-Polley ("Bash-Polley") to Swenson, Ostrem, Birnbaum and others that also mentioned Hudson stated that, "[w]e have been thinking collectively as a group about how to help move some of the risk.  While we have made great progress moving the tail risks - ssr and equity - we think it is critical to focus on the mezz risk that has been built up over the past few months.  Both through sequential abacus ssr/equ trades and the hudson deals (current and prior)."  Bash-Polley also stated that, "[g]iven some of the feedback we have received so far – it seems that cdos maybe [sic] the best target for moving some of this [mezzanine] risk but clearly in limited size (and timing right now not ideal)."

67.     Additional documents Goldman produced to government investigators also demonstrate that, by the time it sponsored the Hudson CDO Securities, Goldman determined to decrease its long exposures to mortgage assets.  For example, according to a March 1, 2010 letter from Gregory K. Palm ("Palm"), Goldman's Executive Vice President and General Counsel, to Phil Angelides, the Chairman of the FCIC:

> "In late 2006, we began to experience losses in our daily residential mortgage-related products P&L as we marked down the value of our inventory of various residential mortgage-related products to reflect lower market prices.
>
> In response to those losses, we decided to reduce our overall exposure to the residential housing market.  We wanted to get 'closer to home' -- i.e.,

> to reduce our overall exposure to the residential
> housing market, consistent with our risk protocols --
> given the uncertainty of the future direction of the
> housing market and the increased volatility of
> mortgage-related product markets."

68.     By January 2007, GS&Co and Tourre were working with subprime mortgage short seller Paulson & Co. ("Paulson") to structure and issue to investors the Abacus 2007-AC1 CDO securities.  The Abacus CDO was a synthetic CDO backed by CDS which referenced various mezzanine subprime RMBS -- including several RMBS that were also referenced in the Hudson CDOs -- and which Paulson intended to short.  The Abacus CDO formed the basis of the SEC's civil enforcement action against GS&Co and Tourre.

69.     According to a January 23, 2007 email from Tourre, who the SEC alleged was "principally responsible" for creating the Abacus series of CDOs:  "The whole building is about to collapse at anytime now.  Only potential survivor, the fabulous Fab ... standing in the middle of all these highly complex, highly leveraged, exotic trades he created without necessarily understanding all of the implications of those monstruosities [sic]!!!"

70.     Additional internal emails confirm that Goldman determined to reverse course and decrease its exposures to mortgage assets by the time it created the Hudson CDOs.  For example, on January 26, 2007, Sparks stated in an email to Montag concerning defendants Ostrem and Herrick, who had closed an unidentified transaction in which Goldman reportedly shorted mortgage assets:  "Need you to send message to peter ostrem and darryl herrick telling them what a great job they did.  They structured like mad and travelled [sic] the world, and worked their tails off to make some lemonade from some big old lemons."  Similarly, on February 11, 2007, Blankfein stated in an email to Montag regarding Goldman's mortgage

positions:  "Could/should we have cleaned up these books before and are we doing enough right now to sell off cats and dogs in other books throughout the division [?]"

71.     On February 21, 2007, Egol sent an email to Sparks that was copied to Swenson, Birnbaum, David A. Lehman ("Lehman") and others concerning certain short positions on mortgage securities.  Sparks responded the following day as follows:  "You called the trade right, now monetize a lot of it."  In another February 21, 2007 email to Winkelried, Sparks stated that "[w]e are net short, but mostly in single name CDS and some tranched index vs the some [sic] index longs.  We are working to cover more, but liquidity makes it tough."

72.     In an email on February 25, 2007, Sparks told Montag that the prior week "the trading desks" had covered certain mezzanine subprime RMBS short trades via the ABX and entered into others, as follows:

> "Cover[ed] around $1.5 billion single name
> subprime BBB- CDS and around $700mm single
> name subprime BBB CDS.  The desk also net sold
> over $400mm BBB- ABX index.  Desk is net short,
> but less than before.  Shorts are in senior tranches of
> indexes sold and in single names.  Plan is to
> continue to trade from short side, cover more single
> names and sell BBB- index outright."

73.     On February 28, 2007, Goldman's Firmwide Risk Committee reportedly held a meeting at 7:30 a.m.  The meeting contained a presentation by Sparks to Viniar and Gerald Corrigan, a managing director and former official of the Federal Reserve Bank of New York.  According to the minutes of that meeting, Sparks reported that "[b]usiness working to reduce exposures"; that "a lot of shorts already covered"; that the "ABX widened 500 bp on the week.  Business covered $4BN in single names"; that there was "a lot of negative news in the subprime market with rumors on everyone"; that "CDS on CDOs started to widen significantly over the

week"; that "[b]usiness continuing to clear out loans"; and that "there is some market concern in the alt-a/prime space.  However, nothing specific."  The minutes also reflect that Goldman CEO Blankfein and several other senior Goldman officials were invited to this meeting but did not attend.

74.     On March 7, 2007, Goldman's Firmwide Risk Committee reportedly met again and received another presentation from Sparks.  According to minutes of that meeting, Sparks reported that it was "'[g]ame [o]ver' -- accelerating meltdown for subprime lenders such as Fremont and New Century"; that "[t]he Street is highly vulnerable, potentially large exposures at Merrill and Lehman"; that "[c]urrent strategies are to 'put back' inventory, where applicable, or liquidate positions"; that "[t]he Mortgage business is currently closing down every subprime exposure possible"; and that "[h]edge funds have been making money in this market, but it is difficult to tell how much others are losing because many CDO's with subprime assets are not MTM [*i.e.,* marked-to-market]."

75.     In a March 9, 2007 email to Viniar, Sheara Fredman, Vice President of Goldman's Finance Division, reported, among other things, that the $266 million in revenue generated by Goldman's mortgage business in the first quarter of 2007 was "primarily driven" by, among other things, "synthetic short positions concentrated in BBB/BBB- sub prime exposure …."

76.     A March 10, 2007 email from Dinias to Sparks regarding an upcoming mortgage presentation to Goldman's Board of Directors stated that, during the first quarter of 2007, Goldman had built up $10 billion notional in short exposure to the ABX BBB-  index and bought $60 million worth of equity put options on subprime mortgage originators (*i.e.*, betting they would decline).  According to Dinias, the presentation also stated as follows:  "in the synthetics

space, the desk started the quarter with long $6.0bn notional ABX BBB- risk and shifted the position to net short $10bn notional by reducing the longs in ABX BBB- and increasing shorts in single name CDS."  Sparks stated in an email to Dinias earlier that same day that the Board presentation should include the point that Goldman, among other things, "g[ot] short CDS on RMBS and CDOs, g[ot] short the super-senior BBB- and BBB index, and g[ot] short AAA index as overall protection.  The puts have also been good."

77.     By March 15, 2007, Goldman's SPG Trading unit had a net short position of $2.1 billion on certain mortgage assets, according to a presentation to Goldman's Board of Directors on September 17, 2007.  Specifically, that group's long positions as of March 15, 2007 included $1.6 billion in RMBS, $1.0 billion in cash CDOs and $3.0 billion in other CDO assets; and its short positions then included $3.5 billion in RMBS CDS, $2.0 billion in CDO CDS, and $2.2 billion on one or more ABX indices.

78.     A presentation on March 26, 2007 to Goldman's Board of Directors concerning the firm's subprime mortgage business stated that, between the third quarter of 2006 and the first quarter of 2007, Goldman:  "scales back purchasing of riskier loans"; "reduces CDO activity"; and "reverses long market position through purchases of single name CDS and reductions of ABX."

79.     In a letter to the SEC dated November 7, 2007, Goldman Controller and Chief Accounting Officer Sarah Smith ("Smith") stated that, between November 24, 2006 and August 31, 2007, Goldman reduced its exposure to "subprime mortgage loans" and "subprime mortgage backed securities" from, respectively, $7.8 billion to $462 million, and $7.2 billion to $2.4 billion.  Additionally, Smith stated "[d]uring most of 2007, we maintained a net short

subprime position with the use of derivatives, including ABX index contracts and single name

CDS which hedged this long cash exposure."

80.     According to a November 1, 2009 report by *McClatchy*, Goldman "sold off nearly

$28 billion of risky mortgage securities it had issued in the U.S. in 2006, including $10 billion on

Oct. 6, 2006" and "unloaded another $11 billion in February 2007, after it had intensified its

contrary bets."

81.     By 2007 and 2008, these short positions reportedly provided huge profits to

Goldman when the value of the collateral deteriorated, as described more fully below.

Commenting on Goldman's shorting of subprime mortgage assets, a former Goldman employee

reportedly stated that "Egol and Fabrice [Tourre] were way ahead of their time … [t]hey saw the

writing on the wall in this market as early as 2005."  Goldman's conduct in structuring and

selling one of the Abacus CDO offerings formed the basis of the civil enforcement action for

*fraud* that the SEC brought against GS&Co and Tourre in April 2010, also as described more

fully below.

### D.     Hudson CDOs

#### 1.     Hudson 1 CDO

82.     The Hudson 1 CDO is a static synthetic CDO that was structured and began to be

marketed by GS&Co in or around late 2006.  The actual offering of the Hudson 1 CDO securities

commenced on or about December 5, 2006, and was led by Ostrem and Herrick.  The Hudson 1

CDO offering comprised $837 million (par, or principal amount) of notes, consisting of eight

separately rated tranches, as well as a senior swap transaction with an initial notional amount of

$1.2 billion (which, at least initially, was not offered for sale to investors, but instead entered into

by Hudson 1 Ltd. and GSI, the London-based affiliate of Goldman, as explained more fully

below), specifically as follows:

| Security | Par | % of Par |
|---|---|---|
| Senior Swap | $1,200.0 million | -0- |
| Class S | $37.0 million | 4.4% |
| Class A-f | $110.0 million | 13.1% |
| Class A-b | $120.0 million | 14.3% |
| Class B | $230.0 million | 27.5% |
| Class C | $170.0 million | 20.3% |
| Class D | $84.0 million | 10% |
| Class E | $26.0 million | 3.1% |
| Income Notes | $60.0 million | 7.1%. |

83.     According to the Confidential Offering Circular dated December 3, 2006 (the

"Hudson 1 Offering Circular"), the Hudson 1 CDO securities referenced 140 subprime-related

and other RMBS via CDS having an aggregate notional amount of approximately $2 billion

(although p. 97 of the Hudson 1 Offering Circular stated that the referenced portfolio "will

consist of 100 issues" of RMBS).  According to the "pitch book" dated October 2006 for the

Hudson 1 CDO (the "Hudson 1 Pitch Book"), $1.2 billion of the value of the CDS were "single

name CDS on all 40 obligors in ABX 2006-1 and ABX 2006-2", and $800 million were "[s]ingle

name CDS on 2005 and 2006 vintage RMBS."  The Hudson 1 Offering Circular also stated the

laws of the State of New York govern the securities issued by the Hudson 1 CDO, among other

things.

84.     Goldman began structuring the Hudson 1 CDO in the latter half of September

2006.  In an email dated September 19, 2006, Ostrem informed Goldman's structured products

CDO group that they "ha[d] been asked to do a CDO of $2bln for the ABS desk" and "need[ed]

to execute" the trade "for the desk over the next 4-6 weeks" because it was "[o]bviously

important to [the] overall SP [structured products] floor and [Jonathan] Sobel and Sparks [were] focused on this happening ...."  Specifically, Ostrem's September 19 email stated in full:

> "From:         Ostrem, Peter L.
> Sent:         Tuesday, September 19, 2006 8:16
> PM
> To:           FICC-SPCDOGROUP
> Subject:      Hudson Mezz - new
>
> We have been asked to do a CDO of $2bln for the ABS desk.  Approx. $1.2bln will be CDS off single-names referenced from the ABS index 06-1 and 06-2.  This is a trade we need to execute for the desk over the next 4-6 weeks and involves selling half the equity (at least 30mm to sell) and the seniors and the mezz (at least half the BBBs to get true sale).  I would like everyone to work together on this one.  We expect to charge ongoing 10bp liquidation agent fees and 1-1.5pts upfront.  Equity will be offered around 22% no-loss yield.  Obviously important to overall SP floor and Sobel and Sparks are focused on this happening ...."

By October 16, 2006, Ostrem reportedly told Sparks that another Goldman client was "upset" that their deal was delayed because of the Hudson 1 CDO.  On October 30, 2006, Ostrem stated in an email to Swenson, Herrick, Birnbaum, Montag and others that the Hudson 1 CDO was the "[f]astest execution of a SP [structured products] CDO done at Goldman (4 weeks from inception to pricing)[.]"

        85.    The Hudson 1 Pitch Book stated that "Goldman Sachs developed the Hudson CDO program in 2006 to create a consistent, programmatic approach to invest in attractive relative value opportunities in the RMBS and structured product market."  The Hudson 1 CDO was a "continuation of the program using mezzanine Baa2/Baa3 quality RMBS."

86.     According to the Hudson 1 Offering Circular, the Preliminary Termsheet dated

October 20, 2006 (the "Hudson 1 Termsheet") and the Hudson 1 Pitch Book, the Hudson 1 CDO

had the following additional characteristics:

a.      of the RMBS referenced by the CDS, 54% were expected to be midprime
        RMBS, 41.35% were expected to be subprime RMBS and 4.65% were
        expected to be prime RMBS;

b.      GS&Co selected the RMBS-related assets for the CDO, and served as the
        CDO's structuring, placement and liquidation agent and warehoused the
        portfolio prior to closing;

c.      three credit events triggered certain payments by the credit protection
        seller under the CDS:  (i) failure to pay principal, (ii) writedowns in value
        of the referenced mortgage-related assets, or (iii) distressed ratings
        downgrade; and

d.      the notes issued by the Hudson 1 CDO were given the following initial
        ratings by S&P and Moody's respectively:  approximately 32% were rated
        AAA/Aaa, approximately 27% were rated AA/Aa2, approximately 20%
        were rated A/A2, approximately 10% were rated BBB/Baa2,
        approximately 3% were rated BB+/Ba1, and approximately 7% were not
        given any rating.

87.     According to the Hudson 1 Offering Circular, the initial credit protection buyer of

the CDS backing the Hudson 1 CDO notes was GSI; GSI was also the initial swap counterparty

for the $1.2 billion notional amount of the senior swap; and Goldman agreed to "guarantee the

obligations" of GSI under the CDS.  Also according to the Hudson 1 Offering Circular, the

notes, the CDS and the senior swap agreement, among other things, are governed by the laws of

the State of New York, and both Hudson 1 Ltd. and Hudson 1 Corp. agreed to submit to the

jurisdiction of the federal and state courts in New York concerning certain disputes relating to

the Hudson 1 CDO.

88.     The Hudson 1 Offering Circular also stated, in capital letters (at p. 19), as follows:

36

"THE ISSUERS ACCEPT RESPONSIBILITY
FOR THE INFORMATION CONTAINED IN
THIS OFFERING CIRCULAR ..... TO THE BEST
OF THE KNOWLEDGE AND BELIEF OF THE
ISSUERS, THE INFORMATION CONTAINED
IN THIS OFFERING CIRCULAR ... IS
ACCURATE IN ALL MATERIAL RESPECTS
AND DOES NOT OMIT ANYTHING LIKELY
TO AFFECT THE IMPORT OF SUCH
INFORMATION."

89.     The Hudson 1 Pitch Book stated that "Goldman Sachs has aligned incentives with

the Hudson program by investing in a portion of equity and playing the ongoing role of

Liquidation Agent."  Similarly, the Hudson 1 Termsheet stated that "Goldman will invest in a

portion of the Income Notes at closing."  The Hudson 1 Offering Circular stated that the Income

Notes are to be treated as equity for purposes of U.S. income taxes.

90.     According to an October 30, 2006 email from Ostrem that was sent to Herrick,

Sparks, Swenson, Birnbaum and more than 20 other Goldman officials the subject of which was

"Great Job on Hudson Mezz", defendant "Herrick led a core team that executed this deal" as

follows (the text of which is quoted in full; bolded emphasis is in the original):

"Wednesday of last week we priced **Hudson
Mezzanine SP CDO, a static $2.0 billion
structured product CDO** backed by $1.2 bln of
the ABX index and $800mm of other RMBS
subprime securities.  Goldman was the **sole buyer**
of protection on the entire $2.0 billion of assets.

Darryl Herrick led a core team that executed this
deal:  Roman Shimonov, Deva Mishra, and Ariane
West.  Highlights of the deal include:

- **P&L booked of $8.5mm** and reserves of
  $8+mm related to retained positions we
  expect to sell over next 3 months.  Plus,
  ongoing P&L to GS for acting as liquidation

37

> agent equal to $2.5mm per year for next 4 years

- Hudson Mezz went long $1.2 bln of BBB/BBB- ABX from ABS trading desk at market wides 4 weeks ago
- Fastest execution of a SP CDO done at Goldman (4 weeks from inception to pricing)
- Over half of the equity sold by **Andy Davilman**
- Excellent super senior execution on the top 60% of the transaction at 20bp (unfunded). Super senior note (1.2bln in size) was executed in the first week of the transaction and was a key driver of this deal[']s success (covered by **Nicole Martin**)
- Other large and key orders in stack sold by **Bridget Fraser/Lira Lee, George Maltezos, Darren Reinstein, Dick Loggins, and Abigail Matthias**
- Second issuance from the Hudson program ($1.5bln Hudson High Grade which priced last month was the first). We expect to repeat issuance of the Hudson program across High Grade and Mezz throughout 2007

> Goldman is currently mandated on **$40+bln of additional CDOs and CLOs** for next 12 months. Increasing velocity on debt and equity placement of our upcoming transactions will be the key to our success in 2007. Let's do it again."

91.     According to the Hudson 1 Offering Circular, GS&Co was to receive a fee of $30.1 million from Hudson 1 Ltd. and Hudson 1 Corp. from the gross proceeds of the offerings of Hudson 1 CDO Securities.

### 2.     Hudson 2 CDO

92.     The Hudson 2 CDO is a static synthetic CDO that was structured and began to be marketed by Goldman in or around late 2006. The actual offering of the Hudson 2 CDO

securities commenced on or about February 8, 2007, and was also led by Ostrem and Herrick.

The Hudson 2 CDO issued $407.9 million (par, or principal amount) of notes, consisting of eight

separately rated tranches specifically as follows:

| Security | Par | % of Par |
|----------|-----|----------|
| Class S | $7.9 million | 1.9% |
| Class A-1 | $240.0 million | 58.8% |
| Class A-2 | $46.0 million | 11.3% |
| Class B | $56.0 million | 13.7% |
| Class C | $20.0 million | 4.9% |
| Class D | $18.0 million | 4.4% |
| Class E | $4.0 million | 1% |
| Income Notes | $16.0 million | 3.9%. |

93.     According to the Confidential Offering Circular dated February 6, 2007 (the

"Hudson 2 Offering Circular"), the Hudson 2 CDO notes referenced 80 subprime-related and

other RMBS via CDS having an aggregate notional amount of approximately $400 million.

Specifically, according to the Preliminary Termsheet dated December 15, 2006 (the "Hudson 2

Termsheet"), "[t]he CDS referenced 80 total RMBS through equal parts exposure to the ABX

2006-1 BBB series; ABX 2006-1 BBB- series; ABX 2006-2 BBB series; and ABX 2006-2 BBB-

series." Further, all of the RMBS referenced in the Hudson 2 CDO were also referenced in the

Hudson 1 CDO. The Hudson 2 Offering Circular also stated the laws of the State of New York

govern the securities issued by the Hudson 2 CDO, among other things.

94.     According to the Hudson 2 Offering Circular and the Hudson 2 Termsheet, the

Hudson 2 CDO had the following additional characteristics:

> a.     of the RMBS referenced by the CDS, 62.5% were expected to be
>        midprime RMBS and 37.5% were expected to be subprime RMBS;
>
> b.     three credit events triggered certain contingent payments under the CDS:
>        (i) failure to pay principal, (ii) writedowns in value of the referenced
>        mortgage-related assets, or (iii) distressed ratings downgrade;

39

       c.      the notes issued by the Hudson 2 CDO were given the following initial ratings by S&P and Moody's respectively: approximately 72% were rated AAA/Aaa, approximately 14% were rated AA+/Aa2, approximately 5% were rated A+/A2, approximately 4% were rated BBB+/Baa1, approximately 1% were rated BBB-/Baa3, and approximately 4% were not given any rating; and

       d.      GS&Co would serve as the liquidation agent.

95.     According to the Hudson 2 Offering Circular, the initial credit protection buyer of the CDS backing the Hudson 2 CDO notes was GSI. Goldman was also the swap guarantor of the CDS, whereby Goldman would "guarantee the obligations" of GSI under the CDS. Also according to the Hudson 2 Offering Circular, both the CDS and the notes, among other things, are governed by the laws of the State of New York, and both Hudson 2 Ltd. and Hudson 2 Corp. agreed to submit to the jurisdiction of the federal and state courts in New York concerning certain disputes relating to the Hudson 2 CDO.

96.     The Hudson 2 Offering Circular also stated, in capital letters (at p. 19), as follows:

> "THE ISSUERS ACCEPT RESPONSIBILITY FOR THE INFORMATION CONTAINED IN THIS OFFERING CIRCULAR ..... TO THE BEST OF THE KNOWLEDGE AND BELIEF OF THE ISSUERS, THE INFORMATION CONTAINED IN THIS OFFERING CIRCULAR ... IS ACCURATE IN ALL MATERIAL RESPECTS AND DOES NOT OMIT ANYTHING LIKELY TO AFFECT THE IMPORT OF SUCH INFORMATION."

97.     According to the Hudson 2 Termsheet, "Goldman will invest in a portion of the Income Notes at closing." As with the Income Notes issued in the Hudson 1 CDO, the Hudson 2 Offering Circular stated that the Income Notes for that CDO should also be treated as equity for purposes of U.S. income taxes.

98.     According to the Hudson 2 Offering Circular, GS&Co was to receive a fee of $4.5 million from Hudson 2 Ltd. and Hudson 2 Corp. from the gross proceeds of the offerings of Hudson 2 CDO Securities.

> **E.     Defendants Structured and Sold
> the Hudson CDO Securities Without
> Disclosing Material Facts of Which
> <u>They Were Then Aware</u>**

99.     As described above, Goldman had not only been reducing its then-existing overall long financial exposures to certain subprime mortgage-related assets, including specifically certain subprime-related RMBS, around the time that it issued the Hudson CDO Securities, but actually increasing its bet that certain subprime-related RMBS and other mezzanine subprime assets would decline in value.  Although these material facts were not disclosed to Plaintiff and other investors, the Hudson CDO Securities were issued by Goldman to further these goals, and to reduce its financial exposure, particularly to subprime-related mezzanine RMBS assets, and also to profit from both the decline in value of mortgage securities generally, including the Hudson CDO Securities specifically.

100.    The defendants knew or disregarded that the Hudson CDO Securities would decline in value given the specific RMBS they selected as collateral for these Securities, their awareness of non-public facts concerning the creditworthiness of many of the underlying mortgages and the quality of at least several of those underlying RMBS, and GS&Co's role as underwriter, liquidation agent and seller of the Hudson CDOs, among other things.  The defendants also did not reasonably believe that, at the time they sold to investors the Hudson CDO Securities, these Securities would have any realistic chance of being profitable for Plaintiff and other similarly situated investors.

101.     In particular, the Hudson CDO Securities were backed (via CDS) in significant part by highly risky subprime-related RMBS, many of which were sponsored specifically by notorious subprime mortgage lenders such as Long Beach, New Century, Fremont, Countrywide, Lehman Brothers, Bear Stearns and others from whom Goldman acquired mortgage pools -- following its own professed due diligence investigation.  Many of those RMBS were rated by S&P and Moody's, respectively, BBB/Baa2, which typically were the lowest investment grade ratings.

102.     Further, GS&Co or its affiliates either sponsored or helped underwrite several of the RMBS referenced in the Hudson CDOs.  These include, for example, the following specific RMBS serving as collateral for both the Hudson 1 CDO and the Hudson 2 CDO:  GSAMP 2005-HE4 B2; GSAMP 2005-HE4 B3; FFML 2006-FF4 M8; GSAMP 2006-HE3 M8; FFML 2006-FF4 B1; and GSAMP 2006-HE3 M9.  These also include the following additional RMBS that served as collateral for the Hudson 1 CDO:  GSAMP 2006-HE1 M8; FHLT 2005-B M10; GEWMC 2005-1 B3; GSAMP 2006-NC2 M9; WFHET 2006-1 M9; GSAA 2005-6 B2; GSAA 2005-8 B2; GSAA 2005-3 B3; GSAA 06-3 B3; GSAA 06-8 B1; GSAA 06-12 B2; GSAA 06-14 B1; GSAA 06-16 B2; and ACCR 2006-2 M9.

103.     Several of these RMBS were downgraded by the credit rating agencies and lost value soon after they were issued.  For example, securities in the GSAMP 2006-NC2 M9 were downgraded by S&P from BBB- to BB on July 12, 2007; BB to B on October 19, 2007; and B to CC by January 30, 2008.  Securities included in GSAA 2005-6 B2, which were initially rated BBB and Baa3 by S&P and Moody's, respectively, were downgraded to B- by December 2007.  Securities in GSAA 06-3 B3, which were initially rated BBB- and Baa3 by S&P and Moody's, respectively, were downgraded to BB+ on December 19, 2007 and placed on negative credit

watch on February 29, 2008. Securities in GSAA 06-8 B1, which were initially rated BBB+ and Baa2 by S&P and Moody's, respectively, were downgraded to BB+ on December 19, 2007 and placed on negative credit watch on February 29, 2008. Securities in GSAA 06-12 B2, which were initially rated A- and Baa3 by S&P and Moody's, respectively, were downgraded to BBB on December 19, 2007. Securities in GSAA 06-14 B1, which were initially rated BBB and Baa2 by S&P and Moody's, respectively, were placed on negative credit watch on February 29, 2008 and, ultimately, downgraded from CC to D and defaulted. Securities in GSAA 06-16 B2, which were initially rated BBB+ and Baa3 by S&P and Moody's, respectively, were downgraded to BBB on December 19, 2007, placed on negative credit watch on February 29, 2008 and, ultimately, downgraded from CC to D and defaulted. And securities in ACCR 2006-2 M9, which were initially rated BBB- and Baa3 by S&P and Moody's, respectively, were downgraded to CCC on January 30, 2008. Further, several of the RMBS referenced in the Hudson CDOs are themselves subject to pending litigation by investors alleging that Goldman and others misstated material facts concerning the quality of those respective RMBS offerings.[3]

104.    As a result of the very due diligence Goldman represented it undertook when it issued or underwrote RMBS and CDOs, the defendants were either aware of, or disregarded, material non-public adverse facts -- unavailable to Plaintiff and other similarly situated investors -- concerning the creditworthiness, loan level quality, regulatory compliance and property valuation, among other things, of the mortgage loans in each of the respective pools backing the RMBS it sponsored and/or underwrote, by the time that the defendants offered and sold the

---

[3]    *See Pub. Employees' Ret. Sys. of Miss. v. Goldman Sachs Group, Inc.*, No. 1:09-cv-01110-HB (S.D.N.Y. filed Feb. 6, 2009); *Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp., I*, 2:08-cv-01713-ERK-WDW (E.D.N.Y.) (removed from N.Y. Supreme Court on Apr. 25, 2008); *Cambridge Place Inv. Mgmt. Inc. v. Morgan Stanley & Co. Inc.*, No. 1:10-cv-11376-NMG (D. Mass.) (removed from Mass. Superior Court on Aug. 13, 2010).

Hudson CDO Securities.  The defendants also then had access to non-public information concerning the liquidity, trading volume and trading prices for these and other RMBS by virtue of GS&Co's capacity as a broker/dealer, and as liquidation agent for the Hudson CDOs more specifically.

105.    The defendants also knew or disregarded material non-public adverse facts that, as of the time that GS&Co issued and sold the Hudson CDO Securities, at least certain of the RMBS referenced in the Hudson CDOs were deteriorating in credit quality.  For example, an April 5, 2007 email Goldman salesperson Cactus Raazi sent to Brad Rosenberg specifically listed a group of RMBS that were "all dirty '06 originations that we are going to trade as a block."  These included at least six RMBS referenced in the Hudson 1 CDO -- specifically, ACCR 2006-2, FFML 2006-FF4, HEAT 2006-4, MABS 2006-NC1, SABR 2006-OP1 and SVHE 2006-OPT5 (two of which, ACCR 2006-2 and FFML 2006-FF4, were underwritten by GS&Co); and five of which were also referenced in the Hudson 2 CDO -- specifically, each of the foregoing six RMBS except ACCR 2006-2 (one of which, FFML 2006-FF4, was underwritten by GS&Co).

106.    Even the major credit agencies had begun to question the quality of certain subprime-related CDOs -- including, specifically, Goldman-sponsored CDOs -- around the time the defendants structured and sold to investors the Hudson CDO Securities.  For example, on December 15, 2006, R. Christopher Meyer, Associate Director of S&P's Global CDO Group, sent an internal email to Belinda Ghetti, a then S&P analyst (and now reportedly S&P Senior Director), and Nicole Billick, Associate Director of S&P's Structured Finance Ratings division, concerning a synthetic CDO within Goldman's Abacus series.  S&P also rated certain of the

securities Goldman issued as part of its Abacus series.  According to that email (quoted in full,

bold and italics emphasis added):

> "------Original Message-------
> From:  Meyer, Chris
> Sent:  Friday, December 15, 2006 8:31 PM
> To:  Ghetti, Belinda; Billick, Nicole
> Subject:  RE:  Synthetic CDO^2 of ABS (both Cash
> and Synthetic)
>
> So, in thinking about Nicole's CDO or CDO
> problem (hee, hee), it seems reasonable (to me
> anyways) to tier recoveries on single tranche CLNs
> (or single tranche swaps).  Doesn't it make sense
> that a BBB synthetic would likely have a zero
> recovery in a AAA scenario -- depending on tranche
> thickness?
>
> When the required subordination for the BBB
> tranche was determined, we modeled the recoveries
> of the assets given a BBB scenario (indicating the
> severity of loss in a BBB economic environment
> given the position of the asset in the capital
> structure).  If we ran the recovery model with the
> AAA recoveries, it stands to reason that the tranche
> would fail ... since there would be lower recoveries
> and presumably a higher degree of defaults.
> Essentially, I'm wondering whether my initial
> feeling that a drill down approach on synthetics
> would not work is false.  BUT are there any knock-
> on effects if the synthetic itself had synthetics in its
> portfolio?  ***Rating agencies continue to create and
> [sic] even bigger monster -- the CDO market.
> Let's hope we are all wealthy and retired by the
> time this house of cards falters.  :o)***"

107.   Internal Goldman documents reflect that Goldman knew or disregarded that the

Hudson 1 CDO securities were not even worth par.  In particular, according to a November 10,

2006 memorandum from defendant Ostrem and others to Goldman's Mortgage Capital

Committee, Goldman valued the Hudson 1 CDO's equity position at only 90% of par even

before the Hudson 1 CDO was offered and sold to Plaintiff and other investors the following

month.

108.    The documents, testimony and findings released by the Senate Subcommittee

further evidence that the defendants created and sold the Hudson CDO Securities to favor

Goldman as part of the firm's undisclosed strategy to reduce its long exposures to subprime-

related assets at the expense of Plaintiff and other investors, and without properly disclosing

other material facts regarding those offerings, including regarding the creditworthiness of at least

certain of the RMBS serving as collateral for the Hudson CDO Securities and that the defendants

did not genuinely believe that those Securities had a realistic chance of being profitable for

Plaintiff and other investors who took long positions.  For example, the Senate Subcommittee

reported that Goldman executives admitted that the firm "was trying to remove BBB assets from

the company books during" the time it issued the Hudson 1 CDO.  According to the findings of

the Senate Subcommittee concerning the Hudson CDOs specifically:

> "Beginning in early 2007, Goldman Sachs initiated
> an intensive effort to not only reduce its mortgage
> risk exposure, but profit from high risk RMBS and
> CDO securities incurring losses.  A presentation to
> the Goldman Sachs Board of Directors identified a
> number of actions taken during the year, including:
> 'Shorted synthetics' and 'Shorted CDOs and
> RMBS.'
>
> ***
>
> At times, the net short position accumulated by
> Goldman Sachs was as large as $13.9 billion.  The
> short positions held by the firm's mortgage
> department became so large that according to the
> Goldman Sachs risk measurements, the positions
> comprised 53 percent of the firm's overall risk,
> according to Goldman Sachs own Value-at-Risk
> (VaR) measures.  Senior management had to

> repeatedly allow the mortgage department to exceed the VaR limits that had been established by the firm.
>
> ***
>
> **Conflict Between Proprietary and Client Trading.** After Goldman Sachs decided to reduce its mortgage holdings, the sales force was instructed to try to sell some of its mortgage related assets, and the risks associated with them, to Goldman Sachs clients. In response, Goldman Sachs personnel issued and sold to clients RMBS and CDO securities containing or referencing high risk assets that Goldman Sachs wanted to get off its books. Three examples demonstrate how Goldman Sachs continued to sell mortgage related products to its clients, while profiting from the decline of the mortgage market."

Quoting Levin Memorandum, p. 8. Also according to the hearings before the Senate Subcommittee:

> The $2-billion Hudson synthetic CDO: Goldman Sachs was the sole protection buyer on this CDO with a $2-billion short. In other words, they were betting against it. A Goldman salesperson described it as junk -- not to the buyer, of course, but inside. The CDO imploded within two years. Your clients lost; Goldman profited."

Statement of Senator Carl Levin, Chairman of the Senate Subcommittee, "*Wall Street and the Financial Crisis: The Role of Investment Banks*," April 27, 2010.

109.    Three former Goldman employees also reportedly admitted in a December 23, 2009 article in *The New York Times* that the firm took a large net short position on the Hudson 1 CDO to profit from that CDO's decline. According to that report (bold and italics emphasis added):

47

"Goldman created other mortgage-linked C.D.O.'s that performed poorly, too.  One, in October 2006, was a $800 million C.D.O. known as Hudson Mezzanine.  It included credit insurance on mortgage and subprime mortgage bonds that were in the ABX index; Hudson buyers would make money if the housing market stayed healthy -- but lose money if it collapsed.  Goldman kept a significant amount of the financial bets against securities in Hudson, so it would profit if they failed, according to three of the former Goldman employees.

A Goldman salesman involved in Hudson said the deal was one of the earliest in which outside investors raised questions about Goldman's incentives:  "***Here we are selling this, but we think the market is going the other way***," he said.

110.     Internal Goldman emails and other documents from Goldman personnel tasked with selling to investors the firm's mortgage securities also indicate that the firm knew or disregarded, and failed to disclose, that the Hudson CDO Securities were issued as part of Goldman's then-existing strategy to reduce its financial exposures to subprime mortgage-related assets and that Goldman had planned, from the outset, to profit from its short position on those Securities.  For example, an internal email sent to Herrick by Tetsuya Ishikawa on October 11, 2006 regarding the Hudson 1 CDO reflects that Goldman saleswoman Sarah Lawlor stated internally that another Goldman client, Allied Irish Bank, was "too smart to buy this kind of junk."  Herrick responded in an email to Ishikawa the next day by stating, in full, "[v]ery interesting[.]"

111.     On October 19, 2006, Mitchell Resnick sent an email to Herrick and Egol that was copied to David J. Rosenblum ("Rosenblum") (and also subsequently forwarded to Ostrem, Swenson and Birnbaum) the subject of which was "BBB RMBS".  That email also raised issues

48

regarding what Goldman's sales force should tell clients about the lower rated mezzanine

RMBS, and specifically referred to the Hudson 1 CDO and another deal:

> "do we have anything talking about how great the
> BBB sector of RMBS is at this point in time... a
> common response I am hearing on both Hudson &
> HGSl is a concern about the housing market and
> BBB in particular?
>
> We need to arm sales with a bit more - do we have
> anything?"

Rosenblum responded that same day:  "So amazing you should ask -- we had this convo

for an hour last night -- brazil and marschoun and primer -- THIS IS WHAT WE'RE

TALKING ABOUT!  Can you come to the rescue here?"

   112.   Similarly, an internal October 24, 2006 email from Goldman employee Geoffrey

Williams to a group of Goldman structured finance employees (specifically, the "ficc-mtgcorr-

desk"), the subject of which was "Structured Product New Issue Pipeline (Internal Only / Verbal

Only)", also specifically cited Hudson (as well as Abacus and eight other CDOs), and stated as

follows (bold emphasis added):

> "Thinking we need to better leverage syndicate to
> move open risk from our bespoke trades given that
> most of them did not go through the initial
> syndication process; **guessing sales people view
> the syndicate 'axe' mail we have used in the past
> as a way to distribute junk that nobody was
> dumb enough to take first time around**.  We
> should have a distinct email that distinguishes our
> open risk that we have not broadly shown out
> versus cash transactions that did not clear.
> Thoughts?"

In response, Goldman mortgage trader Egol replied minutes later that same day stating only

"LDL" -- meaning, presumably, "let's discuss live."

113.    The Hudson CDOs were successful in reducing Goldman's long exposures to subprime mortgage-related assets.  For example, as noted above, on October 26, 2006, Jha reported to multiple Goldman executives in an email that "[r]isk reduction is primarily due to pricing of $2bn Hudson Mez synthetic CDO deal (SPG Secondary desk bought $325k/bp BBB and $350k/bp BBB- RMBS Subprime protection)[.]"  Additionally, as noted above, on December 5, 2006, the day the Hudson 1 CDO was issued, Sparks stated in an email to Montag, McMahon and Ruzika that "structured exits are the way to reduce risk.  Our prior structured trade closes today.  We are focusing on ways to do it again much faster."  The Hudson 2 CDO was issued on February 8, 2007, just two months later.  Similarly, Birnbaum's December 15, 2006 email to Radtke and others stated that "we've had good traction moving risk through our franchise on a variety of fronts: ABX, single names, super-senior, Hudson 2."  In addition, Bash-Polley's December 20, 2006 email to Ostrem, Swenson and others quoted above also referred explicitly to the Hudson CDOs as part of Goldman's then-existing -- but undisclosed to Plaintiff and other investors -- strategy "to help move some of the risk."

114.    The Hudson CDO Securities performed as defendants -- at least internally within the firm, but unbeknownst to Plaintiff and other investors -- had expected.  In particular, by July 2007, S&P reportedly placed 12.8% of the subprime RMBS referenced by the Hudson 1 CDO on a credit watch for a potential ratings downgrade.  By at least September 2007, the Hudson 1 CDO notes reportedly suffered their first ratings downgrade.  For example, at least $280 million of subordinated floating-rate notes of the Hudson 1 CDO were downgraded by Moody's in a report on September 6, 2007.  According to a report by Moody's on September 12, 2007, "the rating actions are the result of deterioration in the credit quality of the transaction's underlying collateral pool, which consists primarily of structured finance securities."  By the end of 2007,

additional downgrades on Hudson 1 CDO securities had been issued.  By at least mid-2008, the Hudson 1 CDO AAA-rated notes had been downgraded to junk status.

115.    According to an S&P report on January 4, 2011 entitled "Cash Flow and Hybrid CDO Event of Default Notices Received as of Jan. 4, 2011," the Hudson 1 CDO was subject to an initial "EOD [events of default] notice received" as of July 22, 2008 due to "[i]nterest payment missed on non-payment-in-kind tranche" and was ultimately "liquidated[.]"

116.    By April and May of 2009, according to *Bloomberg*, at least certain of the Hudson 1 CDO securities were reportedly liquidated at large losses.

117.    Similarly, in its September 6, 2007 report, Moody's also placed on negative watch at least $144 million of floating-rate notes for the Hudson 2 CDO (including a $46 million tranche initially rated AAA).  On August 20, 2008, $286 million of the Hudson 2 CDO notes were downgraded by S&P.  Hudson 2 CDO Class A-1 notes -- comprising $240 million of the total issuance -- were then downgraded to CCC from BB- and were put on review for further negative action.  The A-2 notes were also downgraded to CC from B-.

118.    Further, according to the January 4, 2011 S&P report, the Hudson 2 CDO was subject to an initial "EOD [events of default] notice received" as of March 12, 2009 also due to "[i]nterest payment missed on non-payment-in-kind tranche."

119.    The Levin Memorandum issued as part of the Senate Subcommittee investigation concluded as follows concerning the Hudson 1 CDO:

> "Less than 18 months [after it was issued], the AAA securities had been downgraded to junk status. Goldman Sachs as the sole short investor would have been compensated for these losses, and investors who purchased the Hudson securities would have lost an equivalent amount.  Goldman

> Sachs profited from the loss in value of the very
> CDO securities it had sold to its clients."

120. Goldman also admitted in internal emails that it profited from losses certain firm clients had on subprime-related CDOs and other transactions, and that certain of Goldman's clients had complained about certain trades. For example, an email from Yusuf Aliredha to Sparks on October 12, 2007 stated as follows:

> "Real bad feeling across European sales about some of the trades we did with clients. The damage this has done to our franchise is very significant. Aggregate loss for our clients on just these 5 trades alone is 1bln+. In addition team feels that recognition (sales credits and otherwise) they received for getting this business done was not consistent at all with money it ended making/saving the firm."

121. An email to Blankfein on September 26, 2007 from Peter Kraus claimed that Goldman's clients would be even more attached to the firm via its reputation for financial success due to the massive profits it generated in 2007 from shorting subprime mortgage-related assets, as follows:

> "I met with 10+ individual prospects and clients (and 5 institutional clients) since earnings were announced. The institutions don't and I wouldn't expect them to, make any comments like ur [sic] good at making money for urself [sic] but not us. The individuals do sometimes, but while it requires the utmost humility from us in response I feel very strongly it binds clients even closer to the firm, because the alternative of take ur [sic] money to a firm who is an under performer and not the best, just isn't reasonable. Client's [sic] ultimately believe association with the best is good for them in the long run."

122.     As summarized by Senator Levin during testimony before Congress on May 24,

2010 (156 Cong. Rec. S 4110) regarding proposed reforms of Wall Street:

> "Goldman constructed this $2 billion CDO to
> reflect the value of subprime mortgage securities
> similar to those that Goldman held in its own
> inventory.  Goldman's sales force was told that
> Hudson Mezzanine was a top priority, and it
> worked aggressively to sell Hudson securities to
> clients around the world.  Internal e-mails released
> by our Permanent Subcommittee on Investigations
> showed that one Goldman client was unhappy that
> the firm was spending so much time on Hudson and
> not on a deal the client wanted to make.  In the
> documents Goldman used to sell Hudson
> Mezzanine to clients, the firm even suggested to
> investors that Goldman stood to benefit if the
> investment performed well, telling those customers:
> 'Goldman Sachs has aligned incentives with the
> Hudson project by investing in a portion of the
> equity.'
>
> In fact, that was not true. Goldman Sachs' interests
> were not aligned with its customers.  They were in
> conflict.  Goldman was the sole counterparty in the
> Hudson CDO and made a $2 billion bet; that is, a $2
> billion bet, that the assets referenced in the CDO
> would fall in value.  Goldman won that bet big time.
> The CDO, filled with toxic subprime assets that
> Goldman had selected, assembled, and sold, began
> losing value.  When Goldman first sold the
> securities to its clients, more than 70 percent of
> Hudson Mezzanine had AAA ratings, but within 9
> months those AAA ratings were downgraded, and
> within 18 months Hudson was downgraded to junk
> status, and Goldman cashed in at the expense of its
> clients."

123.     As another commentator put it:

> "'The simultaneous selling of securities to
> customers and shorting them because they believed
> they were going to default is the most cynical use of
> credit information that I have ever seen,' said

53

Sylvain R. Raynes, an expert in structured finance
at R&R Consulting in New York. 'When you buy
protection against an event that you have a hand in
causing, you are buying fire insurance on someone
else's house and then committing arson.'"

124.    Goldman also continued to decrease its long positions on subprime mortgage-

related assets in the weeks after issuing the Hudson CDO Securities as part of the firm's

undisclosed strategy to "get flat" such assets.  For example, a March 2, 2007 email from Patrick

Welch to Broderick and others stated that "my understanding is that desk is no longer buying

subprime. (We are low balling on bids.)"  Notes of an internal meeting of Goldman's risk

committee on March 7, 2007 state that the firm's mortgage division was then "closing down

every subprime exposure possible."

125.    Goldman also created around this time at least two other CDOs to similarly short,

specifically Anderson Mezzanine Funding 2007-1 (the "Anderson CDO") and Timberwolf

2007-1 (the "Timberwolf CDO").  The offering of the Anderson CDO securities began on or

about March 20, 2007.  The Anderson CDO was reportedly backed by $300 million worth of

mezzanine subprime RMBS; most of the underlying mortgages were originated by notorious

subprime lender New Century; Goldman took a $140 million short position on the Anderson

CDO; and certain of Goldman's senior managers directed their sales force to sell to investors the

Anderson securities as quickly as possible.

126.    Seven months after it was issued, the Anderson CDO securities were reportedly

downgraded to junk status.  Significantly, moreover, according to a March 13, 2007 internal

email from Eric Siegel of Goldman's SPG Trading unit that was sent to Ostrem and others, at

least 15 out of the 61 RMBS referenced in the Anderson CDO were also referenced in the

Hudson 1 CDO (and nine in the Hudson 2 CDO).  Similarly, according to the Offering Circular

for the Abacus CDO dated April 26, 2007, eight of the RMBS referenced in the Abacus CDO were also referenced in the Hudson 1 CDO (and five in the Hudson 2 CDO).

127.    The offering of the Timberwolf CDO securities began on or about March 27, 2007.  It was a hybrid cash/synthetic CDO primarily backed by securities of other CDOs, many of which Goldman also had reportedly taken short positions against.  The Timberwolf CDO securities reportedly lost approximately 80% of their value by the end of August 2007, and the CDO was liquidated in 2008.  In an email on June 22, 2007 to Sparks, Montag referred to the deal internally as "one shitty deal."  Another email regarding Timberwolf sent by Donald Mullen ("Mullen") on May 11, 2007 to Sparks that was copied to Montag and Harvey Schwartz stated that one Goldman salesman was "concerned about the representations we may be making to clients as well as how we will price assets once we sell them to clients."

128.    Other internal Goldman emails also demonstrate that the firm had been obtaining huge profits by shorting other mortgage assets around the time of the Hudson CDOs.  For example, a May 17, 2007 email refers to the "wipeout" of one Long Beach mortgage security (LBMLT 2006-A) and the "imminent" collapse of another.  Because of $10 million in protection Goldman held on certain of the tranches, however, Goldman would profit by $5 million on the collapse of the lower tranches.  According to the May 17, 2007 email from Deeb Salem to Swenson:  "bad news ... wipes out the m6s and makes a wipeout on the m5 imminent ... good news ... we own 10mm protection on the m6 marked at $50 ... we make $5mm[.]"

129.    Also commenting on Goldman's shorting of subprime mortgage assets, a July 29, 2007 email from Sparks to Montag that was copied to Swenson and others stated as follows:

> "Department-wide P&L for the week was $375mm
> (this is after adjusting for the $100mm discussed
> today)

> Correlation P&L on the week was $234mm, with
> CMBS, CDOs, and RMBS/ABX shorts all
> contributing
> Rest of department is net short RMBS and CDOs,
> net long cmbs."

130.    On October 11, 2007, Moody's downgraded some $32 billion of mortgage securities.  However, because of Goldman's participation shorting the Hudson CDO Securities and other CDOs and its placement of CDS protection on these CDOs, the firm had also been profiting from these downgrades.  For example, as Mullen stated in an email to Swenson that same day: "Sounds like we will make some serious money" on the Moody's downgrades.  Swenson responded less than one hour later:  "Yes we are well positioned[.]"

131.    Goldman's short position on subprime mortgage-related assets were extremely profitable for the firm.  On October 30, 2007, Blankfein sent an email to Cohn and Viniar asking "[h]ow did the review of the mortgage and cdo books go?"  Viniar replied that same day by stating "[e]xtremely well.  You will be very pleased."  On November 18, 2007, Blankfein wrote in an email to Lucas van Praag that was copied to several senior Goldman officials:  "Of course we didn't dodge the mortgage mess.  We lost money, then made more than we lost because of shorts.  Also, it's not over, so who knows how it will turn out ultimately."  Indeed, while other financial institutions such as New Century and the two subprime-related Bear Stearns hedge funds had been failing in 2007, Goldman reportedly earned $3.69 billion in profit in 2007 via its SPG Trading unit -- fueled in significant part by the firm's shorting of many of the very mortgage securities it had *both* created and been selling to its customers and others, including the Hudson CDO Securities.  According to *The New York Times* on April 18, 2010:

> "Goldman turned over all these negative positions
> to Mr. Swenson and Mr. Birnbaum, the traders who
> had previously been positive on the market.  Along

56

> with Mr. Sparks, they have been credited for
> managing the short position that yielded a $4 billion
> profit for Goldman in 2007. Mr. Sparks retired in
> 2008. Mr. Birnbaum also left in 2008, to start his
> own hedge fund."

132.    Asked by securities analysts during an earnings conference call in June 2007 about Goldman's mortgage business, Viniar responded that it "is just not that big." However, in an internal email on July 25, 2007 to Cohn regarding big write-offs in subprime mortgage-related assets, Viniar responded: "Tells you what might be happening to people who don't have the big short." Even by September 2007 when Goldman began admitting it had been shorting increasing amounts of subprime mortgage-related assets, Viniar stated that while Goldman's "short position was profitable ... I can't tell you the actual profits of the shorts."

133.    According to Goldman's Form 8-K filed with the SEC on December 18, 2007 announcing the firm's financial results for the fourth quarter of 2007 and the fiscal year ended November 30, 2007, Goldman "achieved record net revenues, net earnings and diluted earnings per common share in 2007." Specifically, Goldman reportedly earned $11.6 billion for that fiscal year, up from $9.54 billion for the fiscal year ended November 24, 2006.

### F.    The Fallout

134.    On May 7, 2009, GS&Co (on behalf of itself and affiliates Goldman Sachs Mortgage Company and GS Mortgage Securities Corp.) entered into a settlement agreement with the Massachusetts Attorney General. According to a statement issued by Massachusetts Attorney General Martha Coakley, the settlement stemmed from the office's investigation of subprime mortgage lending and securitization practices. Under that settlement, the three Goldman entities agreed to provide loan restructuring to subprime borrowers in Massachusetts valued at approximately $50 million, and to pay to Massachusetts $10 million. For mortgage

loans not currently held by Goldman but which are serviced by Goldman's affiliated mortgage servicing company, Litton Loan Servicing LP, Goldman agreed, also as part of this settlement, to assist certain borrowers in finding refinancing options and other alternatives to foreclosure.

135.    On December 24, 2009, *The New York Times* published an article entitled "Banks Bundled Debt, Bet Against It and Won," which reported that the SEC, the Financial Industry Regulatory Authority ("FINRA"), and others were investigating certain subprime mortgage-related synthetic CDOs issued by Goldman and others.  Specifically, the article stated that "authorities appear to be looking at whether securities laws or rules of fair dealing were violated by firms that created and sold these mortgage-linked debt instruments and then bet against the clients who purchased them, people briefed on the matter say."

136.    On April 16, 2010, the SEC filed a securities fraud action against GS&Co and Tourre, *SEC v. Goldman Sachs & Co.,* No. 10-cv-3229-BSJ (S.D.N.Y.).  The action alleged that defendants committed *fraud* in violation of section 10(b) of the Exchange Act and violated section 17(a) of the Securities Act of 1933 by structuring and marketing the Abacus 2007-AC1 CDO without disclosing that another Goldman client, Paulson, betting on the CDO's decline, helped select some of the RMBS assets backing the CDO.

137.    On April 19, 2010, it was reported that the FSA, the regulator of the financial services industry in the United Kingdom, had opened a formal investigation of GSI related to the SEC's fraud action regarding the Abacus CDO.

138.    The Senate Subcommittee also investigated Goldman's subprime mortgage-related activities and released publicly hundreds of pages of internal emails and other documents Goldman had produced in connection therewith.  According to the Senate Subcommittee's press releases issued, respectively, on April 24, 2010 and April 26, 2010:

"Investment banks such as Goldman Sachs were not simply market-makers, they were self-interested promoters of risky and complicated financial schemes that helped trigger the crisis … They bundled toxic mortgages into complex financial instruments, got the credit rating agencies to label them as AAA securities, and sold them to investors, magnifying and spreading risk throughout the financial system, and all too often betting against the instruments they sold and profiting at the expense of their clients … The 2009 Goldman Sachs annual report stated that the firm 'did not generate enormous net revenues by betting against residential related products' … These e-mails show that, in fact, Goldman made a lot of money by betting against the mortgage market."

*\*\**

"The Subcommittee's nearly 18-month investigation found evidence that Goldman Sachs, contrary to the repeated public statements of the firm's executives, made and held significant bets against the mortgage market – 'short positions' in Wall Street terms – and that at times those bets were not just against the mortgage market in general, but against securities that Goldman Sachs had assembled and marketed to its customers."

139.    The Senate Subcommittee's investigation reportedly began in November 2008. After completing a "wide-ranging inquiry" consisting of "more than one hundred interviews and depositions, collecting and reviewing millions of pages of documents, and consulting with dozens of government, academic, and private sector experts on banking, securities, financial, and legal issues", the Senate Subcommittee held a hearing on April 27, 2010 -- the last day of the alleged class period -- entitled *Wall Street and the Financial Crisis: The Role of Investment Banks*.  The hearing featured over 10 hours of testimony by seven Goldman officials, including Chairman and CEO Blankfein, CFO Viniar, Swenson, Birnbaum, Sparks, Tourre and Broderick.

140.     Based on its review of the evidence, the Senate Subcommittee concluded that

Goldman profited from shorting subprime mortgage-related assets, in some cases to the

detriment of its clients.  The Senate Subcommittee cited specifically the Hudson, Abacus,

Timberwolf and Anderson CDOs, as described in more detail above.  In a reply to Viniar during

the hearing, Senator Levin stated:  "You call it reducing risk.  I call it making billions."

141.     After the markets closed on April 29, 2010, it was reported that the U.S.

Department of Justice had commenced a criminal investigation of Goldman relating to the firm's

mortgage-related activities.  According to *The Washington Post* on May 1, 2010, the Department

of Justice's criminal investigation began *before* the SEC filed its civil enforcement action related

to the Abacus CDO.  Additionally, on May 13, 2010, *Bloomberg* reported that the NYAG

subpoenaed Goldman and certain other large Wall Street banks "to see whether they misled

credit-rating services about mortgage-backed securities, according to a person familiar with the

investigation."  On May 27, 2010, it was reported that prosecutors in the Southern District of

New York were investigating the Timberwolf CDO.

142.     On June 4, 2010, the FCIC reportedly subpoenaed Goldman regarding certain of

its mortgage-related CDOs and related transactions.  The FCIC also obtained testimony on

June 30, 2010 and July 1, 2010 from Goldman officials, including Cohn, Broderick, Lehman and

Viniar, and publicly released additional internal Goldman documents relating to the firm's

mortgage-related activities.

143.     On June 9, 2010, *The Wall Street Journal* and other news sources reported that the

SEC had been investigating the Hudson 1 CDO and other mortgage securities sponsored by

Goldman and certain other Wall Street banks.  Goldman has also been sued by private investors

alleging fraud concerning CDOs.  For example, one securities fraud action filed against

Goldman, GS&Co and others, *Basis Yield Alpha Fund (Master) v. Goldman Sachs Group, Inc., et al.*, No. 10 CV 4537 (S.D.N.Y. filed June 9, 2010), concerns the Timberwolf CDO and alleges that the firm sought to "dump[] its inventory of toxic securities on customers while simultaneously providing a vehicle for Goldman to profit from the decline in value of such securities."

144.    On July 15, 2010, GS&Co and the SEC announced that they had reached a settlement regarding the SEC's Abacus action.  As part of the settlement, GS&Co agreed to disgorge $15 million and pay a $535 million civil penalty -- reportedly one of the largest ever by a Wall Street firm -- consisting of $150 million and $100 million, respectively, to Abacus CDO investors, and $300 million to the U.S. Treasury.  In connection with the settlement, Goldman admitted that "it was a mistake for the Goldman [Abacus CDO] marketing materials to state that the reference portfolio was 'selected by' ACA Management LLC without disclosing the role of Paulson & Co. Inc. in the portfolio selection process and that Paulson's economic interests were adverse to CDO investors."  As part of the settlement, Goldman also agreed to reform and institute certain internal processes involving future offerings of mortgage securities for a term of three years.  The court approved the parties' settlement and entered a final judgment against GS&Co on July 20, 2010.

145.    Tourre is not a party to the settlement, and the SEC's case against him continues. On July 19, 2010, Tourre filed an answer to the SEC's complaint.  He alleged, among other things, that he "reasonably relied on Goldman Sachs' institutional process to ensure adequate legal review and disclosure of material information, and cannot be held liable for any alleged failings of that process."

146.    Goldman's Form 10-Q report for the second quarter of 2010 stated that "[i]nvestigations of GS&Co by FINRA and of GSI by the U.K. Financial Services Authority (FSA) concerning the ABACUS 2007-AC1 transaction and related matters (including the time of notice to FINRA and the FSA relating to the SEC investigation) continue."

147.    On September 9, 2010, the FSA imposed a fine of 17.5 million pounds (or some $27 million). The FSA claimed that GSI failed to timely disclose that Tourre was the subject of an SEC investigation relating to the Abacus CDO.

148.    On September 29, 2010, Goldman took out full-page advertisements in *The New York Times, The Wall Street Journal* and other publications. According to Goldman spokesman David Wells, "[w]e need to provide a broader audience a better understanding of who we are and what we need to do," and "[t]his is meant to help do that."

149.    On November 9, 2010, the Financial Industry Regulatory Authority ("FINRA") fined GS&Co $650,000 concerning its disclosures relating to Abacus. FINRA alleged that GS&Co failed to timely disclose that both Tourre and Goldman mortgage trader Jonathan Egol had received "Wells" notices from the SEC (indicating that the SEC may bring enforcement proceedings).

### G.    Defendants' Misconduct Caused Damage to Plaintiff and the Classes

150.    The defendants' unlawful conduct alleged in this Complaint directly and proximately caused damage to Plaintiff and the members of the Classes in connection with their purchases of the Hudson CDO Securities. At the time Plaintiff and the members of the Classes purchased their Hudson CDO Securities, the prices of the Hudson CDO Securities were artificially inflated as a result of defendants' misconduct, as alleged more fully below. The

defendants' misconduct consisted of structuring, offering and selling the Hudson CDO Securities to benefit Goldman at the expense of Plaintiff and other members of the Classes and omitting to disclose the truth concerning Goldman's then-existing strategy to reduce its financial exposures to subprime assets of which the Hudson CDO Securities were a part, all as alleged more fully above.  The defendants' misconduct also consisted of omitting to properly disclose the truth concerning the financial prospects of the Hudson CDO Securities and the defendants' then-existing actual beliefs concerning whether these Securities would have a realistic chance of being profitable to long investors, among other things, also as alleged more fully above.

151.   In fact, as noted above, unlike a privately negotiated CDS or other over-the-counter privately-negotiated structured finance transaction limited to two parties, the defendants created the Hudson CDOs to market and sell the Hudson CDO Securities more broadly to Plaintiff and other investors.  Accordingly, the defendants had a duty to timely and properly disclose to Plaintiff and other investors all material facts concerning the offerings of Hudson CDO Securities, particularly the truth concerning defendants' own then-existing actual beliefs regarding the financial prospects of those Securities and Goldman's strategy to then reduce its financial exposures to subprime-related assets of which the Hudson CDO Securities were a part. Had the defendants timely and properly disclosed the truth, the Hudson CDO Securities would have been unmarketable or marketable only on terms materially more favorable to Plaintiff and other investors.

152.   Plaintiff and other members of the proposed Classes incurred damages when they sold their Hudson CDO Securities at a loss.  Other members of the proposed class of investors in the Hudson 1 CDO incurred damages, including loss of principal and/or interest, when the Hudson 1 CDO was liquidated, and still other members of the proposed Classes may still retain

Hudson CDO Securities and have additional realized or unrealized losses of principal and/or interest. By virtue of defendants' alleged misconduct, all members of the proposed Classes were also damaged because they paid artificially inflated prices to acquire their Hudson CDO Securities.

153.   As a major participant in mortgage lending and finance, Goldman's misconduct alleged above caused at least a material amount of the losses of Plaintiff and the members of the proposed Classes even if those losses coincided with, or occurred around the same time as, an overall decline in the prices of other similar CDOs. As alleged above, Goldman, along with other investment banks, fueled the RMBS market to a bursting point, placing loans in securitization pools with lower or defective underwriting standards and pressuring rating agencies for investment grade ratings, in order to record fees for at least the short term. From 2001 to 2007, Goldman sold at least $135 billion in residential mortgage-related securities. In late 2006 and early 2007, Goldman pursued a strategy to reduce its financial exposures to subprime mortgage-related assets -- of which the offerings of Hudson CDO Securities were a part.

154.   To disguise the existence of Goldman's then-existing strategy to reduce the firm's exposures to subprime assets, the SPG Trading unit of Goldman developed structured finance products designed to short increasing amounts of subprime mortgage-related assets, including the Hudson CDOs. Goldman and its affiliates selected weak RMBS -- many of which it itself or its affiliates either sponsored, underwrote or both as alleged above -- with certain credit ratings and non-payment and default profiles, to strategically reference in its synthetically-structured Hudson CDO Securities. And although many of these RMBS were included in ABX indices, the defendants failed to timely and properly disclose to Plaintiff and other investors material non-

public facts concerning many such RMBS which they knew from sponsoring and/or

underwriting or trading them, among other things, as alleged more fully above.  A Goldman

affiliate, GSI, also itself took the swap position against the Hudson CDO Securities while

Goldman simultaneously represented that its interests were aligned with investors and while

Goldman had also been exiting as many long positions as it quickly could around the time it

issued the Hudson CDO Securities.  Consequently, defendants' alleged misconduct also

perpetrated a fraud on the market to disguise Goldman's true trading positions and activities, all

at the expense of Plaintiff and the other members of the proposed Classes.

155.    Had Goldman timely and properly disclosed in its offering documents for the

Hudson CDO Securities that it was simultaneously pursuing a strategy to reduce its financial

exposures to subprime-related mortgage assets -- and that the Hudson CDO Securities were

sponsored by Goldman and sold by GS&Co as a part of that strategy -- Plaintiff and the members

of the Classes would not have bought the Hudson CDO Securities at all or would have paid less

and/or been provided a higher yield to account for the true, then-existing but undisclosed

increased investment risk.  Along these lines, the defendants were active participants in causing

the decline in value of not only the Hudson CDO Securities but also, to at least a material extent,

the subprime-related CDO markets in general.  Indeed, according to the FCIC Report,

Goldman's synthetic CDOs and other mortgage-related structured finance transactions

"multiplied the effects of the collapse in subprime assets."  Accordingly, even though the prices

of many subprime-related CDOs declined beginning in the period 2007-2008, defendants'

wrongdoing caused at least a material portion of that overall decline and, thus, a material portion

of the decline in the value of the Hudson CDO Securities.

156.     The findings of the Senate Subcommittee support the conclusion that Goldman's alleged misconduct helped perpetrate a fraud on the overall market for subprime mortgage-related CDOs.  For example, the Senate Subcommittee made the following specific "findings of fact", among others, as set forth in the Levin Memorandum:

> "(1)     **Securitizing High Risk Mortgages**.  From 2004 to 2007, in exchange for lucrative fees, Goldman Sachs helped lenders like Long Beach, Fremont, and New Century, securitize high risk, poor quality loans, obtain favorable credit ratings for the resulting residential mortgage backed securities (RMBS), and sell the RMBS securities to investors, pushing billions of dollars of risky mortgages into the financial system.
>
> (2)     **Magnifying Risk**.  Goldman Sachs magnified the impact of toxic mortgages on financial markets by re-securitizing RMBS securities in collateralized debt obligations (CDOs), referencing them in synthetic CDOs, selling the CDO securities to investors, and using credit default swaps and index trading to profit from the failure of the same RMBS and CDO securities it sold.
>
> (3)     **Shorting the Mortgage Market**.  As high risk mortgage delinquencies increased, and RMBS and CDO securities began to lose value, Goldman Sachs took a net short position on the mortgage market, remaining net short throughout 2007, and cashed in very large short positions, generating billions of dollars in gain.
>
> (4)     **Conflict Between Client and Proprietary Trading**.  In 2007, Goldman Sachs went beyond its role as market maker for clients seeking to buy or sell mortgage related securities, traded billions of dollars in mortgage related assets for the benefit of the firm without disclosing its proprietary positions to clients, and instructed its sales force to sell mortgage related assets, including high risk RMBS and CDO securities that Goldman Sachs wanted to get off its books, creating a conflict between the

66

firm's proprietary interests and the interests of its clients."

157.    Further, according to then Senate Subcommittee Chairman Sen. Carl Levin:

> "Investment banks such as Goldman Sachs were not simply market-makers, they were self-interested promoters of risky and complicated financial schemes that helped trigger the [financial] crisis[.] They bundled toxic mortgages into complex financial instruments, got the credit rating agencies to label them as AAA securities, and sold them to investors, magnifying and spreading risk throughout the financial system, and all too often betting against the instruments they sold and profiting at the expense of their clients."

158.    The defendants also failed to properly disclose to investors in the Hudson CDO Securities Goldman's role in sponsoring and/or underwriting several of the RMBS referenced in the Hudson CDOs and material facts they knew or disregarded regarding the creditworthiness, trading market for, and value of, those and other RMBS referenced in the Hudson CDOs; their belief that the Hudson CDO Securities would not be profitable to "long" investors like Plaintiff and other members of the proposed Classes; and the fact that the defendants structured, marketed and sold to investors the Hudson CDO Securities as part of Goldman's then-existing strategy to hedge its long positions and short increasing amounts of subprime mortgage-related assets.

159.    Goldman also knew or disregarded and failed to disclose that the rating agencies failed to properly assess and monitor the creditworthiness of a large number of RMBS and CDOs that had been issued in the market during the period 2006 through 2008.  Although Moody's indicated in July 2007 that it would be reviewing the ratings of various structured finance instruments and S&P also then indicated that 12.8% of the subprime RMBS referenced in the Hudson 1 CDO were on credit watch, it was not until later that any action was taken by the rating

agencies.  Meanwhile, as described above, Goldman already had by then -- in "front" of the

markets -- engaged in many transactions to short subprime-related mortgage assets, including by

issuing the Hudson CDO Securities.  As the value of many RMBS and CDOs declined in 2007

and more credit default swaps became payable, and further downgrades were announced in

January 2008 and later, the market prices of many subprime-related CDOs kept declining which

Goldman not only knew or disregarded, but itself had a material role in creating.

160.    Goldman's use of these specially-developed CDOs such as Hudson allowed the

firm, in substance, to trade ahead of the market collapse which its own misconduct, at least in

material part, helped create.  Hence, this misconduct contributed to the losses of Plaintiff and the

members of proposed Classes when the value of both the RMBS underlying the Hudson CDO

Securities and the Hudson CDO Securities declined as the ratings on the instruments were

lowered.  Accordingly, while the *amount* remains an issue for the trier of fact to determine on  a

complete record, the damages incurred by Plaintiff and the members of the Classes in investing

in Hudson CDO Securities were not caused solely by any general decline in the value of real

estate, the U.S. housing market, the structured finance markets, or any other sector of the

economy, but instead -- at least in significant part -- directly as a result of the misconduct of the

defendants alleged in this Amended Complaint.

161.    By April 27, 2010, Plaintiff and other investors began to learn the truth regarding

the Hudson CDO Securities and Goldman's own financial interests in connection therewith,

when the Senate Subcommittee obtained testimony from seven Goldman officials and released

its findings concerning certain of Goldman's mortgage-related practices, all as alleged more fully

above.  It was entirely foreseeable to the defendants that concealing from Plaintiff and other

investors the truth concerning Goldman's then-existing strategy to reduce its financial exposures

to subprime mortgage-related assets and the true financial prospects of the Hudson CDO

Securities, among other things, would inflate artificially the price of the Hudson CDO Securities.

As a direct and proximate consequence of defendants' misconduct in structuring, offering and

selling to Plaintiff and the members of the Classes the Hudson CDO Securities at artificially

inflated prices, and in omitting to disclose the truth concerning Goldman's own financial

interests and the defendants' actual beliefs concerning those Securities, Plaintiff and the

members of the Classes were damaged.

162.    Plaintiff's own transactions demonstrate how defendants' misconduct directly and

proximately caused damage to investors.  In particular, Plaintiff acquired $4 million (principal

amount) of the Hudson CDO Securities, consisting of $1 million (principal amount) of the

Hudson 1 CDO, and $3 million (principal amount) of the Hudson 2 CDO on, respectively,

February 6, 2007 and January 24, 2007 at, respectively, $95.00/per $100 principal and $100/per

$100 principal, as reflected in its attached certification.  Following ratings warnings and

downgrades as alleged more fully above, Plaintiff sold all such securities on October 9, 2007 at

$2.50/per $100 principal.

## COUNT I

**For Violation of Section 10(b) of the Exchange Act**
**and SEC Rules 10b-5(a) and (c) Against Defendants**
**GS&Co, Goldman, Hudson 1 Corp., Hudson 2 Corp., Ostrem and Herrick**

163.    Plaintiff repeats and realleges each and every allegation contained above as if

fully set forth herein.

164.    This Count is brought by Plaintiff individually and on behalf of the proposed

Classes exclusively under section 10(b) of the Exchange Act and SEC Rules 10b-5(a) and (c)

against defendants GS&Co, Goldman, Hudson 1 Corp., Hudson 2 Corp., Ostrem and Herrick.

Since this Count is brought exclusively under SEC Rules 10b-5(a) and (c), Plaintiff need not

allege, nor prove for this Count, that any of the foregoing defendants made any misrepresentation

or omission of material fact or otherwise for which these defendants may also be liable under

SEC Rule 10b-5(b), New York common law and/or any other provision of law.  Likewise, and

for that same reason, the statutory safe harbor for certain forward-looking statements does not

apply to this Count in any respect.

166.    Each defendant named in this Count knowingly or recklessly employed a

manipulative and deceptive device, scheme or artifice to defraud in violation of SEC Rule 10b-

5(a), and/or engaged in an act, practice or course of business which operated as a fraud or deceit

in violation of SEC Rule 10b-5(c), in connection with the structuring, issuance and sale of the

Hudson CDO Securities to Plaintiff and the members of the proposed Classes.  These

defendants' manipulative and deceptive devices and practices were to structure, issue and sell the

Hudson CDO Securities knowing or disregarding both that they were part of Goldman's overall

then-existing strategy to reduce the firm's financial exposures to subprime mortgage-related

assets, and that these defendants did not reasonably believe that those Securities would have a

realistic chance of being profitable to Plaintiff and other investors, all as alleged more fully

above.

166.    More specifically, defendant Goldman sponsored the Hudson CDO Securities and

directed and controlled the alleged misconduct of GS&Co and the Hudson issuers and the firm's

decision, by the time the Hudson CDO Securities were issued, to engage in increasing amounts

of transactions to short or hedge subprime mortgage-related assets of which the Hudson CDO

Securities were a part; defendant GS&Co structured, underwrote, offered and sold the Hudson

CDO Securities, among other things; defendants Hudson 1 Corp. and Hudson 2 Corp. were the

70

co-issuers of certain of the tranches of Hudson CDO Securities; and defendants Ostrem and Herrick helped lead in structuring, marketing and selling the Hudson CDO Securities, all as alleged more fully above.

167.    As a result of these manipulative and deceptive devices and practices, Plaintiff and other members of the proposed Classes purchased the Hudson CDO Securities.  Plaintiff and other members of the Classes who acquired such securities were injured as a direct and proximate result of these defendants' manipulative and deceptive devices and practices.

168.    In connection with their manipulative and deceptive devices and practices as alleged, the defendants named in this Count used the means or instrumentalities of interstate commerce and the mails.

169.    By virtue of the foregoing, the defendants named in this Count have violated section 10(b) of the Exchange Act and SEC Rules 10b-5(a) and (c).

170.    As a direct and proximate result of the wrongful conduct of these defendants, Plaintiff and the other members of the Classes incurred damages in an amount to be proven at trial.

171.    This Count is brought within the time permitted by law.

## COUNT II

**For Violation of Section 10(b) of the Exchange Act
and Rule 10b-5(b) Against Defendants GS&Co,
Hudson 1 Corp., Hudson 2 Corp., Ostrem and Herrick**

172.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

173.    This Count is brought by Plaintiff individually and on behalf of the proposed Classes exclusively under section 10(b) of the Exchange Act and SEC Rule 10b-5(b) against

defendants GS&Co, Hudson 1 Corp., Hudson 2 Corp., Ostrem and Herrick.  In particular, this Count is brought against GS&Co because it issued, sponsored and drafted the Hudson 1 Offering Circular and the Hudson 2 Offering Circular, used those Offering Circulars to sell the Hudson CDO Securities, and served as the underwriter, offeror and seller of those Securities, among other things; Hudson 1 Corp. and Hudson 2 Corp., because they co-issued certain of the tranches of Hudson CDO Securities; and Ostrem and Herrick, because they helped lead in structuring, marketing and selling the Hudson CDO Securities, all as alleged more fully above.

174.    The defendants named in this Count omitted to state material facts necessary to make statements made not misleading in selling the Hudson CDO Securities to Plaintiff and other members of the Classes in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5(b).  In particular, each of these defendants knowingly or recklessly failed to disclose to Plaintiff and other investors that the Hudson CDO Securities were issued as part of Goldman's then-existing strategy to reduce its financial exposures to subprime mortgage-related assets so that Goldman could profit thereby, all as alleged more fully above.  These defendants also failed to disclose that they did not genuinely believe that the Hudson CDO Securities would have a realistic chance of being profitable for investors like Plaintiff and other members of the proposed Classes, also as alleged more fully above.

175.    Along these lines, the Hudson 1 Offering Circular and the Hudson 2 Offering Circular stated, respectively, only that "GSI will be the initial Credit Protection Buyer and the initial Senior Swap Counterparty" and that "[t]he initial Credit Protection Buyer under the Credit Default Swap will be [GSI]."  Similarly, the Hudson 1 Pitch Book also stated that "Goldman Sachs has aligned incentives with the Hudson program by investing in a portion of equity and playing the ongoing role of Liquidation Agent."  The Hudson 1 Pitch Book also stated that the

72

Hudson 1 CDO was designed "to create a consistent, programmatic approach to invest in attractive relative value opportunities in the RMBS and structured product market." More generally, the Hudson 1 Offering Circular and the Hudson 2 Offering Circular stated that the "INFORMATION CONTAINED IN THIS OFFERING CIRCULAR … DOES NOT OMIT ANYTHING LIKELY TO AFFECT THE IMPORT OF SUCH INFORMATION"; that investing in the Hudson CDO Securities "IS SPECULATIVE"; that such investments involved "SIGNIFICANT RISK"; and that "[v]arious potential and actual conflicts of interest may arise from the overall activities of the Credit Protection Buyer, the overall underwriting, investment and other activities of the Liquidation Agent, the Senior Swap Counterparty and the Collateral Put Provider, their respective affiliates and its clients and employees and from the overall investment activity of the Initial Purchaser, including in other transactions with the Issuer."

176.    However, like the hiker's perilously incomplete warning that risk *may* lie ahead (*see* n.1 *supra*), these statements served only to conceal the actual, then-existing truths:  a) that these defendants created and sold the Hudson CDO Securities as part of the firm's undisclosed strategy to reduce its then-existing long exposures to subprime mortgage-related assets; b) that these defendants marketed and sold the Hudson CDO Securities knowing or disregarding that such Securities would lose value so that Goldman could profit thereby; c) that these defendants knew or disregarded that the quality and creditworthiness of several of the RMBS serving as collateral for the Hudson CDO Securities were deteriorating by the time these defendants marketed and sold the Hudson CDO Securities; and d) that these defendants did not even genuinely believe that the Hudson CDO Securities would have a realistic chance of being profitable for investors like Plaintiff and other member of the proposed Classes.  Precisely because the defendants created the Hudson CDOs not for a privately-negotiated credit

73

derivatives transaction but instead to broadly market and sell the Hudson CDO Securities to Plaintiff and other investors, the defendants had a duty to properly and timely disclose to such investors these material facts.

177.    As a result of these defendants' failure to disclose material facts, Plaintiff and other members of the Classes were ignorant of the facts concerning the Hudson CDO Securities, including that Goldman would profit thereby and that these defendants did not even genuinely believe that the Hudson CDO Securities had a realistic chance of being profitable for long investors, among other things, all as alleged more fully above.  By relying, directly or indirectly, on the absence of material adverse information omitted by these defendants, Plaintiff and other members of the Classes purchased the Hudson CDO Securities at artificially inflated prices and were damaged thereby.

178.    Had Plaintiff and the other members of the Classes known of the truth regarding Goldman's strategy to sponsor the Hudson CDO Securities as part of the firm's strategy to reduce its subprime-related financial exposures and these defendants' beliefs concerning the Hudson CDO Securities, they would not have purchased such Securities or, if they had purchased such Securities, would not have done so at the artificially inflated prices which they paid and/or would have obtained a higher yield.

179.    By reason of the foregoing, the defendants named in this Count violated Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) and are liable to Plaintiff and other members of the Classes for damages which they suffered in connection with their purchases of the Hudson CDO Securities.

180.    This Count is brought within the time permitted by law.

## COUNT III

### For Violations of Section 20(a) of the Exchange
### Act Against Defendants GS&Co, Goldman, Ostrem and Herrick

181.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

182.     This Count is brought by Plaintiff individually and on behalf of the proposed Classes under section 20(a) of the Exchange Act against GS&Co, Goldman, Ostrem and Herrick.

183.     Defendant GS&Co was, at the time of the wrongs alleged herein, the issuer, sponsor and drafter of the Hudson 1 Offering Circular and the Hudson 2 Offering Circular, marketed the Hudson CDO Securities through those Offering Circulars, and was the seller of the Hudson CDO Securities, among other things, all as alleged more fully above, and thus was a controlling person of the Hudson issuers.  Defendant Goldman sponsored the Hudson CDO Securities and directed and controlled the alleged misconduct of GS&Co, GSI and the Hudson issuers and thus was, at the time of the wrongs alleged herein, a controlling person of GS&Co and the Hudson issuers within the meaning of section 20(a) of the Exchange Act.  Defendants Ostrem and Herrick helped lead in structuring, marketing and selling the Hudson CDO Securities and, as such, were also controlling persons of Hudson issuers within the meaning of section 20 of the Exchange Act.

184.     GS&Co, Goldman, Ostrem and Herrick had the power and influence, and exercised the same, to cause the defendants to engage in the misconduct complained of herein. Each of the defendants named in this Count controlled the Hudson issuers and the issuance of the Hudson CDO Securities because it/he helped lead in structuring, marketing and selling the Hudson CDO Securities to Plaintiff and the members of the Classes.

185.     Due to their relationships with the Hudson issuers and the Hudson CDO Securities, among other things, each of the defendants named in this Count had a duty to disseminate accurate and truthful information regarding the Hudson CDO Securities and to ensure that no material facts were omitted.  Each of these defendants also had a duty to not structure, offer and sell the Hudson CDO Securities while knowing or disregarding that the Hudson CDO Securities were issued as part of Goldman's undisclosed strategy to reduce the firm's financial exposures to subprime mortgage-related assets, and given that each such defendant did not genuinely believe that these Securities had a realistic chance of being profitable for Plaintiff and other similarly situated investors, among other things, all as alleged more fully above.

186.     Because of their positions and access to material non-public information, all of the defendants named in this Count knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, Plaintiff and the other members of the Classes.

187.     By reason of the conduct alleged herein, each defendant named in this Count is liable for the aforesaid wrongful conduct, and is liable to Plaintiff and other members of the Classes for the damages which such investors suffered in connection with their purchases of Hudson CDO securities.

188.     This Count is brought within the time permitted by law.

## COUNT IV

### Common Law Fraud Under
### New York Law Against All Defendants

189.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

190.    This Count is brought by Plaintiff individually and on behalf of the Classes against all defendants for fraud under New York law.

191.    Defendants' course of conduct and material omissions detailed above regarding the Hudson CDO Securities constitute fraud and fraudulent inducement under New York common law.

192.    The structuring, marketing and selling of the Hudson CDO Securities as part of Goldman's undisclosed strategy to reduce the firm's financial exposures to subprime mortgage-related assets, and the other material omissions by defendants as alleged above, were undertaken intentionally or recklessly, to induce reliance thereon by Plaintiff and the Classes in soliciting purchases of the Hudson CDO Securities.

193.    Plaintiff and the Classes reasonably relied on defendants' course of conduct in structuring the Hudson CDO Securities and material omissions when deciding to purchase the Hudson CDO Securities.

194.    At the time the Hudson CDO Securities were purchased by Plaintiff and other members of the Classes, Plaintiff and the Classes did not know the truth concerning the Hudson CDO Securities, including Goldman's own proprietary financial interests and material omissions in connection therewith.

195.     As a direct and proximate result of the fraud of defendants, Plaintiff and the

Classes suffered damages in connection with their purchases of the Hudson CDO Securities.

196.     The fraud and deceit committed by defendants was intentional and/or involved

conscious acts that willfully and wantonly or recklessly disregarded the rights of Plaintiff and the

Classes.

197.     Plaintiff and the Classes are entitled to recover punitive damages in an amount to

be proved at trial in connection with this Count to the full extent permitted by the laws of New

York.

198.     Defendants are jointly and severally liable for any and all amounts owing to each

member of the Classes for each investment made by each member of the proposed Classes.

199.     This Count is brought within the time permitted by law.

## COUNT V

**Aiding and Abetting Fraud Under New York Law
Against Defendants Goldman, Hudson 1 Ltd., Hudson 1 Corp.,
Hudson 2 Ltd., Hudson 2 Corp., Ostrem and Herrick**

200.     Plaintiff repeats and realleges each and every allegation contained above as if

fully set forth herein.

201.     This Count is brought by Plaintiff individually and on behalf of the Classes

against Goldman, Hudson 1 Ltd., Hudson 1 Corp., Hudson 2 Ltd., Hudson 2 Corp., Ostrem and

Herrick for aiding and abetting fraud under New York law.

202.     As alleged more fully above, a fraud was perpetrated on Plaintiff and the Classes.

203.     Goldman, Hudson 1 Ltd., Hudson 1 Corp., Hudson 2 Ltd., Hudson 2 Corp.,

Ostrem and Herrick had actual knowledge of, and substantially assisted in, the fraudulent scheme

to issue and sell the Hudson CDO Securities to Plaintiff and the Classes, and by omitting to

disclose the truth concerning those Securities and Goldman's own financial interests in connection therewith, all as alleged more fully above.

204.    Goldman aided and abetted in the fraud because it created and directed the activities of the four Hudson issuers and GS&Co as part of the firm's undisclosed then-existing strategy to reduce Goldman's financial exposures to subprime mortgage-related assets, and because its representatives structured, marketed and sold the Hudson CDO Securities and issued statements to investors in connection therewith.  The Hudson issuers aided and abetted in the fraud by issuing and selling the Hudson CDO Securities.  Defendants Ostrem and Herrick aided and abetted in the fraud by helping lead in structuring and selling the Hudson CDO Securities. Each defendant named in this Count knew or disregarded that the Hudson CDO Securities were being sold to Plaintiff and the Classes so that Goldman would profit therefrom.  Each such defendant also knew that it/he did not even believe that these Securities had a realistic chance of being profitable to long investors like Plaintiff and the members of the proposed Classes, or recklessly disregarded and failed to disclose these highly material facts.

205.    Each defendant named in this Count substantially assisted in the fraud perpetrated on Plaintiff and the Classes by means of the actions alleged above.  GS&Co, which marketed the Hudson CDO Securities through the Hudson 1 Offering Circular and the Hudson 2 Offering Circular, could not have perpetrated its fraud without the substantial assistance of Goldman, the Hudson issuers and defendants Ostrem and Herrick, all as alleged more fully above.

206.    As a direct and foreseeable result of the misconduct of the defendants named in this Count in aiding and abetting GS&Co's fraudulent scheme alleged herein, Plaintiff and the Classes have suffered damages.

207.    This Count is brought within the time permitted by law.

79

## COUNT VI

### Fraudulent Concealment Under
### New York Law Against All Defendants

208.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

209.    This Count is brought by Plaintiff individually and on behalf of the Classes against all of the defendants for fraudulent concealment under New York law.

210.    Defendants failed to disclose to, and concealed from, Plaintiff and the Classes the truth concerning the Hudson CDO Securities, including that defendants had structured and sold them to profit for Goldman's own proprietary accounts, and that the defendants did not even genuinely believe that the Hudson CDO Securities had a realistic chance of being profitable for long investors.

211.    Defendants had a duty to disclose these material facts to Plaintiff and the Classes due to defendants' superior knowledge and unique position of control over the information concerning both Goldman's financial strategies and positions and the prospects for the Hudson CDO Securities and Goldman's financial interests in connection therewith, and in view of the statements made to Plaintiff and the Classes in the Hudson 1 Offering Circular, the Hudson 2 Offering Circular and other documents used in connection with marketing the Hudson CDO Securities to Plaintiff and the Classes, including the Hudson 1 Pitch Book and the Hudson 1 Preliminary Term Sheet and Hudson 2 Preliminary Term Sheet.  Defendants knew that Plaintiff and the Classes would rely on the information that defendants provided in connection with the Hudson CDO Securities, and that the defendants knowingly or recklessly failed to disclose material facts in connection therewith, all as alleged more fully above.

80

212.     Defendants intentionally or recklessly concealed the fact that the Hudson CDOs were issued as part of the firm's then-existing strategy to reduce Goldman's financial exposures to subprime mortgage-related assets, and that they did not genuinely believe that the Hudson CDO Securities would have a realistic chance of being profitable to long investors, which was information that would have been clearly material to Plaintiff and the Classes in deciding whether to purchase the Hudson CDO Securities.  Defendants concealed this so that Plaintiff and the Classes would thereby be induced to purchase the Hudson CDO Securities, and Goldman could profit therefrom, all as alleged more fully above.

213.     Due to their reasonable reliance on the obligation of the defendants to provide full and accurate information, Plaintiff and the Classes were induced to, and in fact did, purchase Hudson CDO Securities.

214.     Plaintiff and the Classes suffered millions of dollars of damages as a direct and proximate result of their reliance on the defendants' concealment of the truth in connection with the Hudson CDO Securities.

215.     This Count is brought within the time permitted by law.

### COUNT VII

**Unjust Enrichment Under
New York Law Against Goldman and GS&Co**

216.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

217.     This Count is brought by Plaintiff individually and on behalf of the Classes against defendants Goldman and GS&Co only.

218.     As a direct and proximate result of their wrongful conduct described more fully above, defendants Goldman and GS&Co were unjustly enriched.  Defendants Goldman and GS&Co were unjustly enriched by receiving fees, profits (and loss avoidance) and other compensation to which they would not have been entitled absent their fraudulent and other wrongful conduct in structuring, offering and selling the Hudson CDO Securities to Plaintiff and the Classes without disclosing the true facts concerning those Securities and Goldman's own financial interests in connection therewith, all as alleged more fully above.

219.     Defendants Goldman and GS&Co unjustly obtained fees, profits (and loss avoidance) and other compensation to which they were not entitled in connection with the Hudson CDO Securities at the expense of Plaintiff and the members of the Classes, again as alleged more fully above.

220.     Equity and good conscience require that defendants Goldman and GS&Co be directed to make restitution to Plaintiff and the members of the Classes of all such fees, profits (and loss avoidance) and other compensation that these defendants obtained in connection with their fraudulent and other misconduct alleged herein, in an amount to be proven at trial.

221.     Defendants Goldman and GS&Co fraudulently concealed the truth concerning the Hudson CDO Securities from Plaintiff and the members of the Classes, all as alleged more fully above.  Also as alleged more fully above, Plaintiff and other investors began to learn the truth regarding the Hudson CDO Securities and Goldman's own financial interests in connection therewith, beginning April 27, 2010.

222.     This Count is brought within the time permitted by law.

## BASIS OF ALLEGATIONS

223.    Plaintiff alleges the foregoing based upon its information and belief except those allegations concerning itself, which are based upon personal knowledge.  Plaintiff's information and belief is based on the investigation conducted by its attorneys which included, among other things, review and analysis of:  SEC filings; public statements, news articles, and other reports disseminated by, or concerning, defendant Goldman and others; internal Goldman documents publicly released by, and testimony of Goldman employees and others before, the Senate Subcommittee, the FCIC and other government and regulatory bodies; pleadings and other documents from other proceedings involving Goldman and others; and other publicly available information.  Many of the facts supporting the allegations contained herein are known only to the defendants, or are within their control.  In addition, Plaintiff is continuing its investigation via its counsel, and believes that substantial additional evidentiary support will exist for its allegations after it is afforded a reasonable opportunity for discovery.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory, punitive and other damages, as well as restitution, to the full extent permitted by law in favor of Plaintiff and the other members of the Classes against defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Classes their reasonable costs and expenses incurred in this action, including counsel fees and expert fees to the full extent permitted by law; and

D.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: February 4, 2011          Respectfully submitted,
       New York, NY

                                 Berger & Montague, P.C.

                                 Lawrence J. Lederer/LP
                                 Lawrence J. Lederer (LL-3250)
                                 Robin Switzenbaum
                                 Arthur Stock
                                 Steven L. Bloch
                                 Josh M. Rubens
                                 1622 Locust Street
                                 Philadelphia, PA 19103
                                 Tel: (215) 875-3000
                                 Fax: (215) 875-4604
                                 Email: llederer@bm.net
                                        rswitzenbaum@bm.net
                                        astock@bm.net
                                        sbloch@bm.net
                                        jrubens@bm.net

                                 *Lead Counsel for Plaintiff Dodona I, LLC and
                                 the Proposed Classes*

                                 Frydman, LLC

                                 David S. Frydman/LP
                                 David S. Frydman, Esq. (DF-8095)
                                 18 East 48th Street – 10th Floor
                                 New York, New York 10017
                                 Tel.: (212) 355-9100
                                 Fax: (212) 355-8988
                                 Email: dfrydman@frydmanllc.com

                                 *Local Counsel for Plaintiff Dodona I, LLC and
                                 the Proposed Classes*

## CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS
## RELATING TO HUDSON MEZZANINE/GOLDMAN, SACHS & CO. CDOs

Alan Brody, the sole Managing Member of BrodyCo, LLC, the sole Managing Member of plaintiff Dodona I, LLC ("Plaintiff"), hereby duly swears and says, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed the complaint against Goldman, Sachs & Co. ("GS&Co"), Hudson Mezzanine Funding 2006-1, Ltd., Hudson Mezzanine Funding 2006-2, Ltd. and other defendants, and approves of its contents and authorizes its selected counsel, Berger & Montague, P.C. and any other counsel with whom or which Berger & Montague, P.C. may associate, to represent it in this action, including filing the complaint and a lead plaintiff petition on Plaintiff's behalf.

2.      As noted above, I am the sole Managing Member of BrodyCo, LLC. BrodyCo, LLC is, in turn, the sole Managing Member of Plaintiff. I am authorized to act on behalf of Plaintiff in connection with all matters in this litigation, including without limitation, all matters set forth in this Certification.

3.      Plaintiff did not purchase the securities that are the subject of the complaint at the direction of its counsel or in order to participate in this private action.

4.      Plaintiff is willing to serve as representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

5.      Plaintiff acquired $1 million (principal amount) of Income Notes of Hudson Mezzanine Funding 2006-1, Ltd. on or about February 6, 2007 at a price of $95.00/per $100.00 principal from Colonial Fund, LLC which, in turn, acquired such securities on or about January 4, 2007 directly from GS&Co. Plaintiff acquired $3 million (principal amount) of Income Notes of Hudson Mezzanine Funding 2006-2, Ltd. on or about January 24, 2007 at a price of $100.00/per $100.00 principal directly from GS&Co. Plaintiff sold back directly to GS&Co all such Income Notes on October 9, 2007 at a price of $2.50/per $100.00 principal.

6.      Plaintiff has not sought to serve or served as a representative party on behalf of a class under the United States federal securities laws during the three (3) years preceding the date on which this certification is signed.

7.      Plaintiff has not accepted and will not accept any payment for serving as representative party on behalf of the class beyond its *pro rata* share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I, Alan Brody, declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 28 day of September, 2010.

By:  _____
     Alan Brody, for and on behalf of
     Dodona I, LLC