**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------x
:
DODONA I, LLC, on Behalf of Itself          :
and All Others Similarly Situated,          :
:
Plaintiff,          :
:          10 Civ. 7497 (VM)(DCF)
v.          :
:          ECF CASE
GOLDMAN, SACHS & CO., THE          :
GOLDMAN SACHS GROUP, INC.,          :
HUDSON MEZZANINE FUNDING          :
2006-1, LTD., HUDSON MEZZANINE          :
FUNDING 2006-1, CORP., HUDSON          :
MEZZANINE FUNDING 2006-2, LTD.,          :
HUDSON MEZZANINE FUNDING          :
2006-2, CORP., PETER L. OSTREM and          :
DARRYL K. HERRICK,          :
:
Defendants.          :
----------------------------------------------------x


**LEAD PLAINTIFF DODONA I, LLC'S MEMORANDUM OF LAW IN SUPPORT OF**
**ITS MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF**
**CLASS REPRESENTATIVE AND CLASS COUNSEL**


Publicly-Filed Redacted Version

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

I.     PRELIMINARY STATEMENT .................................................................... 1

II.    STATEMENT OF FACTS ............................................................................ 4

III.   ARGUMENT ............................................................................................... 9

    A.   The Standards Governing This Motion ................................................ 9

    B.   The Proposed Class Satisfies the Requirements of Rule 23(a) ............... 10

        1.   The Class Is Sufficiently Numerous ........................................ 10

        2.   There Are Questions of Law *and* Fact Common to the Class .................. 11

        3.   Lead Plaintiff's Claims are Typical of the Class ........................ 13

        4.   Plaintiff Will Fairly and Adequately Protect the Class ................ 14

    C.   The Proposed Class Satisfies the Requirements of Fed. R. Civ. P. 23(b)(3) ......... 16

        1.   Common Questions Predominate ............................................ 16

        2.   Class Treatment is Superior .................................................. 23

CONCLUSION ............................................................................................................. 25

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Affiliated Ute Citizens of Utah v. United States*,
 406 U.S. 128 (1972)..................................................................................................18, 19

*Ambassador Hotel Co., Ltd. v. Wei-Chuan Inv.*,
 189 F.3d 1017 (9th Cir. 1999) ...........................................................................................20

*Amchem Prods., Inc. v. Windsor*,
 521 U.S. 591 (1997)...........................................................................................................17

*Boguslavsky v. Kaplan*,
 159 F.3d 715 (2d Cir. 1998).............................................................................................20

*Central States Southeast and Southwest Areas Health & Welfare Fund v. Merck–Medco
 Managed Care, L.L.C.*, 504 F.3d 229 (2d Cir. 2007) ...............................................10

*Chasins v. Smith, Barney & Co.*,
 438 F.2d 1167 (2d Cir. 1970)...........................................................................................20

*Consol. Rail Corp. v. Town of Hyde Park*,
 47 F.3d 473 (2d Cir. 1995).................................................................................................10

*Damassia v. Duane Reade, Inc.*,
 250 F.R.D. 152 (S.D.N.Y. 2008) ........................................................................................14

*Dodona I, LLC v. Goldman, Sachs & Co.*,
 847 F. Supp. 2d 624 (S.D.N.Y. 2012)..................................................................8, 17, 18, 21

*Erica P. John Fund, Inc. v. Halliburton Co.*,
 131 S. Ct. 2179 (2011)........................................................................................................20

*Flaks v. Koegel*,
 504 F.2d 702 (2d Cir. 1974)..............................................................................................20

*Glauser v. EVCI Career Colleges Hldg. Corp.*,
 236 F.R.D. 184 (S.D.N.Y. 2006) .......................................................................................15

*In re Beacon Assocs. Litig.*,
 282 F.R.D. 315 (S.D.N.Y. 2012) ......................................................................................19

*In re College Bound Consol. Litig.*,
 No. 93-cv-2348(MBM), 1994 WL 236163 (S.D.N.Y. May 31, 1994)....................................19

*In re Crazy Eddie Secs. Litig.,*
 802 F. Supp. 804 (E.D.N.Y. 1992) .................................................................20

*In re DRDGold Ltd. Secs. Litig.,*
 472 F. Supp. 2d 562 (S.D.N.Y. 2007).............................................................16

*In re Dynex Capital, Inc. Secs. Litig.,*
 No. 05-cv-1897(HB), 2011 WL 781215 (S.D.N.Y. Mar. 7, 2011)................... *passim*

*In re EVCI Career College Holding Corp. Sec. Litig.,*
 No. 05-cv-10240, 2007 WL 2230177 (S.D.N.Y. July 27, 2007)............................23

*In re IndyMac Mortgage-Backed Secs. Litig.,*
 No. 09-cv-4583(LAK), 2012 WL 3553083 (S.D.N.Y. Aug. 17, 2012).......................... *passim*

*In re Initial Pub. Offerings Sec. Litig.,*
 243 F.R.D. 79 (S.D.N.Y 2007) .......................................................................12

*In re Initial Pub. Offerings Secs. Litig.,*
 471 F.3d 24 (2d Cir. 2006)......................................................................10, 19

*In re Marsh & McLennan Cos., Inc. Sec. Litig.,*
 No. 04-cv-8144(CM), 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) .....................17

*In re Merrill Lynch Secs., Deriv. & ERISA Litig.,*
 07-cv-9633 (JSR) (S.D.N.Y.) .......................................................................16

*In re Monster Worldwide, Inc. Secs. Litig.,*
 251 F.R.D. 132 (S.D.N.Y. 2008) .........................................................14, 22, 23

*In re Pfizer Inc. Secs. Litig.,*
 282 F.R.D. 38 (S.D.N.Y. 2012) .....................................................................21

*In re Revco Secs. Litig.,*
 142 F.R.D. 659 (N.D. Ohio 1992) ..................................................................19

*In re Salomon Analyst Metromedia Litig.,*
 544 F.3d 474 (2d Cir. 2008).........................................................................18

*In re Vivendi Universal, S.A. Sec. Litig.,*
 605 F. Supp. 2d 586 (S.D.N.Y. 2009)..............................................................21

*In re Vivendi Universal, S.A. Secs. Litig.,*
 242 F.R.D. 76 (S.D.N.Y. 2007) .....................................................................13

*In re Worldcom, Inc. Secs. Litig.,*
 219 F.R.D. 267 (S.D.N.Y. 2003) .......................................................11, 15, 21, 24

*Int'l Fund Mgmt. S.A. v. Citigroup Inc.,*
    822 F. Supp. 2d 368 (S.D.N.Y. 2011)................................................................20

*JP Morgan Chase Bank v. Winnick,*
    350 F. Supp. 2d 393 (S.D.N.Y. 2004)................................................................19

*Kenavan v. Empire Blue Cross and Blue Shield,*
    No. 91-cv-2393(KMW), 1993 WL 128012 (S.D.N.Y. Apr. 19, 1993) ...................19

*Lapin v. Goldman Sachs & Co.,*
    254 F.R.D. 168 (S.D.N.Y. 2008) ......................................................17, 18, 20, 22

*Litwin v. Blackstone Grp. L.P.,*
    634 F.3d 706 (2d Cir.), *cert. denied* 132 S.Ct. 242 (2011) ......................................18

*Matrixx Initiatives Inc. v. Siracusano,*
    131 S. Ct. 1309 (2011) ................................................................................18

*Meijer, Inc. v. Warner Chilcott Hldgs Co. III,*
    246 F.R.D. 293 (D.D.C. 2007)......................................................................10

*New Jersey Carpenters Health Fund v. DLJ Mortgage Capital, Inc.,*
    No. 08-5653(PAC), 2011 WL 3874821 (S.D.N.Y. Aug. 16, 2011) .............3, 14, 22

*New Jersey Carpenters Health Fund v. RALI Series 2006-QO1 Trust,*
    477 Fed. Appx. 809 (2d Cir. Apr. 30, 2012)........................................................22

*New Jersey Carpenters Health Fund v. Residential Capital, LLC,*
    Nos. 08-cv-8781(HB), 08-cv-5093(HB), 2012 WL 4865174
    (S.D.N.Y. Oct. 15, 2012) ........................................................................11, 22

*Public Employees' Ret. System of Mississippi v. Goldman Sachs Group, Inc.,*
    280 F.R.D. 130 (S.D.N.Y. 2012) ......................................................... *passim*

*Public Employees' Ret. System of Mississippi v. Merrill Lynch & Co.,*
    277 F.R.D. 97 (S.D.N.Y. 2011) ........................................................... *passim*

*Randall v. B.J. Loftsgaarden,*
    478 U.S. 647 (1986).....................................................................................21

*Robidoux v. Celani,*
    987 F.2d 931 (2d Cir. 1993).............................................................................11

*Seijas v. Republic of Argentina,*
    606 F.3d 53 (2d Cir. 2010)...............................................................................20

*Steinhardt Group Inc. v. Citicorp,*
    708 N.Y.S.2d 91 (N.Y. App. Div. 2000) .............................................................19

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,*
   546 F.3d 196 (2d Cir. 2008)...................................................................................9

*Town of New Castle v. Yonkers Contracting Co.,*
   131 F.R.D. 38 (S.D.N.Y. 1990) ...........................................................................10

*Tsereteli v. Residential Asset Securitization Trust 2006-A8,*
   283 F.R.D. 199 (S.D.N.Y. 2012), *appeal pending* (2d Cir. Nov. 26, 2012)............3, 16, 22, 24

*Wagner v. Barrick Gold Corp.,*
   251 F.R.D. 112 (S.D.N.Y. 2008) .........................................................................15

*Wal-Mart Stores, Inc. v. Dukes,*
   131 S. Ct. 2541 (2011).........................................................................................11


**STATUTES**

Securities Exchange Act of 1934..................................................................................12

Private Securities Litigation Reform Act of 1995 ........................................................15


**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 ........................................................................................... *passim*

SEC Rule 10b-5 ............................................................................................................21

H.R. Conf. Rep. No. 104-369, 1995 WL 709276 (Nov. 28, 1995) ................................15

Robert B. Thompson, *The Measure of Recovery Under Rule 10b-5: A Restitution
   Alternative to Tort Damages*, 37 Vand. L. Rev. 349, 365 (1984) ...........................21

# I.   **PRELIMINARY STATEMENT**

Court-appointed lead plaintiff Dodona I, LLC ("Plaintiff") respectfully submits this memorandum in support of its motion to certify a class of investors in collateralized debt obligation securities (the "CDOs") as defined below, appoint Plaintiff as class representative, and appoint class counsel pursuant to Fed. R. Civ. P. 23(a), (b)(3) and (g).

This action arises out of The Goldman Sachs Group, Inc.'s ("Goldman") use of the CDOs to decrease its then-existing "long" financial exposures to mortgage-related assets.  Plaintiff claims, in sum, that the defendants failed to accurately disclose the true investment risks, of which they were actually aware, associated with investing in the CDOs.

The CDOs were issued via Offering Circulars.  Dkt. 50-1, 50-2.  The first, dated Dec. 3, 2006, consisted of $837 million of notes spread over eight tranches ("Hudson 1").  The second, dated Feb. 6, 2007, consisted of $407.9 million of notes also spread over eight tranches ("Hudson 2").

Internal email of Goldman officials, released publicly as part of an investigation of Goldman by the U.S. Senate, *admit* that the firm used the CDOs to help "flip our risk" and "not only get flat, but get VERY short[,]" and described the CDOs as "junk" and "lemons" that at least one of the firm's retail clients was "too smart to buy[.]"  Plaintiff purchased $1 million of Hudson 1 notes at $95 per $100 principal, and $3 million of Hudson 2 notes at $100 per $100 principal, in early 2007.  Dkt. 40 at ECF p. 86.  By October 2007, tranches of the CDOs had been downgraded or placed on review by rating agencies and plummeted in value, and Plaintiff sold them all back to Goldman's broker-dealer subsidiary that served as the sole underwriter of both CDOs, defendant Goldman, Sachs & Co. ("GS&Co"), at $2.50 per $100 principal.  *Id.*

Goldman, meanwhile, made over $2.08 *billion* in profits shorting the very Hudson CDOs it had been selling to Plaintiff and other of the firm's similarly situated client investors.

Plaintiff seeks certification of a class of those who, from their initial offering through April 27, 2010, purchased or otherwise acquired the Hudson CDOs in the United States, and were damaged thereby (the "Class").[1] The April 27, 2010 close of the Class period is the date on which seven Goldman officials testified before the U.S. Senate amid a broad investigation of Goldman's mortgage securities practices that led to the report "*Wall Street and the Financial Crisis: Anatomy of a Financial Collapse*" which, among other things, addresses Goldman's conduct concerning the Hudson CDOs.[2]

This action satisfies all requirements for class certification. There are over 70 putative members of the proposed Class.[3] Plaintiff's claims arise from the same offerings as all members of the Class. The same omissions from the Offering Circulars are alleged to have similarly damaged all investors, regardless of such investors' general investment sophistication or knowledge of CDOs or the mortgage markets. Indeed, by definition, no amount of knowledge or

---

[1]     Excluded from the Class are the defendants; any subsidiaries of the defendants; the members of the individual defendants' immediate families; and the legal representatives, heirs, successors and assigns of any excluded person or entity. In addition to Goldman and GS&Co, the defendants include Hudson Mezzanine Funding 2006-1, Ltd., Hudson Mezzanine Funding 2006-1, Corp., Hudson Mezzanine Funding 2006-2, Ltd. and Hudson Mezzanine Funding 2006-2, Corp. (collectively, the "Hudson Defendants"), and former Goldman employees Peter Ostrem ("Ostrem") and Darryl Herrick ("Herrick") (collectively, the "Defendants"). Hudson 1 also included a $1.2 billion senior swap that is not included in the Class. Dkt. 50-1 at 2. By Notice of Voluntary Dismissal Without Prejudice filed Dec. 13, 2012 (Dkt. 103), Plaintiff agreed to dismiss the Hudson Defendants from the litigation, without prejudice and subject to providing certain discovery without resort to the Hague Convention, among other things.

[2]     *See, e.g.*, http://www.levin.senate.gov/imo/media/doc/supporting/2011/PSI_WallStreetCrisis_041311.pdf (the "Senate Report") at pp. 517-31, 574-88.

[3]     *See* Declaration of Lawrence J. Lederer in Support of Plaintiff's Motion for Class Certification filed contemporaneously herewith (the "Lederer Decl.") at Exhibit 1 (Expert Report of Joseph R. Mason (the "Mason Report")), ¶ 45. All citations in this memorandum to "Ex. __" are to exhibits attached to the Lederer Decl.

sophistication could have timely uncovered that which Plaintiff alleges Defendants fraudulently concealed -- namely, Goldman's intent to profit from the CDOs' decline -- short of an outright admission or, as the case here, public disclosure amid a broad Congressional investigation. There are no disabling conflicts between Plaintiff and the Class. Plaintiff has retained experienced, competent counsel.

Similarly, the elements of each claim, such as materiality, scienter, causation and damages, will be proven with common evidence arising from the same claimed omissions, and therefore raise legal and factual issues that overwhelmingly predominate over any individual issues. And while reliance is an element of Plaintiff's fraud claims, where, as here, the claim is primarily for failure to disclose, reliance is presumed where the allegedly omitted facts are material. Plaintiff's expert, Dr. Joseph Mason, has submitted a report concluding that the allegedly omitted facts would have been highly relevant to investors' investment decisions. *See* Ex. 1 at ¶¶ 31-36. Even Goldman's "sophisticated investor" and other defenses raise common issues. Class treatment is also far superior to potentially multiple individual actions that may result in inconsistent adjudication.

In sum, as with other cases involving claimed misstatements common to investors in mortgage-based securities offerings that have been certified as class actions in this District, each applicable requirement of Rule 23 is met here.[4] Accordingly, the Court should certify the Class.

---

[4]      *See, e.g., In re IndyMac Mortgage-Backed Secs. Litig.*, No. 09-cv-4583(LAK), 2012 WL 3553083 (S.D.N.Y. Aug. 17, 2012) (Kaplan, J.) ("*IndyMac MBS*"); *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 283 F.R.D. 199 (S.D.N.Y. 2012) (Kaplan, J.), *appeal pending*, (2d Cir. Nov. 26, 2012) ("*RA MBS*"); *Public Employees' Ret. System of Mississippi v. Goldman Sachs Group, Inc.*, 280 F.R.D. 130 (S.D.N.Y. 2012) (Baer, J.) ("*Goldman MBS*"); *Public Employees' Ret. System of Mississippi v. Merrill Lynch & Co.*, 277 F.R.D. 97 (S.D.N.Y. 2011) (Rakoff, J.) ("*Merrill MBS*"); *New Jersey Carpenters Health Fund v. DLJ Mortgage Capital, Inc.*, No. 08-5653(PAC), 2011 WL 3874821 (S.D.N.Y. Aug. 16, 2011) (Crotty, J.) ("*DLJ MBS*"); *In re Dynex Capital, Inc. Secs. Litig.*, No. 05-cv-1897(HB), 2011 WL 781215 (S.D.N.Y. Mar. 7, 2011) (Baer, J.) ("*Dynex MBS*").

## II.    STATEMENT OF FACTS

Plaintiff alleges that Defendants violated the Securities Exchange Act of 1934 (the "1934 Act") and New York common law by issuing the CDOs without disclosing material facts concerning the investment risk. *See, e.g.,* ¶ 5.[5] Defendant GS&Co served, *inter alia*, as the sole underwriter and liquidation agent for both CDOs; purchased the CDOs from the Hudson Defendants; and offered and resold them to Plaintiff and numerous other investors in the United States. Dkt. 50-1 at 108, 130; 50-2 at 100, 122; Mason Report ¶ 48 (Ex. 1). Defendants Ostrem and Herrick led Goldman's team in structuring, marketing and selling the CDOs. ██████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████ Ex. 2.

The Hudson CDOs are "synthetic" CDOs. Whereas "cash" CDOs are backed by a portfolio of asset-backed securities ("ABS") such as pools of residential mortgages securitized into mortgage-backed securities ("RMBS"), a synthetic CDO references underlying collateral such as RMBS typically via contracts called credit default swaps ("CDS"). Mason Report ¶¶ 13-14 (Ex. 1). A CDS functions like an insurance agreement covering a referenced asset. One party, the "credit protection buyer" (here Goldman via its subsidiary, Goldman Sachs International ("GSI")), pays periodic premiums in exchange for a promise that the other party, the "credit protection seller" (here the Hudson CDOs, with funds received from investors), will make an insurance payout if the underlying asset experiences a negative credit event, such as a payment default or credit rating downgrade. Mason Report ¶¶ 14-19 (Ex. 1).

---

[5]     Unless otherwise noted, all citations to "¶ __" are to Plaintiff's Amended Class Action Complaint for Violation of the Federal Securities Laws and New York Common Law (Dkt. 40).

Hudson 1 referenced 140 subprime-related RMBS via CDS with a notional amount of approximately $2 billion, $1.2 billion of which on all 40 obligors in two specific indices measuring the performance of certain RMBS, namely ABX 2006-1 and ABX 2006-2; and the remaining $800 million on single name CDS on 2005-2006 vintage RMBS. *See* ¶ 83; Dkt. 50-1 at 35; Dkt. 50-8 at 4. Hudson 2 referenced ██████████████████████████████ ████████████████████. *See* Ex. 3.

In a classic case of "heads we win, tails you lose," Defendants used and sold the Hudson CDOs as part of Goldman's decision, by late 2006, to decrease the firm's then-existing long exposures to mortgage-related assets. *See* ¶¶ 2, 108-110, 113. Josh Birnbaum ("Birnbaum"), co-head of Goldman's ABS and structured products trading group ("SPG Trading"), stated in his self-performance review for 2007[6] that, by 2006, "[t]he fundamentals for mortgage credit were undeniably deteriorating"; that "[g]iven how much ABX we had purchased through the broker market in 2006, the world would think [Goldman] was very long for the foreseeable future"; that "[w]e could use that fear to our advantage if we could *flip our risk*" (emphasis added); and that "I concluded that we should not only *get flat*, but get VERY short." Ex. 4 (capitalization in original; emphasis added). Michael J. Swenson ("Swenson"), co-head of SPG Trading, stated in his 2007 self-performance review that "during the early summer of 2006 it was clear that the market fundamentals in subprime and the highly levered nature of CDOs was going to have a very unhappy ending"; that "[t]he beauty of the CDO short was that it allowed for a very efficient method for capturing the value in the ABX to single-name basis from the short side"; that "[k]nowing there was a huge opportunity on that front, I directed the ABS desk to enter into

---

[6] Goldman's 2007 fiscal year began on November 25, 2006. ¶ 55 at n.2; *accord* Goldman 2007 Form 10-K filed with the U.S. Securities and Exchange Commission on January 29, 2008, at p.1.

a $1.8bb short in ABS CDOs that has realized approx. $1.0bb of p & 1 to date"; that "[w]e were long and needed to reduce risk in a situation where there were few opportunities to shed the ABX indices we were long"; and that "I recognized the enormous opportunity the CDO market presented us and took advantage of the Index to single-name basis." Ex. 5. In a July 25, 2007 internal email to Goldman President and COO Gary D. Cohn ("Cohn") addressing write-offs by others in "[m]ortgage numbers[,]" Goldman's CFO, David Viniar, stated "[t]ells you what might be happening to people who don't have the big short." Ex. 6. As stated by Goldman official Sheara Fredman ("Fredman") in an August 2, 2010 email to the U.S. Senate counsel: "In an effort to reduce that [long ABX] exposure, Goldman Sachs sponsored the Hudson Mezzanine Funding 2006-1 and 2006-2 transactions." Ex. 7.

Accordingly, the Defendants used the Hudson CDOs not to earn profits for Goldman's retail clients to whom they sold the securities, but instead as a proprietary *trade* to help the firm "get flat." Ostrem stated in a September 19, 2006 internal email regarding "Hudson Mezz-new" that "[w]e have been asked to do a CDO of $2bln for the ABS desk. … This is a *trade* we need to execute for the desk over the next 4-6 weeks …." Ex. 8 (emphasis added). Arbind Jha stated in an October 26, 2006 internal email to Goldman CEO, Lloyd Blankfein ("Blankfein"), Cohn, head of the mortgage department, Dan Sparks ("Sparks"), Ostrem, Herrick and others, that "[r]isk reduction is primarily due to pricing of $2bn Hudson Mez synthetic CDO deal …." Ex. 9. On December 5, 2006, the day Hudson 1 was offered, Sparks stated in an internal email that "[s]tructured exits are the way to reduce risk. Our prior structured *trade* closes today [*i.e.*, Hudson 1]. We are focusing on ways to do it again much faster." Ex. 10 (emphasis added). A December 15, 2006 email from Birnbaum stated that "we've had good traction moving risk through our franchise on a variety of fronts:  ABX, single names, super-senior, Hudson 2." Ex.

11. A December 20, 2006 email from Stacy Bash-Polley ("Polley") stated that "[w]hile we have made great progress moving the tail risks - ssr and equity - we think it is critical to focus on the mezz risk that has been built up over the past few months. Both through sequential abacus ssr/equ trades and *the hudson deals* (current and prior)." Ex. 12 (emphasis added). Even Goldman's CEO Blankfein was directly involved, asking in a February 11, 2007 email "[c]ould/should we have cleaned up these books before and are we doing enough right now to sell off cats and dogs in other books throughout the division[?]" Ex. 13.

The Offering Circulars described the structure and terms of the CDOs and the roles of the various parties, and contained certain boilerplate risk disclosures. *See* Dkt. 50-1, 50-2. Specifically, each Offering Circular stated that investing in the CDOs "IS SPECULATIVE" and involves "SIGNIFICANT RISK" (emphasis in original) (Dkt. 50-1 at 5, 50-2 at 5); that "[t]he use of leverage generally magnifies an investor's opportunities for gain and risk of loss" (Dkt. 50-1 at 45, 50-2 at 41); that credit ratings are "not a guarantee of quality" (Dkt. 50-1 at 55, 50-2 at 52); and that the value of the investment could fluctuate based on "the credit quality of the underlying pool of assets ... general economic conditions, [and] the condition of certain financial markets ...." Dkt. 50-1 at 49, 50-2 at 46.

In truth, however, internal Goldman documents demonstrate that Defendants knew that investing in the CDOs was far riskier for Plaintiff and similarly situated "long investors" than the Offering Circulars portrayed. For example, an October 11, 2006 email by Tetsuya Ishikawa to Herrick concerning Hudson 1 quoted Goldman employee Sarah Lawlor as stating that Goldman client, Allied Irish Bank, was "too smart to buy this kind of junk[.]" Ex. 14. An October 24, 2006 email chain citing Hudson 1 and marked "Internal Only/Verbal Only" noted the "need to better leverage syndicate to move open risk from our bespoke trades" and the "syndicate 'axe'

email ... as a way to distribute junk that nobody was dumb enough to take first time around[,]"
and was met with the reply "LDL" (*i.e.,* presumably "let's discuss live"). Ex. 15.  A January 26,
2007 email from Sparks also presumably concerning Hudson 1 praised Ostrem and Herrick for
"what a great job they did.  They structured like mad and travelled the world, and worked their
tails off to make some lemonade from some *big old lemons*." Ex. 16 (emphasis added).

The Offering Circulars stated that GSI would be the "initial" credit protection buyer on
the CDOs.  *See, e.g.,* Dkt. 50-1 at 56, 50-2 at 53.  A Marketing (or "Pitch") Book for Hudson 1
stated that "Goldman Sachs developed the Hudson CDO program in 2006 to create a consistent,
programmatic approach to invest in attractive relative value opportunities in the RMBS and
structured product market" and that "Goldman Sachs has aligned incentives with the Hudson
program by investing in a portion of equity and playing the ongoing role of Liquidation Agent."
Dkt. 50-8 at 4.  However, the truth was that Goldman intended to remain short and use the CDOs
as a proprietary "trade" to help Goldman "get flat" as noted above.  *See* ¶¶ 53, 55-60.  According
to the Senate Report (at p. 525), Goldman invested only $6 million in Hudson 1 notes.

Since the Court's ruling granting in part and denying in part Defendants' motions to
dismiss, *Dodona I, LLC v. Goldman, Sachs & Co.,* 847 F. Supp. 2d 624 (S.D.N.Y. 2012),
Defendants filed answers, and defendant GS&Co asserted two counterclaims against Plaintiff.
Dkt. 81.  First, GS&Co asserts that, as a result of representations in GS&Co's standard-form
brokerage agreement, GS&Co disclaimed owing any duties to Plaintiff, and that Plaintiff
breached that agreement by bringing this lawsuit.  Dkt. 81 ¶¶ 242-45.  Second, GS&Co alleges
that it was fraudulently induced to sell Plaintiff the CDOs in violation of representations actually
made in the Offering Circulars.  Dkt. 81 ¶¶ 247-50.  Accordingly, even GS&Co's counterclaims
raise classwide legal and factual issues.

Both CDOs began declining in value soon after they were issued.  For example, Moody's placed four tranches of Hudson 1 notes on watch for possible downgrades on July 11, 2007; S&P followed on August 9, 2007.  Ex. 17.  Moody's first downgraded Hudson 1 on September 12, 2007.  *Id.*  Ultimately, both CDOs were downgraded further and defaulted and have been or still are being dissolved.  Meanwhile, according to an August 4, 2010 email chain between Goldman official Fredman and the U.S. Senate counsel, Goldman made $1.697 billion in profits on Hudson 1, and $391 million in profits on Hudson 2.  Ex. 7.

## III.   ARGUMENT

### A.   The Standards Governing This Motion

Fed. R. Civ. P. 23(a) states that "[o]ne or more members of a class may sue ... as representative parties on behalf of all members only if:

(1)   the class is so numerous that joinder of all members is impracticable;

(2)   there are questions of law or fact common to the class;

(3)   the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)   the representative parties will fairly and adequately protect the interests of the class."

Rule 23(b)(3) requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *See also* Fed. R. Civ. P. 23(g) (governing the appointment of class counsel).

Plaintiff must demonstrate, by a preponderance of the evidence, that each requirement of Rule 23 is met. *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d

196, 202 (2d Cir. 2008).  The Court "should not assess any aspect of the merits unrelated to a

Rule 23 requirement" and "has ample discretion ... in order to assure that a class certification

motion does not become a pretext for a partial trial of the merits." *In re Initial Pub. Offerings*

*Secs. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006) ("*In re IPO*").

**B.**   **The Proposed Class Satisfies the Requirements of Rule 23(a)**

**1.**   **The Class Is Sufficiently Numerous**

Rule 23(a)(1) is satisfied when "'the number of class members is sufficiently large so that

joinder of all members would make litigation needlessly complicated and inefficient.'" *Goldman*

*MBS*, 280 F.R.D. at 134 (citation omitted); *see also Central States Southeast and Southwest*

*Areas Health & Welfare Fund v. Merck–Medco Managed Care, L.L.C.*, 504 F.3d 229, 244-45

(2d Cir. 2007) ("The numerosity requirement in Rule 23(a)(1) does not mandate that joinder of

all parties be impossible - only that the difficulty or inconvenience of joining all members of the

class make use of the class action appropriate.").

The Second Circuit has held that "numerosity is presumed at a level of 40 members."

*Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995); *accord Merrill MBS*,

277 F.R.D. at 104; *Dynex MBS*, 2011 WL 781215, at \*1; *Town of New Castle v. Yonkers*

*Contracting Co.*, 131 F.R.D. 38, 40-41 (S.D.N.Y. 1990) (certifying class of 36; citing cases);

*Meijer, Inc. v. Warner Chilcott Hldgs Co. III*, 246 F.R.D. 293, 306 (D.D.C. 2007) (certifying

class of 30 class members; citing cases).

Here, conservatively and based on currently available discovery Plaintiff has obtained

from Defendants and by subpoena to several non-party financial institutions, there are over 70

members of the proposed Class. *See* Mason Report ¶ 45 (Ex. 1). *See also Goldman MBS*, 280

F.R.D. at 134 (rejecting Goldman's argument that numerosity is measured tranche-by-tranche);

*IndyMac MBS*, 2012 WL 3553083, at *2 (certifying class of purchasers of 10 offerings); *Merrill MBS*, 277 F.R.D. at 100-01 (certifying class of purchasers of four trusts); *Dynex MBS*, 2011 WL 781215, at *1 (certifying class of purchasers of two offerings); *In re Worldcom, Inc. Secs. Litig.*, 219 F.R.D. 267, 274-75 (S.D.N.Y. 2003) (certifying class of purchasers of common stock and debt securities issued under various registration statements).[7]

Class certification will also promote judicial economy and uniformity of decision by concentrating the claims in this forum. *See Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993) ("[r]elevant considerations include judicial economy arising from the avoidance of a multiplicity of actions [and] geographic dispersion of class members"). Class members are also geographically dispersed with a wide range in the size of transactions, with some as little as $250,000 in face amount. *See* Mason Report ¶ 47 (Ex. 1); *Merrill MBS*, 277 F.R.D. at 105 (numerosity met where there is a "wide range in the size of transactions, from 10,000 units to hundreds of millions of units"). Thus, Rule 23(a)(1) is satisfied.

## 2. There Are Questions of Law *and* Fact Common to the Class

Commonality requires that "there are questions of law *or* fact common to the class." Fed. R. Civ. P. 23(a)(2) (emphasis added). Even a single common question may be sufficient to satisfy commonality. *See, e.g., Dynex MBS*, 2011 WL 781215, at *2; *Merrill MBS*, 277 F.R.D. at 105; *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (the claims must be "capable of classwide resolution").

---

[7]   In the alternative, the Court could certify separate subclasses of Hudson 1 and 2 purchasers because they independently meet the Rule 23 requirements. *See* Mason Report ¶¶ 45-46 (Ex. 1); *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, Nos. 08-cv-8781(HB), 08-cv-5093(HB), 2012 WL 4865174, at *1 n.1 (S.D.N.Y. Oct. 15, 2012) (certifying subclass of 22; "The courts in this district have concluded that a class may be certified even if certain sub-classes do not meet the presumptive 40-member requirement.") ("*RC MBS*"); *IndyMac MBS*, 2012 WL 3553083, at *3 ("decisions in this district have concluded that a class may be certified even where certain sub-groups of that class do not meet the presumptive 40-member requirement"; citing cases).

There are questions of law *and* fact common to all investors in the Class such as:

(1)   whether Defendants omitted to disclose material facts concerning, *inter alia,* the risks of investing in the CDOs;

(2)   whether Defendants acted with the requisite state of mind;

(3)   whether Plaintiff and Class members are entitled to a presumption of reliance;

(4)   whether Defendants violated the 1934 Act and New York common law by the omissions and conduct alleged;

(5)   whether Plaintiff and the members of the Class have been damaged; and

(6)   even whether the Offering Circulars and GS&Co's brokerage agreements absolve Defendants of any liability.

"In general, where putative class members have been injured by similar material misrepresentations and omissions, the commonality requirement is satisfied." *In re Initial Pub. Offerings Sec. Litig.*, 243 F.R.D. 79, 85 (S.D.N.Y 2007).  Rule 23(a)(2) is "'plainly satisfied [where] the alleged misrepresentations in the prospectus relate to all the investors, and the existence and materiality of such misrepresentations obviously present important common issues.'" *Goldman MBS*, 280 F.R.D. at 135 (quoting *Korn v. Franchard Corp.*, 456 F.2d 1206, 1210 (2d Cir. 1972)); *accord Dynex MBS*, 2011 WL 781215, at \*2 (finding commonality where the class was "impacted by the same misrepresentations and omissions" as to loan impairment).

Here, the Class' claims all similarly arise out of Offering Circulars that allegedly omitted to disclose material facts concerning then-existing risks associated with investing in the CDOs. All such alleged omissions similarly affected investors in the CDOs, regardless of which tranche they invested in, because the nature of RMBS generally, and the Hudson CDOs in particular, is that each tranche represents a claim on cash flows tied to the same underlying reference obligations.  Mason Report ¶¶ 4-6, 27-30 (Ex. 1).  Thus, while the *order* of payment differs

12

based on the seniority of each tranche, all cash flows to the different tranches based on the performance of the same reference obligations. *Id. Accord Merrill MBS*, 277 F.R.D. at 108. Therefore, win or lose, proof of liability may be resolved classwide in one "stroke" because it turns on the same alleged omissions for all members of the proposed Class, thereby satisfying Rule 23(a)(2).

### 3.   Lead Plaintiff's Claims are Typical of the Class

Rule 23(a)(3) focuses on "'whether the claims of the putative class representatives are typical of the class sharing common questions.'" *In re Vivendi Universal, S.A. Secs. Litig.*, 242 F.R.D. 76, 84-85 (S.D.N.Y. 2007) (citation omitted). Plaintiff must show that "'each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability.'" *Dynex MBS*, 2011 WL 781215, at *3 (quoting *In re Flag Telecom Holdings Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009)).

Rule 23(a)(3) is "'not demanding.'" *Dynex MBS*, 2011 WL 781215, at *3 (citation omitted). "'When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims.'" *Merrill MBS*, 277 F.R.D. at 106 (quoting *Robidoux,* 987 F.2d at 936-37).

Plaintiff's claims are typical of the claims of the Class.  Like other investors, Plaintiff was damaged by purchasing the CDOs pursuant to Offering Circulars that contained the same allegedly material omissions concerning investment risk.  Thus, while Plaintiff purchased only one tranche in each CDO, its claims arise from the same course of conduct that gives rise to the claims of the Class, and will focus on the same omissions and legal theories in proving Defendants' liability.  Mason Report ¶ 30 (Ex. 1). *Accord Dynex MBS*, 2011 WL 781215, at *8

(finding typicality where offering documents allegedly misstated mortgage underwriting and origination practices); *Merrill MBS*, 277 F.R.D. at 108 (finding typicality where the "representations in each Offering apply equally to all tranches within that Offering"); *DLJ MBS*, 2011 WL 3874821, at *3-4.

Nor do differences in purchase amounts or dates render a claim atypical. *See Merrill MBS*, 277 F.R.D. at 109 ("'Factual differences involving the date of acquisition, type of securities purchased and manner by which the investor acquired the securities will not destroy typicality if each class member was the victim of the same material misstatements and the same fraudulent course of conduct.'") (citation omitted).  Plaintiff and all CDO investors share the same claims based on the same alleged underlying conduct and omissions.  Plaintiff therefore satisfies Rule 23(a)(3).

### 4.  Plaintiff Will Fairly and Adequately Protect the Class

Rule 23(a)(4) inquires into whether "'(1) plaintiffs' interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation.'" *Dynex MBS*, 2011 WL 781215, at *2 (quoting *Flag Telecom*, 574 F.3d at 35).  *Accord* Fed. R. Civ. P. 23(g)(1) and (4) (appointment of class counsel).

A finding that a class representative satisfies the typicality requirement constitutes "strong evidence that [its] interests are not antagonistic to those of the class; the same strategies that will vindicate plaintiff['s] claims will vindicate those of the class." *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 158 (S.D.N.Y. 2008); *see also In re Monster Worldwide, Inc. Secs. Litig.*, 251 F.R.D. 132, 134 (S.D.N.Y. 2008) (stating that the typicality and adequacy requirements "tend to merge").

14

Plaintiff's interests are directly aligned with the putative members of the proposed Class, each of whom purchased Hudson CDOs pursuant to the same alleged omissions. And far from being an impediment, Plaintiff -- with nearly $4 million in losses and all the investment sophistication it allegedly has -- is precisely the type of investor that Congress encouraged under the Private Securities Litigation Reform Act of 1995 ("PSLRA") to lead securities class actions, and thereby "increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel." H.R. Conf. Rep. No. 104-369, 1995 WL 709276, at *32 (Nov. 28, 1995); *see also Wagner v. Barrick Gold Corp.,* 251 F.R.D. 112, 117 (S.D.N.Y. 2008) ("[C]ourts have held that sophistication of the class representative does not necessarily mean 'his claim arises any less from the same course of events and raises the same legal liabilities as every other member of the putative class.'") (citations omitted); *Glauser v. EVCI Career Colleges Hldg. Corp.,* 236 F.R.D. 184, 188 (S.D.N.Y. 2006) (sophisticated investors are "ideally suited to control this type of securities class action litigation").

Plaintiff and the Class share the same interests in establishing Defendants' liability and damages, and even in defeating GS&Co's defenses that it disclaimed owing any duties to investors. *See Goldman MBS,* 280 F.R.D. at 136 (certifying class despite "the differences among tranches"); *In re WorldCom,* 219 F.R.D. at 282 ("plaintiffs' interests are directly aligned with those of the absent class members: they are purchasers of WorldCom equity and debt securities who suffered significant losses as a result of the investments").

Plaintiff has also produced over 40,000 pages of documents, sat for a full-day deposition and demonstrated its commitment to prosecute this action. *See* Ex. 18 (attaching Declaration of

Alan S. Brody). It has also retained experienced counsel who have prosecuted this case from inception and are committed to doing so going forward. Lederer Decl. ¶¶ 3-4. Proposed Class counsel, Berger & Montague, P.C. ("B&M"), is qualified and capable in prosecuting *and* defending complex class action litigation; has a proven record of success in securities class actions; and has served as lead or co-lead counsel in several cases that have produced among the largest recoveries since the passage of the PSLRA. *See, e.g.,* Ex. 19 (attaching B&M résumé); *In re Merrill Lynch Secs., Deriv. & ERISA Litig.,* 07-cv-9633 (JSR) (S.D.N.Y.) ($475 million recovery approved in August 2009); *In re DRDGold Ltd. Secs. Litig.,* 472 F. Supp. 2d 562 (S.D.N.Y. 2007) (Marrero, J.) (dismissing securities class action). Gusrae Kaplan & Nusbaum PLLC ("GKN"), which is based in New York, is also experienced in securities matters and is qualified to serve as local counsel for the proposed Class. Ex. 20 (attaching GKN résumé). Hence, the requirements of Rules 23(a)(4) and (g)(1) and (4) are satisfied.

### C.   The Proposed Class Satisfies the Requirements of Fed. R. Civ. P. 23(b)(3)

#### 1.   Common Questions Predominate

"'Class-wide issues predominate if resolution of *some* of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'" *Merrill MBS,* 277 F.R.D. at 110-11 (emphasis added) (quoting *UFCW Local 1776 v. Eli Lilly and Co.,* 620 F.3d 121, 131 (2d Cir. 2010)).

Predominance under Rule 23(b)(3) "does not require a plaintiff to show that there are no individual issues." *Merrill MBS,* 277 F.R.D. at 111; *accord IndyMac MBS,* 2012 WL 3553083, at *5; *RA MBS,* 283 F.R.D. at 210. While some individual issues may arise, "to allow 'various secondary issues of plaintiff's claim to preclude certification of a class would render the rule an

16

impotent tool for private enforcement of the securities laws.'" *Merrill MBS*, 277 F.R.D. at 111

(citation omitted).  The Supreme Court has recognized that "[p]redominance is a test readily met

in certain cases alleging consumer or securities fraud." *Amchem Prods., Inc. v. Windsor*, 521

U.S. 591, 625 (1997).

     Courts in this District routinely find that common questions predominate over individual

questions in cases alleging misstatements in RMBS offering documents, despite defendants'

claims that plaintiffs were sophisticated and had access to publicly available facts concerning the

riskiness of the underlying collateral.  *See* n.4 *supra*.

     Here, common questions predominate over any individual ones.  With respect to

Plaintiff's § 10(b) claim, the elements are: "'the defendant (1) made misstatements or omissions

of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities,

(4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of

its injury.'" *Dodona*, 847 F. Supp. 2d at 637 (quoting *ATSI Comm., Inc. v. Shaar Fund, Ltd.*, 493

F.3d 87, 105 (2d Cir. 2007)).  Each of these elements may be met with proof common to the

proposed Class.  *See* Ex. 21 (attaching Plaintiff's Proposed Trial Plan).

     *First*, Plaintiff intends to use Goldman's own internal documents and other common

evidence to prove that Defendants are liable for their respective roles in omitting material facts

from the Offering Circulars.  *See, e.g., Id.* §§ II(B)(2)(a-e); *Lapin v. Goldman Sachs & Co.*, 254

F.R.D. 168, 181 (S.D.N.Y. 2008) (omission claims are susceptible to generalized proof); *In re*

*Marsh & McLennan Cos., Inc. Sec. Litig.*, No. 04-cv-8144(CM), 2009 WL 5178546, at *11

(S.D.N.Y. Dec. 23, 2009) (accord).

     By definition, materiality can also be assessed on a classwide basis because it "is satisfied

when a plaintiff alleges 'a statement or omission that a reasonable investor would have

17

considered significant in making investment decisions[.]'" *Litwin v. Blackstone Grp. L.P.,* 634

F.3d 706, 717 (2d Cir.) (citation omitted), *cert. denied* 132 S.Ct. 242 (2011); *accord Dynex MBS*,

2011 WL 781215, at *7 (omitted facts are material where a "'reasonable investor might have

considered them important'") (citations omitted); *Matrixx Initiatives Inc. v. Siracusano,* 131 S.

Ct. 1309, 1318 (2011) (materiality is met where disclosure "significantly altered the 'total mix'

of information made available") (citation omitted); *In re Salomon Analyst Metromedia Litig.,*

544 F.3d 474, 486 n.9 (2d Cir. 2008) ("plaintiffs must show that the statement is material").

Here, Dr. Mason has concluded that full disclosure of the risk associated with investing in the

Hudson CDOs would have been "quite relevant in evaluating the investment opportunity[.]"

Mason Report ¶ 36 (Ex. 1).

     *Second*, Plaintiff intends to also demonstrate on a classwide basis via Goldman's own

internal documents and other common evidence that Defendants acted with the requisite mental

state. *See, e.g., Lapin*, 254 F.R.D. at 181 (scienter can be proven by common evidence for

predominance purposes). *Accord* Ex. 21 § II(B)(2)(b) (Plaintiff's Proposed Trial Plan).

     *Third*, there can be no reasonable dispute that the alleged omissions were in connection

with the sale and purchase of securities. To the extent any such dispute arises, that too may be

resolved via resort to the Offering Circulars and trading records which likewise implicate

evidence common to the Class. *Id.* § II(B)(2)(c).

     *Fourth*, "[s]ince Dodona alleges omissions rather than affirmative misstatements, the

element of reliance may be presumed if the omissions were material." *Dodona*, 847 F. Supp. 2d

at 648; *accord Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972)

(Where, as here, the claim is "primarily a failure to disclose, positive proof of reliance is not a

prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense

that a reasonable investor might have considered them important in the making of this decision."); *Dynex MBS*, 2011 WL 781215, at *7 ("The *Affiliated Ute* presumption applies here because 'the alleged omissions played an independent, or at least interdependent, role in the alleged fraud.' ... This renders the issue of reliance common to all class members.") (citation omitted); *In re Beacon Assocs. Litig.*, 282 F.R.D. 315, 328-29 (S.D.N.Y. 2012) (accord).[8]

Indeed, "'whether Plaintiffs will be able to utilize [the *Affiliated Ute*] presumption of reliance presents a question that is common to the classes.'" *In re Revco Secs. Litig.*, 142 F.R.D. 659, 664-65 (N.D. Ohio 1992) (citation omitted).

Although less settled than under § 10(b), several cases have recognized a similar presumption under New York law where, as here, the omitted facts are peculiarly within the defendant's knowledge. *See, e.g., JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 410 (S.D.N.Y. 2004) ("Under New York law, a plaintiff is not precluded from claiming reliance if the facts allegedly misrepresented are 'peculiarly within the [defendant's] knowledge.'") (quoting *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 80 (2d Cir. 1980)); *Steinhardt Group Inc. v. Citicorp*, 708 N.Y.S.2d 91, 93 (N.Y. App. Div. 2000) ("[A] purchaser may not be precluded from claiming reliance on misrepresentations of facts peculiarly within the seller's knowledge, notwithstanding the execution of a specific disclaimer."); *Kenavan v. Empire Blue Cross and Blue Shield*, No. 91-cv-2393(KMW), 1993 WL 128012, at *4 (S.D.N.Y. Apr. 19, 1993) ("New York courts have observed that reliance may be assumed for purposes of class certification 'subject to such proof as is required on the trial'") (citation omitted); *In re College Bound Consol. Litig.*, No. 93-cv-2348(MBM), 1994 WL 236163, at *3 (S.D.N.Y. May 31, 1994)

---

[8]    Hence, cases such as *In re IPO*, 471 F.3d at 42, that involve the *other* way reliance may be presumed in securities fraud cases -- *i.e.,* the fraud-on-the-market presumption -- simply have no applicability here, as Plaintiff is not proceeding under that presumption.

(certifying common law fraud claim); *In re Crazy Eddie Secs. Litig.*, 802 F. Supp. 804, 812 (E.D.N.Y. 1992).[9]

*Fifth*, though not required for class certification, issues of loss causation and even damages can be resolved by common proof. Mason Report ¶ 53 (Ex. 1); *Lapin*, 254 F.R.D. at 181 (differences in damages do "not defeat certification if the method of calculating damages is common to the class"). Indeed, "it is well-established that the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification." *Seijas v. Republic of Argentina*, 606 F.3d 53, 58 (2d Cir. 2010); *accord Dynex MBS*, 2011 WL 781215, at *3. *See also Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2183 (2011) (securities fraud plaintiffs need not "prove loss causation in order to obtain class certification").

For example, Plaintiff seeks rescission for members of the Class who continue to hold their CDOs, and a rescissionary measure of damage for those who, like Plaintiff, sold which clearly applies classwide. *See* Mason Report ¶¶ 49-50 (Ex. 1); *Chasins v. Smith, Barney & Co.*, 438 F.2d 1167, 1173 (2d Cir. 1970) (awarding rescission under § 10(b); "[s]uch a measurement is justified where, as here, the evil is not the price at which [plaintiffs] bought but the fact of being induced to buy and invest for some future growth in these stocks without disclosure"); *Boguslavsky v. Kaplan*, 159 F.3d 715, 721 n.5 (2d Cir. 1998) ("We note that rescission is also available as a remedy for violations of § 10(b) ...."); *Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974) (accord); *Ambassador Hotel Co., Ltd. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1031 (9th Cir. 1999) ("If true rescission is no longer possible (perhaps because the plaintiff no longer owns the

---

[9]     Cases such as *Int'l Fund Mgmt. S.A. v. Citigroup Inc.*, 822 F. Supp. 2d 368, 387 (S.D.N.Y. 2011), have found a presumption of reliance to be unavailable under New York common law. Unlike here, however, the plaintiffs there alleged affirmative misrepresentations, and the court found that the allegations of reliance were "too conclusory to state a claim to relief." *Id.* at 387.

subject of the sale), the court may order its monetary equivalent."); *Randall v. B.J. Loftsgaarden*, 478 U.S. 647, 661-62 (1986) (acknowledging rescission under § 10(b)); Robert B. Thompson, *The Measure of Recovery Under Rule 10b-5: A Restitution Alternative to Tort Damages*, 37 Vand. L. Rev. 349, 365 (1984) ("most courts recognize that a plaintiff instead may choose rescission or a money judgment that is the financial equivalent of rescission").

Additionally, the Hudson CDOs began to be downgraded by ratings agencies within only months after they were issued. Ex. 17.[10]  Ratings downgrades that reveal the risk of a deterioration in the credit quality of a security can satisfy loss causation under § 10(b) and provide a basis to compute damages classwide. *See, e.g., Dodona,* 847 F. Supp. 2d at 650 (holding that there is a "reasonable inference that the omissions 'bear upon the loss suffered such that [Dodona] would have been spared all or an ascertainable portion of that loss absent the fraud'") (citation omitted); *In re Vivendi Universal, S.A. Sec. Litig.,* 605 F. Supp. 2d 586, 598 (S.D.N.Y. 2009) (issue of fact as to whether rating downgrades materialized the concealed risk of issuer's liquidity crisis).  Plaintiff also contends that Goldman was "'an active participant in the collapse of [the Hudson CDOs] and the financial markets in general, rather than a passive victim.'" *Dodona,* 847 F. Supp. 2d at 649-50 (citations omitted).

Many of the elements of Plaintiff's claims under New York common law are similar to § 10(b) and can be met with the same proof common to the Class. *See Dodona,* 847 F. Supp. 2d

---

[10]     Though downgrades occurred earlier, the class period should end on April 27, 2010, when the truth about the CDOs began to be disclosed amid Goldman's U.S. Senate testimony. *See, e.g., In re Pfizer Inc. Secs. Litig.*, 282 F.R.D. 38, 53 (S.D.N.Y. 2012) ("In a securities class action, the class period should end when the market is 'cured' - that is, 'when the full truth has been disclosed to the market[.]'") (citation omitted); *In re Worldcom*, 219 F.R.D. at 307 ("a class period should not be cut off if questions of fact remain as to whether the disclosures completely cured the market").

21

at 652 (citing cases); Plaintiff's Proposed Trial Plan § II(B)(2)(a-c) (Ex. 21) (illustrating ways in which to prove Plaintiff's common law claims with classwide proof).

Defendants might cite *New Jersey Carpenters Health Fund v. RALI Series 2006-QO1 Trust*, 477 Fed. Appx. 809 (2d Cir. Apr. 30, 2012). There, the court affirmed the denial of class certification on predominance grounds since the plaintiffs and other class members had *actual* knowledge of the allegedly misstated underwriting guidelines at issue. One plaintiff hired an investment advisor who met with the loan originators and actually learned of their lax underwriting practices prior to investing, and information about those practices had even become public before certain plaintiffs invested. Here, by contrast, Plaintiff and the Class not only lacked knowledge that Defendants used the CDOs to bet fraudulently against the interests of Goldman's own clients, but could not have timely known the truth absent an admission (or, as the case here, until the U.S. Senate proceedings). Other cases have similarly distinguished *RALI*.[11] Further, Judge Baer subsequently certified a class on a fuller record in *RALI*, holding that "Defendants' affirmative defenses may not be as individualized as I had previously concluded." *RC MBS*, 2012 WL 4865174, at *3.

---

[11]    *See, e.g., Goldman MBS*, 280 F.R.D. at 137 (finding predominance where there was no evidence that sophisticated investor plaintiffs had knowledge of defendants' lax underwriting); *Merrill MBS*, 277 F.R.D. at 117 (stating that *RALI* was "narrowly confined to its own particular facts and the record before that Court"); *RA MBS*, 283 F.R.D. at 213 ("This stands in contrast to [*RALI*], where the district court found what it felt were specific statements by certain class members, many of whom were sophisticated investors, demonstrating specific individual knowledge of the underlying loans and underwriting guidelines set forth in the relevant offering documents. Such findings are not easily made, and this Court makes no such finding here."); *IndyMac MBS*, 2012 WL 3553083, at *8 (accord); *DLJ MBS*, 2011 WL 3874821, at *7 n.1 (rejecting defendants' knowledge arguments, distinguishing *RALI*, and finding predominance). *See also In re Monster*, 251 F.R.D. at 137 (predominance found absent "direct evidence that any putative class member actually knew about" the alleged misconduct); *Lapin*, 254 F.R.D. at 184 (S.D.N.Y. 2008) (accord).

### 2.    Class Treatment is Superior

Rule 23(b)(3) also requires that a class action be superior to other available methods for fairly and efficiently adjudicating the controversy.  In general, "'securities suits ... easily satisfy the superiority requirement.'"  *Merrill MBS*, 277 F.R.D. at 120 (quoting *Lapin*, 254 F.R.D. at 187); *accord In re Monster*, 251 F.R.D. at 139.

Rule 23(b)(3) provides four factors pertinent to the superiority analysis:

(A)    the class members' interests in individually controlling the prosecution or defense of separate actions;

(B)    the extent and nature of any litigation concerning the controversy already brought by or against class members;

(C)    the desirability of concentrating the litigation of the claims in the particular forum; and

(D)    the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D).  Each of these factors weighs in favor of certifying the Class.

*First*, Class members have not sought to individually control their own separate actions.  The absence of any such interest supports a finding of superiority.  *Merrill MBS*, 277 F.R.D. at 120; *IndyMac MBS*, 2012 WL 3553083, at *10; *Dynex MBS*, 2011 WL 781215, at *8.  Indeed, absent class certification, many Class members may as a practical matter be denied any chance for relief given the relative size of their investments.  *See* Mason Report ¶ 47 (Ex. 1); *IndyMac MBS,* 2012 WL 3553083, at *10 ("Smaller investors who were not allowed to partake in a class action would be unlikely to have the resources or the incentive to bring individual suits.").

*Second,* Plaintiff is unaware of any other pending litigation brought by or against putative Class members concerning the Hudson CDOs.  This fact also favors a finding of superiority.  *See Merrill MBS*, 277 F.R.D. at 120; *In re EVCI Career College Holding Corp. Sec. Litig.*, No. 05-

cv-10240, 2007 WL 2230177, at *14 (S.D.N.Y. July 27, 2007) (class members who "would prefer to individually control the prosecution of their claims ... have the opportunity to opt out or be represented by counsel of their own choice").

*Third*, it is desirable to concentrate the litigation in this Court. The action has been pending since September 30, 2010. The Court has already ruled on Defendants' motions to dismiss, is familiar with the claims and defenses, and is experienced in complex securities litigation, among other things. All claims and defenses should be resolved by the Court that is familiar with the issues and has a record of efficiently adjudicating complex litigation of this type. *See RA MBS*, 283 F.R.D. at 218 ("Here, where this action has been before it since 2009 and the Court has issued previous opinions, including the opinion resolving [defendant's] motion to dismiss, efficiency further counsels in favor of class certification."); *Merrill MBS*, 277 F.R.D. at 121 ("'[C]oncentrating litigation in a single forum plainly has a number of benefits, including eliminating the risk of inconsistent adjudications and promoting the fair and efficient use of the judicial system ....'"; also holding that "Beyond all this, there is a fundamental fact that trying this as a class action, as opposed to multiple individual actions ... , cannot help but result in a huge savings of judicial resources ....  No one familiar with modern federal dockets can minimize the importance of such savings.") (citation omitted).

*Fourth*, the Court is unlikely to face unusual manageability difficulties with the class action "apart from those inherent in any hard fought battle where substantial sums are at issue and all active parties are represented by able counsel." *In re WorldCom*, 219 F.R.D. at 305. Plaintiff's Trial Plan illustrates the manageability of the issues here which may be tried on a classwide basis. *See* Ex. 21. To the extent that any management issues arise, the Court has many tools "'to see that all members of the class are protected, including but not limited to the

authority to alter or amend the class certification order pursuant to Rule 23(c)(1)(C), to certify

subclasses pursuant to Rule 23(c)(5), and the authority under Rule 23(d) to issue an order

ensuring the fair and efficient conduct of the action.'" *Merrill MBS*, 277 F.R.D. at 121 (quoting

*In re Flag Telecom*, 574 F.3d at 37).

## CONCLUSION

Plaintiff respectfully requests that the Court certify the Class and appoint Plaintiff as

Class representative, B&M as Class counsel, and GKN as local counsel.

Dated:  December 17, 2012

David S. Frydman
(dfrydman@gkblaw.com)
Gusrae Kaplan Nusbaum, PLLC
120 Wall Street
New York, NY  10005
Tel:  (212) 269-1400
Fax:  (212) 809-5449

*Local Counsel for Lead Plaintiff Dodona I,*
*LLC and the Proposed Class*

Respectfully submitted,

Berger & Montague, P.C.

Lawrence J. Lederer (llederer@bm.net)
Robin Switzenbaum (rswitzenbaum@bm.net)
Arthur Stock (astock@bm.net)
Gary Cantor (gcantor@bm.net)
Steven L. Bloch (sbloch@bm.net)
Lane L. Vines (lvines@bm.net)
Jon Lambiras (jlambiras@bm.net)
1622 Locust Street
Philadelphia, PA 19103
Tel:  (215) 875-3000
Fax:  (215) 875-4604

*Lead Counsel for Lead Plaintiff Dodona I,*
*LLC and the Proposed Class*

kal5091229