**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DODONA I, LLC, on Behalf of Itself and All Others
Similarly Situated,

      Plaintiff,

v.

GOLDMAN, SACHS & CO.; THE GOLDMAN
SACHS GROUP, INC.; HUDSON MEZZANINE
FUNDING 2006-1, LTD.; HUDSON MEZZANINE
FUNDING 2006-1, CORP.; HUDSON MEZZANINE
FUNDING 2006-2, LTD.; HUDSON MEZZANINE
FUNDING 2006-2, CORP.; PETER L. OSTREM and
DARRYL K. HERRICK,

      Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

No. 10 Civ. 7497 (VM) (DCF)

ECF Case

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVE AND CLASS COUNSEL

Richard H. Klapper (*klapperr@sullcrom.com*)
Theodore Edelman (*edelmant@sullcrom.com*)
Michael T. Tomaino, Jr. (*tomainom@sullcrom.com*)
Andrew J. DeFilippis (*defilippisa@sullcrom.com*)
Jacob M. Croke (*crokej@sullcrom.com*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Counsel for Defendants Goldman, Sachs & Co.,*
*The Goldman Sachs Group, Inc., Peter L.*
*Ostrem and Darryl K. Herrick*

May 15, 2013

Contains Confidential Discovery Material

# <u>TABLE OF CONTENTS</u>

Page

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ....................................................................................................................6

    A.    Summary of Plaintiff's Allegations and Class Certification Motion ......................6

    B.    The Hudson CDOs ..................................................................................................8

    C.    Plaintiff Was a Sophisticated Hedge Fund ............................................................9

    D.    ███████████████████████████ ............................................10

    E.    The Putative Class Consists of Highly Sophisticated Investors from Around the World, Each of Which Disclaimed Reliance on Goldman Sachs ...................................................................................................................11

STANDARD FOR CLASS CERTIFICATION .........................................................................12

ARGUMENT .......................................................................................................................13

I.     PLAINTIFF FAILS TO MEET RULE 23(b)(3)'S REQUIREMENT OF PREDOMINANCE ....................................................................................................13

    A.    Individualized Issues of Reliance Predominate .................................................13

         1.    No Class-Wide Presumption of Reliance Applies ....................................13

             a.    The *Affiliated Ute* Presumption Does Not Apply .........................14

             b.    In Any Event, the *Affiliated Ute* Presumption Has Been Rebutted ........................................................................................19

             c.    The *Affiliated Ute* Presumption is Inapplicable to State Law Claims ..........................................................................................20

         2.    Reliance Must Be Assessed on an Investor-by-Investor Basis .................20

         3.    *Anwar* v. *Fairfield Greenwich* Is Not to the Contrary ...............................25

    B.    Individualized Issues of Loss Causation and Damages Predominate ..................25

II.    THE RULE 23(a) REQUIREMENT OF NUMEROSITY IS NOT MET ........................27

III.   PLAINTIFF HAS FAILED TO MEET THE RULE 23(a) REQUIREMENTS OF TYPICALITY AND ADEQUACY ..................................................................................29

      A.     Plaintiff Is Subject to Unique Defenses ..................................................................29

      B.     Plaintiff's Interests Are Antagonistic to Other Class Members ...........................30

IV.    A CLASS ACTION IS NOT SUPERIOR TO INDIVIDUAL ACTIONS ......................30

CONCLUSION ...........................................................................................................................30

# <u>TABLE OF AUTHORITIES</u>

Page(s)

## CASES

*Abbey* v. *3F Therapeutics Inc.*,
2011 WL 651416 (S.D.N.Y. Feb. 22, 2011)..........................................................................23

*Abu Dhabi Comm. Bank* v. *Morgan Stanley & Co.*,
269 F.R.D. 252 (S.D.N.Y. 2010) .......................................................................21, 26, 27, 28

*ACA Fin. Guar. Corp.* v. *Goldman, Sachs & Co.*,
2013 WL 1953751 (1st Dep't May 14, 2013)......................................................................23

*Affiliated Ute Citizens of Utah* v. *United States*,
406 U.S. 128 (1972).................................................................................................. *passim*

*Amchem Prods. Inc.* v. *Windsor*,
521 U.S. 591 (1997)...........................................................................................................13

*Amgen Inc.* v. *Conn. Ret. Plans & Trust Funds*,
133 S. Ct.1184 (2013)......................................................................................................1, 14

*Anwar* v. *Fairfield Greenwich Ltd.*,
2013 WL 662972 (S.D.N.Y. Feb. 25, 2013).............................................................. *passim*

*Basic Inc.* v. *Levinson*,
485 U.S. 224 (1988)...........................................................................................................17

*Basis Yield Alpha Fund* v. *Goldman Sachs Grp., Inc.*,
789 F. Supp. 2d 533 (S.D.N.Y. 2011)...........................................................................29, 30

*Berrios* v. *Sprint Corp.*,
1998 WL 199842 (E.D.N.Y. Mar. 16, 1998).....................................................................30

*Blessing* v. *Sirius XM Radio Inc.*,
2011 WL 1194707 (S.D.N.Y. Mar. 29, 2011) ...................................................................12

*Citibank, N.A.* v. *K-H Corp.*,
968 F. Supp. 2d 1489 (2d Cir. 1992) ...............................................................................27

*Comcast Corp.* v. *Behrend*,
133 S. Ct. 1426 (2013) ......................................................................................................25

*Congregation of the Passion, Holy Cross Province* v. *Kidder Peabody & Co.*,
800 F.2d 177 (7th Cir. 1986) ............................................................................................28

*Dodona I, LLC* v. *Goldman, Sachs & Co.*,
  847 F. Supp. 2d 624 (S.D.N.Y. 2012)..........................................................................*passim*

*DuPont* v. *Brady*,
  828 F.2d 75 (2d Cir. 1987)...........................................................................................14

*Epirus Capital Mgmt., LLC* v. *Citigroup Inc.*,
  2010 WL 1779348 (S.D.N.Y. Apr. 29, 2010)..................................................................9

*Ganino* v. *Citizens Utils Co.*,
  228 F.3d 154 (2d Cir. 2000)..........................................................................................14

*Gary Plastic Packaging Corp.* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  903 F.2d 176 (2d Cir. 1990)..........................................................................................29

*Global Intellicom, Inc.* v. *Thomson Kernaghan & Co.*,
  1999 WL 544708 (S.D.N.Y. July 27, 1999) ...................................................................22

*HSH Nordbank AG* v. *UBS AG*,
  95 A.D.3d 185 (N.Y. 1st Dep't 2012)........................................................................*passim*

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*,
  398 F. Supp. 2d 244 (S.D.N.Y. 2005)...........................................................................28

*In re Beacon Assocs. Litig.*,
  282 F.R.D. 315 (S.D.N.Y. 2012) ..................................................................................19

*In re College Bound Consol. Litig.*,
  1994 WL 172408 (S.D.N.Y. May 4, 1994) ....................................................................20

*In re College Bound Consol. Litig.*,
  1994 WL 236163 (S.D.N.Y. May 31, 1994) ..................................................................20

*In re Crazy Eddie Securities Litigation*,
  802 F. Supp. 804 (E.D.N.Y. 1992) ...............................................................................20

*In re Fed. Home Loan Mortg. Corp.*,
  281 F.R.D. 174 (S.D.N.Y. 2012) ..................................................................................13

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  574 F.3d 29 (2d Cir. 2009)...........................................................................................30

*In re Goldman Sachs Group, Inc. S'holder Litig.*,
  2011 WL 4826104 (Del. Ch. Oct. 12, 2011) ...................................................................8

*In re IPO Sec. Litig.*,
  471 F.3d 24 (2d Cir. 2006)......................................................................................13, 21

*In re Laser Arms Corp. Sec. Litig.,*
   794 F. Supp. 475 (S.D.N.Y. 1989) ........................................................................27

*In re Livent Noteholders Sec. Litig.,*
   211 F.R.D. 219 (S.D.N.Y. 2002) ..........................................................................23

*In re Moody's Corp. Sec. Litig.,*
   274 F.R.D. 480 (S.D.N.Y. 2011) ..........................................................................14

*In re Omnicom Grp., Inc. Sec. Litig.,*
   597 F.3d 501 (2d Cir. 2010)..................................................................................26

*In re Revco Sec. Litig.,*
   142 F.R.D. 659 (N.D. Ohio 1992) ........................................................................17

*In re Salomon Analyst Metromedia Litig.,*
   236 F.R.D. 208 (S.D.N.Y. 2006) ..........................................................................14

*In re Smith Barney Transfer Agent Litig.,*
   2013 WL 1150737 (S.D.N.Y. Mar. 21, 2013) ......................................................14

*In re Tronox, Inc. Sec. Litig.,*
   2010 WL 2835545 (S.D.N.Y. June 28, 2010) ......................................................28

*Int'l Fund Mgmt. S.A. v. Citigroup, Inc.,*
   822 F. Supp. 2d 368 (S.D.N.Y. 2011).................................................................20

*JP Morgan Chase Bank v. Winnick,*
   350 F. Supp. 2d 393 (S.D.N.Y. 2004)..................................................................20

*JSMS Rural LP v. GMG Capital Partners II, LP,*
   2006 WL 186742 (S.D.N.Y. July 6, 2006) ..........................................................26

*Kenavan v. Empire Blue Cross & Blue Shield,*
   1993 WL 128012 (S.D.N.Y. Apr. 19, 1993)........................................................20

*Kottler v. Deutsche Bank AG,*
   2010 WL 1221809 (S.D.N.Y. Mar. 29, 2010) ....................................................13

*Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.,*
   478 Fed. App'x 679 (2d Cir. 2012)......................................................................21

*Lentell v. Merrill Lynch & Co.,*
   396 F.3d 161 (2d Cir. 2005)..................................................................................27

*Levitt v. J.P. Morgan Sec., Inc.,*
   710 F.3d 454 (2d Cir. 2013)..................................................................................17

*Lewis Tree Serv.* v. *Lucent Techs., Inc.*,
211 F.R.D. 228 (S.D.N.Y. 2002) ........................................................27

*Loreley Fin. (Jersey) No. 4 Ltd.* v. *UBS Ltd.*,
2013 WL 1406036 (N.Y. Sup. Ct. Apr. 5, 2013) .................................19

*Matthews* v. *Kidder, Peabody 7 Co.*,
260 F.3d 239 (3d Cir. 2001) .............................................................26

*Morris* v. *Wachovia Sec., Inc.*,
223 F.R.D. 284 (E.D. Va. 2004) ......................................................17

*Morrison* v. *Nat'l Australia Bank*,
130 S. Ct. 2869 (2010) ....................................................................29

*Myers* v. *Hertz Corp.*,
624 F.3d 537 (2d Cir. 2010) ............................................................12

*N.J. Carpenters Health Fund* v. *Residential Capital, LLC*,
272 F.R.D. 160 (S.D.N.Y. 2011) ......................................................22

*Novella* v. *Westchester Cnty.*,
443 F. Supp. 2d 540 (S.D.N.Y. 2006) ..............................................30

*Pa. Ave. Funds* v. *Inyx Inc.*,
2011 WL 273544 (S.D.N.Y. July 5, 2011) ........................................29

*Primavera Familienstiftung* v. *Askin*,
178 F.R.D. 405 (S.D.N.Y. 1998) ......................................................28

*Public Emps. Ret. Sys. of Mississippi* v. *Merrill Lynch & Co.*,
277 F.R.D. 97 (S.D.N.Y. 2011) ........................................................24

*Rail Corp.* v. *Town of Hyde Park*,
47 F.3d 473 (2d Cir. 1995).............................................................28

*Robidoux* v. *Celani*,
987 F.2d 931 (2d Cir. 1993)............................................................28

*Schuler* v. *NIVS Intellimedia Tech. Grp., Inc.*,
2013 WL 944777 (S.D.N.Y. Mar. 12, 2013) ....................................26

*Sec. Investor Prot. Corp.* v. *BDO Seidman, LLP*,
222 F.3d 63 (2d Cir. 2000)..............................................................20

*SEC* v. *Goldman, Sachs & Co.*,
790 F. Supp. 2d 147 (S.D.N.Y. 2011)..............................................29

*Seibert* v. *Sperry Rand Corp.*,
    586 F.2d 949 (2d Cir. 1978)........................................................................19

*Spagnola* v. *Chubb Corp.*,
    264 F.R.D. 76 (S.D.N.Y. 2010) ..............................................................13

*Starr ex rel. Estate of Samson* v. *Georgeson S'holder, Inc.*,
    412 F.3d 103 (2d Cir. 2005).....................................................................15

*State St. Bank & Trust Co.* v. *Salovaara*,
    326 F.3d 130 (2d. Cir. 2003).....................................................................30

*Steinhardt Grp. Inc.* v. *Citicorp*,
    272 A.D.2d 255 (App. Div. 2000) ...........................................................20

*Wal-Mart Stores, Inc.* v. *Dukes*,
    131 S. Ct. 2541 (2011).............................................................................12

## STATUTES, RULES AND REGULATIONS

28 U.S.C. § 1685(b) ...................................................................................................30

FED. R. CIV. P. 23 ................................................................................................ *passim*

FED. R. CIV. P. 26 ......................................................................................................33

S.E.C. Regulation S, 17 C.F.R. § 230.901, *et seq.* ...................................................4

S.E.C. Rule 10b-5, 17 C.F.R. § 240.10b-5 ...........................................10, 21, 22, 30

S.E.C. Rule 144A, 17 C.F.R. § 230.144A ..................................................................4

Defendants Goldman, Sachs & Co., The Goldman Sachs Group, Inc. (together with

Goldman, Sachs & Co., "Goldman Sachs"), Peter L. Ostrem, and Darryl K. Herrick (collectively,

"Defendants") respectfully submit this memorandum in opposition to Plaintiff Dodona I, LLC's

("Plaintiff" or "Dodona") Motion for Class Certification and Appointment of Class

Representative and Class Counsel (the "Motion").

## PRELIMINARY STATEMENT

Plaintiff—a hedge fund whose complex strategies included investing in, *and betting*

*against*, highly-risky mortgage-related securities—asks the Court to certify a class of at most

several dozen exceptionally sophisticated institutional purchasers that privately negotiated

investments in two collateralized debt obligations ("CDOs") called Hudson Mezzanine Funding

2006-1 ("Hudson 1") and Hudson Mezzanine Funding 2006-2 ("Hudson 2") (collectively, the

"Hudson CDOs"), neither of which traded in any liquid or efficient market.  Plaintiff asserts

claims for violations of Sections 10(b) and 20(a) of the Securities Act of 1934 and New York

common law fraud, aiding and abetting fraud, and unjust enrichment.  Plaintiff alleges that

Defendants misrepresented Goldman Sachs' investment strategies regarding, and opinions as to

the future performance of, the Hudson CDOs' static reference portfolios (the "Reference

Obligations"), whose performance mirrored that of the broader mortgage market and not

anyone's individual investment strategy.

Plaintiff concedes, as this Court has previously observed, that the fraud-on-the-market

presumption of reliance does not apply here because no efficient market for the securities existed.

(Motion at 2.)  The absence of such a presumption in a Section 10(b) case "ordinarily preclude[s]

certification of a class action[.]"  *Amgen Inc.* v. *Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184,

1193 (2013).  That rule applies with even more force here given Plaintiff's common law claims,

as to which no reliance presumption could possibly apply.  Indeed, this Court already has held

that Plaintiff's federal securities law and state common law claims will hinge on factual determinations of investors' knowledge and reliance, including "the import of publicly available information," whether investors were "sophisticated" and whether they had access to "information necessary to unmask the alleged fraud." *Dodona I, LLC* v. *Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 649 (S.D.N.Y. 2012) (internal citation omitted).

Plaintiff seeks to salvage its proposed class—at least as to the Section 10(b) claims—by portraying this as an "omissions" case in which a rebuttable presumption of class-wide reliance may arise pursuant to *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972). (Motion at 3, 18.)  But the "omissions" label does not apply here and any such presumption would be vulnerable to investor-by-investor rebuttal.  Not only does Plaintiff challenge various affirmative representations, but each purported class member had access to and in some cases availed themselves of information that disclosed what Plaintiff claims was omitted.

It is difficult to conjure up a less appropriate case for class certification, given that the only commonality among the putative class members is that they all affirmatively disclaimed reliance on Defendants, and were all capable of, and required to make, their own investment analyses based on their own investment views and strategies.  Even the limited discovery to date has demonstrated that individual questions predominate here:

- In direct contradiction to Plaintiff's "omissions" theory, the February 4, 2011 amended complaint ("Amended Complaint" or "AC") filed by Plaintiff cites supposed misstatements by Defendants, ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████

- While the Offering Circulars informed all investors that Goldman Sachs was retaining the short position in the Hudson CDOs, at least two Hudson 1 investors—████████████████████—had *actual knowledge* of the very fact Plaintiff alleges was not disclosed—that Goldman Sachs intended to use Hudson 1 to reduce its long exposure to the ABX indices and other RMBS positions. █████████████████
  ███████████████████████████████████████████████████████
  ████████████████████████████████████████████████████████████
  ███████████████████████████████████████████████████████
  █████████████████████

- Other investors have submitted sworn statements in which they *directly contradicted* Plaintiff's claim that investors relied on their understanding of Goldman Sachs' alleged motivations, investment positions and views relating to the Hudson CDOs or the mortgage-backed securities market.  One investor declared, *inter alia*, that it (i) "[d]id not consider, and would not have considered material to its investment decision, Goldman Sachs's motivation for participating in the Hudson 2 offering or its views of the mortgage-backed securities market in general"; (ii) "[d]id not consider it to be material or relevant whether Goldman Sachs . . . held, or intended to hold, a 'long' or 'short' position with regard to the Hudson 2 Notes or the referenced securities"; and (iii) "[u]nderstood that it was common industry practice for firms such as Goldman Sachs to take "short" positions in CDOs such as Hudson 2 in order to reduce the firm's 'long' exposure to the referenced securities for the CDO."  (K.D., Ex. C, at ¶¶ 7-8.)  Another investor declared, *inter alia,* that it (i) "generally did not focus on whether [Goldman Sachs] kept the risk [of Hudson 1] or in turn hedged that risk by selling it to someone else," and (ii) "was driven by whether our side of the . . . transaction met our needs and our view of the relevant market, and not by what [Goldman Sachs] did with its side of the risk."  (K.D., Ex. D. at ¶ 7.)

- Although Plaintiff's Motion misleadingly characterizes the putative class as comprised of "similarly-situated long investors," ██████████████████████████
  ███████████████████████████████████████████████████████████
  ██████████████████████████████████████████████████████
  ██████████████████████████████████████████████████████
  ████████████████████████████████████████████████████████████

- ████████████████████████████████████████████████████████████
  ███████████████████████████████████████████████████████████
  ███████████████████████████████████████████████████████
  █████████████████████████████████████████

- ████████████████████████████████████████████████████████████
  ████████████████████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

In light of this and other evidence, Plaintiff's claims cannot be certified for class treatment for the following reasons:

*First*, Plaintiff fails to meet Rule 23(b)(3)'s requirement of predominance. Plaintiff cannot invoke the *Affiliated Ute* presumption of class-wide reliance for its Section 10(b) claim given the affirmative misstatements alleged.█████████████████████████████

████████████████████████████████████████████

████████████████████████ This testimony not only demonstrates the necessity of individualized inquiries concerning reliance, but also shows that Dodona's claims are not typical of other investors' claims, that Dodona is subject to unique defenses and that Dodona is not an adequate representative of a class pursuing claims predicated on an "omissions" theory. The evidence also shows that other investors ██████████████████████ had *actual knowledge* of the very information that Plaintiff claims was omitted, which underscores the need for individualized factual inquiries into what each investor knew and purportedly relied upon despite their reliance disclaimers. In short, unlike the typical Section 10(b) case in which passive investors have the same interests and obtain information from a common source, *see*, *e.g.*, *Anwar* v. *Fairfield Greenwich Ltd.*, 2013 WL 662972 (S.D.N.Y. Feb. 25, 2013), the sophisticated investors and their investment advisors here actively pursued unique strategies, sought varying information from multiple sources about the Hudson CDOs, and formed their own views about the overall market as to which the Hudson CDOs provided exposure, all without relying on Goldman Sachs' purported views. Assessing Plaintiff's claims and Defendants' defenses will

invariably entail individualized inquiries into myriad factual issues.[1]  *See* Section I(A).  Further, because New York law recognizes no *Affiliated Ute* presumption and requires that sophisticated purchasers conduct independent research and prove their reasonable reliance, individual issues of reliance necessarily will predominate with respect to Plaintiff's common law claims.  *See HSH Nordbank AG* v. *UBS AG*, 95 A.D.3d 185 (N.Y. 1st Dep't 2012).  Individualized issues concerning damages, loss causation, choice of law and statute of limitations defenses only compound the predominance of individual issues.  *See* Section I(B).

*Second,* the putative class does not meet the numerosity requirements of Rule 23(a).  Plaintiff's transparent attempt to lump the investors in Hudson 1 and Hudson 2 into a single class fails because the securities were issued in two separate and distinct offerings, at different times, with different offering materials and fundamental differences in their reference portfolios and capital structures.  Even considering the two offerings together, the number of putative class members is at most fewer than the forty-investor threshold for class actions.  *See* Section II.

*Third*, Plaintiff does not meet Rule 23(a)'s requirements of adequacy and typicality.  Plaintiff epitomizes the atypical and inadequate class representative because of, among other things, ███████████████████████████████████████████████████████████

███████████████████████████████████████████  *See* Section III.

---

[1]      Plaintiff repeatedly has sought this Court's intervention to quash or curtail Defendants' efforts to obtain narrowly-targeted discovery of putative class members on critical issues of knowledge and reliance.  Even the limited materials obtained from such discovery to date demonstrate that the proposed class members invested in the Hudson CDOs with materially different knowledge, objectives and investment strategies—requiring further individualized inquiries as to their purported reliance on Defendants.  *See* Section I(A) *infra*.

[2]   ██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
█████████████████████████████████████

*Fourth*, the class mechanism is not superior to litigation by those investors that believe they can prove a claim for fraud, because the sophisticated institutional investors and their investment advisors made their own decisions and are fully capable of pursuing their own actions ███████████████████████ *See* Section IV.

## BACKGROUND

### A.    Summary of Plaintiff's Allegations and Class Certification Motion

Plaintiff's Amended Complaint—████████████████████████████████████ ██████████████████████████████████ *see* Background Section D, *infra*—alleges both affirmative misstatements and purported omissions contained in the Hudson CDO Offering Circulars and in the marketing materials for Hudson 1.  The Amended Complaint's central premise is that, as active participants in the mortgage market, Defendants predicted the onset of the global financial crisis and used the Hudson CDOs to shift long exposure to clients.  (AC ¶¶ 2, 55-81, 160.)  Among the affirmative misstatements alleged in the Amended Complaint are that Hudson 1 was designed "to create a consistent, programmatic approach to invest in attractive relative value opportunities," that "GSI will be the initial Credit Protection Buyer" and that "Goldman Sachs has aligned incentives with the Hudson program by investing in a portion of equity . . . ."  (*Id*. ¶¶ 175-76.)  Plaintiff alleges that these statements were misleading because they misrepresented the risks associated with the Hudson CDOs and Defendants' role in the transactions.  (*Id*. ¶¶ 150-158, 174-177.)  Plaintiff also alleges that these statements failed to disclose (1) Defendants' "strategy to reduce [Goldman Sachs'] then-existing long exposure to subprime mortgage-related assets" and to "profit thereby," and (2) that "Defendants knew or disregarded . . . the quality and creditworthiness" of several Hudson CDO Reference Obligations and therefore did not "genuinely believe" that the Hudson CDOs would be profitable for investors."  (*Id*. ¶ 176.)

In ruling on Defendants' Motion to Dismiss the Amended Complaint, prior to the First Department's decision in *Nordbank*, the Court held that the first of these alleged misrepresentations—involving Goldman Sachs' alleged "strategy" to reduce long exposure—was not actionable because Defendants had no duty to disclose their internal investment strategies.[3]   *Dodona*, 847 F. Supp. 2d at 646.   The Court held that the second alleged misrepresentation—involving Defendants' purported "belief" that the Hudson CDOs would not be profitable—presented a "closer question" but concluded that, "*assuming [Plaintiff] is right* about the known risks," the misrepresentation rendered disclosures in the Offering Circulars misleading.   (*Id.* at 646) (emphasis added).   Noting that Plaintiff "rather conspicuously avoid[ed] discussing the nature of Dodona's business or making any representations regarding Dodona's level of sophistication," the Court declined to determine, prior to discovery, "whether Dodona was sophisticated and whether it should have uncovered the alleged fraud."   (*Id.* at 648-49.)

On December 17, 2012, Plaintiff moved for certification under Rule 23(b)(3).   (Motion at 2.)   The Amended Complaint alleged two separate classes of Hudson 1 and Hudson 2 investors.   (AC ¶ 19.)   In a change of course, Plaintiff now seeks certification of a single "class of those who, from their initial offering through April 27, 2010, purchased or otherwise acquired the Hudson CDOs in the United States, and were damaged thereby."   (Motion at 2.)   Plaintiff proposes as the end date for the putative class period April 27, 2010, when investors in the Hudson CDOs allegedly "began to learn the truth regarding the Hudson CDO Securities" through widely-publicized hearings conducted by the United States Senate Permanent Subcommittee on Investigations.   (AC ¶ 161).   Plaintiff concedes, however, that the Hudson

---

[3]      The Court dismissed Plaintiff's market manipulation claim under Section 10(b) and denied Defendants' motion as to all other claims.

CDO securities had lost nearly all of their value more than *two years earlier*—long before the April 2010 "corrective disclosure" of the alleged fraud—and that Plaintiff had sold back its Hudson CDO securities to Goldman Sachs in October 2007.  (Motion at 1.)

### B.    The Hudson CDOs

The Hudson CDOs were synthetic CDOs that provided broad exposure to the direction of the mortgage market by referencing the performance of indices of RMBS and other mezzanine (or lower-rated) subprime RMBS.  (K.D., Ex. B (Expert Report of René M. Stulz ("Stulz")), ¶ 11-12.)  By definition, a synthetic CDO must have a short investor (the credit protection buyer) who takes a position in a CDS transaction *opposite to* the CDO (the credit protection seller).[4] The Offering Circulars made clear that a Goldman Sachs affiliate would hold that short position.[5]

As in most CDOs, the Hudson CDOs issued notes divided into classes, or tranches, which paid differing returns based on their relative levels of risk.  (Stulz ¶ 11-12.)  The transactions differed significantly in their composition:

- Hudson 1 consisted of (i) the 80 RMBS comprising the 2006 BBB and BBB- ABX indices, which were created by a consortium of Wall Street firms to serve as an RMBS reference portfolio (analogous to the S&P 500) that allowed sophisticated investors to bet on (or hedge against) the performance of the mortgage market,[6] and (ii) 60 RMBS selected by Goldman Sachs.  (Stulz ¶ 11, 43)

---

[4]    *See In re Goldman Sachs Group, Inc. S'holder Litig.*, 2011 WL 4826104, at *20 (Del. Ch. Oct. 12, 2011) ("[I]nherent in the structure of a synthetic CDO is that another party is taking a short position.")

[5]    The Offering Circulars for the Hudson CDOs expressly stated that Goldman Sachs International's ("GSI's") participation as the "sole Credit Protection Buyer . . . may create certain conflicts of interest" and that GSI and its affiliates might engage in all forms of trades or transactions "in the same manner as if the Credit Default Swap and the Notes did not exist and without regard to whether any such action might have an adverse affect (*sic*) on such Reference Obligation [or the purchasers of the Hudson CDO securities.]"  (K.D., Ex. K, at 50; Ex. L, at 47.)

[6]    Goldman Sachs sponsored or underwrote just 7.5% of the RMBS included in the relevant ABX indices, and had no more information about the remaining 92.5% of the RMBS in those indices than any other investor.  (Stulz ¶ 20.)

- Hudson 2 consisted solely of the 80 RMBS comprising the 2006 BBB and BBB- ABX indices. Hudson 2's performance was thus based solely on these widely-traded indices, much like an S&P 500 index fund. (*Id*. ¶ 12.)

All of the Reference Obligations were disclosed prior to issuance of the Hudson CDOs, and investors could perform their own analysis based on publicly-available monthly performance reports and their projections of future market performance. Sales of the Hudson CDO notes occurred at different times and only through individually-negotiated transactions.

### C.    Plaintiff Was a Sophisticated Hedge Fund

Dodona was a hedge fund founded by Alan Brody to engage in long and short trades of high-risk mortgage related securities. ██████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████ The court characterized Brody as "a sophisticated investor" in *Epirus Capital Mgmt., LLC* v. *Citigroup Inc.*, 2010 WL 1779348, at *1 (S.D.N.Y. Apr. 29, 2010), and all investors in the Hudson CDOs represented that they were "sophisticated investor[s]" as a condition of investment. (K.D., Ex. K, at 9; Ex. L, at 9.)

Plaintiff alleges that it purchased $1 million of the Hudson 1 equity securities and $3 million of the Hudson 2 equity securities. (AC ¶ 162.) Colonial Fund—the incubator for Plaintiff—purchased Hudson 1 at 95% of par value on January 3, 2007. (K.D., Ex. N.)[7] Dodona purchased Hudson 2 at 100% of par value on January 24, 2007. (K.D., Ex. O.) Plaintiff

---

[7]    Brody's PSLRA Certification claims that Dodona "acquired" the Hudson 1 securities from Colonial Fund at 95% of par value on February 6, 2007. (AC Ex. 1, PSLRA Certification.)

strikingly omits from its Amended Complaint (and all other filings in this action) ███████████

████████████████████████████████████████████████████ ██

████████████████████████████████████████████

██████████████ █ ████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████ █

█████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

     **D.**     ████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

---

[8] ████████████████████████████████████████████████
████████████████████████████████████

[9] ████████████████████████████████████
████████████████

[10] ██████████████████████████████████████████████
█████████████████████

[REDACTED]

**E.    The Putative Class Consists of Highly Sophisticated Investors from Around the World, Each of Which Disclaimed Reliance on Goldman Sachs**

Unlike RMBS or other securities issued pursuant to registration statements, the Hudson CDOs were sold exclusively to sophisticated institutional investors through private placements pursuant to U.S. Securities and Exchange Commission ("SEC") Rule 144A and Regulation S. (K.D., Ex. K, at 1; Ex. L, at 1.)  Each investor acknowledged that it "had access to such financial and other information . . . as it deemed necessary" and that it invested "based upon its own judgment . . . and not upon any view expressed by [Goldman Sachs]."  (K.D., Ex. K, at 8-9; Ex. L, at 8-9.)  The sophisticated Hudson CDO purchasers and their investment advisors engaged in highly complex and varied trading and investment strategies and expressed widely differing views regarding the performance of the underlying Reference Obligations.  (Stulz ¶¶ 40-54; Dolan pt. VI.A.)

- ***Hedge Funds.***  The putative class includes a number of hedge funds, such as Dodona, [REDACTED]

███████████████████████ (Dolan ¶ 32.)  Many hedge funds in the RMBS market pursued a "long-short" investment strategy, whereby the funds would purchase *both* long exposure to a very risky investment *and* short exposure to related securities (such as the underlying RMBS) in an offsetting or even greater amount.  (*Id.*, at ¶¶ 47-51.) ████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████

- ***Collateral Managers.***  The largest group (at least 45%) of Hudson CDO purchasers were collateral managers that selected the Hudson CDOs for inclusion in their own CDO transactions.  (Dolan ¶ 21.)  These purchasers included, among others, ████████ ████████████████████████████████████████████  Those investors purchased the Hudson CDOs to hold them during the ramp up phase during which they selected assets for their CDOs, and did not retain significant long-term exposure to the Hudson CDOs.  (*Id.*, at ¶ 59.)

- ***Financial Institutions.***  The putative class also includes financial institutions, such as ████ ████████████████████████which made substantial investments (often in the tens or hundreds of millions of dollars) in the Hudson CDOs, and were among the most active participants in the mortgage market.  (Dolan ¶ 68.)  For example, ████████████████████████████████████████████████████████████████ ████████████████████████████████████

- ***Other Investors.***  Other putative class members, including ████████████████ ████████████ also pursued distinct investment strategies. ████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████

## STANDARD FOR CLASS CERTIFICATION

A plaintiff seeking certification under Rule 23(b)(3) must satisfy both Rule 23(a)'s requirements of numerosity, commonality, typicality and adequacy and Rule 23(b)(3)'s requirements of predominance and superiority.  FED. R. CIV. P. 23(a), (b)(3).  Rule 23(b)(3) requires a plaintiff to demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and adjudicating the controversy."  *Wal-Mart Stores, Inc.* v. *Dukes*, 131 S. Ct. 2541, 2558 (2011).  "[C]ourts must consider potential defenses in assessing the predominance requirement," *Myers* v. *Hertz Corp.*, 624 F.3d 537, 551 (2d Cir. 2010), and "must deny certification where individual issues of fact abound." *Blessing* v. *Sirius*

-12-

*XM Radio Inc.*, 2011 WL 1194707, at *6 (S.D.N.Y. Mar. 29, 2011) (internal quotations omitted).
Plaintiff faces "a significant burden to show that class certification is appropriate," *Spagnola* v.
*Chubb Corp.*, 264 F.R.D. 76, 92 (S.D.N.Y. 2010), and must provide "enough evidence, by
affidavits, documents, or testimony, to [satisfy the Court] that each Rule 23 requirement has been
met" by a preponderance of the evidence.  *In re IPO Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006).
The predominance criterion is "far more demanding" than the commonality inquiry under
Rule 23(a).  *Amchem Prods. Inc.* v. *Windsor*, 521 U.S. 591, 623 (1997).

## ARGUMENT

## I.   PLAINTIFF FAILS TO MEET RULE 23(b)(3)'S REQUIREMENT OF PREDOMINANCE

Even the limited discovery conducted to date demonstrates that individualized issues
would require extensive and unmanageable inquiries, leading to "a series of mini-trials within a
class-action framework." *Kottler* v. *Deutsche Bank AG*, 2010 WL 1221809, at *3 (S.D.N.Y.
Mar. 29, 2010).

### A.   Individualized Issues of Reliance Predominate

### 1.   No Class-Wide Presumption of Reliance Applies

Plaintiff has failed to establish that any class-wide presumption of reliance obviates the
need for individualized proof of reliance.  If a plaintiff cannot establish a presumption of reliance,
it will be "unable to satisfy [its] burden of proving that common questions . . . predominate and
class certification must be denied." *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 494
(S.D.N.Y. 2011); *see also In re Fed. Home Loan Mortg. Corp.*, 281 F.R.D. 174, 177 (S.D.N.Y.
2012).

"Absent the fraud-on-the-market theory, the requirement that Rule 10b-5 plaintiffs
establish reliance would ordinarily preclude certification of a class action . . . because individual

reliance issues would overwhelm questions common to the class." *Amgen*, 133 S. Ct. at 1193.

Plaintiff cannot avoid the differences in the representations made and information available to

putative class members and their investment advisors by portraying this as an omissions case

justifying the *Affiliated Ute* presumption of reliance (Motion at 18-20), which applies only to

federal securities law claims involving "primarily a failure to disclose," *Moody's*, 274 F.R.D.

at 494.  It is not a talisman to divert attention from clear facts establishing non-reliance.

### a.     The *Affiliated Ute* Presumption Does Not Apply

The *Affiliated Ute* presumption applies to claims solely based on omissions, because "in

instances of total non-disclosure . . . it is of course impossible to demonstrate reliance," *DuPont*

v. *Brady*, 828 F.2d 75, 78 (2d Cir. 1987) (internal quotations omitted, omission in original); *In re*

*Smith Barney Transfer Agent Litig.*, 2013 WL 1150737, at *6 n.3 (S.D.N.Y. Mar. 21, 2013)

(presumption applies when disclosures "are so sparse that, in practical terms, they approximate

total non-disclosure"), and only if the alleged failure to disclose is material.[11]  *Dodona*, 847 F.

Supp. 2d at 648; *DuPont*, 828 F.2d at 78.  Plaintiff's claims do not give rise to such a

presumption of reliance for three reasons.

*First*, Plaintiff asserts reliance on *affirmative representations* by Defendants.  *See In re*

*Salomon Analyst Metromedia Litig.*, 236 F.R.D. 208, 219 (S.D.N.Y. 2006), *vacated on other*

*grounds*, 544 F.3d 474 (2d Cir. 2008) ("[T]he complaint is rife with allegations of affirmative

---

[11]     The Supreme Court's recent decision in *Amgen* does not eliminate the requirement to assess materiality before certifying a class.  *Amgen* held that materiality is not a prerequisite to class certification when an efficient market gives rise to a "fraud-on-the-market" presumption of reliance.  133 S. Ct. at 1196.  The Court based its holding on the observation that materiality is assessed under an "objective standard" and could be "proved through evidence common to the class."  *Id.*  Here, Plaintiff purchased the Hudson CDOs in a non-efficient market, the information available to investors varied and at least some purchasers had actual knowledge of alleged omissions.  Because information "already known" is immaterial, *Ganino* v. *Citizens Util. Co.*, 228 F.3d 154, 167 (2d Cir. 2000), addressing the materiality of particular omissions here will depend on individualized factual issues not common across the purported class.

misstatements that do not on their face suggest . . . evidentiary problems with which the Supreme

Court was concerned in *Affiliated Ute*.")  The Amended Complaint alleges affirmative

misstatements relating to Goldman Sachs' efforts to "align incentives" and role as "initial Credit

Protection Buyer," as well as to the offering materials' risk disclosures.[12]  *See* p. 6, *supra*.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████  Because the Court must resort to the extensive

factual record to conduct individualized inquiries as to whether Plaintiff (and possibly other

investors) actually received and relied on such affirmative representations, there are no

"evidentiary problems" necessitating application of the *Affiliated Ute* presumption.  *In re*

*Salomon*, 236 F.R.D. at 218-20 ("Where positive statements form a central part of the alleged

fraud such that evidentiary problems inherent in proving reliance on a non-disclosure are not

present, the *Affiliated Ute* exception does not apply."); *see also Starr ex rel. Estate of Samson* v.

*Georgeson S'holder, Inc.* 412 F.3d 103, 109 n.5  (2d Cir. 2005) (presumption does not apply to

omissions that merely exacerbate misleading information).

    *Second*, even if Plaintiff had properly alleged only an omissions theory, discovery has

revealed that establishing that any omissions occurred would still require highly individualized

proof before any presumption could apply.  At least some Hudson CDO investors had actual

knowledge of the very information that Plaintiff claims Defendants allegedly hid—Goldman

Sachs' efforts to "reduce its exposures to subprime-mortgage risk" through the Hudson CDO

---

[12]    *See* AC ¶ 175.  This Court viewed Plaintiff's allegations as containing both omissions and affirmative misstatements.  *Dodona*, 847 F. Supp. 2d at 648 ("[T]he disclosures . . . were somewhat undermined, or at least downplayed, by statements elsewhere . . . [and] an incomplete or misleading disclosure may be just as damaging as total concealment.")  ████████████████████████

offerings. *Dodona*, 847 F. Supp. 2d at 646. For example,



In an April 2007 investor letter, Plaintiff declared that New Century's bankruptcy, and those of other mortgage originators, was "an event *ten years in the making*," and that Plaintiff had "recognized New Century's business model and loan underwriting as *flawed and unsustainable from the start*."[14] (K.D., Ex. S, at 1 (emphasis added).) More than 20% of the Reference Obligations included loans underwritten by New Century. (Stulz ¶ 30.) To the extent Plaintiff has alleged some omissions, it must show that each putative class member did not, and could not,

---

[13]



[14]

learn what supposedly was omitted before the *Affiliated Ute* presumption could apply.[15]  Because

the Hudson CDO purchasers sought and received different information according to their

strategies and market views, Plaintiff's class-wide "omissions" theory is illusory.

*Third*, establishing any actionable "omissions" under the securities laws would require

highly individualized inquiries.  As the Second Circuit recently held, the *Affiliated Ute*

presumption of reliance does not apply if the Defendant did not have an affirmative legal duty to

disclose the allegedly omitted information.  *Levitt* v. *J.P. Morgan Sec., Inc.*, 710 F.3d 454, 467-

68 (2d Cir. 2013); *Basic Inc.* v. *Levinson*, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty

to disclose, is not misleading under Rule 10b-5.").  This Court already has determined that

Defendants had "no duty" to divulge Goldman Sachs' alleged "strategy to reduce its financial

exposures to subprime mortgage-related assets and to profit thereby."  *Dodona*, 847 F. Supp. 2d

at 646.  Investors including ███████ and Plaintiff already knew those alleged omissions.

*Moody's*, 274 F.R.D. at 489 ("Information already known . . . is immaterial.")

As to the remaining "omissions" concerning Defendants' purported views on the future

performance of the Hudson CDOs, this Court concluded that *if* Defendants were aware of

"singularly prohibitive risks associated with the Hudson CDOs," then the Offering Circulars'

disclosures "[did] not accurately represent Defendants' assessment of [those] risks."  *Dodona*,

847 F. Supp. 2d at 647.  But in concluding that Plaintiff "sufficiently alleged" material omissions,

the Court expressly declined to "hazard a guess" regarding how discovery might affect its

---

[15]      Plaintiff relies on *In re Revco Securities Litigation*, 142 F.R.D. 659, 664-665 (N.D. Ohio 1992), to argue
that "whether Plaintiffs will be able to utilize [the *Affiliated Ute*] presumption of reliance presents a question that is
common to the class." (Motion at 19.)  But *Revco's* holding was based on the absence of the "obvious variances
between the reliance by the proposed representatives and the absent class members," *Revco*, 142 F.R.D. at 664, that
exist here.  *See Morris* v. *Wachovia Sec., Inc.*, 223 F.R.D. 284, 300 (E.D. Va. 2004) ("[Because] some [] investors
may have received information that would refute, or at least enlighten, the alleged misrepresentations . . .
determining the basic question of whether [the defendant] has made any misrepresentations to [] investors . . . will
involve many differences among class members.").

eventual conclusion in light of Dodona's "level of sophistication" and "the import of publicly available information." *Id.* at 649.  Discovery to date has not only confirmed Dodona's sophistication but also has entirely refuted the significance of these alleged misrepresentations.

As a threshold matter, two putative class members have attested that they did not deem significant to their investment decisions the very information that Plaintiff alleges should have been disclosed concerning Goldman Sachs' internal positions, motivations, market views and opinions about the likely performance of the Hudson CDOs.  (K.D., Ex. C, at ¶¶ 7-8; Ex. D, at ¶¶ 6-7.)  Indeed, the Hudson CDOs consisted primarily (or, in the case of Hudson 2, entirely) of the RMBS comprising the 2006 BBB and BBB- ABX indices, and thus served as a surrogate for exposure to the subprime mortgage market generally.  (Stulz ¶¶ 43-46.)  Knowledge of the future performance of the Hudson CDOs would require knowledge of the direction of the broader mortgage market, an insight that no one could possibly have had.  Although Plaintiff asserts broadly that Defendants knew "non-public facts concerning the creditworthiness, quality, regulatory compliance and property valuation" of loans backing the Reference Obligations (AC ¶ 100), Goldman Sachs did not sponsor or underwrite the vast majority of the Reference Obligations and therefore had no material non-public information about those RMBS.  (Stulz ¶ 20.)  Further, a number of the Reference Obligations were sponsored or underwritten by putative class members or their affiliates, and the RMBS sponsored by Goldman Sachs outperformed the balance of the Reference Obligations.  (Stulz ¶¶ 33, 38.)  At the very least— even assuming that knowledge about certain specific RMBS could be material when the Hudson CDO portfolios essentially tracked the overall market—assessing materiality and reliance requires an investor-specific determination of how investors made use of the abundant public information about the actual performance (including loan defaults and delinquencies) of the

Reference Obligations prior to the closings of the Hudson CDOs.[16]  (Stulz ¶¶ 48-49.)  *Seibert* v. *Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978) ("[W]here the information is equally available to both parties, a defendant should not be held liable . . . for failure to disclose.").

### b.    In Any Event, the *Affiliated Ute* Presumption Has Been Rebutted

Even if the *Affiliated Ute* presumption applied here, that presumption has either already been rebutted or would be at summary judgment or trial.[17]  Discovery to date has demonstrated "by a preponderance of the evidence that disclosure of the information [Defendants] omitted would not have altered [Plaintiff's] investment decision."  *In re Beacon Assocs. Litig.*, 282 F.R.D. 315, 331 (S.D.N.Y. 2012) (internal quotations omitted).  To presume reliance in the face of the express disclaimers in the Offering Circulars, *see* pp. 22-23 *infra,* would "in effect condone [the putative class members'] own fraud in deliberately misrepresenting [their] true intention." *Nordbank,* 95 A.D.3d 185, at 193-94 (internal quotations omitted).

Plaintiff's assertion that it would not have invested in the Hudson CDOs had it known of Defendants' supposedly negative views regarding their future performance is entirely illogical, given that the transaction necessarily required that a party take the short position.  *See Loreley Fin. (Jersey) No. 4 Ltd.* v. *UBS Ltd.*, 2013 WL 1406036, at *7 (N.Y. Sup. Ct. Apr. 5, 2013) ("[T]he identity of the [credit] protection buyer is irrelevant because, whoever it was, its bets were foreseeably based on its negative view of the housing market.") ████████████

████████████████████████████

████████████████████████

---

[16]     Prior to the Hudson CDO closings, an average of 10 and 12 months of remittance reports for the Hudson 1 and Hudson 2 Reference Obligations, respectively, were publicly available.  (Stulz ¶ 23.)

[17]     Even if this Court concludes that the presumption has not been rebutted at this stage, no class should be certified because Defendants intend to introduce rebuttal evidence at trial that is highly particularized—and in some cases, unique—to investors in the Hudson CDOs.  Thus, individual issues will predominate.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████  *See,*

*e.g.*, *Loreley*, 2013 WL 1406036, at *7.  The fact that ████████████ were aware of the

information that Plaintiff alleges was omitted, yet invested anyway, also rebuts the presumption,

as do sworn statements by two other putative class members.  (K.D., Ex. C; Ex. D.)

### c.  The *Affiliated Ute* Presumption is Inapplicable to State Law Claims

No *Affiliated Ute* presumption possibly applies to Plaintiff's common law fraud claims.

"[C]ommon-law fraud claims require a different analysis than those brought under the federal

securities regulation scheme."  *Sec. Investor Prot. Corp.* v. *BDO Seidman, LLP*, 222 F.3d 63, 73

(2d Cir. 2000).  Although Plaintiff cites several inapplicable decisions in support of its argument

that New York recognizes a presumption of reliance at common law,[18] no presumption of

reliance applies to Plaintiff's state law claims.  *Int'l Fund Mgmt. S.A.* v. *Citigroup, Inc.*, 822 F.

Supp. 2d 368, 387 (S.D.N.Y. 2011).

### 2.  Reliance Must Be Assessed on an Investor-by-Investor Basis

Individual issues predominate here because the Court must consider issues of reliance on

an investor-by-investor basis.  This Court has already held that this case will hinge on reliance

issues, including whether particular investors were "sophisticated" and whether they "should

---

[18]      Two of those decisions, *JP Morgan Chase Bank* v. *Winnick*, 350 F. Supp. 2d 393, 410 (S.D.N.Y. 2004),
and *Steinhardt Grp. Inc.* v. *Citicorp*, 272 A.D.2d 255, 257 (1st Dep't 2000), addressed whether a plaintiff was
precluded, as a matter of law, from claiming its reliance was justifiable, not whether plaintiffs were entitled to a
presumption of reliance.  Two other decisions, *Kenavan* v. *Empire Blue Cross & Blue Shield*, 1993 WL 128012,
at *4 (S.D.N.Y. Apr. 19, 1993), and *In re Crazy Eddie Securities Litigation*, 802 F. Supp. 804, 813 (E.D.N.Y. 1992),
declined to apply any presumption of reliance and instead addressed whether there was evidence that any plaintiff
had actually relied on the alleged fraud.  The remaining decision, *In re College Bound Consolidated Litigation*, 1994
WL 236163, at *3 (S.D.N.Y. May 31, 1994), applied Florida, not New York, law.  *See In re College Bound Consol.
Litig.*, 1994 WL 172408, at *1 (S.D.N.Y. May 4, 1994).

have uncovered the alleged fraud." *Dodona*, 847 F. Supp. 2d at 649.  Reliance issues apply to

both Plaintiff's Rule 10b-5 and state law claims.  Subsequent to the Court's March 21, 2012

ruling, the First Department issued its decision in *Nordbank*, dismissing claims against UBS AG

relating to another CDO and holding that sophisticated investors could not allege justifiable

reliance when they both disclaimed reliance and could have independently verified the

representations.  95 A.D.3d at 197-98; *see also Landesbank Baden-Wurttemberg* v. *Goldman,*

*Sachs & Co.,* 478 Fed. App'x 679, 682 (2d Cir. 2012) (upholding dismissal of fraud claims

because Plaintiff was a "sophisticated investor" aware of the risks of investing in CDOs).

Individualized issues of reliance predominate here because "the record evidence reveals material

differences among investors with regard to their decision making processes, investment

guidelines, due diligence inquiries, and communications with those involved." *Abu Dhabi*

*Comm. Bank* v. *Morgan Stanley & Co.*, 269 F.R.D. 252, 261 (S.D.N.Y. 2010).

   ***The Putative Class Members Possessed Varying Levels of Knowledge About the***

***Alleged Conduct.***  Each of the Hudson CDO investors had sufficient knowledge concerning facts

central to the alleged "fraud" to defeat its claims.  *See In re IPO*, 471 F.3d at 43 (Plaintiff must

prove that it "traded 'in ignorance of the [fraud]'") (internal quotations omitted).  At least some

Hudson CDO purchasers also had *actual knowledge* of information that Defendants allegedly

failed to disclose concerning Goldman Sachs' purported exposure and concerning the practices

of certain originators of loans underlying the Reference Obligations.  █████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████  Thus, there must be "individual inquiries as to the knowledge of each member of the class." *N.J. Carpenters Health Fund* v. *Residential Capital, LLC*, 272 F.R.D. 160, 169 (S.D.N.Y. 2011) ("*RALI*").[20]  Resolving Plaintiff's claims necessarily will require that the Court examine whether other individual purchasers "traded in ignorance of" the alleged facts, *In re IPO*, 471 F.3d at 43, whether "information necessary to unmask the alleged fraud [would] have been accessible to [such] sophisticated part[ies] through minimal diligence," *Dodona*, 847 F. Supp. 2d at 649, and whether any facts relevant to individual purported class members' investment decisions were "peculiarly within [Defendants'] knowledge," *Nordbank*, 95 A.D.3d at 196.

   ***The Putative Class Members Expressly Disclaimed Reliance.***  In determining whether an investor's reliance is reasonable, a court must consider the existence of any disclaimers.  *See Global Intellicom, Inc.* v. *Thomson Kernaghan & Co.*, 1999 WL 544708, at *10-11 (S.D.N.Y. July 27, 1999).  Here, the putative class members expressly acknowledged and contractually agreed through the Offering Circulars that they would conduct their own such analysis.[21]  Each of the Hudson CDO investors disclaimed reliance through the Offering Circulars, which stated

---

19 

20     Although the court in *RALI* later certified a much smaller class based on an expanded record, it did so based on the theory that certain due diligence materials had been withheld from the entire class.  2012 WL 4865174, at *2-4 (S.D.N.Y. Oct. 15, 2012).

21 

that the investor was "not relying . . . upon any advice, counsel or representations (whether written or oral) of [Defendants]" other than in the Offering Circulars or other written agreements, "had access to such financial and other information . . . as it deemed necessary or appropriate," and "made its own investment decisions . . . based upon its own judgment . . . and not upon any view expressed by [Defendants]."  (K.D., Ex. K, at 8-9; Ex. L, at 8-9.)  The First Department recently cited nearly identical disclaimers in dismissing fraud claims.  *ACA Fin. Guar. Corp.* v. *Goldman, Sachs & Co.*, 2013 WL 1953751 at *2-3 (1st Dep't May 14, 2013).

***The Putative Class Members Conducted Individualized Due Diligence.***  Under Section 10(b) and Rule 10b-5, an investor does not reasonably rely on a misrepresentation "if, through minimal diligence, the investor should have discovered the truth," or if "the plaintiff was a 'sophisticated' investor who failed to take reasonable steps to access critical information related to the transaction in question."  *Abbey* v. *3F Therapeutics Inc.*, 2011 WL 651416, at *7 (S.D.N.Y. Feb. 22, 2011).  New York similarly requires that sophisticated investors perform their own analysis and take steps to protect themselves.  *See Nordbank*, 95 A.D.3d at 194-95.  The Court must inquire as to each individual purchaser's knowledge and due diligence.  *In re Livent Noteholders Sec. Litig.*, 211 F.R.D. 219, 223 (S.D.N.Y. 2002) (certification inappropriate where plaintiffs "conducted no primary research . . . [and] institutional investors . . . likely did").  Assessing the due diligence conducted by Hudson CDO investors requires highly particularized inquiries.  Many investors or their advisors conducted independent analyses using proprietary models and trading data and requested that Goldman Sachs provide individualized cash flows and other analysis of particular tranches using assumptions they provided.[22]  (Dolan ¶¶ 65-68.)

---

[22]   *See, e.g.,* ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

*The Putative Class Members Had Materially Different Risk Profiles, Interests and*

*Objectives*.  The putative class members' interests and objectives also differed markedly.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

Several additional factors compound the individualized nature of the reliance inquiry:

- Many investors, such as III Offshore (a hedge fund that purchased $10 million of Hudson 2 securities), invested in the Hudson CDOs as "relative value trades" because they believed the Hudson CDOs were undervalued relative to other, similar investments and did not focus on Goldman Sachs' directional views concerning the performance of RMBS or "motivation for participating in" the Hudson CDOs.  (K.D., Ex. C, at 7; *see also* Dolan ¶¶ 47-49.)

- Collateral managers—who made investment decisions on behalf of the CDOs in the putative class—did not stand to lose or gain due to the Hudson CDOs' performance.  ████████████
████████████████████████████████████████████████
████████████████████████████████████

- Debt and equity investors had different interests and objectives.[23]  (Dolan ¶ 46.)  ████████
████████████████████████████████████████████████

████████████████████████████  This case is thus readily distinguishable from *Public Employees Retirement System of Mississippi* v. *Merrill Lynch & Co.*, 277 F.R.D. 97, 109 (S.D.N.Y. 2011), on which Plaintiff relies (Motion at 14).

[23]     Other than Plaintiff, only five investors purchased Hudson 1 equity securities and just two purchased Hudson 2 equity securities.

███████████████████████████████████████

██████████████████████████████████

- Investors here purchased the Hudson CDOs in bespoke trades at individually-negotiated prices, requiring that they perform their own analysis to value the transactions (as they undertook to do via the Offering Circulars).  (K.D., Ex. K, at 8-9; Ex. L, at 8-9.)

### 3.  *Anwar* v. *Fairfield Greenwich* Is Not to the Contrary

Plaintiff's reliance on this Court's recent decision in *Anwar* v. *Fairfield Greenwich Ltd.*, 2013 WL 662972, is entirely misplaced.  In *Anwar*—involving a Ponzi scheme that fleeced 1000 passive investors—the Court concluded that "there was little to no publicly available information relating to [the] investments," and that "any information relating to [the investments] was likely obtained through the Defendants."  *Id.* at *4.  In stark contrast to this Court's holding in *Anwar* that the passive investors there relied on a single source for information of joint concern, *id.* at *2-3, the record in this case demonstrates individual negotiations and analysis by the Hudson CDO purchasers, as well as a wealth of public information from which they could and did make independent investment determinations to manage complex individualized strategies.  (Stulz ¶¶ 45-52; Dolan ¶¶ 100-110.)

### B.  Individualized Issues of Loss Causation and Damages Predominate

Class certification is inappropriate where "[q]uestions of individual damage calculations will inevitably overwhelm issues common to the class."  *Comcast Corp.* v. *Behrend*, 133 S. Ct. 1426, 1433 (2013).  Determining appropriate damages will require an analysis of each investor's financial positions.  For example, determining Plaintiff's damages will require individualized inquiry because ███████████████████████████████████

█████████████████████████████████████████

███████████████████.[24]  (Dolan ¶ 40.)  The Hudson CDO securities traded only

episodically and in individually-negotiated, over-the-counter transactions, providing no uniform

way to calculate the "true value" of the investments on a common basis.  (Stulz ¶ 70.)  Because

"plaintiffs have not articulated any common method by which damages could be assessed on a

class-wide basis," certification is inappropriate.  *See Abu Dhabi*, 269 F.R.D. at 266.[25]

Class certification also is inappropriate because individualized proof will be required to

determine whether investors' losses were "foreseeable and caused by materialization of the risk

concealed by the fraudulent statement [or omission]."  *In re Omnicom Grp., Inc. Sec. Litig.*, 597

F.3d 501, 513 (2d Cir. 2010) (internal quotations omitted).  Although the Amended Complaint

alleges that the "truth" about the risks of the Hudson CDOs was concealed until at least April 27,

2010, the decline in the price of the Hudson CDOs and the downgrades of their rated tranches

had occurred years earlier.  (Dolan ¶ 110.)  Indeed, Plaintiff alleges that it sold its investments

back to Goldman "on October 9, 2007 at $2.50/per $100 principal."  (AC ¶ 162.)  Plaintiff and

other putative class members will face insurmountable burdens in proving loss causation because

a plaintiff who "sold all his stock well prior to the corrective disclosures" cannot establish loss

causation.  *Schuler* v. *NIVS Intellimedia Tech. Grp., Inc.*, 2013 WL 944777, at *10 (S.D.N.Y.

Mar. 12, 2013).  Even if some putative class members could establish loss causation (as opposed

to mere transaction causation)—a dubious proposition at best—they could do so only after an

individualized inquiry of the causes, timing and extent of that specific investor's alleged losses,

---

[24] ████████████████████████████████████████████

███████████████████████████████████████████████

[25] Although Plaintiff proposes rescissory damages (Motion at 20), "rescission is disfavored as a Rule 10b-5 remedy," particularly when some of a security's decline in value is attributable to conditions other than fraud.  *JSMS Rural LP* v. *GMG Capital Partners II, LP*, 2006 WL 1867482, at *4 (S.D.N.Y. July 6, 2006); *accord Matthews* v. *Kidder, Peabody 7 Co.*, 260 F.3d 239, 249 (3d Cir. 2001).

including any offsetting or hedging transactions or sales. *See Citibank, N.A.* v. *K-H Corp.*, 968 F.2d 1489, 1495 (2d Cir. 1992). Thus, it will be impossible to prove loss causation on a class-wide basis. *See, e.g.*, *Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005).[26]

## II.    THE RULE 23(a) REQUIREMENT OF NUMEROSITY IS NOT MET

In contrast to typical securities class actions involving countless investors in public securities or funds, Plaintiff contends that it has satisfied the requirement of numerosity because "there are over 70 members of the proposed class." (Expert Report of Joseph R. Mason, dated December 11, 2012, Dkt. No. 109-1.) Significantly, Plaintiff has failed to meet its burden to establish numerosity because it has provided no reliable list of putative class members.[27] Plaintiff's recent about-face in its Motion to count Hudson 1 and Hudson 2 investors together in a single class is a transparent ploy to overcome its failure to meet numerosity requirements for two separate classes. Securities should not be pooled into one class when they were "sold pursuant to different information memoranda" on "different dates . . . in individually negotiated and priced transactions." *Abu Dhabi*, 269 F.R.D. at 257-58; *see also RALI*, 272 F.R.D. at 169. This was undoubtedly true here. *See* Background Section B, *supra*. While Hudson 2 consisted solely of 80 RMBS in the 2006 BBB and BBB- ABX indices, Hudson 1 included 60 RMBS not within those indices. (Stulz ¶ 43.) By the time of the Hudson 2 offering in February 2007, the ABX indices had suffered a significant downturn, placing Hudson 2 investors in a materially

---

[26]    Individualized issues also predominate because the Court must inquire as to whether New York law applies to each class member's common law claims. (Motion at 21.) Plaintiff's proposed class includes class members from at least eight states and six countries. (*See* Dolan, Appx. C.) Because "[t]he elements of fraud vary greatly from state to state," *Lewis Tree Serv.* v. *Lucent Techs., Inc.*, 211 F.R.D. 228, 236 (S.D.N.Y. 2002), common questions of law do not predominate. *In re Laser Arms Corp. Sec. Litig.*, 794 F. Supp. 475, 495 (S.D.N.Y. 1989).

[27]    ██████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████

different position than Hudson 1 investors. (Dolan ¶¶ 106-07.) *RALI*, 272 F.R.D. at 169. Properly counting investors in the Hudson 1 and Hudson 2 CDOs as part of separate classes yields, at most, *23* putative class members for Hudson 1 and *12* for Hudson 2. (Dolan ¶ 21.)

Even considering all Hudson CDO investors as part of a single class, there are just *31* putative class members,[28] well short of even the 40-member threshold that this Circuit has held gives rise to a rebuttable presumption of numerosity. *See Rail Corp.* v. *Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).[29] ██████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████ █ ██████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████

• ██████████████████████████████████████████████████████

• ████████████████████████████████████████████████████████
  ████████████████████████████████████████████████

---

[28]      Dolan ¶ 21. ████████████████████████████████████████████

[29]      Numerosity "depends on all the circumstances surrounding a case, not on mere numbers." *Robidoux* v. *Celani*, 987 F.2d 931, 936 (2d Cir. 1993). It can hardly be said that the proposed class members, who include some of the world's largest and most sophisticated financial players, "lack the financial resources to join plaintiffs' lawsuit or . . . are otherwise incapable of bringing individual lawsuits," and "plaintiff already ha[s] at [its] finger tips information sufficient to identify a large majority of potential class members." *Abu Dhabi*, 269 F.R.D. at 258, 259; s*ee also Primavera Familienstiftung* v. *Askin*, 178 F.R.D. 405, 411 (S.D.N.Y. 1998).

[30]      Although not settled, numerous decisions—including in this Circuit—have also held that if an investor delegates all discretion regarding investment decisions to its advisor, the investor lacks standing to sue. *See Congregation of the Passion, Holy Cross Province* v. *Kidder Peabody & Co.*, 800 F.2d 177, 178 (7th Cir. 1986); *In re Tronox, Inc. Sec. Litig.*, 2010 WL 2835545, at *11 n.160 (S.D.N.Y. June 28, 2010); *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 398 F. Supp. 2d 244, 260 (S.D.N.Y. 2005).

- ███████████████████████████████████████████████
  █████████████████████████████████████████████████
  █████████████████████████████████████████████████

- █████████████████████████████████████████████████
  ████████████████████████████████

  ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

## III.   PLAINTIFF HAS FAILED TO MEET THE RULE 23(a) REQUIREMENTS OF TYPICALITY AND ADEQUACY

### A.   Plaintiff Is Subject to Unique Defenses

"[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Gary Plastic Packaging Corp.* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990).

████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████   *Pa. Ave. Funds* v. *Inyx Inc.*, 2011 WL 273544, at *4-5 (S.D.N.Y. July 5, 2011). Moreover, ████████████████████████████████████████████████

████████████████████████████  exposes Plaintiff to unique legal and factual defenses related to its lack of standing.  Compounding Plaintiff's lack of typicality is ████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████

### B.   Plaintiff's Interests Are Antagonistic to Other Class Members

Plaintiff is also an inadequate representative whose "interests are antagonistic [to those] of other members[.]"  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (quotations omitted). ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████ *See*

*State St. Bank & Trust Co.* v. *Salovaara*, 326 F.3d 130, 134-35 (2d. Cir. 2003).[31]

## IV.   A CLASS ACTION IS NOT SUPERIOR TO INDIVIDUAL ACTIONS

Plaintiff also has failed to demonstrate that a class action is superior under Rule 23(b)(3). As is discussed above, the proposed class is rife with differences, idiosyncrasies and conflicts. This is not a case in which "prospective class members lack the financial resources to bring individual lawsuits."  *Novella* v. *Westchester Cnty.*, 443 F. Supp. 2d 540, 547 (S.D.N.Y. 2006).

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

There is no reason why claims relating to the Hudson CDOs could not be asserted independently.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion should be denied.

---

[31]   Plaintiff is also an inadequate representative because of Defendants' counterclaim for fraud and breach of contract.  (Answer and Counterclaims of Defendants Goldman, Sachs & Co. and The Goldman Sachs Group, Inc., Dkt. No. 81.)  No other member of the proposed class currently is subject to this counterclaim.  *See Berrios* v. *Sprint Corp.*, 1998 WL 199842, at *8-9 (E.D.N.Y. Mar. 16, 1998).

Dated: New York, New York
            May 15, 2013                         Respectfully submitted,

                                                SULLIVAN & CROMWELL LLP

                                                By: _____
                                                Richard H. Klapper (*klapperr@sullcrom.com*)
                                                Theodore Edelman (*edelmant@sullcrom.com*)
                                                Michael T. Tomaino, Jr. (*tomainom@sullcrom.com*)
                                                Andrew J. DeFilippis (*defilippisa@sullcrom.com*)
                                                Jacob M. Croke (*crokej@sullcrom.com*)
                                                125 Broad Street,
                                                New York, New York  10004-2498
                                                Telephone:  (212) 558-4000
                                                Facsimile:  (212) 558-3588

                                                *Counsel for Defendants Goldman, Sachs & Co.,*
                                                *The Goldman Sachs Group, Inc., Peter L. Ostrem*
                                                *and Darryl K. Herrick*