# SULLIVAN & CROMWELL LLP



TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*
*New York, NY 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.
FRANKFURT • LONDON • PARIS
BEIJING • HONG KONG • TOKYO
MELBOURNE • SYDNEY

September 25, 2013

*Via Facsimile to (212) 805-6382*

The Honorable Victor Marrero,
   United States District Judge,
      United States District Court, Southern District of New York,
         Daniel Patrick Moynihan United States Courthouse,
           500 Pearl Street,
              New York, New York 10007-1312.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/26/13

      Re:   *Dodona I, LLC v. Goldman, Sachs & Co., et al.,*
            *No. 10-cv-7497 (VM) (DCF)*

Dear Judge Marrero:

      I write on behalf of defendants Goldman, Sachs & Co., The Goldman Sachs Group, Inc. (together with Goldman, Sachs & Co., "Goldman Sachs"), Peter L. Ostrem and Darryl K. Herrick (collectively, "Defendants"), to request leave to file a motion to strike certain portions of the September 10, 2013 Expert Rebuttal Report of Dr. Joseph R. Mason ("Rebuttal Report") in support of Plaintiff's pending motion for class certification ("Motion"), or, in the alternative, to file a sur-reply brief responding to the Rebuttal Report.[1]

      Plaintiff's Motion was accompanied by the December 11, 2012 Expert Report of Dr. Mason ("Initial Report"), which relied on the allegations of the Amended Complaint and a review of the trading records and offering materials for the transactions at issue. Dr. Mason expressed confidence during his deposition that he believed he had a sufficient basis for the

---

[1] Expert reports or testimony may be excluded where they fail to satisfy a basic threshold of admissibility. Courts in this district have evaluated expert testimony at the class certification stage using the factors set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 584–87 (1993), and Federal Rule of Evidence 702. *See, e.g., In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 181 (S.D.N.Y. 2012) (denying motion for class certification after concluding that expert's testimony was not credible). Recent dicta from the Supreme Court supports this approach. *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2553-54, (2011) ("The parties dispute whether [plaintiffs' expert's] testimony even met the standards for the admission of expert testimony under Federal Rule of [Evidence] 702 and our *Daubert* case. The District Court concluded that *Daubert* did not apply to expert testimony at the certification stage of class-action proceedings. We doubt that is so . . . .") (internal citation omitted).

CONTAINS CONFIDENTIAL INFORMATION PER COURT'S JULY 18, 2012 PROTECTIVE ORDER

The Hon. Victor Marrero                                                                               -2-
September 25, 2013

views expressed in the Initial Report and did not need to conduct further inquiry. (Mason Tr. at 264:11–265:7, Dkt. No. 120-9.)[2] The Rebuttal Report is three times longer than the Initial Report and consists primarily of references to documents cited in Plaintiff's "Proposed Trial Plan" (Dkt. No. 109-21) and Motion submissions in support of arguments and legal theories indistinguishable from those made by Plaintiff's counsel. Dr. Mason's role in his rebuttal report is in almost all respects not that of an expert, but rather a human highlighter, parroting Plaintiff's arguments using language at times identical to that in Plaintiff's prior Motion submissions (*see* examples in attached Appendix A) and making—without any personal knowledge or relevant expertise—"conclusory statements about questions of fact masquerading behind a veneer of technical language." *LinkCo, Inc. v. Fujitsu Ltd.*, No. 00 Civ. 7242 (SAS), 2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002).

The bulk of Dr. Mason's Rebuttal Report should accordingly be stricken first and foremost because it does not constitute proper expert opinion, instead offering legal arguments and speculation concerning questions of fact. For example, the Rebuttal Report draws legal conclusions as to the purported significance of documents in the discovery record, ascribes knowledge and motivations to Goldman Sachs personnel and opines as to the jurisdictional significance of purchases of certain putative class members. Dr. Mason thus "does not serve as an expert but, rather, seeks to supplant the role of counsel in making argument at trial, and the role of the jury interpreting the evidence." *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 529, *amended on reconsideration*, 137 F. Supp. 2d 438 (S.D.N.Y. 2001). "Where an 'expert report' amounts to 'written advocacy . . . akin to a supplemental brief,' a motion to strike is appropriate because this evidence is not useful for class certification purposes." *Williams v. Lockheed Martin Corp.*, No. 09 cv 1669 (WQH) (POR), 2011 WL 2200631, at *15 (S.D. Cal. June 2, 2011) (alteration in original) (citation omitted). Much like the Proposed Trial Plan, the Rebuttal Report is little more than a thinly-veiled effort to evade the page limitations established by this Court's Individual Practices, which is an independent basis to strike the Report.

Moreover, to the extent that the Rebuttal Report addresses proper areas for expert opinions—*e.g.*, whether Goldman Sachs' counterclaims raise issues common to the putative class, the applicability of a class-wide damages model and the number of unique purchasers—much of that discussion should also be excluded because it is a transparent effort to reserve for reply opinions that Dr. Mason could, and should, have raised (if at all) in his Initial Report. *See, e.g., Hunt v. CNH Am. LLC*, 857 F. Supp. 2d 320, 339-40 (W.D.N.Y. 2012) (excluding portions of supplemental expert report exceeding the scope of expert's written report and deposition testimony under Rules 26 and 37, noting that "[t]he purpose of the rule is to prevent the practice of 'sandbagging' an opposing party with new evidence.") (citation omitted).

---

[2]    Defendants submitted in connection with their opposition to the Motion expert reports of Dr. René M. Stulz and John H. Dolan responding to the opinions in Dr. Mason's Initial Report. Dr. Stulz addressed the Initial Report's claims that Defendants possessed asymmetric information relative to all members of the putative class and that damages could be determined on a class-wide basis. (*See* Dkt. No. 120-2.) Mr. Dolan addressed the Initial Report's claim that the alleged misstatements and omissions in the offering materials would have affected all members of the putative class similarly. (*See* Dkt. No. 120-1.)

CONTAINS CONFIDENTIAL INFORMATION PER COURT'S JULY 18, 2012 PROTECTIVE ORDER

The Hon. Victor Marrero -3-
September 25, 2013

        Rule 26(a)(2)(B) requires that expert reports include "a complete statement of all opinions the witness will express and the basis and reasons for them," as well as "the facts or data considered by the witness in forming them." FED. R. CIV. P. 26(a)(2)(B). The Rebuttal Report is not as it claims limited to a "direct rebuttal to matters raised by Dr. Stulz and Mr. Dolan in their respective reports" (Rebuttal Report ¶ 1), but rather includes new arguments and copious material that far exceeds the scope of Defendants' expert reports. Besides Dr. Mason's belated interpretations of discovery documents that he previously declined to consider, the Rebuttal Report includes a section regarding Goldman Sachs' counterclaims, which were not mentioned in any of the other expert reports. The Rebuttal Report also offers a new theory that the transactions at issue were part of an "an undisclosed block trade" that supposedly added intrinsic risk to investors and necessitated additional credit enhancement.

        Plaintiff has "provided no justification for [Dr. Mason's] omission of these opinions in his [Initial Report], as required by Rule 26(a)(2)(B)." *Ebbert v. Nassau Cty.*, No. CV 05-5445 (FB) (AKT), 2008 WL 4443238, at *14 (E.D.N.Y. Sept. 26, 2008). The new arguments in the Rebuttal Report rely in whole or in part on documents produced well in advance of the Initial Report or publicly available before the filing of the Motion. Plaintiff "should not now be afforded an opportunity to address an issue it had ample opportunity to explore in its [Initial Report]." *Ironshore Ins. Ltd. v. W. Asset Mgmt. Co.*, No. 11 Civ. 5954 (LTS) (JCF), 2013 WL 2051863, at *4 (S.D.N.Y. May 15, 2013). Plaintiff's introduction of entirely new theories and arguments after the close of class certification briefing would severely prejudice Defendants' ability to litigate this action, and has prevented them from fairly and fully opposing Plaintiff's motion for class certification. "[Plaintiff's] gamesmanship in this regard is precisely what the Rules were intended to prevent." *Lidle v. Cirrus Design Corp.*, No. 08 Civ. 1253 (BSJ) (HBP), 2009 WL 4907201, at *5 (S.D.N.Y. Dec. 18, 2009).

        \*    \*    \*

        For the foregoing reasons, Defendants request that the Court schedule a pre-motion conference regarding Defendants' request for leave to file a motion asking the Court to exercise its inherent authority to exclude the portions of the Rebuttal Report that (i) constitute improper advocacy rather than admissible expert testimony and serve only to evade this Court's page limitations; and (ii) introduce new arguments far beyond the scope of the Initial Report or the reports filed by Defendants' experts. In the alternative, Defendants request leave to file a sur-reply brief of no more than ten pages and supporting declarations. Defendants also respectfully reassert their request for oral argument in connection with Plaintiff's Motion.

> *Plaintiffs are directed to respond by 9-30-13, by letter not to exceed three (3) pages, to the matter set forth above by defendants Goldman Sachs.*
>
> **SO ORDERED.**
>
> 9-26-13
> DATE     VICTOR MARRERO, U.S.D.J.

Respectfully submitted,

*[signature]*

Richard H. Klapper

cc: All counsel of record (via facsimile and e-mail)

CONTAINS CONFIDENTIAL INFORMATION PER COURT'S JULY 18, 2012 PROTECTIVE ORDER

# Appendix A

Differences between the passages have been underlined and citations have been omitted.

**Plaintiff's Proposed Trial Plan (p. 11)**

... Oct. 30, 2006 email from Ostrem to senior Goldman executive Harvey Schwartz and numerous other Goldman officials regarding "Great Job on Hudson Mezz" stating, among other things, that "Wednesday of last week we priced Hudson Mezzanine SP CDO, a static $2.0 billion structured product CDO backed by $1.2 bln of the ABX index and $800mm of other RMBS subprime securities"; "Goldman was the sole buyer of protection on the entire $2.0 billion of assets"; "Darryl Herrick led a core team that executed this deal: Roman Shimonov, Deva Mishra, and Ariane West"; "P&L booked of $8.5mm and reserves of $8+mm related to retained positions we expect to sell over next 3 months. Plus, ongoing P&L to GS for acting as liquidation agent equal to $2.5mm per year for next 4 years"; "Hudson Mezz went long $1.2 bln of BBB/BBB- ABX from ABS trading desk at market wides 4 weeks ago"; "Fastest execution of a SP CDO done at Goldman (4 weeks from inception to pricing)"; "Over half of the equity sold by Andy Davilman"; "Excellent super senior execution on top 60% of the transaction at 20bp (unfunded). Super senior note ($1.2bln in size) was executed in the first week of the transaction and was a key driver of this deal[']s success (covered by Nicole Martin)"; "Other large and key orders in stack sold by Bridget Fraser/Lira Lee, George Maltezos, Darren Reinstein, Dick Loggins, and Abigail Matthias"

**Dr. Mason's Rebuttal Report (¶ 29)**

... Oct. 30, 2006 email from Ostrem to senior Goldman executive Harvey Schwartz and numerous other Goldman officials regarding "Great Job on Hudson Mezz", stating, among other things, that "Wednesday of last week we priced Hudson Mezzanine SP CDO, a static $2.0 billion structured product CDO backed by $1.2 bln of the ABX index and $800mm of other RMBS subprime securities"; "Goldman was the sole buyer of protection on the entire $2.0 billion of assets"; "Darryl Herrick led a core team that executed this deal: Roman Shimonov, Deva Mishra, and Ariane West"; "P&L booked of $8.5mm and reserves of $8+mm related to retained positions we expect to sell over next 3 months. Plus, ongoing P&L to GS for acting as liquidation agent equal to $2.5mm per year for next 4 years"; "Hudson Mezz went long $1.2 bln of BBB/BBB- ABX from ABS trading desk at market wides 4 weeks ago"; "Fastest execution of a SP CDO done at Goldman (4 weeks from inception to pricing)"; "Over half of the equity sold by Andy Davilman"; "Excellent super senior execution on top 60% of the transaction at 20bp (unfunded). Super senior note ($1.2bln in size) was executed in the first week of the transaction and was a key driver of this deal[']s success (covered by Nicole Martin)"; "Other large and key orders in stack sold by Bridget Fraser/Lira Lee, George Maltezos, Darren Reinstein, Dick Loggins, and Abigail Matthias" ....

**Plaintiff's Motion (pp. 5-6)**

> Josh Birnbaum ("Birnbaum"), co-head of Goldman's ABS and structured products trading group ("SPG Trading"), stated in his self-performance review for 2007 that, by 2006, "[t]he fundamentals for mortgage credit were undeniably deteriorating"; that "[g]iven how much ABX we had purchased through the broker market in 2006, the world would think [Goldman] was very long for the foreseeable future"; that "[w]e could use that fear to our advantage if we could flip our risk" (emphasis added); and that "I concluded that we should not only get flat, but get VERY short." (capitalization in original; emphasis added). Michael J. Swenson ("Swenson"), co-head of SPG Trading, stated in his 2007 self-performance review that "during the early summer of 2006 it was clear that the market fundamentals in subprime and the highly levered nature of CDOs was going to have a very unhappy ending"; that "[t]he beauty of the CDO short was that it allowed for a very efficient method for capturing the value in the ABX to single-name basis from the short side"; that "[k]nowing there was a huge opportunity on that front, I directed the ABS desk to enter into a $1.8bb short in ABS CDOs that has realized approx. $1.0bb of p & l to date"; that "[w]e were long and needed to reduce risk in a situation where there were few opportunities to shed the ABX indices we were long"; and that "I recognized the enormous opportunity the CDO market presented us and took advantage of the Index to single-name basis."

**Dr. Mason's Rebuttal Report (¶¶ 8-9)**

> 8. ... For example, Joshua S. Birnbaum ("Birnbaum"), who with Swenson helped manage Goldman's structured product trading group ("SPG Trading"), stated in his self performance review for 2007 that, in 2006, "[t]he fundamentals for mortgage credit were undeniably deteriorating"; that "[g]iven how much ABX we had purchased through the broker market in 2006, the world would think [Goldman] was very long for the foreseeable future"; that "[w]e could use that fear to our advantage if we could flip our risk"; and that "I concluded that [Goldman] should not only get flat, but get VERY short[.]"

> 9. Similarly, according to Swenson's self-performance review for 2007, "during the early summer of 2006 it was clear that the market fundamentals in subprime and the highly levered nature of CDOs was going to have a very unhappy ending"; that "[t]he beauty of the CDO short was that it allowed for a very efficient method for capturing the value in the ABX to single-name basis from the short side"; that "[k]nowing there was a huge opportunity on that front, I directed the ABS desk to enter into a $1.8bb short in ABS CDOs that has realized approx. $1.0bb of p & l to date"; that "[w]e were long and needed to reduce risk in a situation where there were few opportunities to shed the ABX indices we were long"; and that "I recognized the enormous opportunity the CDO market presented us and took advantage of the Index to single-name basis[.]"

-2-