# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*
*New York, NY 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.
FRANKFURT • LONDON • PARIS
BEIJING • HONG KONG • TOKYO
MELBOURNE • SYDNEY

February 28, 2014

*By ECF*

The Honorable Debra Freeman,
    United States Magistrate Judge,
        United States District Court, Southern District of New York,
        Daniel Patrick Moynihan United States Courthouse,
            500 Pearl Street,
                New York, New York 10007-1312.

      Re:    *Dodona I, LLC v. Goldman, Sachs & Co., et al.*,
             No. 10-cv-7497 (VM) (DCF)

Dear Judge Freeman:

      I write on behalf of defendants Goldman, Sachs & Co., The Goldman Sachs Group, Inc., Peter L. Ostrem and Darryl K. Herrick (collectively, "Defendants") in response to Dodona I, LLC's ("Dodona's") letter dated February 25, 2014 (the "Feb. 25 Letter"). Dodona's letter seeks the extraordinary remedy of prohibiting both Defendants and their counsel from communicating with the highly sophisticated class members regarding any aspect of this action (i) even though it has not yet provided them notice of class certification or the choice of whether to participate in this action or be represented by Dodona's counsel, and (ii) even if such communications are with class members' own counsel.

      Dodona has ample motivation to obstruct communications with potential class members, as several already have provided compelling evidence adverse to Dodona's theories, and Dodona's counsel *publicly advertises that it is suing several class members that it now purports to represent.*[1] Consistent with its strategy of maintaining total control over prosecution of the action, Dodona not only wishes to foreclose Defendants from engaging in permissible communications with class members, but also refuses to provide notice to those class members, thus keeping the sophisticated potential class members in the dark for as long as possible.

---

[1]     Dodona's Feb. 25 Letter cites a decision issued in a still-pending action in which Dodona's counsel is suing a class member in this action. *See In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237, 254 (S.D.N.Y. 2005). Just this month, Dodona's counsel also filed a 55-page amended complaint in *In re MF Global Holdings, Ltd. Sec. Litig.*, No. 11-cv-07866 (VM), Dkt. No. 665, in which it is suing a class member in this action.

The Honorable Debra Freeman
February 28, 2014 -2-

Dodona's proposed extraordinary remedy also goes far beyond the authorities that it cites, and repeatedly misconstrues those authorities and the basis for the relief that it requests.

As a threshold matter, none of the authorities that Dodona cites supports deviation from the general ethics rule that parties and their counsel are permitted to communicate with *counsel* for adverse parties. To the extent that several of these authorities invoke the "no-contact" rule, they involve communications between opposing counsel and *non-lawyers*. This concern is not present where the members of the class are highly sophisticated entities with their own experienced in-house and outside counsel:

> "The principal purposes of [the "no-contact" rule] are to prevent a lawyer from taking advantage of a non-lawyer who is represented by counsel (for example, in eliciting damaging admissions or agreement to unfair settlement terms) and to preserve the attorney-client relationship once it has been established. *These purposes are at best attenuated when the recipient of the communication is a lawyer, and is acting as such.* It fairly may be presumed that an in-house counsel, trained in the law, can exercise judgment as to whether he or she should engage in a given communication."

NYC Bar Comm. on Prof. and Jud. Ethics, Formal Op. 2007-1 (internal citations omitted, emphasis added). Under no circumstances should Defendants and their counsel be foreclosed from engaging in communications with the absent class members' *counsel* permitted under applicable ethics rules.

A fair reading of the cases that Dodona cites shows that restrictions on communications with class members themselves, other than through counsel, are justified only where clear evidence shows that the communications will be coercive or misleading. Neither factor is present here. Dodona has not identified any decision barring a defendant from communicating with sophisticated financial entities about their potential claims. To the contrary, the cases on which Dodona relies invariably concern parties threatened by an obvious power imbalance. For instance, *Gortat* v. *Capala Bros. Inc.*, No. 07-cv-3629 (ILG), 2010 WL 1423018 (E.D.N.Y. Apr. 9, 2010), was a Fair Labor Standards Act case involving a class of construction workers employed by the defendants. Similarly, *Urtubia* v. *B.A. Victory Corp.*, 857 F. Supp. 2d 476, 483-85 (S.D.N.Y. 2012), involved a putative class of "waiters," "dishwashers," "runners and busboys," including one class member who stated that a defendant had "threatened to have him reported to immigration authorities and possibly deported."[2] *Id.* at 480. Dodona has not identified any remotely comparable coercive threats here.

---

[2] The other cases that Dodona cites similarly are inapposite. *See, e.g., Tedesco* v. *Mishkin*, 629 F. Supp. 1474, 1482-84 (S.D.N.Y. 1986) (defendant "committed perjury" and sent ghost-written letters to individuals urging them to opt-out of the class); *Kleiner* v. *First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1202 (11th Cir. 1985) (class consisted of *individuals* who were "dependent on the [defendant] Bank for future financing"); *Zamboni* v. *Pepe West 48th St. LLC*, No. 12 Civ. 3157(AJN)(JCF), 2013 WL 978935, at *3 (S.D.N.Y. Mar. 12, 2013) ("inherently coercive for the defendants to solicit from [restaurant] employee[s] a statement that [they] do[] not have a claim for unpaid wages"); *In re Currency Conversion*

The Honorable Debra Freeman
February 28, 2014 -3-

      There is a good reason why Dodona's letter gives short shrift to the Supreme Court's decision in *Gulf Oil Co. v. Bernard*, 452 U.S. 89 (1981). *Gulf Oil* addressed precisely the question of when parties may communicate with class members, holding that communications with class members should be limited only where there is a "specific record showing by the moving party of the particular abuses by which it is threatened." *Id.* at 102 (quoting *Coles v. Marsh*, 560 F.2d 186, 189 (3d Cir. 1977)). This is one of "many cases" where there is "no problem" with parties communicating with class members, let alone with their in-house or outside counsel. *Gulf Oil*, 452 U.S. at 104.

      Indeed, Dodona's only attempt to suggest some kind of "abuse" is its displeasure with two class members which provided declarations undermining its theories. Nothing about the process of obtaining those declarations, however, was "surreptitious" or abusive, as Dodona implies.[3] In November and December 2012, Defendants served subpoenas on several absent class members. After Dodona objected to the subpoenas, the parties appeared before Your Honor on April 18, 2013 to discuss this issue (among others). Defendants explained that they had served subpoenas seeking documents and testimony and had engaged in extensive negotiations with the recipients of those subpoenas (through their in-house or outside counsel in virtually all instances) in an effort to narrow the subpoenas and limit the burden. The Court expressly permitted Defendants to proceed. Following those negotiations, two class members (Vanderbilt and III Offshore) chose to submit declarations disclaiming reliance on Defendants or the alleged misrepresentations. Those declarations resulted from detailed discussions with a sophisticated investor (III Offshore) and an international law firm representing the declarant (Vanderbilt). The declarants submitted the declarations under penalty of perjury and unquestionably understood the substance and significance of the statements in them. Any suggestion by Dodona's counsel that the declarations were not truthful would place counsel in the unseemly position of questioning the credibility of class members they purport to represent. Dodona's disappointment that these sophisticated entities submitted sworn declarations

---

*Fee Antitrust Litig.*, 361 F. Supp. 2d 237, 254 (S.D.N.Y. 2005) (barring credit card companies from integrating arbitration clauses into their contracts with class members after litigation had begun); *Ralph Oldsmobile, Inc. v. General Motors Corp.*, No. 99 Civ. 4567(AGS), 2001 WL 1035132, at *4 (S.D.N.Y. Sept. 7, 2001) (communications from car manufacturer to car dealers coercive because "GM dealers have no other source of GM vehicles"); *Rankin v. Bd. of Educ.*, 174 F.R.D. 695, 697 (D. Kan. 1997) (litigation-related communications with a class of "speech-language impaired" students barred); *Hampton Hardware v. Cotter & Co.*, 156 F.R.D. 630, 631, 633 (N.D. Tex. 1994) (threat of coercion when defendants mailed letters to members of a hardware cooperative warning that the class action would result in "enormous potential cost," because "[m]embers must necessarily rely upon the defendant for dissemination of factual information regarding hardware goods and for lower prices in purchasing those goods. They are therefore particularly susceptible to believing defendant's comments that the lawsuit will cost them money").

[3]   Dodona first raised with the Court its objections to these declarations three days ago—more than nine months after Defendants submitted the declarations in opposition to Dodona's motion for class certification. Dodona's newly expressed "outrage" is not credible.

The Honorable Debra Freeman
February 28, 2014 -4-

regarding their knowledge and investment decisions that explicitly discredit Dodona's legal theories does not in any way render the declarations improper.[4]

Even if Dodona were correct that communications with class members are prohibited under ethics rules, that restriction would not apply until class members receive notice and an opportunity to opt out of the class. Until that time, they have not chosen to participate in this action or to have Dodona's counsel represent them.[5] As American Bar Association Formal Op. 07-445 (Apr. 11, 2007) (the "ABA Opinion") states:

> "A client-lawyer relationship with a potential member of the class does not begin until the class has been certified and the time for opting out by a potential member of the class has expired. If the client has neither a consensual relationship with the lawyer nor a legal substitute for consent, there is no representation. Therefore, putative class members are not represented parties . . . prior to certification of the class and the expiration of the opt-out period."

Dodona cannot distinguish the ABA Opinion by arguing that "the issue now is not whether a client-lawyer relationship exists between class members and class counsel[.]" (Feb. 25 Letter at 3 n.3.) It is exactly this relationship (which does not exist here) that forms the basis for the conclusions in the authorities that Dodona cites.[6]

---

[4] Dodona makes much of the fact that Vanderbilt's counsel removed three words from an earlier draft of its declaration. (See Ex. A (earlier draft stating: "Our analysis and investment decision were not driven by any information *(or lack thereof)* about (a) Goldman Sachs' motivation for participating in the Hudson 1 transaction . . .") (emphasis added).) Setting aside that this revision in no way changes the plain meaning of the declaration and that the statements in the declaration refute Dodona's speculation as to the significance of the change, the fact that Vanderbilt's counsel made these revisions demonstrates that the sophisticated members of this class and their in-house and outside counsel are capable of protecting their own interests.

[5] The authorities that Dodona cites are not to the contrary. Although Dodona refers to a treatise stating that communications between defendants and absent class members are limited "for a simple reason: . . . Absent class members are . . . 'represented parties,' and ethics rules prohibit opposing counsel from contacting them directly," William B. Rubenstein *et al.*, *Newberg on Class Actions* § 9:9 (5th ed. 2013), the "simple reason" on which the treatise bases its opinion does not apply here: until class members receive notice and an opportunity to opt out of the class, Dodona's counsel does not represent them.

[6] Dodona correctly notes that the ABA Opinion does not bind this Court (although the treatises Dodona cites are less persuasive non-binding authority). Numerous courts, however, have cited the ABA Opinion in holding that there is no attorney-client relationship between class counsel and absent class members until the expiration of the opt-out period. *See, e.g., Bobryk* v. *Durand Glass Manuf. Co., Inc.*, No. 12-cv-5360 (NLH/JS), 2013 WL 5574504, at *9 (D.N.J. Oct. 9, 2013) (relying on ABA Opinion and holding that "until a Rule 23 class is certified and the opt-out period expires, defense counsel is not completely barred from communicating with putative class members"); *Altier* v. *Worley Catastrophe Response, LLC*, No. 11-241 & 11-242, 2012 WL 161824, at *11 (E.D. La. Jan. 18, 2012) (until class has been certified and class members "receive[] notice of their rights, including the opportunity to exclude themselves from the class," absent class members were not represented by class counsel); *accord In re*

The Honorable Debra Freeman
February 28, 2014 -5-

It is particularly important here that the Court does not impose a premature and potentially unwanted[7] attorney-client relationship on absent class members, because Dodona's counsel *advertises on its website that it is actively suing several class members* (*see, e.g.*, http://www.bergermontague.com/cases?t=in-re-libor-based-financial-instruments-antitrust-litigation&id=2619).[8] Attorneys may not unilaterally declare someone to be their client. *See, e.g., Alioto* v. *Hoiles*, 531 F. App'x 842, 858-59 (10th Cir. 2013) ("[Counsel] might have believed he was representing [certain individuals], but a lawyer's unilateral, subjective belief does not create an attorney-client relationship.") Class actions are no different: the certification of a class does not mean that Dodona may represent class members without their consent, which may be why Dodona seeks to defer notification of the class for as long as possible.

Nor is the requested remedy warranted by Dodona's purported concern that Defendants might improperly influence these sophisticated class members (or their counsel) and cause them to opt out of the class. Courts routinely have upheld negotiations of opt-outs or settlements with individual class members in the absence of coercion. *See, e.g., In re Shell Oil Refinery*, 152 F.R.D. at 535 (class members had the right to negotiate individual settlements after the opt out period expired). If Dodona truly is worried that class members may settle with Defendants "without knowing what they are releasing," *Ralph Oldsmobile, Inc.*, 2001 WL 1035132, at *4, it could begin the process of providing notice and advice to the class. Instead, Dodona has sought to delay notice for as long as possible. The Court should reject Dodona's attempt to delay further notice to absent class members of the pendency of this action and of their rights, including their rights to opt out or refuse representation by Dodona's counsel.[9]

\*     \*     \*

---

*Shell Oil Refinery*, 152 F.R.D. 526, 529 (E.D. La. 1989) (attorney-client relationship between class members and class counsel began on the date that "the exclusion or opt-out period expired").

[7] In another action pending in this Court (in which Dodona's counsel is suing a class member in this action), Dodona's counsel expressed an understanding of how these sophisticated class members might respond if they learned that Dodona's counsel sought to represent them here. *See* Trial Tr. at 4310-12, *In re Currency Conversion Fee Antitrust Litig.*, No. 05-cv-07116-WHP-JCF (June 14, 2013) (Merrill G. Davidoff describing "the [defendant] banks [*sic*] venomous, venomous attitude toward class actions and incidentally toward class action lawyers" and noting "I think we were called barbarians.").

[8] This is one of the reasons Defendants have requested that the Court adjourn the deadline for summary judgment motions until after absent class members have been given notice and an opportunity to opt out or appear separately, a request that Dodona has opposed. An extension would not only ensure fairness and facilitate an efficient briefing process, but also would give class members the opportunity to decide whether to provide waivers of any conflicts that class counsel may have.

[9] Dodona's request that the Court enter an order barring communications by *Defendants* (in addition to Defendants' counsel) also is unwarranted, particularly where by Dodona's own admission, many of the sophisticated class members are active Goldman Sachs clients. Even in *Gortat* v. *Capala Bros., Inc.*, No. 07-CV-3629(ILG)(SMG), 2010 WL 1879922 (E.D.N.Y. 2010), where the court found extensive evidence of improper and potentially abusive actions by defendants' counsel, the court declined to grant the extraordinary remedy of imposing a bar on the defendants, noting that it was "sensitive to the First Amendment rights of defendants" and that the ethics rules "appl[y] only to lawyers." *Id.* at *4.

The Honorable Debra Freeman
February 28, 2014                                                                                          -6-

       For the foregoing reasons, Defendants respectfully request that the Court reject Dodona's requested ban on communications between Defendants and absent class members. Defendants are available to discuss this matter further at the Court's request.

                                                              Respectfully submitted,

                                                              Richard H. Klapper

(Attachment)

cc:     All counsel of record (via e-mail and ECF)

# EXHIBIT A

Case 1:10-cv-07497-VM-DCF   Document 145   Filed 02/28/14   Page 7 of 11

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DODONA I, LLC, on Behalf of Itself and All
Others Similarly Situated,

                Plaintiff,

v.

GOLDMAN, SACHS & CO., THE
GOLDMAN SACHS GROUP, INC.,
HUDSON MEZZANINE FUNDING 2006-1,
LTD., HUDSON MEZZANINE FUNDING
2006-1, CORP., HUDSON MEZZANINE
FUNDING 2006-2, LTD., HUDSON
MEZZANINE FUNDING 2006-2, CORP.,
PETER L. OSTREM and DARRYL K.
HERRICK,

                Defendants.

10 Civ. 7497 (VM) (DCF)

## DECLARATION OF STEPHEN C. BERNHARDT

STEPHEN C. BERNHARDT declares under penalty of perjury:

1.    I currently serve as Senior Portfolio Manager of Vanderbilt Capital Advisors, LLC ("Vanderbilt"), which I joined in 2003. I am also a Senior Portfolio Manager for investment advisors affiliated with Vanderbilt's ultimate parent company, Pioneer Investment Management (USA) Inc.

2.    Vanderbilt is a registered investment advisor. Since the firm's inception, Vanderbilt's investment team in Chicago has focused on structuring and managing collateralized debt obligations (CDOs). From 2003-2009, Vanderbilt structured and managed 17 CDOs with a par value of tens of billions of dollars.

3.      As part of its CDO business, Vanderbilt regularly purchased and invested in both mortgage-backed securities and synthetic mortgage-related derivatives (such as swap contracts).

4.      In late 2006 and early 2007, Vanderbilt was structuring and ramping up a $3 billion CDO called Armitage CDO, Ltd., which closed in March 2007. Approximately five portfolio managers at Vanderbilt (including me) were involved in selecting the collateral for that CDO, and one of the securities we purchased was a $10 million position in the Class B Notes in the Hudson Mezzanine Funding 2006-1 ("Hudson 1") offering. Vanderbilt purchased the Hudson 1 notes at 100% of face value. It was just one of over 350 securities purchased for our Armitage CDO, representing approximately 0.3% of our collateral pool.

5.      In selecting securities to be included in the Armitage CDO collateral pool, Vanderbilt's goal was to select asset-backed and synthetic mortgage securities that met the criteria we had established for our CDO. The idea was that the securities we selected, when viewed together as an aggregate pool, would generate inbound cash flows and returns consistent with the risks we were willing to take and the outbound cash flows we were modeling for the various debt and equity tranches of the CDO we planned to market. Vanderbilt analyzed the Hudson 1 notes and thought that they were appropriate as part of the total package of securities we were purchasing for inclusion in the Armitage CDO collateral pool.

6.      Vanderbilt's investment in the Hudson 1 Notes was an individually negotiated transaction between Vanderbilt and Goldman Sachs. We were satisfied, based on information we had been provided about the Hudson 1 notes and from our knowledge of the marketplace and the securities referenced in the Hudson 1 pool, that we had sufficient information to understand and analyze the risks of that investment. Our analysis and investment decision were not driven by any information about Goldman Sachs' motivation for participating in the Hudson 1

transaction or by information about Goldman Sachs' views about the anticipated performance of the Hudson 1 securities or the securities referenced in the Hudson 1 collateral pool.

7. Vanderbilt also understood (and I understood) that Goldman Sachs or one of its affiliates was the sole credit protection buyer with regard to the credit default swaps underlying the Hudson 1 notes. We had seen in other synthetic securities that a major financial institution such as Goldman Sachs would often act as the sole credit protection buyer because that simplified the process of transacting with the credit protection seller(s). We generally did not focus on whether the credit protection buyer kept the risk of our swap, or in turn hedged that risk by selling it to someone else; and I do not recall focusing on that issue with respect to Goldman Sachs and the Hudson 1 notes. Our investment decision was driven by whether our side of the swap transaction met our needs and our view of the relevant market, and not by what our counterparty did with its side of the risk.

8. The foregoing statements are true and correct and are based on my personal knowledge and involvement in the matters referred to.

Dated: Chicago, Illinois
May 7, 2013

Stephen C. Bernhardt

8978643