**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x
                                              :
DODONA I, LLC, on Behalf of Itself            :
and All Others Similarly Situated,            :
                                              :
              Plaintiff,                      :
                                              :       10 Civ. 7497 (VM)(DCF)
v.                                            :
                                              :
GOLDMAN, SACHS & CO., THE                     :       ECF CASE
GOLDMAN SACHS GROUP, INC.,                    :
PETER L. OSTREM and                           :
DARRYL K. HERRICK,                            :
                                              :
              Defendants.                     :
-------------------------------------------------------x


**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**


Publicly Filed Redacted Version

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... ii

GLOSSARY OF DEFINED TERMS.................................................................. viii

INTRODUCTION .................................................................................................1

FACTUAL BACKGROUND.................................................................................5

    A.    The Hudson CDOs...................................................................5

    B.    The Offering Documents ..........................................................6

    C.    The Purchases by Plaintiff and the Class ................................7

ARGUMENT ........................................................................................................9

I.    THE EVIDENCE DEMONSTRATES THAT DEFENDANTS COMMITTED
FRAUD ........................................................................................................9

    A.    The Jury May Find That Defendants Concealed Investment Risk ........................10

    B.    Class Members Relied on Defendants to Fully Disclose Investment Risk............16

    C.    Defendants' Conduct Caused Class Members' Losses..........................................19

II.    THE JURY MAY FIND GOLDMAN LIABLE FOR UNJUST ENRICHMENT............23

III.    PLAINTIFF HAS STANDING FOR HUDSON 1............................................................24

CONCLUSION....................................................................................................25

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abu Dhabi Comm. Bank v. Morgan Stanley & Co.*,
  2013 WL 1155420 (S.D.N.Y. Mar. 20, 2013) ........................................................................1

*Abu Dhabi Comm. Bank v. Morgan Stanley & Co.*,
  888 F. Supp. 2d 431 (S.D.N.Y. 2012)....................................................................................20

*Affiliated Ute Citizens of Utah v. U.S.*,
  406 U.S. 128 (1972)................................................................................................................16

*Allstate Ins. Co. v. Ace Sec. Corp.*,
  2013 N.Y. Misc LEXIS 3531 (N.Y. Supr. Mar. 14, 2013)...................................................22

*Anwar v. Fairfield Greenwich Ltd.*,
  2015 WL 935454 (S.D.N.Y. Mar. 3, 2015) .....................................................................16, 17

*Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*,
  132 F.3d 1017 (4th Cir. 1997) ...............................................................................................19

*Barrows v. Seneca Foods Corp.*,
  512 Fed. App'x 115 (2d Cir. 2013)...........................................................................................9

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)................................................................................................................10

*Basis Yield Alpha Fund (Master) v. Goldman Sachs Grp., Inc.*,
  115 A.D.3d 128 (N.Y. App. Div. 2014) ...........................................................................16, 18

*Basis Yield Alpha Fund (Master) v. Goldman Sachs Grp., Inc.*,
  2014 WL 3571698 (N.Y. Supr. July 18, 2014)......................................................................19

*In re Bear Stearns Cos., Inc. Secs., Deriv. & ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011)....................................................................................22

*Berckeley Inv. Grp. v. Colkitt*,
  455 F.3d 195 (3d Cir. 2006)...................................................................................................24

*Boguslavsky v. Kaplan*,
  159 F.3d 715 (2d Cir. 1998).............................................................................................22, 24

*Castellano v. Young & Rubicam, Inc.*,
  257 F.3d 171 (2d Cir. 2001)...................................................................................................20

*Chasins v. Smith, Barney & Co.*,
    438 F.2d 1167 (2d Cir. 1970).................................................................................22

*Chrysler Cap. Corp. v. Century Pwr. Corp.*,
    778 F. Supp. 1260 (S.D.N.Y. 1991)......................................................................23

*Clark v. John Lamula Investors, Inc.*,
    583 F.2d 594 (2d Cir. 1978)..................................................................................22

*In re Coordinated Title Ins. Cases*,
    2004 WL 690380 (N.Y. Supr. Jan. 8, 2004).........................................................16

*Countrywide Fin. Corp. Secs. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) ...............................................................22

*Cuff ex rel. B.C. v. Valley Cent. S. Dist.*,
    677 F.3d 109 (2d Cir. 2012)....................................................................................9

*Dodona I, LLC v. Goldman, Sachs & Co.*,
    296 F.R.D. 261 (S.D.N.Y. 2014), *pet. to appeal denied* (2d Cir. June 27, 2014)...............3, 13

*Dodona I, LLC v. Goldman, Sachs & Co.*,
    847 F. Supp. 2d 624 (S.D.N.Y. 2012)............................................. *passim*

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)...............................................................................................20

*In re Enron Corp. Secs., Deriv. & ERISA Litig.*,
    2008 WL 4178151 (S.D. Tex. Sept. 8, 2008) ......................................................24

*Fed. Hsg. Fin. Agency v. HSBC N. Am. Hldgs. Inc.*,
    33 F. Supp. 3d 455 (S.D.N.Y. 2014).....................................................................19

*Fin. Guar. Ins. Co. v. Putnam Adv. Co.*,
    2015 WL 1654120 (2d Cir. Apr. 15, 2015) ..........................................1, 4, 18, 21

*In re Flag Tel. Hldgs. Ltd. Secs. Litig.*,
    574 F.3d 29 (2d Cir. 2009).....................................................................................23

*Flaks v. Koegel*,
    504 F.2d 702 (2d Cir. 1974)..................................................................................22

*Gabriel Capital, L.P. v. NatWest Fin., Inc.*,
    94 F. Supp. 2d 491 (S.D.N.Y. 2000).......................................................................5

*Ge Dandong v. Pinnacle Performance Ltd.*,
    2013 WL 5658790 (S.D.N.Y. Oct. 17, 2013) ......................................................18

*Gordon Partners v. Blumenthal*,
   293 F. App'x 815 (2d Cir. 2008) ........................................................................23

*Gordon v. Sonar Cap. Mgmt. LLC*,
   2015 U.S. Dist. LEXIS 34443 (S.D.N.Y. Mar. 19, 2015) ................................19, 22

*Granite Partners, L.P. v. Bear, Stearns & Co.*,
   17 F. Supp. 2d 275 (S.D.N.Y. 1998)...................................................................24

*IKB Int'l S.A. v. Bank of Am. Corp.*,
   584 F. App'x 26 (2d Cir. 2014) ..........................................................................13

*The Ind. Order of Foresters v. Donaldson, Lufkin & Jenrette, Inc.*,
   157 F.3d 933 (2d Cir. 1998)...............................................................................24

*J.P. Morgan Chase Bank v. Winnick*,
   350 F. Supp. 2d 393 (S.D.N.Y. 2004)................................................................16

*JSMS Rural LP v. GMG Cap. Partners III, LP*,
   2006 WL 1867482 (S.D.N.Y. July 6, 2006) .......................................................23

*King County, Wa. v. IKB Deutsche Industriebank AG*,
   708 F. Supp. 2d 334 (S.D.N.Y. 2010).................................................................22

*King County, Wa. v. IKB Deutsche Industriebank AG*,
   751 F. Supp. 2d 652 (S.D.N.Y. 2010).................................................................13

*Kuriakose v. Fed. Home Loan Mort. Corp.*,
   897 F. Supp. 2d 168 (S.D.N.Y. 2012).................................................................21

*In re Lehman Bros. Secs. & ERISA Litig.*,
   2013 WL 5730020 (S.D.N.Y. Oct. 22, 2013) ......................................................16

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005)...........................................................................19, 20

*Loreley Fin. (Jer.) No. 3 Ltd v. Citigroup Global Mkts. Inc.*,
   119 A.D.3d 136 (N.Y. App. Div. 2014) ..............................................................18

*Marisol A. v. Giuliani*,
   126 F.3d 372 (2d Cir. 1997)...............................................................................24

*MBIA Ins. Corp. v. Royal Bank of Canada*,
   2010 N.Y. Misc. LEXIS 3958 (N.Y. Supr. Aug. 19, 2010)..................................13

*McCabe v. Ernst & Young, LLP*,
   494 F.3d 418 (3d Cir. 2007)...............................................................................23

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
    900 F.2d 576 (2d Cir. 1990)........................................................................11

*In re MF Global Hldgs. Secs. Litig.*,
    982 F. Supp. 2d 277 (S.D.N.Y. 2013).........................................................13

*Miller v. Grigoli*,
    712 F. Supp. 1087 (S.D.N.Y. 1989).............................................................19

*Minpeco, S.A. v. Conticommodity Servs. Inc.*,
    676 F. Supp. 486 (S.D.N.Y. 1987) ..............................................................19

*In re Moody's Corp. Secs. Litig.*,
    2013 WL 4516788 (S.D.N.Y. Aug. 23, 2013)..............................................21

*Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*,
    760 F.3d 151 (2d Cir. 2014)..........................................................................1

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
    693 F.3d 145 (2d Cir. 2012).........................................................................24

*Net2Globe Int'l, Inc. v. Time Warner Tel. of New York*,
    273 F. Supp. 2d 436 (S.D.N.Y. 2003)..........................................................23

*NRAM PLC v. Société Gen. Corp. & Inv. Banking*,
    2014 N.Y. Misc. LEXIS 3654 (N.Y. Supr. Aug. 5, 2014)...................15, 18, 20, 22

*Nuveen Mun. High Income Oppt. Fund v. Cty. of Alameda*,
    730 F.3d 1111 (9th Cir. 2013) .....................................................................21

*In re Omnicom Grp. Inc. Secs. Litig.*,
    597 F.3d 501 (2d Cir. 2010).........................................................................21

*Op. Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*,
    595 F.3d 86 (2d Cir. 2010)...........................................................................11

*Picture Patents, LLC v. Aeropostale, Inc.*,
    2009 WL 2569121 (S.D.N.Y. Aug. 19, 2009)..............................................23

*Ray v. Citigroup Global Markets, Inc.*,
    482 F.3d 991 (7th Cir. 2007) .......................................................................21

*Regents of the Univ. of Cal. v. Credit Suisse First Bos (USA), Inc.*,
    482 F.3d 372 (5th Cir. 2007) .......................................................................19

*Rivera v. Roch. Gen. Reg'l Tran. Auth.*,
    743 F.3d 11 (2d Cir. 2014)............................................................................9

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015)...................................................................23

*Rousseff v. E.F. Hutton Co.*,
    843 F.2d 1326 (11th Cir. 1988) ............................................................23

*In re Sadia, S.A. Sec. Litig.*,
    643 F. Supp. 2d 521 (S.D.N.Y. 2009).....................................................11

*In re Sadia, S.A. Secs. Litig.*,
    269 F.R.D. 298 (S.D.N.Y. 2010) ...............................................................4

*Shanahan v. Vallat*,
    2008 WL 4525452 (S.D.N.Y. Oct. 3, 2008) ...........................................23

*Silsby v. Icahn*,
    17 F. Supp. 3d 348 (S.D.N.Y. 2014).......................................................13

*Steinhardt Grp. Inc. v. Citicorp*,
    708 N.Y.S.2d 91 (N.Y. App. Div. 2000) .................................................16

*Syncora Guar. Inc. v. Alinda Capital Partners LLC*,
    2013 N.Y. Misc. LEXIS 2943 (N.Y. Supr. July 1, 2013).........................22

*Teamsters Local 445 Freight Div. Pen. Fund v. Dynex Cap. Inc.*,
    531 F.3d 190 (2d Cir. 2008)....................................................................11

*Twin Holdings of Delaware LLC v. CW Capital, LLC*,
    2010 WL 309022 (N.Y. Supr. Jan. 19, 2010) .........................................24

*UBS Secs. LLC v. Highland Cap. Mgmt., L.P.*,
    2011 WL 781481 (N.Y. Supr. Mar. 1, 2011)...........................................24

*U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*,
    33 F. Supp. 3d 494 (S.D.N.Y. 2014) .......................................................20

*In re U.S. Foodservice Inc. Pricing Litig.*,
    729 F.3d 108 (2d Cir. 2013), *cert. denied* 134 S. Ct. 1938 (2014)...................................16, 21

*Van Dongen v. CNinsure Inc.*,
    951 F. Supp. 2d 457 (S.D.N.Y. 2013).....................................................11

*In re Verifone Secs. Litig.*,
    11 F.3d 865 (9th Cir. 1993) ...................................................................13

*In re Vivendi Univ., S.A., Secs. Litig*,
    605 F. Supp. 2d 586 (S.D.N.Y. 2009)...........................................19, 21, 22

*In re Wash. Mut. Mortg. Backed Secs. Litig.*,
    2012 WL 2995046 (W.D. Wash. July 23, 2012) ...................................................................1

*In re Williams Secs. Litig.-WCG Subclass*,
    558 F.3d 1130 (10th Cir. 2009) ...........................................................................................23

*Windsor v. U.S.*,
    699 F.3d 169 (2d Cir. 2012), *aff'd,* 133 S. Ct. 2675 (2013) ........................................9

*In re WorldCom, Inc. Secs. Litig.*,
    294 F. Supp. 2d 392 (S.D.N.Y. 2003)................................................................................11

## Other Authorities

§ 29(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78cc(b).........................................24

Fed. R. Evid. 803(8)(A)(iii) ..............................................................................................................1

## GLOSSARY OF DEFINED TERMS

The following terms used in this brief and/or Plaintiff's accompanying briefs opposing

Defendants' separate motions for summary judgment have the meaning set forth below:

| | |
|---|---|
| ABX: | a group of indices that referenced certain subprime RMBS. |
| ABS Desk: | the Asset-Backed Securities Desk in Goldman's Mortgage Department. |
| Amended Complaint: | the Amended Class Action Complaint for Violation of the Federal Securities Laws and New York Common Law filed Feb. 4, 2011 (Dkt. 40). |
| CDOs: | Collateralized Debt Obligations. |
| CDS: | Credit Default Swaps. |
| Class: | those who, from their initial offering through April 27, 2010, purchased or otherwise acquired the Hudson CDOs in the United States and were damaged thereby, except Defendants, any subsidiaries of Goldman, the members of the Individual Defendants' immediate families, the legal representatives, heirs, successors and assigns of any excluded person or entity, and those who filed a valid request to be excluded from the Class. |
| Defendants: | Goldman, Peter L. Ostrem ("Ostrem") and Darryl K. Herrick ("Herrick"). |
| Goldman: | Goldman, Sachs & Co. ("GS&Co") and The Goldman Sachs Group, Inc. |
| GSI: | Goldman Sachs International. |
| Hudson CDOs: | the Hudson 1 CDO and Hudson 2 CDO. |
| Hudson 1 CDO: | the CDO securities issued or co-issued by Hudson Mezzanine Funding 2006-1, Ltd. and Hudson Mezzanine Funding 2006-1, Corp. |
| Hudson 2 CDO: | the CDO securities issued or co-issued by Hudson Mezzanine Funding 2006-2, Ltd. and Hudson Mezzanine Funding 2006-2, Corp. |
| Individual Defendants: | Ostrem and Herrick. |
| Offering Circulars: | the Offering Circular for the Hudson 1 CDO dated Dec. 3, 2006 (Dkt. 196-2) (the "Hudson 1 Offering Circular") and the Offering Circular for the Hudson 2 CDO dated Feb. 6, 2007 (the "Hudson 2 Offering Circular") (Dkt. 196-3). |
| Plaintiff: | Court-appointed (Dkt. 36) lead plaintiff Dodona I, LLC. |

PSI Report: The U.S. Senate PSI's report *Wall Street and the Financial Crisis: Anatomy of a Financial Collapse* dated Apr. 13, 2011 and available at http://www.hsgac.senate.gov/download/report-psi-staff-report-wall-street-and-the-financial-crisis-anatomy-of-a-financial-collapse.

PSLRA: Private Securities Litigation Reform Act.

RMBS: Residential Mortgage-Backed Securities.

ROs: the 140 RMBS referenced in the Hudson 1 CDO, and the 80 RMBS referenced in the Hudson 2 CDO.

SEC: the U.S. Securities and Exchange Commission.

SPEs: Special Purpose Entities.

SPG: the Structured Products Group in Goldman's Mortgage Department, which included the ABS Desk.

U.S. Senate PSI: the U.S. Senate's Permanent Subcommittee on Investigations.

Plaintiff, individually and on behalf of the Class, respectfully submits this opposition to the motion for summary judgment (Dkt. 193) filed by Defendants.

## INTRODUCTION

Goldman sponsored the Hudson CDOs as a proprietary trade to short them and, thereby, offload onto Goldman client investors a multi-billion dollar long position in the very RMBS the CDOs referenced.  Ultimately the scheme worked, as the CDOs lost virtually all of their value shortly after they were first sold to investors (¶ 273);[1] Goldman made over $2.08 billion in profits as a result (¶ 267); and the U.S. Senate PSI concluded:  "By holding 100% of the short position at the same time it solicited clients to buy the Hudson [1] securities, Goldman created a conflict of interest with its clients, concealed the conflict from them, and profited at their expense."[2]

With discovery, the record now demonstrates that Defendants also designed and pursued a marketing plan to sell the CDOs to investors in a manner that deliberately concealed investment risk.  For example, internal Goldman email and other evidence establish that:

- the CDOs were a "*structured exit*" specifically for the $5 billion BBB and BBB-ABX long position that Goldman's ABS Desk, then headed by Michael Swenson ("Swenson"), had in Sept. 2006 which "continue[s] to bleed on unabated wide[n]ing in ABX index.  Including today, the desk has lost $60mm this month with $50mm of losses coming in last 8 business days" (¶ 148) (emphasis added).  Goldman thus "*sponsored*" the CDOs "to *offload* our long risk" and was actually "*desperate to get rid of the risk*" (¶¶ 141, 234) (emphasis added);

---

[1]     Citations to "¶ __" are to Plaintiff's Response to the Local Rule 56.1 Statement of Material Facts filed by Defendants (Dkt. 195).  Unless otherwise noted, all emphasis is in the original and all internal quotations and citations are omitted in this Memorandum.

[2]     *Quoting* PSI Report at 531.  The PSI Report contains admissible evidence under Fed. R. Evid. 803(8)(A)(iii).  *See Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 760 F.3d 151, 167 (2d Cir. 2014); *In re Wash. Mut. Mortg. Backed Secs. Litig.*, 2012 WL 2995046, at *8 (W.D. Wash. July 23, 2012) (admitting PSI Report); *Abu Dhabi Comm. Bank v. Morgan Stanley & Co.*, 2013 WL 1155420, at *7 (S.D.N.Y. Mar. 20, 2013) (declining to admit PSI Report "as a whole" but "testimony … memorialized in the reports may be admissible"); *Fin. Guar. Ins. Co. v. Putnam Adv. Co.,* 2015 WL 1654120, at *8 n.2 (2d Cir. Apr. 15, 2015) (citing PSI Report).

- Goldman had a "[s]ensitivity to how we market the underlying portfolio, given the negative reception that might come from [Hudson 1] deal being perceived as a deal for us to place all our trading book risk" and thus had "formulat[ed] a message for sales and accounts," to which a Goldman official replied "[t]his is suicide" (¶ 236);

- although internal email referred to it as "the CDO solution" (¶ 170), the "ABX CDO trade" (¶ 190) and the "CDO exit for our long ABX risk" (¶ 188), a Marketing Book stated that Hudson 1 represented "attractive relative value opportunities in the RMBS and structured product market", that "Goldman Sachs has aligned incentives with the Hudson program by investing in a portion of the equity" and that it was "not a Balance Sheet CDO" (¶ 225);

- Class members clearly wanted full disclosure of investment risk because, as one summarized, "[i]f you are short[]ing two billion into a CDO and only taking $30 million of equity, you would want the bonds to all fail and make a billion, 970 and walk away." ¶ 285; and

- Hudson 1 was "**a huge axe** [*i.e.,* sales priority] **for the firm**" (¶ 238) despite internal email stating that one potential client was "too smart to buy this kind of junk" and that Ostrem and Herrick had been making "some lemonade from some big old lemons." ¶ 260.

In sum, there is no question that the jury may reasonably find that "Goldman's conduct, viewed charitably," was "not only reckless, but bordering on cynical." *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 641 (S.D.N.Y. 2012). That Defendants structured the CDOs to short them alone is compelling circumstantial evidence "that Defendants knew that they were selling toxic assets to their clients and … were unlikely to profit investors." *Id.*

The time has come to permit Plaintiff to present its case at trial on behalf of the Class it represents.[3] Defendants' motion largely previews their jury arguments. They claim they made no misrepresentations, that investors did not rely on Goldman and that Defendants did not cause any losses. The jury may even agree. But those arguments do not come close to establishing that there are no triable issues entitling Defendants to judgment as a matter of law. Each of

---

[3]     Per the Court's Order (Dkt. 176), publication and direct notice was given to Class members, and only one investor excluded itself from the Class. *See* Dkt. 181 ECF 3. As discussed more fully in Plaintiff's opposition to Defendants' motion for summary judgment as to certain Class members (Dkt. 189), another nominee opted-out but was a "pass through" that invested in the CDOs for the benefit of another CDO.

Defendants' arguments turns on highly disputed factual questions that are the quintessential province of the jury.  Each of these arguments is also incorrect on the merits.

First, Defendants again mischaracterize the Court's prior rulings and Plaintiff's claims which are not even premised on affirmative misrepresentation.  This case is not about Defendants' failure to predict the direction of the "mortgage markets" (a term they use six times; *see* Dkt. 194 ECF 8, 13, 17, 18), "that the housing market would collapse" (*id.* at 8), "undisclosed clairvoyance" (*id.*) or omitting their own personal opinions and beliefs.  Nor is this an insider trading case.  The jury may find Defendants liable based on the evidence even if it determines that Goldman had no non-public information concerning mortgage assets.  And while some Class members are big, that is usual in securities class actions.  Further, Goldman made $9.5 billion in profits in 2006 and $11.5 billion in 2007 (¶ 270) -- including "record profitability" in its Mortgage Department (¶ 270) -- while other Class members or their affiliates that Defendants single out went bankrupt or near bankrupt or required massive governmental bailouts (such as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).  ¶ 270.

Instead, Plaintiff's claim is that "the Hudson CDO offering documents resulted in failure to disclose investment risk."  *Dodona I, LLC v. Goldman, Sachs & Co.,* 296 F.R.D. 261, 267 (S.D.N.Y. 2014), *pet. to appeal denied* (2d Cir. June 27, 2014).  That claim is for the jury to adjudicate.  Remarkably, the dozens of pages accompanying Defendants' motion do not even *mention* the boilerplate risk disclosures they made, let alone defeat as a matter of law the mounds of evidence demonstrating the "'vast gap' between the picture that Defendants presented to investors - of an admittedly risky investment, but one that was not in any way extraordinarily risky - and the actions that Goldman took coupled with the language regarding 'junk' and 'lemons' that appears in emails."  *Dodona,* 847 F. Supp. 2d at 644.

Second, the argument that investors "expressly *disclaimed reliance on Goldman Sachs' views*" (Dkt. 194 ECF 11) ignores that investors were entitled to rely on the Offering Circulars as Defendants later admit. *Id.* ECF 21.  Defendants also ignore that they cannot disclaim acting in good faith even if they were not fiduciaries because "when investors, sophisticated or not, purchase securities they do so in reliance on the reputation for integrity and good faith of the issuers and dealers, placing trust in their agents' implied representations that they would not engage in conduct which would place their own interests ahead of those of their customers." *Dodona*, 847 F. Supp. 2d at 641.  Defendants instead devote pages to argue the undisputed point that investors investigated before investing.  But far from refuting reliance, that "only underscore[s] the significance of" what was and was not disclosed in the offering documents as the Second Circuit recently held in a CDO fraud case. *Putnam*, 2015 WL 1654120, at *10.

Third, what caused investor losses is also for the jury, and the jury may properly determine that all of the losses represent materialization of undisclosed investment risk.  Defendants conflate corrective disclosure cases with, as here, materialization of risk, but previously conceded that "the availability of rescissory damages depends ultimately on evidence that *some* 'portion of loss is attributable to defendants' fraud,' rather than supervening market forces."  Dkt. 180 ECF 2.  Defendants ignore the report of Plaintiff's expert, Dr. Joseph Mason ("Mason"), which contains a separate *section* on causation. *See* Dkt. 196-16 ¶¶ 44-49.  Numerous courts have rejected Defendants' "'blame the financial crisis'" argument, *e.g., In re Sadia, S.A. Secs. Litig.*, 269 F.R.D. 298, 317 (S.D.N.Y. 2010), which is further undermined here by Goldman's own marks which show that tranches of the Hudson CDOs collapsed by ***July 2007*** although the underlying ABX ROs were then still valued at ***55-90%*** of par.  ¶ 273.

Defendants' final arguments fare no better.  The jury may determine that Class members were fraudulently induced to invest even if the Offering Circulars are contracts.  Plaintiff also lost money investing in Hudson 1 and has standing anyway by investing also in Hudson 2.

## FACTUAL BACKGROUND

### A.    The Hudson CDOs

The Hudson CDOs were issued via two Offering Circulars similar in all relevant aspects. ¶ 211.  They consisted of over $1.24 billion in notes, $837 million for Hudson 1, and $407.9 million for Hudson 2.[4]  Goldman was, *inter alia*, the sole sponsor, initial purchaser, liquidation agent and underwriter of the CDOs.[5]  Herrick was Goldman's "deal captain" for both Hudson CDOs, and Ostrem was Herrick's boss on Goldman's CDO Desk.  ¶ 174.  The CDO Desk led in structuring, marketing and selling the CDOs, pricing and sourcing the CDS which referenced the ROs, and designing the credit enhancements for the debt tranches of both CDOs.  *E.g.,* ¶¶ 165, 177-79, 181, 183, 185, 187, 198-99, 218-19, 224, 227, 235-36, 244.

Unlike "cash" CDOs backed by a pool of assets such as RMBS, the Hudson CDOs synthetically referenced the underlying ROs via CDS.  Defendants alone selected all of the ROs. ¶ 178.  Defendants claim that "nearly all of the [ROs] backing the Hudson CDOs were components of the ABX" (Dkt. 194 ECF 10), but Hudson 1 referenced 60 "single name" RMBS and each of the 80 RMBS then included in the ABX 2006-1 and 2006-2 BBB and BBB- indices -- which were the very assets that Swenson's ABS Desk then had a multi-billion dollar long

---

[4]     Hudson 1 also contained a senior swap between Goldman and Morgan Stanley to which Goldman was also the short counterparty.  Though not part of the Class, Goldman made nearly $960 million on that swap which is part of its over $2.08 billion total profits on the CDOs.  *See* PSI Report at 392 ("Morgan Stanley lost nearly $960 million on its Hudson investment.").

[5]     Goldman has disputed that it was an underwriter.  However, Goldman's own documents refer to it as underwriter.  ¶ 255.  Also, the SEC rules on which Goldman relies are "of limited application" and do not apply to fraud claims.  *Gabriel Capital, L.P. v. NatWest Fin., Inc.*, 94 F. Supp. 2d 491, 503 (S.D.N.Y. 2000).

position on.  ¶¶ 148-49.  Hudson 2 referenced only the same 80 ABX RMBS.  ¶ 13.  Contrary to

the Hudson 1 Marketing Book's statement that "[a]ssets [were] sourced from the Street[,]" the

ROs for both CDOs were sourced from Swenson's ABS Desk.  ¶¶ 178, 181, 183, 191, 198-99.

Goldman served as an ABX market maker, sponsored, underwrote and traded RMBS,

CDOs and other ABS, and had proprietary in-house models to analyze and value those assets.

¶¶ 150, 152.  Goldman underwrote 20 of the Hudson 1 ROs, and six of the Hudson 2 ROs.  ¶ 15.

Goldman obtained $35 million from the gross proceeds for underwriting the Hudson CDOs, and

additional fees as liquidation agent and collateral put provider.  ¶¶ 255-56.

Goldman CEO Lloyd Blankfein ("Blankfein") admitted in a written submission to the

U.S. Senate PSI that the Hudson CDOs were "***initiated*** by Goldman Sachs principally as an

efficient method ***to reduce long ABX exposure***" and "intended to hedge" Goldman's ABX long

position.  ¶ 203 (emphasis added).  As Goldman partner Sheara Fredman told U.S. Senate PSI

counsel Daniel Goshorn, Goldman's role as an ABX market maker "resulted in a multi-billion

dollar long ABX position for the firm.  In an effort to reduce that exposure, Goldman Sachs

***sponsored*** the Hudson" CDOs.  ¶ 141 (emphasis added).  A spreadsheet Goldman submitted to

the U.S. Senate PSI stated that "[t]he Hudson Mezzanine deals were initiated by the firm as the

most efficient method to reduce long ABX exposure."  ¶ 202.

### B.    The Offering Documents

Both Offering Circulars represent that they are "true and correct in all material respects";

that they do "NOT OMIT ANYTHING LIKELY TO AFFECT THE IMPORT OF SUCH

INFORMATION"; that "an investment in the Notes involves certain risks, including the risk of

loss of its entire investment under certain circumstances"; "that there are no other facts the

omission of which would make any such information or the expression of any such opinions or

intentions misleading"; that the CDOs' value may fluctuate based on "the credit quality of the

underlying pool of assets ... general economic conditions, [and] the condition of certain financial markets"; that Goldman affiliate GSI will be "the ***initial*** Credit Protection Buyer" (emphasis added); and that "actual conflicts of interest ***may*** arise from" Goldman's roles in the CDOs (emphasis added).  ¶ 215.  Both Offering Circulars also state that New York law governs the CDO notes.  ¶ 215.

Although Goldman employees referred to Hudson 1 and/or its ROs in internal email as "junk", "lemons" and "crap" and a "CDO exit" for Goldman, the Marketing Book also stated that Goldman's "CDO desk pre-screens and evaluates assets for portfolio suitability"; "[a]ll investment grade rated RMBS.  No BBs"; and "[t]he goal is to create attractive proprietary investments by leveraging expertise of both Goldman Sachs CDO and Mortgage Desks[.]" ¶ 225.  The evidence shows that Plaintiff and other Class members relied on the Marketing Book by quoting it in internal memos and other documents as they considered whether to invest. ¶¶ 280-85, 287-88.

Defendants also used Preliminary Termsheets to market the Hudson CDOs.  Like the Hudson 1 Marketing Book, both Termsheets stated, *inter alia,* that "Goldman will invest in a portion of the Income Notes at closing."  ¶ 226.

## C.    The Purchases by Plaintiff and the Class

Plaintiff was a small "start-up" hedge fund at the time it invested in the Hudson CDOs. Plaintiff's principal, Alan Brody ("Brody"), investigated to determine whether to invest.  ¶¶ 38-39.  Defendants assert that "[t]here is no evidence that any investors" asked Goldman for its views before investing (Dkt. 194 ECF 21 n.14), but Brody explicitly asked Swenson, with whom he was then friends, whether Goldman was selling Hudson 1 "for the merits of the transaction or are you doing it to remove risk from the firm's books" and Swenson replied that it was "for the merits" and "wasn't to remove risk from the firm."  ¶¶ 228, 230.  Ultimately for the benefit of

Brody and certain of his family members and friends who were its investors, Plaintiff purchased in early 2007 $1 million of Hudson 1 notes at $95 per $100 principal, and $3 million of Hudson 2 notes at $100 per $100 principal. Within just weeks according to Goldman's own "marks," tranches of the CDOs began to rapidly lose value. ¶ 273. By Oct. 2007, Plaintiff sold the Hudson notes back to Goldman at $2.50 per $100 principal. ¶ 275. Shortly thereafter, Plaintiff ceased operations. ¶ 275.

Goldman sold to investors $872.5 million of the over $1.24 billion in CDO notes available for sale ¶ 246. No evidence indicates that Goldman paid any money to the Hudson SPEs for the notes. To the contrary, Blankfein stated that Goldman merely "retained" the Hudson CDO notes which it did not sell, including the income notes that the Marketing Book and Preliminary Termsheets represented Goldman would "invest in." ¶¶ 232, 247. Goldman sold the Hudson 2 notes and over $57.1 million (par amount) of Hudson 1 notes even *after* it determined internally during a Dec. 14, 2006 senior level meeting in CFO David Viniar's conference room to sell its subprime assets and thereby "get closer to home" -- including, as then Mortgage Dept. head Dan Sparks wrote that same day, by "[d]istribut[ing] as much as possible on bonds created from new loan securitizations[.]" ¶¶ 250-51.

Although some investors invested millions of dollars, the Class also includes numerous smaller investors, such as government and union pension funds, that invested less than $1 million. ¶ 249. Regardless of their size and sophistication, the record shows that investors thought investing in the CDOs was not extraordinarily risky. For example, one investor testified to the SEC that, had he known the CDOs were designed to offload Goldman's ABX long position, "we wouldn't have invested in the product … [b]ecause if they are structured to fail, we

wouldn't take them on." ¶ 282.  Another investor stated ██████████████████████████

████████████████████████████████████████████████  ¶ 288.

On April 27, 2010, when the class period ends, seven senior Goldman officials testified before the U.S. Senate PSI including Blankfein and three of the central players in Hudson, Swenson, Sparks and ABX trader Josh Birnbaum ("Birnbaum").  ¶ 139.  Amid those hearings, the U.S. Senate PSI released publicly thousands of internal Goldman emails and other documents, including regarding Hudson.  Brody testified that from this hearing, he "first understood the fraud that had been perpetrated here."  ¶ 278.

## ARGUMENT

Summary judgment is proper "only where, construing all the evidence in the light most favorable to the non-movant and drawing all reasonable inferences in that party's favor, there is 'no genuine issue as to any material fact and … the movant is entitled to judgment as a matter of law.'" *Rivera v. Roch. Gen. Reg'l Tran. Auth.,* 743 F.3d 11, 19 (2d Cir. 2014).  "A fact is material if it might affect the outcome of the suit … and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Windsor v. U.S.,* 699 F.3d 169, 192 (2d Cir. 2012), *aff'd,* 133 S. Ct. 2675 (2013).  "The role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Cuff ex rel. B.C. v. Valley Cent. S. Dist.,* 677 F.3d 109, 119 (2d Cir. 2012).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences" are for the jury.  *Barrows v. Seneca Foods Corp.*, 512 Fed. App'x 115, 117 (2d Cir. 2013).

## I.    THE EVIDENCE DEMONSTRATES THAT DEFENDANTS COMMITTED FRAUD

The parties agree that, to prove its fraud claims, Plaintiff must establish an omission of material fact, scienter, reliance and causation.  Dkt. 194 ECF 15; *Dodona*, 847 F. Supp. 2d at

637.  Notably, Goldman disputes only the omission, reliance and causation elements, but not scienter.[6]  The evidence regarding all elements, however, is sufficient to present to a jury.

### A.      The Jury May Find That Defendants Concealed Investment Risk

The jury may clearly find Defendants liable for concealing the likelihood that the Hudson CDOs "would decline in value" which, contrary to Defendants, has been the claim from the outset.  Amended Complaint ¶ 100.  *See also id.* ¶ 176 ("[D]efendants marketed and sold the Hudson CDO Securities knowing or disregarding that such Securities would lose value so that Goldman could profit thereby.").

The evidence shows that Defendants knew the Hudson CDOs were "junk" and consisted of "lemons"[7] that Goldman sought to "offload" onto client investors; that the CDOs referenced "crap" (¶ 242) and were a "structured exit" for Goldman's "bad" (¶ 208) ABX long position amid a market that Defendants knew was rapidly deteriorating and actually "desperate" to reduce Goldman's financial exposures to; and that all Class members -- sophisticated or not -- clearly wanted full disclosure of risk, for "[w]ho would knowingly roll the dice in a crooked crap game?"  *Basic Inc. v. Levinson,* 485 U.S. 224, 247 (1988).  "Yet, in addressing the risks, the Offering Circulars provide only boilerplate statements regarding the 'SPECULATIVE' and risky

---

[6]      Defendants Ostrem and Herrick dispute scienter in their separate motion (Dkt. 199 ECF 7-10).  Plaintiff has separately responded to that motion which is incorporated here.

[7]      Defendants' claim that Plaintiff "falsely represented" this email (Dkt. 194 ECF 16) is frivolous.  The very paragraph in the Amended Complaint Defendants cite (Dkt. 40 ¶ 70) actually states that this email refers to "an ***unidentified*** transaction" (emphasis added).  Also contrary to Defendants, the email is not limited to Camber 7, but instead addresses "SP CDOs" (which Hudson was) and responds to a question from Goldman senior official Tom Montag "is it done–all risk gone or do we own some still …?"  ¶ 260.  The deposition testimony Defendants cite adds nothing as Sparks actually testified "I don't know" when asked "what were the lemons?"  ¶ 261.  Defendants are also incorrect on the merits since, like the Hudson CDOs, Camber 7 also referenced subprime RMBS "lemons" -- indeed, *34* of the *same* RMBS as Goldman placed in Hudson 1.  ¶ 263.

nature of investing in securities, the possibility of market downturns, and the risks generally associated with mortgage-backed assets." *Dodona,* 847 F. Supp. 2d at 647.

The jury may also reasonably determine that the Offering Circulars misleadingly stated that GSI will be the "initial Credit Protection Buyer" given that Defendants intended for Goldman to retain its short position *from the outset* which was the very purpose for which it "initiated" the Hudson CDOs; that they do "NOT OMIT ANYTHING LIKELY TO AFFECT" what they disclosed when they concealed investment risk; and that "[v]arious potential and actual conflicts of interest *may* arise from the overall activities of" Goldman (emphasis added) when multiple such conflicts were a then-existing *fait accompli* given Defendants' scheme, *again from the outset,* to use the Hudson CDOs to offload onto clients Goldman's money losing ABX long position.[8]  Where, as here, a defendant has voluntarily chosen to speak, it "must speak honestly -- not in half-truths, in bad faith, or without a reasonable basis for their statements."  *In re WorldCom, Inc. Secs. Litig.*, 294 F. Supp. 2d 392, 428 (S.D.N.Y. 2003).[9]

Substantial additional evidence supports Plaintiff's claims.  For example:

---

[8]     Although the Court ruled that Defendants had no duty to disclose Goldman's trading strategy, evidence concerning that strategy is admissible to prove scienter.  *See, e.g., In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 527 (S.D.N.Y. 2009) ("plaintiff must prove that an agent of the corporation committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to the corporation"); *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 472 n.4 (S.D.N.Y. 2013) (Marrero, J.) ("The intent of company executives acting with scienter can be imputed to the company itself."); *Teamsters Local 445 Freight Div. Pen. Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195-96 (2d Cir. 2008) (accord).

[9]     *See also Op. Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC,* 595 F.3d 86, 92 (2d Cir. 2010) ("The veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers."); *McMahan & Co. v. Wherehouse Entm't, Inc.,* 900 F.2d 576, 579, 582 (2d Cir. 1990) ("Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors."; reversing summary judgment given "question of fact … whether the offering materials … misled a reasonable investor"); *Dodona*, 847 F. Supp. 2d at 648 ("Ultimately, an incomplete or misleading disclosure may be just as damaging as total concealment.").

- the Hudson CDOs were a proprietary "trade" for Goldman itself.  As Sparks stated, "[s]tructured exits are the way to reduce risk.  Our prior structured trade [Hudson 1] closes today.  We are focusing on ways to do it again much faster."  ¶ 200.  Sparks testified that his "CDO solution" was "a very efficient way to do it" *i.e.*, far more profitable than if Goldman had tried selling a $2 billion ABX long position outright.  ¶ 205.  Another Goldman official called Hudson 1 "a viable takeout" (¶ 189), while another stated on Sept. 20, 2006 -- the day after Ostrem and Herrick met and conceived the Hudson CDOs with the approval of Goldman's Firmwide Risk Committee (¶¶ 165, 194) -- that the Hudson 1 CDO "will help ABX desk to offload close to 20 pct of its current long BBB/BBB- risk."  ¶ 148;

- another Goldman partner, Stacy Bash-Polley, cited the Hudson CDOs and asked Swenson, Ostrem and others "to help move some of the risk" and "to start making the targeted calls" including to specific Class members (¶ 259);

- an "Internal Only/Verbal Only" email concerning Hudson 1 stated that a Goldman official was "guessing sales people view the syndicate 'axe' email we have used in the past as a way to distribute junk that nobody was dumb enough to take [the] first time around[,]" to which the reply was "LDL" (let's discuss live) (¶ 241).  Also in marketing the CDOs, Goldman did "not want to show out abx tranches at same time as a full capital structure cdo that is essentially an abx repack.  The mkt will figure out our position too easily."  ¶ 184;

- Swenson stated in his self-review for 2007 that "[w]e were long and needed to reduce risk in a situation where there were few opportunities to shed the ABX indices we were long"; "[t]he beauty of the CDO short was that it allowed for a very efficient method of capturing the value in the ABX"; and "knowing that there was a huge opportunity on that front, I directed the ABS desk to enter into a $1.8bb short in ABS CDOs that has realized approx. $1.0bb of a p & l today."  ¶ 209;

- Birnbaum said in his self-review that, by 2006,[10] "[t]he fundamentals for mortgage credit were undeniably deteriorating"; "[g]iven how much ABX we had purchased through the broker market in 2006, the world would think GS was very long for the forseeable future"; "[w]e could use that fear to our advantage if we could flip our risk"; "I concluded that we should not only get flat, but get VERY short"; and, in a tacit admission that Goldman's own client investors like Plaintiff and other Class members were the victims, "[t]he #1 missed opportunity for the mortgage department in 2007 was externalizing profitable shorts from the ABS desk to clients instead of applying them against longs" ¶¶ 207, 266; and

- another ABS Desk employee who helped select the assets for Hudson, Deeb Salem, stated in his 2007 self-review that "Mike [Swenson], Josh [Birnbaum] and I were able to learn from our bad long position at the end of 2006 and layout [sic] the game plan to put on an enormous directional short.  The results of that are obvious."  ¶ 208.

Defendants now even admit in a footnote that Goldman "structured the Hudson CDOs" to

"reduce a large, long position" but contradictorily maintain that they were "attractive investment

---

[10]   Goldman's 2006 fiscal year ended Nov. 24, 2006.  ¶ 193.

opportunities to clients[.]"  Dkt. 194 ECF 18 n.9.  Which is it?  How could the CDOs be

attractive to *any* long investor if the sponsor structured them to "offload" their assets onto

others?  More fundamentally, can there be any reasonable doubt that these core questions, and

the inferences that may be drawn regarding investment risk, are for the jury to answer based on

the evidence, not the Court as a matter of law?

Plaintiff's claim is that "the Hudson CDO offering documents resulted in failure to

disclose investment risk."  *Dodona*, 296 F.R.D. at 267.  The failure to accurately disclose

investment risk is "more substantial than a failure to disclose 'mere disbelief' or 'opinions.'"

*Dodona,* 847 F. Supp. 2d at 646.  *Accord In re MF Global Hldgs. Secs. Litig.*, 982 F. Supp. 2d

277, 318 (S.D.N.Y. 2013) (Marrero, J.) ("By superficially warning of possible risks while failing

to disclose critical facts, [defendant] was akin 'to someone who warns his hiking companion to

walk slowly because there might be a ditch ahead when he knows with near certainty that the

Grand Canyon lies one foot away.'"); *MBIA Ins. Corp. v. Royal Bank of Canada,* 2010 N.Y.

Misc. LEXIS 3958, at *89 (N.Y. Supr. Aug. 19, 2010) (CDO fraud claims alleging misstated

credit ratings were not "statements of predictions or opinions"); *King County, Wa. v. IKB*

*Deutsche Industriebank AG,* 751 F. Supp. 2d 652, 663 (S.D.N.Y. 2010) (upholding fraud claim

that defendant knew "the portfolio was not a safe, stable investment").[11]

Despite nearly 50 pages of briefs, Defendants barely mention their boilerplate risk

disclosures.  The Offering Circulars have some 18 pages of "Risk Factors" but none address that

---

[11]     By contrast, Defendants' cases involved disclosure of all relevant facts, *see Silsby v.
Icahn*, 17 F. Supp. 3d 348, 362 (S.D.N.Y. 2014) ("Dynegy supplied investors with financial
information from which investors could draw their own conclusions"); *In re Verifone Secs.
Litig.*, 11 F.3d 865, 869 (9th Cir. 1993) (failure to disclose future prospects not actionable when
all underlying financial data had been disclosed), or pleading insufficiency.  *IKB Int'l S.A. v.
Bank of Am. Corp.,* 584 F. App'x 26, 28 (2d Cir. 2014) (complaint failed to identify due
diligence reports "containing inconsistent information").

Defendants were "desperate" for Goldman to "offload" onto investors the very RMBS ROs for which the Hudson CDOs were "initiated" and "sponsored." As Dr. Mason summarized, "[g]iven the clear evidence that the Hudson CDOs were 'initiated' as an undisclosed proprietary trade that was structured and executed for Goldman's benefit alone, it also necessarily follows as a matter of fundamental economics that the CDOs were riskier than Defendants portrayed them[.]" Dkt. 196-16 ¶ 38. *See also id.* ¶¶ 19-26 (comparing the Hudson CDOs to an Abacus CDO; concluding "that Goldman's conduct in the Hudson CDOs was worse" (*id.* ¶ 26)).

Defendants focus instead on the underlying ROs. They claim there is no evidence that Goldman selected ROs likely to underperform; that Goldman underwrote only a portion of the ROs and there was publicly available information concerning the ROs and the underlying loans; and that Goldman's "belief" regarding the ROs had no "impact on whether borrowers would pay their mortgages." Dkt. 194 ECF 12. However, these arguments raise factual issues and are meritless since they ignore *the Hudson CDOs*. The ROs alone did not control the value of the Hudson CDOs which were separately structured and priced offerings. Defendants controlled the sourcing and pricing of the CDS pursuant to which the ROs were referenced, set the credit enhancements throughout the senior capital structures of the CDOs, and actually had a disincentive to provide adequate structural credit enhancements since they created the CDOs for Goldman to profit by shorting them. Dkt. 196-18 ¶¶ 63-64, 71, 89; Dkt. 196-16 ¶¶ 45-47. Defendants also ignore Mason's testimony that Goldman had "asymmetric information regarding [its] own intent and purpose of the vehicle" (¶ 292), and that there was far less "real-time" data regarding the ROs than Defendants claim since the monthly RMBS remittance reports lacked "important information" as to, *e.g.*, "[r]ealized loss." ¶ 16. Mason is clearly correct that Goldman had nonpublic information concerning the Hudson CDOs (¶ 293); Defendants

14

previously *conceded* that underwriters like Goldman have "information about those securitizations superior to any information" investors have.  Dkt. 119 ECF 31 n.19.

Defendants' selective citation to Brody's testimony that he investigated and held views about the subprime market is irrelevant to Defendants' scheme concerning the *Hudson CDOs*. Defendants also mischaracterize Brody's views which, following his discussions with Swenson, were "that the market for subprime CDO equity would remain strong" (¶ 229), and does not refute Mason's testimony that Goldman had "asymmetric" information in any event.

The argument that Plaintiff disclaimed reliance on the Marketing Book mischaracterizes Brody's testimony, which actually involved whether he "rel[ied] on things that were in the marketing book *if* they weren't in the offering circular[.]" ¶ 231 (emphasis added).  Defendants also cannot "amble away from liability" by arguing that the Offering Circular superseded the Marketing Book. *NRAM PLC v. Société Gen. Corp. & Inv. Banking,* 2014 N.Y. Misc. LEXIS 3654, at *18 (N.Y. Supr. Aug. 5, 2014).

Defendants' argument that the Offering Circulars disclosed that GSI was taking the short position is also for the jury and unpersuasive since it renders meaningless their use of the term "initial" which clearly implies that GSI might sell or transfer that position.  Even the definition of "Credit Protection Buyer" also implied that by stating "*if* [GSI] is no longer the Credit Protection Buyer" (¶ 35) (emphasis added).  In other CDOs in which Goldman acted as the permanent counterparty, the offering circular unequivocally disclosed that fact.  For example, the offering circular for an Abacus CDO sponsored by Goldman one month prior to Hudson 1 stated clearly:  "The Protection Buyer is Goldman Sachs Capital Markets, L.P."  ¶ 222.  The CDO Desk used that offering circular as a "precedent document" for drafting the Hudson Offering Circulars. ¶ 220.  In contrast to the Hudson CDOs, Goldman determined internally that "the ABACUS 11

disclosure will clearly state that Goldman will act as a protection buyer." ¶ 221.  *Accord Basis Yield Alpha Fund (Master) v. Goldman Sachs Grp., Inc.,* 115 A.D.3d 128, 137-38 (N.Y. App. Div. 2014) ("the offering circulars disclosed that an affiliate 'will act as the sole Synthetic Security counterparty'").  And as Mason stated, it was highly material "that Goldman *both* intended to retain the short *and* initiated the Hudson CDOs to help reduce the firm's ABX mortgage risk exposure." ¶ 291.  *Accord* Dkt. 196-16 ¶¶ 30-32.

The clear inference is that the term "initial" was part of Defendants' overall scheme to structure Hudson as a concealed proprietary trade rather than a legitimate, arm's-length offering, especially in view of Goldman's "[s]ensitivity to how we market the underlying portfolio, given the negative reception that might come from this deal being perceived as a deal for us to place all our trading book risk." ¶ 236.  An even greater "negative reception" would occur if investors had been timely advised that Goldman structured the Hudson CDOs as a part of a larger scheme to offload toxic ABX exposures.

### B.      Class Members Relied on Defendants to Fully Disclose Investment Risk

Where, as here, the claim is "primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material ...." *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128, 153-54 (1972).  Reliance may also be presumed under New York law "in certain cases involving material omissions." *In re Coordinated Title Ins. Cases*, 2004 WL 690380, at *7 (N.Y. Supr. Jan. 8, 2004).[12]  Whether an "omission is material is an inherently fact-specific finding ...." *Dodona,* 847 F. Supp. 2d at 637.

---

[12]      *Accord J.P. Morgan Chase Bank v. Winnick,* 350 F. Supp. 2d 393, 410 (S.D.N.Y. 2004); *Steinhardt Grp. Inc. v. Citicorp,* 708 N.Y.S.2d 91, 93 (N.Y. App. Div. 2000).  *In re Lehman Bros. Secs. & ERISA Litig.,* 2013 WL 5730020, at *4 n.44 (S.D.N.Y. Oct. 22, 2013) held that actual reliance is required, but that standard is satisfied since all investors invested based on the Offering Circulars which Defendants actually claim *bind* investors.  This Court's ruling in *Anwar v. Fairfield Greenwich Ltd.,* 2015 WL 935454, at *12 (S.D.N.Y. Mar. 3, 2015) addressed the

These standards are satisfied because "the risks associated with an investment are typically of primary concern for prospective investors." *Id.* at 648. *Accord Anwar,* 2015 WL 935454, at *10 ("payment alone may constitute circumstantial proof of reliance upon a financial representation"); *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 119-20 (2d Cir. 2013), *cert. denied* 134 S. Ct. 1938 (2014) (same).

Contrary to Defendants, there is no evidence demonstrating that any Class member understood the actual then-existing risk associated with investing in the Hudson CDOs. The evidence that does exist reveals just the opposite. For example:



- ████████████████, which invested $2.5 million in Hudson 2, stated ████████████████

- ██████, which invested $30 million in Hudson 1, stated in sworn testimony to the SEC via its CDO executive, ████████████████, that "assets being sourced from the street" meant "it was not a balance sheet deal .... Goldman would go out to the street, 'here are 100 names, what is your bid for CDS protection.'" "[A]ligned incentives" "means Goldman has taken a position in the notes where if they win, investors win … and … if the deal goes badly, obviously, Goldman does badly" (¶ 285);

- ██████████████████████ which invested $80 million in Hudson 1, ██████████████████████████, thought Goldman "will invest in approximately 50% of the income Notes at closing." ¶ 284. "It is possible for the deal to sustain minimal losses …." "This presents an acceptable risk to the Bank and exceeds ROE hurdles." "The AAA rating given a 25% recovery rate … can withstand $451MM of defaults before it's downgraded to AA …." (¶ 284);

- ████████████████, which invested $20 million in Hudson 1, thought ████████████████████████████████████████████████████████████

- ██████, which invested $20 million in Hudson 2 ████████████████████████████████████████████████

_____

*Affiliated Ute* presumption, not the separate presumption available under New York common law where, as here, omitted facts are peculiarly within a defendant's knowledge.

███████████████████████████████████

-     ███ officials testified to the SEC that, "[b]y investing in a portion of the equity, it showed they are on the same side as us as investor and they could actually suffer losses" (¶ 281); "not a balance sheet CDO" meant Goldman was not "transfer[ring] risk from its books" (¶ 281); if Goldman took "a short on the whole position, that's basically a negative view on those particular securities in the market as a whole" (¶ 282); "If they had a short position and we have a long position, we are diametrically opposed to their interest.  In fact, you would actually state that Goldman is disaligned, and our incentive is disaligned" (¶ 282); "aligned incentive" "meant as equity holder they have skin in the game and they are interested in the success of the transaction as we are" (¶ 283); "not a balance sheet CDO … means they were not looking to transfer risk" (¶ 283); and one ███ official "[a]bsolutely" wanted to know if Goldman intended to short the CDOs "[b]ecause there would have been a major conflict of interest with the material that they provided us and their true intentions in executing this trade."  (¶ 283).

That investors were sophisticated and investigated is neither novel nor relevant given the evidence of concealed investment risk.  Every investor -- big and small, sophisticated and less sophisticated -- investigates.  However, no precedent supports the rule Defendants seek that investigation alone "rebuts any presumption of reliance under *Affiliated Ute*."  Dkt. 194 ECF 20.

The argument that investors disclaimed "relying … upon any advice, counsel or representations" of Goldman is also meritless because that general disclaimer is insufficiently specific to bar the claim of concealed investment risk.  Dkt. 194 ECF 21.

*Basis*, 115 A.D.3d 128, is directly on point.  That case also involved a hedge fund that lost its investment in Goldman CDOs, and then failed.  As here, Goldman argued that the *same* disclaimer precludes any claim.  The court rejected that argument, holding that "there is a 'vast gap' between the speculative picture Goldman presented to investors and the events that Goldman knew had already occurred."  *Id.* at 138.  *Accord Loreley Fin. (Jer.) No. 3 Ltd v. Citigroup Global Mkts. Inc.*, 119 A.D.3d 136, at *144 (N.Y. App. Div. 2014) (fraud case where sponsor also shorted the CDO; citing *Basis,* holding "that these disclaimers and disclosures fall well short of tracking the particular … omissions alleged by plaintiffs"); *Putnam,* 2015 WL 1654120, at *10 (citing cases); *NRAM,* 2014 N.Y. Misc. LEXIS 3654, at *25; *Ge Dandong v.*

*Pinnacle Performance Ltd.,* 2013 WL 5658790, at *10 (S.D.N.Y. Oct. 17, 2013) (alleged

omissions "were so fundamental to the value of the Notes that it is hard to imagine a reasonable

investor purchasing them if the Offering Documents had revealed their true nature"); *Fed. Hsg.*

*Fin. Agency v. HSBC N. Am. Hldgs. Inc.*, 33 F. Supp. 3d 455, 484 (S.D.N.Y. 2014).[13]

      Defendants are also incorrect that Plaintiff profited.  Plaintiff lost $3,850,000 on the

Hudson CDOs (¶ 55), its shorts on the three underlying ROs yielded a profit of $1,570,147.78

(¶ 53), and those profits are not "attributable to the same conduct" and thus do not offset

Plaintiff's Hudson losses in any event.  *Gordon v. Sonar Cap. Mgmt. LLC,* 2015 U.S. Dist.

LEXIS 34443, at *18 (S.D.N.Y. Mar. 19, 2015).[14]

      Documents produced by three investors and lawyer-driven declarations from two others

do not address concealed investment risk and do not rebut reliance even as to them as discussed

more fully in Plaintiff's response to Defendants' separate motion (Dkt. 189), much less Class-

wide.  Defendants also omit that none of those investors opted-out of the Class.

### C.    Defendants' Conduct Caused Class Members' Losses

      "[C]ausation is fundamentally a factual matter[.]"  *In re Vivendi Univ., S.A., Secs. Litig,*

605 F. Supp. 2d 586, 600 (S.D.N.Y. 2009) (denying summary judgment in materialization of risk

case); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) ("the chain of causation

---

[13]    Defendants' cases involved adequate disclosure of risk, *Miller v. Grigoli*, 712 F. Supp.
1087, 1094 (S.D.N.Y. 1989), or no duty of disclosure as non-sellers, *Regents of the Univ. of Cal.*
*v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 385 (5th Cir. 2007).  *See also Banca*
*Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1028 (4th Cir. 1997) ("through minimal
diligence, the investor should have discovered the truth").  The argument that *Basis* involved a
motion to dismiss is irrelevant to the disclaimer issue, and the subsequent opinion in *Basis Yield*
*Alpha Fund (Master) v. Goldman Sachs Grp., Inc.*, 2014 WL 3571698, at *1 n.2 (N.Y. Supr.
July 18, 2014) held that representations regarding CDO collateral could state a fraud claim.

[14]    Defendants rely on *Minpeco, S.A. v. Conticommodity Servs. Inc.*, 676 F. Supp. 486, 488
(S.D.N.Y. 1987), but the plaintiff there was "both injured and enriched by" the same alleged
misconduct, and the court actually denied summary judgment.

… is a matter of proof at trial"); *NRAM*, 2014 N.Y. Misc. LEXIS 3654, at *32.  Defendants

concede that "transaction causation" is satisfied (Dkt. 194 ECF 25), and the jury should hear the

evidence on loss causation.

Where, as here, the decline in the price of a security constituted materialization of

undisclosed investment risk, loss causation is satisfied.  *Dura Pharms., Inc. v. Broudo*, 544 U.S.

336, 342 (2005); *Lentell*, 396 F.3d at 173 (plaintiff must show that the "risk that caused the loss

was within the zone of risk concealed"); *Castellano v. Young & Rubicam, Inc.,* 257 F.3d 171,

188 (2d Cir. 2001) (reversing summary judgment in omissions case where "a jury could find that

[plaintiff] lacked information crucial to understanding the true 'investment quality'").

Defendants' omissions caused at least "*some* portion" of the Class's losses.  *See* Dkt. 180

ECF 2; *Abu Dhabi Comm. Bank v. Morgan Stanley & Co.,* 888 F. Supp. 2d 431, 472 (S.D.N.Y.

2012).  Defendants failed to disclose the likelihood -- indeed, their expectation -- that the Hudson

CDOs would fail.  That undisclosed risk began to materialize when the Hudson CDOs declined

in value soon after they were issued.  The concealed risk was within the zone of risk that

ultimately materialized, thus satisfying loss causation.  As Mason discusses in detail (*see* Dkt.

196-16 at ¶¶ 44-49), those omissions were a "foreseeable" and "substantial and significant

factor" in ultimately causing investor losses.  *Id.* at ¶ 44.

Defendants say Mason's testimony is "fanciful theory" (Dkt. 194 ECF 24 n.17), but their

experts also do not dispute his core opinion that, "[i]n economic substance, Defendants deprived

Hudson CDO investors of the ability to fairly assess, timely and accurately, the risks of investing

in the Hudson CDOs."  Dkt. 196-16 ¶ 43.  *See also U.S. ex rel. O'Donnell v. Countrywide Home

Loans, Inc.*, 33 F. Supp. 3d 494, 502 n.10 (S.D.N.Y. 2014) (relying on Mason's testimony for the

U.S. in imposing $1.2 billion penalty concerning the sale of RMBS).

20

Defendants claim that "macroeconomic forces" caused the losses (Dkt. 194 ECF 24) and that, by the April 27, 2010 U.S. Senate PSI hearing, Hudson 1 was liquidated and Hudson 2 lost over 92% of its value.  But, Goldman's own internal "marks" show that certain of the Hudson CDOs declined far more -- and far more rapidly -- than the underlying ABX ROs.  ¶ 273.  That refutes not only Defendants' credit crisis defense, but also their argument that the performance of the ROs alone controlled the value of the Hudson CDOs.

Plaintiff has never claimed that the disclosures at the U.S. Senate PSI hearing *caused* investor losses, but instead that investors then began to be on notice they were defrauded.  Unlike corrective disclosure cases, a risk can materialize without disclosure of the omitted facts as Defendants' own case holds.  *See Nuveen Mun. High Income Oppt. Fund v. Cty. of Alameda,* 730 F.3d 1111, 1120 (9th Cir. 2013) ("Disclosure of the fraud is not a sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss.").  *Accord Vivendi*, 605 F. Supp. 2d at 598; *Foodservice*, 729 F.3d at 123 n.8 (damages "directly linked with [the] underlying theory of classwide liability").[15]

The evidence also supports a finding that Defendants are liable for all losses incurred by the Class *even if* those losses coincided with, or were part of, an overall decline in subprime-related CDOs.  *See* ¶ 294; Dkt. 196-16 ¶ 55; *Putnam,* 2015 WL 1654120, at *10 n.2 (reversing dismissal of a CDO fraud case Defendants rely on; holding that "there may be circumstances under which a marketwide economic collapse is itself caused by the conduct alleged to have

---

[15]     Defendants' cases do not involve rescission and are otherwise distinguishable.  *See Kuriakose v. Fed. Home Loan Mort. Corp.*, 897 F. Supp. 2d 168, 177 (S.D.N.Y. 2012) (relevant information was available to investors); *In re Moody's Corp. Secs. Litig.*, 2013 WL 4516788, at *12 (S.D.N.Y. Aug. 23, 2013) (rating agency conflicts were publicly known; plaintiffs' loss causation theory was "unsupported by any evidence"); *In re Omnicom Grp. Inc. Secs. Litig.*, 597 F.3d 501, 514 (2d Cir. 2010) (adverse information "far too tenuously connected" to price decline); *Ray v. Citigroup Global Markets, Inc.*, 482 F.3d 991, 995 (7th Cir. 2007) (accord).

caused a plaintiff's loss"); *Dodona,* 847 F. Supp. 2d at 649-50 ("'The conduct that plaintiffs

allege, if true, would make [Goldman] an active participant in the collapse of [the Hudson

CDOs] and the financial markets in general, rather than a passive victim.'"); *NRAM,* 2014 N.Y.

Misc. LEXIS 3654, at *31 ("general market downturn" defense has been "consistently rejected

on numerous occasions"); *In re Bear Stearns Cos., Inc. Secs., Deriv. & ERISA Litig.*, 763 F.

Supp. 2d 423, 504-05 (S.D.N.Y. 2011); *King County, Wa. v. IKB Deutsche Industriebank AG*,

708 F. Supp. 2d 334, 342 (S.D.N.Y. 2010); *Allstate Ins. Co. v. Ace Sec. Corp.*, 2013 N.Y. Misc

LEXIS 3531, at *26 (N.Y. Supr. Mar. 14, 2013) ("the housing market collapse was … in part

caused by the securitization practices of industry participants like Morgan Stanley");

*Countrywide Fin. Corp. Secs. Litig.*, 588 F. Supp. 2d 1132, 1174 (C.D. Cal. 2008).

    The jury may properly determine that rescission is appropriate where, as here, all losses

were the foreseeable result of undisclosed investment risk.  *See, e.g., Vivendi*, 605 F. Supp. 2d at

598; *Gordon,* 2015 U.S. Dist. LEXIS 34443, at *19 ("courts have considerable discretion in

determining how best to calculate compensable losses … ranging from disgorgement to …

rescission").  Rescission does not require ruling out the financial crisis or other potential causes

of investor loss.  *See Chasins v. Smith, Barney & Co.*, 438 F.2d 1167, 1173 (2d Cir. 1970)

(rescission "is justified where, as here, the evil is not the price at which [plaintiff] bought but the

fact of being induced to buy and invest … without disclosure"); *Clark v. John Lamula Investors,

Inc.*, 583 F.2d 594, 604 (2d Cir. 1978); *Boguslavsky v. Kaplan*, 159 F.3d 715, 721 n.5 (2d Cir.

1998); *Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974); *Syncora Guar. Inc. v. Alinda Capital

Partners LLC*, 2013 N.Y. Misc. LEXIS 2943, at *36 (N.Y. Supr. July 1, 2013) ("a party is

entitled to rescission of a contract if it was induced by a fraud to enter the agreement").

Rescission also measures the "damages that result from the class's asserted theory of injury[.]" *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015).[16]

## II.   THE JURY MAY FIND GOLDMAN LIABLE FOR UNJUST ENRICHMENT

Even if the Offering Circulars are binding contracts, Plaintiff's unjust enrichment claim is for the jury because Goldman (the sole defendant on the claim) had an independent legal duty to fully disclose investment risk. *See, e.g.*, *Net2Globe Int'l, Inc. v. Time Warner Tel. of New York*, 273 F. Supp. 2d 436, 466 (S.D.N.Y. 2003) (Marrero, J.) ("[A] claim of unjust enrichment may serve as a basis for recovery should a trier of fact determine that … the contractual obligations did not encompass the events underlying the asserted basis for [an] unjust enrichment claim."); *Chrysler Cap. Corp. v. Century Pwr. Corp.,* 778 F. Supp. 1260, 1272 (S.D.N.Y. 1991) (fraudulently induced contract is no bar to unjust enrichment claim).[17]

---

[16]     By contrast, in *Shanahan v. Vallat*, 2008 WL 4525452, at *6-7 (S.D.N.Y. Oct. 3, 2008), there was no evidence that the company caused plaintiffs' losses. *See also In re Williams Secs. Litig.-WCG Subclass*, 558 F.3d 1130, 1142 (10th Cir. 2009) (causal connection "is too remote"; not rescission case); *In re Flag Tel. Hldgs. Ltd. Secs. Litig.*, 574 F.3d 29, 40-41 (2d Cir. 2009) (accord; no materialization of risk theory); *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 436-38 (3d Cir. 2007) (not rescission case; plaintiff's expert had "no opinion" regarding causation); *Gordon Partners v. Blumenthal*, 293 F. App'x 815, 818 (2d Cir. 2008) (not rescission case; plaintiff "did not proffer *any* evidence" to "find loss causation"); *JSMS Rural LP v. GMG Cap. Partners III, LP*, 2006 WL 1867482, at *4 (S.D.N.Y. July 6, 2006) (no evidence plaintiff lost any money; corrective disclosure theory); *Rousseff v. E.F. Hutton Co.*, 843 F.2d 1326, 1329 (11th Cir. 1988) (issue of loss causation "was not submitted to the jury").

[17]     The Court "anticipate[d] that a contract will materialize during discovery," *Dodona*, 847 F. Supp. 2d at 653, but Goldman has failed to submit any such evidence.  Instead, it asserts only that the "Offering Circulars themselves constituted such a contract."  Dkt. 194 ECF 30.  The Offering Circulars state, in turn, that investors in certain class E and income notes "WILL BE REQUIRED TO EXECUTE AND DELIVER A LETTER CONTAINING CERTAIN REPRESENTATIONS AND AGREEMENTS," and investors in other notes "WILL BE DEEMED TO HAVE MADE SUCH REPRESENTATIONS AND AGREEMENTS …."  ¶ 252. However, even in discovery Goldman has produced letter agreements for only *five* of the 15 investors in class E and income notes.  ¶¶ 253-54.  Where, as here, "there is a bona fide dispute as to the existence of a contract, a party may proceed upon a theory of unjust enrichment …." *Picture Patents, LLC v. Aeropostale, Inc.*, 2009 WL 2569121, at *3 (S.D.N.Y. Aug. 19, 2009). Also, the two cases Defendants cite do not support a rule that offering circulars automatically

The jury may also determine that Class members were fraudulently induced to invest, rendering any such contracts void under § 29(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78cc(b). *See, e.g., Berckeley Inv. Grp. v. Colkitt*, 455 F.3d 195, 206 (3d Cir. 2006) ("If an agreement cannot be performed without violating the securities laws, that agreement is subject to rescission under Section 29(b)."); *Twin Holdings of Delaware LLC v. CW Capital, LLC*, 2010 WL 309022, at *9 (N.Y. Supr. Jan. 19, 2010) (fraudulent inducement claim).

## III.    PLAINTIFF HAS STANDING FOR HUDSON 1

The argument that the Hudson 1 notes were "gifts" (Dkt. 194 ECF 31) is incorrect since Plaintiff acquired those notes in exchange for a capital contribution to Colonial Fund. ¶ 48. Defendants' own expert agreed.  ¶ 46.  Even if Plaintiff did not, it still has standing by investing in Hudson 2 which "implicate[s] the same set of concerns …."  *See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.,* 693 F.3d 145, 149 (2d Cir. 2012).[18]

The jury may also find for Plaintiff on its § 20 and aiding and abetting claims.  Goldman controlled the Hudson SPEs (¶ 201); Ostrem and Herrick led the structuring, marketing and selling of the Hudson CDOs; Goldman senior executives closely followed the development and sale of the CDOs which were also discussed during at least five different Firmwide Risk Committee meetings attended by Goldman executives; and all Defendants culpably and substantially assisted in the fraud.  *Boguslavsky,* 159 F.3d at 720; *UBS Secs. LLC v. Highland Cap. Mgmt., L.P.,* 2011 WL 781481, at *7 (N.Y. Supr. Mar. 1, 2011).

---

qualify as binding contracts, and are distinguishable. *See The Ind. Order of Foresters v. Donaldson, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 939 (2d Cir. 1998) (breach of warranty claim, not unjust enrichment); *Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 312 (S.D.N.Y. 1998) (allegedly unjust fees were paid via "the express terms of" the contract).

[18]     Defendants' cases are not to the contrary.  *See In re Enron Corp. Secs., Deriv. & ERISA Litig.*, 2008 WL 4178151, at *9 (S.D. Tex. Sept. 8, 2008) (donees lack claims "who part[] with no consideration and incur[] no liabilities"); *Marisol A. v. Giuliani*, 126 F.3d 372 (2d Cir. 1997) (affirming class certification; does not involve standing for securities claims).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants'

motion for summary judgment.

Dated:  April 20, 2015

David S. Frydman (dfrydman@frydmanllc.com)
Frydman LLC
501 Fifth Avenue - 15th Floor
New York, NY  10017
Tel:  (212) 355-9100
Fax:  (212) 997-0371
          – and –
D'Anna Harper (dharper@gusraekaplan.com)
Gusrae Kaplan Nusbaum, PLLC
120 Wall Street
New York, NY  10005
Tel:  (212) 269-1400
Fax:  (212) 514-8479

*Local Counsel for Lead Plaintiff Dodona I, LLC and the Class*

Steven L. Bloch (sbloch@baileyglasser.com)
Bailey Glasser LLP
One Tower Bridge
100 Front Street - Suite 1235
West Conshohocken, PA  19428
Tel:  (610) 834-7506
Fax:  (610) 834-7509

*Additional Counsel for Lead Plaintiff Dodona I, LLC*

KAL6935284

Respectfully submitted,

Berger & Montague, P.C.

Merrill G. Davidoff (mdavidoff@bm.net)
Lawrence J. Lederer (llederer@bm.net)
Robin Switzenbaum (rswitzenbaum@bm.net)
Barbara A. Podell (bpodell@bm.net)
Jon J. Lambiras (jlambiras@bm.net)
Lane L. Vines (lvines@bm.net)
1622 Locust Street
Philadelphia, PA 19103
Tel:  (215) 875-3000
Fax:  (215) 875-4604

*Lead  Counsel for Lead Plaintiff Dodona I, LLC and the Class*

25