UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------- X
DODONA I, LLC, on Behalf of Itself :
and All Others Similarly Situated, :     10-CV-7497 (VM)
                                    :
                    Plaintiffs,     :
                                    :     **DECISION AND ORDER**
         - against -                :
                                    :
GOLDMAN SACHS & CO, et al.,         :
                                    :
                    Defendants.     :
-----------------------------------X
**VICTOR MARRERO, United States District Judge.**

     Lead Plaintiff Dodona I, LLC, on behalf of itself and

others similarly situated[1] (collectively, "Plaintiffs"),

assert federal and state fraud-based claims against

defendants Goldman, Sachs & Co. ("GS & Co"), The Goldman Sachs

Group, Inc. ("Goldman," and together, with GS & Co, the

"Goldman Sachs Defendants"), and former Goldman employees

Peter L. Ostrem ("Ostrem") and Derryl K. Herrick ("Herrick")

(collectively, with the Goldman Sachs Defendants,

"Defendants"). Currently before the Court are Defendants'

Motion for Summary Judgment (Dkt. No. 193, the "Main Motion"),

Ostrem and Herrick's Supplemental Motion for Summary Judgment

(Dkt. No. 197, the "Ostrem and Herrick Motion"), and

---

[1] The Court certified a class comprised of investors in two collaterized
debt obligations ("CDOs"), Hudson Mezzanine Funding 2006-1 ("Hudson 1")
and Hudson Mezzanine Funding 2006-2 ("Hudson 2") (collectively, the
"Hudson CDOs"), and "who, from their initial offering through April 27,
2010, purchased or otherwise acquired the Hudson CDOs in the United States
and were damaged thereby." Dodona I, LLC v. Goldman Sachs & Co., 296
F.R.D. 261, 264 (S.D.N.Y. 2014) ("Dodona Class Cert").

Defendants' Motion for Summary Judgment as to the Claims of Certain Class Members (Dkt. No. 189, the "Certain Class Members Motion"), which all seek dismissal of Plaintiffs' remaining fraud-based federal and state law claims against Defendants. For the reasons stated below, the Court grants Defendants' Main Motion for summary judgment, and denies without prejudice the Ostrem and Herrick Motion and the Certain Class Members Motion.

## I.   BACKGROUND[2]

---

[2] The factual summary presented herein derives from the following documents: Amended Class Action Complaint, filed Feb. 4, 2011, Dkt. No. 40; Defendants' Memorandum of Law in Support of their Motion for Summary Judgment, filed Feb. 2, 2015, Dkt. No. 194 ("Defs.' Mem."); Defendants' Rule 56.1 Statement, filed Feb. 2, 2015, Dkt. No. 195; Memorandum of Law in Support of Defendants Ostrem and Herrick's Supplemental Motion for Summary Judgment, filed Feb. 2, 2015, Dkt. No. 199 ("Ostrem and Herrick Mem."); Defendants Ostrem and Herrick's Rule 56.1 Statement, filed Feb. 2, 2015, Dkt. No. 198; the Declaration of Jacob Croke in Support of Defendants' Motion for Summary Judgment and Defendants Ostrem and Herrick's Supplemental Motion for Summary Judgment, filed Feb. 2, 2015, Dkt. No. 196 ("Croke Decl."); Defendants' Memorandum of Law in Support of Summary Judgment as to the Claims of Certain Class Members, filed Jan. 30, 2015, Dkt. No. 190 ("Certain Class Members Mem."); Defendants' Rule 56.1 Statement in Support of Defendants' Summary Judgment Motion as to the Claims of Certain Class Members, filed Jan. 30, 2015, Dkt. No. 191; the Declaration of Nathaniel P. T. Read in Support of Defendants' Motion for Summary Judgment as to the Claims of Certain Class Members, Dkt. No. 192 ("Read Decl."); Plaintiffs' Memorandum of Law in Opposition to Defendants' Summary Judgment Motion, filed on Apr. 20, 2015, Dkt. No. 206 ("Pls.' Opp. Mem."); Plaintiffs' Rule 56.1 Counter-Statement, filed on Apr. 20, 2015, Dkt. No. 207; Plaintiffs' Memorandum of Law in Opposition to the Defendants' Motion for Summary Judgment as to the Claims of Certain Class Members, filed on Apr. 20, 2015, Dkt. No. 208 ("Pls.' Opp. Mem. as to Certain Class Members"); Plaintiffs' Rule 56.1 Counter-Statement as to Certain Class Members, filed on Apr. 20, 2015, Dkt. No. 209; Plaintiffs' Memorandum of Law in Opposition to Ostrem and Herrick's Supplemental Motion for Summary Judgment, Dkt. No. 210 ("Pls.' Opp. Mem. as to Ostrem and Herrick"); Plaintiffs' Rule 56.1 Counter-Statement as to Ostrem and Herrick, filed on Apr. 20, 2015, Dkt. No. 211; the Declaration of Lawrence J. Lederer in Opposition to Defendants' Motions for Summary Judgment, filed on Apr. 20, 2015, Dkt. No. 212 ("Lederer Decl."); Defendants' Reply Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment and in Further Support of Defendants Ostrem and Herrick's

The Court has previously addressed in detail the facts surrounding Plaintiffs' investments in the Hudson CDOs in its Decision and Order dated March 21, 2012 (Dkt. No. 73), see Dodona I, LLC v. Goldman, Sachs & Co., 847 F. Supp. 2d 624 (S.D.N.Y. 2012) ("Dodona I"), and in its Decision and Order dated January 23, 2014 (Dkt. No. 138) granting class certification, see Dodona I, LLC v. Goldman, Sachs & Co., 296 F.R.D. 261 (S.D.N.Y. 2014) ("Dodona Class Cert."). The Court assumes familiarity with the facts as described in those prior decisions, and thus will provide only a brief overview here.

During 2006 and 2007, Plaintiffs privately acquired highly-leveraged securities issued by the Hudson 1 and Hudson 2 CDOs, which were structured by GS & Co, a broker-dealer subsidiary of Goldman.[3] The Hudson CDOs were backed by a

---

Supplemental Motion for Summary Judgment, filed on June 1, 2015, Dkt. No. 223 ("Defs.' Reply Mem."); Defendants' Reply to Plaintiffs' Rule 56.1 Counter-Statement as to the Rule 56.1 Statements of Defendants, and Ostrem and Herrick, filed on June 1, 2015, Dkt. No. 225; the Declaration of Jacob E. Cohen in Further Support of Defendants' Motion for Summary Judgment and Ostrem and Herrick' Supplemental Motion for Summary Judgment, filed on June 1, 2015, Dkt. No. 224; Defendants' Reply Memorandum of Law in Support of Summary Judgment as to the Claims of Certain Class Members, filed on June 1, 2015, Dkt. No. 226 ("Defs.' Reply Mem. as to Certain Class Members"); Defendants' Reply to Plaintiffs' Rule 56.1 Counter-Statement as to the Rule 56.1 Statement of Defendants as to the Claims of Certain Class Members, filed on June 1, 2015, Dkt. No. 227. The parties also submitted letter briefs on certain case developments in the New York Court of Appeals and in related arbitration. (See Dkt. Nos. 214, 215, 216, 217.) Except where specifically referenced, no further citation to these sources will be made.

[3] GS & Co began structuring the Hudson 1 CDO in September 2006, and that offering commenced on or about December 5, 2006. GS & Co began structuring the Hudson 2 CDO in or around late 2006, and that offering commenced on or about February 8, 2007. During those times, defendants Herrick and Ostrem were GS & Co employees. Herrick was a vice president in the

number of residential mortgage-backed securities ("RMBS").[4] Those securities (the "Reference Obligations" or "ROs") were constituents of the ABX index of RMBS. Both Hudson CDOs included, as ROs, the 80 constituents of the 2006 BBB and BBB- ABX indices. For Hudson 1, the Goldman Sachs Defendants selected an additional 60 RMBS to serve as ROs.[5] All of the ROs selected were identified in the Hudson CDO Offering Circulars.

A Goldman subsidiary, Goldman Sachs International ("GSI"), acted as the "credit protection buyer" for the Hudson CDOs. As the credit protection buyer, GSI agreed to make period premium payments to the "credit protection seller" -- here, Plaintiffs -- during the lifetime of the CDS in exchange for payments from the credit protection seller if the ROs experienced defaults or other adverse credit events. As such, GSI took "short" positions on RMBS, essentially betting that the underlying ROs would underperform. On the other hand, by investing in the Hudson CDOs, the Plaintiffs took "long"

---

structured products trading group ("SPG Trading"), and Ostrem was one of Herrick's direct reports on the CDO desk.

[4] The Hudson CDOs were "synthetic," meaning that the CDOs did not buy the underlying ROs, but rather acquired identical exposure to those ROs through Credit Default Swaps ("CDS"). The Hudson CDOs were also "static," meaning that the collateral referenced could only be modified, sold, or otherwise transferred in limited circumstances.

[5] Additionally, Goldman was the sponsor for 12% of the Hudson 1 ROs, and 7.5% of the Hudson 2 ROs; Goldman also underwrote approximately 14% of the Hudson 1 ROs, and 7.5% of the Hudson 2 ROs.

positions, essentially betting that the underlying ROs would perform well.

Thus, if the RMBS ROs used in the Hudson CDOs were to perform well, the Plaintiffs stood to gain from the transaction. If, however, the ROs underperformed, then GSI would benefit. Of course, by mid-2007, much of the subprime RMBS market -- including the ROs used by the Hudson CDOs -- were subject to credit watches, ratings downgrades, and significant price deterioration. As a result of these negative credit events in the RMBS market, Plaintiffs, who held long positions, lost much of their investment in the Hudson CDOs. But GSI, as the credit protection buyer, profited from that same decrease in RMBS value.

In 2010, after several senior Goldman officials testified before a United States Senate Subcommittee hearing regarding Goldman's subprime mortgage-related activities, it became publicly known that, prior to structuring the Hudson CDOs, Goldman held significant long exposure to subprime RMBS and Goldman sought to reduce this exposure by taking offsetting short positions on RMBS. Plaintiffs then filed the instant action, asserting fraud-based claims under New York common law, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. Section 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. Section 240.10b-5,

and Section 20(a) of the Exchange Act, 15 U.S.C. Section 78t, against Defendants. To support those claims, Plaintiffs alleged that Defendants created the Hudson CDOs as part of a scheme to decrease Goldman's subprime exposure at the expense of its investors by shorting those same CDOs; that Defendants failed to disclose this strategy to investors; and that Defendants failed to disclose that they did not reasonably believe that the Hudson CDOs would be profitable for investors like Dodona.

At the motion to dismiss phase, the Court held that Defendants had no duty to disclose that they structured the Hudson CDOs as part of a strategy to reduce their long position, and thus this theory could not form the basis of their fraud-based claims. See Dodona I, 847 F. Supp. 2d at 646. The Court also found that the Plaintiffs had not adequately pleaded fraud claims based on market manipulation, because the Amended Class Action Complaint failed to allege that there was "an open and developed market for the Hudson CDOs, or even that the price of the Hudson CDO securities reflected all publicly available information, and hence, any material misrepresentations." See id. at 651 (internal quotation marks omitted). However, the Court did not dismiss all of Plaintiffs' claims. The Court held that the Plaintiffs had adequately pleaded their fraud-based claims on a single

omissions theory: whether Defendants genuinely believed that
the Hudson CDOs did not have a realistic chance of being
profitable for investors, and did not adequately disclose
those beliefs. See id. at 646.

Now, Defendants move for summary judgment for dismissal
of all surviving claims against them. In their Main Motion,
Defendants argue that: (1) there is no evidence that
Defendants violated Section 10(b) or committed common law
fraud, because the Plaintiffs have not shown evidence that
any actionable misrepresentations or omissions were made by
Defendants, that class members reasonably relied on any
purported misrepresentation or omission, or that
misrepresentations or omissions caused their losses; (2) the
class purchased the securities pursuant to the offering
circulars, and as such, the unjust enrichment claims should
be dismissed; and (3) Dodona cannot bring claims relating to
the Hudson 1 securities because it did not purchase those
securities and suffered no cognizable damages. Ostrem and
Herrick, who also join the Main Motion, make additional
arguments in the Ostrem and Herrick Motion: that (1) Ostrem
and Herrick did not "make" the alleged misrepresentations or
omissions in the offering circulars; that (2) there is no
evidence that either Ostrem or Herrick intended to defraud
Hudson CDO investors; and (3) Dodona's "control person" and

-7-

"aiding and abetting" claims against Ostrem and Herrick are not viable.

Additionally, Defendants move for summary judgment as to the claims of certain class members on additional grounds. In their Certain Class Members Motion, Defendants argue that, for reasons not applicable to the entire class, the Plaintiffs cannot show the necessary elements of fraud for certain class members. In particular, Defendants argue that: (1) some of the class members purchased Hudson CDO securities in non-domestic transactions, and thus should be barred from recovery under the federal securities laws under Morrison v. Nat'l Australia Bank Ltd., 561 U.S. 247 (2010); (2) that some of the class members demonstrably did not rely on an alleged misrepresentation made by Defendants, because those class members either admitted their non-reliance in sworn declarations or could not have relied by virtue of their roles as global investment banks trading extensively in the RMBS and the CDO markets; (3) that one class member sold its position in the Hudson CDOs before the earliest date on which the allegedly concealed risk materialized; and (4) that certain class members suffered no loss, either because they were Goldman sponsored CDOs or because they held larger short positions on the underlying ROs.

As discussed _infra_, upon review of the summary judgment record -- which follows a lengthy discovery period, and includes numerous emails, deposition transcripts, financial documents, and other material -- the Court finds Defendants have satisfied their burden of demonstrating the absence of any genuine issue of material fact. The record does demonstrate, as acknowledged by Defendants (see Defs.' Mem. at 11 n.9), that Goldman held substantial long positions on subprime RMBS in 2006 and 2007, and that the Hudson CDOs were part of Goldman's internal strategy to reduce that exposure. But crucially absent from the summary judgment record is sufficient evidence supporting the sole claim in dispute: that Defendants structured the Hudson CDOs with the expectation that they would fail, or that Defendants were particularly aware of an undisclosed risk of Plaintiffs' investing in the RMBS market. Thus, the Court is not persuaded that a genuine dispute of material fact exists here as to the presence of an actionable omission.

Therefore, the Court **GRANTS** Defendants' Main Motion for Summary Judgment. As the Court finds that the Plaintiffs' fraud-based claims cannot survive summary judgment, the Court need not address the arguments raised in the Ostrem and Herrick Motion, or in the Certain Class Members Motion.

Therefore, the Ostrem and Herrick Motion and the Certain Class Members Motion are **DENIED** without prejudice.

## I.   LEGAL STANDARD

### A.   STANDARD OF REVIEW UNDER RULE 56

The Court may grant a motion for summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this assessment, the Court looks to the relevant substantive law to determine which facts are material: "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). To survive summary judgment, the disputed factual issues must also be "genuine" -- that is, "sufficient evidence [must] favor[] the nonmoving party for a jury to return a verdict for that party." Id. at 249. The role of a court in ruling on such a motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Knight v. United States Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material

fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).
If the moving party satisfies its burden, the nonmoving party
must provide specific facts showing that there is a genuine
issue for trial in order to survive the motion for summary
judgment. See Matsushita Elec. Indus. Co., Ltd. v. Zenith
Radio Corp., 475 U.S. 574, 586 (1986); Shannon v. New York
City Transit Auth., 332 F.3d 95, 98—99 (2d Cir. 2003). To do
so, it "must do more than simply show that there is some
metaphysical doubt as to the material facts, and it may not
rely on conclusory allegations or unsubstantiated
speculation." In re Celestica Inc. Sec. Litig., No. 07-CV-
312, 2014 WL 4160216, at *4 (S.D.N.Y. Aug. 20, 2014) (internal
quotation marks and citations omitted). "Rather, the non-
moving party must produce admissible evidence that supports
its pleadings. In this regard, the mere existence of a
scintilla of evidence supporting the non-movant's case is
also insufficient to defeat summary judgment." Id. (internal
quotation marks and citations omitted).

**B.   FRAUD-BASED CLAIMS UNDER THE FEDERAL SECURITIES LAWS**

Plaintiffs claim that GS & Co, Ostrem, and Herrick made
misrepresentations and omissions of material fact in
connection with the Hudson CDO offerings in violation of
Section 10(b) and Rule 10b-5. To state a claim under Section
10(b) and Rule 10b-5 for misrepresentations, a plaintiff must

allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter,[6] (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury. ATSI Commc'ns Inc. v. Shaar Fund. Ltd., 493 F.3d 87, 105 (2d Cir. 2007).

Plaintiffs also allege Section 20(a) claims against Defendants for controlling at least one primary violator and being culpable participants in the alleged fraudulent omissions. See Dodona I, 847 F. Supp. 2d at 651-52. Liability for violations of Section 20(a) of the Exchange Act is derivative of liability for violations of Section 10(b). See S.E.C. v. First Jersey Sec. Inc., 101 F.3d 1450, 1472 (2d Cir. 1996). Section 20(a) imposes liability upon "every person who, directly or indirectly, controls any person liable under any provision of [Section 10(b)] or of any rule or regulation thereunder . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t. To establish a prima facie claim under Section 20(a), a plaintiff must show "a primary

---

[6] The requisite scienter for fraud is "a mental state embracing intent to deceive, manipulate, or defraud." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007).

violation by the controlled person and control of the primary violator by the targeted defendant . . . and show that the controlling person was in some meaningful sense [a] culpable participant[] in the fraud perpetrated . . ." First Jersey Sec. Inc., 101 F.3d at 1472 (internal quotation marks and citations omitted) (alterations in original).

C.   **FRAUD-BASED CLAIMS UNDER NEW YORK COMMON LAW**

Plaintiffs allege New York common law fraud and fraudulent concealment against all Defendants. The elements of common law fraud under New York law are: "(1) a material misrepresentation or omission of fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff." Haggerty v. Ciarelli & Dempsey, 374 F. App'x 92, 94 (2d Cir. 2010) (internal citations omitted). "Because the elements of common-law fraud are substantially identical to those governing [Section] 10(b), the identical analysis applies." In re Optimal U.S. Litig., 837 F. Supp. 2d 244, 252 (S.D.N.Y. 2011) (internal quotation marks omitted).

Additionally, Plaintiffs allege aiding and abetting fraud claims against Goldman, Ostrem, and Herrick. To state a claim for aiding and abetting fraud under New York law, a plaintiff must plead facts showing: (1) the existence of a

fraud; (2) defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission. See Wight v. BankAmerica Corp., 219 F.3d 79, 91 (2d Cir. 2000). "The knowledge requirement of an aiding and abetting fraud claim is satisfied by alleging actual knowledge of the underlying fraud." JP Morgan Chase Bank v. Winnick, 406 F. Supp. 2d 247, 252 (S.D.N.Y. 2005) (internal citation omitted). "A defendant provides substantial assistance only if [she] affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables [the fraud] to proceed." Id. at 256 (internal quotation marks omitted).

Finally, Plaintiffs claim that Goldman and GS & Co were unjustly enriched at Plaintiffs' expense. Under New York law, an unjust enrichment claim requires a plaintiff to prove that: "(1) [the] defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." Ashland v. Morgan Stanley & Co., 652 F.3d 333, 339 (2d Cir. 2011).

## II.   DISCUSSION

As the Court framed the inquiry in Dodona I, for Plaintiffs' fraud-based claims to survive, they must be premised on one specific omissions-based theory: that

-14-

Defendants were aware of singularly prohibitive risks associated with the Hudson CDOs in particular, yet failed to disclose those risks completely and accurately. See 847 F. Supp. 2d at 647. Since the Offering Circulars contained affirmative representations regarding the risks of investing in the RMBS market, the Defendants had a duty to ensure that those statements were accurate and complete. See Panther Partners, Inc. v. Ikanos Commc'ns, Inc., 538 F. Supp. 2d 662, 669 (S.D.N.Y. 2008) ("[R]isk disclosures must accurately characterize the scope and specificity of the risk, as understood at the time the statements are made."); see also Dandong v. Pinnacle Performance Ltd., No. 10-CV-8086, 2011 WL 5170293, at *13 (S.D.N.Y. Oct. 31, 2011) ("General risk disclosures in the face of specific known risks which border on certainties are not sufficient to defeat a securities fraud claim." (internal quotation marks and citation omitted) (emphasis added)). Specifically, the Offering Circulars provided only "boilerplate statements regarding the 'SPECULATIVE' and risky nature of investing in securities, the possibility of market downturns, and the risks generally associated with mortgage-backed assets" -- which could be found to include material omissions if Defendants "were aware of singularly prohibitive risks associated with the Hudson CDOs in particular." Dodona I, 847 F. Supp. 2d at 647. Such

undisclosed investment risk includes material, non-public information, and cannot be premised entirely on Defendants' internal strategy of obtaining short positions in order to reduce their long exposure, which Defendants had no duty to disclose. See id. at 646-47.

At the motion to dismiss stage, in accordance with the applicable standard, the Court accepted Plaintiffs' allegations of undisclosed investment risk as true. However, now with the benefit of discovery, the Plaintiffs have not pointed to any evidence, beyond mere speculation, sufficient to demonstrate "singularly prohibitive risks" of which Defendants were aware and which they failed to disclose; thus, the Court finds that the risk disclosures Defendants did make were not misleading in this context and cannot support an actionable omissions theory.

Plaintiffs argue that three main categories of evidence support their argument that Defendants concealed investment risk, thereby making omissions of material fact. The Court is not persuaded that Plaintiffs have done more than make conclusory allegations or unsubstantiated speculation, even when considered in the aggregate, in arguing that Defendants made actionable omissions. First, Plaintiffs point to emails and documents from Goldman employees indicating that the Hudson CDOs were "crap," "junk that nobody was dumb enough to

-16-

take [the] first time around," and consisted of "lemons" that Goldman sought to "offload" onto client investors. (See Pls.' Opp. Mem. at 10, 12.)[7] Other emails from employees indicated their belief that the "fundamentals for mortgage credit were undeniably deteriorating" and the need for Goldman to "flip" its risk. (See Pls.' Opp. Mem. at 12.) Such emails are not enough to support a finding, at this stage, that Defendants made actionable omissions; those emails show, at most, that some Goldman employees, based on the same information available to the Plaintiffs, were bearish on the RMBS market. Indeed, courts have been hesitant to impose disclosure duties of internal projections based on publicly available information, as compared to disclosure of predictions based on "existing negative factors known only to the company." See In re Lyondell Petrochemical Co. Sec. Litig., 984 F.2d 1050, 1052-53 (9th Cir. 1993); see also S.E.C. v. Tex. Gulf Sulphur Co., 401 F.2d 833, 848 (2d Cir. 1968) (finding that issuers were not required to disclose "educated guesses or predictions"); Silsby v. Icahn, 17 F. Supp. 3d 348, 362 (S.D.N.Y. 2014) (finding that when defendant had supplied investors "with financial information from which investors

---

[7] One email also shows a Goldman employee writing "this is suicide" (see Pls.' Opp. Mem. at 2 (citing Lederer Decl. Ex. 87), however, the Court notes that the email is ambiguous as to what or for whom that phrase references.

could draw their own conclusions," the defendant had no duty to use the precise term "insolvent" in otherwise accurate disclosures). And as Defendants point out, some of these emails -- including the email discussed at length in Dodona I, which allegedly called the Hudson CDO securities "lemons" -- clearly refer to other CDO transactions and not the Hudson CDOs.[8] (See Defs.' Mem. at 9 n.6 (citing Croke Decl. Ex. 5; Ex. 6 at 344:13-346:15.)

The Court did consider these emails and others similar to them at the motion to dismiss phase -- but the Court considered these emails primarily as part of its assessment that Plaintiffs had adequately alleged facts supporting an inference of recklessness as to scienter. Dodona I, 847 F. Supp. 2d at 642-44. See also In re Citigroup Inc. Sec. Litig., 753 F. Supp. 2d 206, 236-37 (S.D.N.Y. 2010) (considering similar email correspondence in finding that plaintiffs had adequately pleaded scienter at motion to dismiss phase). Such emails would support an inference of recklessness, if Plaintiffs could point to specific information that Goldman

---

[8] For example, the "lemon" email clearly refers to Camber 7, another Goldman CDO. Plaintiffs respond that Camber 7 included some of the same RMBS as Hudson 1. (Pls.' Mem. at 10 n.7.) However, at issue in the present litigation is whether there were actionable omissions made with respect to the Hudson CDOs, and whether Defendants concealed some type of investment risk that could not be gleaned through public information regarding the ROs selected for the CDO transactions. (See, e.g., Pls.' Mem. at 14.)

omitted. That some Goldman employees -- especially traders or employees in sales -- described RMBS as "junk" in their emails is not enough to show a dispute of material fact as to whether Goldman, as a knowing business strategy, did conceal actual investment risk.

Other emails Plaintiffs relied on deal specifically with Goldman's internal strategy of reducing its long exposure through structuring the Hudson CDOs (see Pls.' Opp. Mem. at 12) -- a strategy that Goldman had no duty to disclose. For example, documents cited by Plaintiffs discuss using the Hudson CDOs "to help move some of the risk," as a "structured exit," as a way to "offload close to 20 pct of its current long BBB/BBB- risk," or to "reduce risk in a situation where there were few opportunities to shed the ABX indices [Goldman was] long."[9] (Id.) Therefore, although such emails may not place Goldman's business practices and regard for some clients in the most favorable light, and perhaps could support a finding of scienter, they do not support a finding that Goldman made material omissions -- which is an equally necessary component of Plaintiffs' claims.

---

[9] As to Ostrem and Herrick, Plaintiffs similarly focus on documents and emails suggesting that Ostrem and Herrick had knowledge that Goldman sought to decrease its long exposure on RMBS. (See Pls.' Opp. Mem. as to Ostrem and Herrick at 1-2, 5-6.)

-19-

Second, Plaintiffs argue that Defendants concealed the likelihood that the Hudson CDOs would decline in value, as the Defendants controlled the sourcing and pricing of the CDS, and set credit enhancements. (See Pls.' Opp. Mem. at 10, 14.) However, the Plaintiffs have not shown, beyond mere speculation, that Defendants concealed material investment risk about the structure of the Hudson CDOs or did not provide adequate structural enhancements.[10] The only evidence that Plaintiffs provide to support their allegation that Defendants did not provide adequate structural credit enhancements or otherwise hid risk, is their expert's testimony that Goldman had "asymmetric information regarding [its] own <u>intent</u> and <u>purpose</u> of the vehicle," and that monthly RMBS remittance reports lacked "important information," such as realized loss.[11] (See Pls.' Opp. Mem. at 14 (emphasis added).) However, the expert testimony quoted by Plaintiffs does not support a finding that Defendants made material omissions. Plaintiffs' expert stated that Defendants did not have any "inside information" about the ROs or "how the [ROs]

---

[10] Notably, the Offering Circulars disclosed the ROs for the Hudson CDOs, and investors had access to certain remittance reports and other financial documents. (See Pls.' Rule 56.1 Counter-Statement at 4-6.)

[11] As discussed <u>infra</u>, Plaintiffs' expert did not actually state that the remittance reports lacked realized loss information.

-20-

would perform in the future."[12] (Defs.' Mem. at 7 (citing Croke Decl. Ex. 1 at 54:20-23; 178:14-21).) Further, that same witness stated that there is "no evidence in this case that any adverse exercise was undertaken with respect to selection" of the ROs.[13] (See Croke Decl. Ex. 1 at 307:21-308:2; Defs.' Mem. at 10.) Instead, Plaintiffs' expert focused on Defendants' "fail[ure] to disclose that [Defendants] intended to use the short positions arising from this transaction for their own proprietary interest." (Ex. 1 at 57:9-12) But as the Court held in Dodona I, Defendants had no duty to disclose this strategy -- i.e., Goldman's "intent and purpose of the vehicle."[14] As such, Plaintiffs' expert testimony cannot support the single fraud theory remaining.

If, however, Plaintiffs' expert had actually indicated that Goldman concealed "important information," such as

---

[12] Similarly, Ostrem and Herrick argue that Plaintiffs have shown no evidence that they "had access to some 'non-public information,' let alone knew, that the Hudson CDOs would not be profitable for long investors." (Ostrem and Herrick Mem. at 4.)

[13] Indeed, Defendants' expert witness concluded that the RMBS sponsored or underwritten by Goldman Sachs had lower delinquency rates than the balance of the ROs, and Plaintiffs have not disputed this finding. (Defs. Mem. at 10 n.8.)

[14] Plaintiffs similarly point to their expert's testimony that "[g]iven the clear evidence that the Hudson CDOs were 'initiated' as an undisclosed proprietary trade that was structured and executed for Goldman's benefit alone, it also necessarily follows as a matter of fundamental economics that the CDOs were riskier than Defendants portrayed them[.]" (Pls.' Opp. Mem. at 14.) Again, the expert's assessment that there was undisclosed investment risk follows solely from Goldman's undisclosed strategy. As the Court held in Dodona I, Defendants had no duty to disclose this strategy.

realized loss, there might be a genuine dispute as to a
material fact. However, unlike Plaintiffs' characterization
of their expert's testimony, their expert actually stated
that the remittance reports available to investors did show
"realized loss" data -- just that the realized loss was zero,
as none of the delinquencies had resulted in a realized loss
to investors by the date of the report. (Defs.' Reply Mem. at
5 (citing Croke Decl. Ex. 16 at 169:9-170:9).) Testimony from
Defendants' expert also indicates that the remittance reports
showed performance information showing delinquencies and
losses. (Defs.' Reply Mem. at 5 (citing Lederer Decl. Ex. 4
at 109:9-110:2).)

On this point, Plaintiffs have not shown evidence,
beyond mere conclusory allegations, that Defendants concealed
investment risk. For example, Plaintiffs have not shown
evidence that Defendants had information on realized loss
that was different from that indicated on remittance reports
but concealed from investors. See Landesbank Baden-
Wurttemberg v. Goldman, Sachs & Co., 821 F. Supp. 2d 616, 623
(S.D.N.Y. 2011), aff'd 478 F. App'x 679 (2d Cir. 2012)
(dismissing complaint alleging that defendants concealed risk
when complaint was "bereft of any specifics about
[defendant's] due diligence or how any of its statements were
false"); IKB Int'l S.A. v. Bank of Am. Corp., 584 F. App'x

26, 28 (2d Cir. 2014) (affirming dismissal of complaint at motion to dismiss phrase, noting that "[a]n allegation that defendants had access to information inconsistent with their alleged misstatements must specifically identify the reports or statements containing this information" (internal quotation marks and citation omitted)). Here, there is no indication in the record of any specific "critical facts" that were undisclosed by Defendants, see In re MF Global Holdings Ltd. Sec. Litig., 982 F. Supp. 2d 277, 318 (S.D.N.Y. 2013), that would indicate a genuine issue of material fact as to whether Defendants made material omissions.

Such a finding is consistent with the Court's reasoning in Dodona I. At the motion to dismiss phase, the Court found that because "Goldman's sudden -- and prescient -- shift to reducing subprime risk supports the inference that it possessed some unique insight; it is not unreasonable to infer that GS & Co's role as underwriter and the due diligence Goldman performed provided Defendants with material nonpublic information supporting that decision." Dodona I, 847 F. Supp. 2d at 643. The Court noted, though, that it was "unclear to what degree the information Defendants allegedly gathered from due diligence was in fact nonpublic." Id. Now, armed with the benefit of significant discovery, Plaintiffs must point to some relevant evidence showing Defendants possessed

and failed to disclose some material, non-public information. Despite such discovery, Plaintiffs have not pointed to any evidence of "'contemporaneous [due diligence] reports containing inconsistent information,' much less any reports containing material, non-public information about the subprime market or the ABX" for the ROs that Defendants issued or underwrote. (Defs.' Mem. at 8 n.4. (quoting IKB Int'l S.A., 584 F. App'x at 28).) Yet Plaintiffs still argue -- despite being unable to point to any specific information obtained through discovery indicating that Goldman possessed nonpublic information about the performance of the ROs -- that Defendants had "asymmetric information" about performance indicators and credit enhancements for the Hudson CDOs. (See Pls.' Opp. Mem. at 14.) Such unsupported statements constitute conclusory allegations or unsubstantiated speculation and do not show the existence of a genuine dispute of material fact. See In re Celestica Inc. Sec. Litig., 2014 WL 4160216, at *4.

Third, Plaintiffs argue that the Offering Circulars misleadingly stated that GSI would be the "initial Credit Protection Buyer," when Goldman actually intended for GSI to be a permanent counterparty. (See Pls.' Opp. Mem. at 11, 15. (emphasis added).) Plaintiffs claim that the term "initial credit protection buyer" hid that the Hudson CDOs were "a

-24-

concealed proprietary trade rather than a legitimate, arm's-length offering." (Pls.' Opp. Mem. at 16.) However, Goldman's Offering Circulars did disclose that GSI was the "sole Credit Protection Buyer" on the Hudson CDOs. Such a disclosure surely indicated to the Plaintiffs that a Goldman subsidiary stood to gain if there were an adverse credit event and a decrease in value of the securities. Yet, as the Court noted in Dodona I, such disclosure of GSI's role was "somewhat undermined, or at least downplayed, by statements elsewhere that GSI was the 'initial' credit protection buyer, that the Hudson CDOs were 'attractive relative value opportunities in the RMBS and structured product market,' or that 'Goldman has aligned incentives with the Hudson program by investing in a portion of equity.'" Id. at 648. Defendants argue that the word "initial" "correctly reflected that the credit protection buyer for the Hudson CDOs could change in certain circumstances (e.g., if the credit rating of the relevant Goldman Sachs entity was downgraded)." (Defs.' Mem. at 12 n.11 (citing Croke Decl. Ex. 9 at ¶ 45; Ex. 10 at 30-31; Ex. 11 at 120:2-14).) Plaintiffs respond that this was only a "half-truth," and that despite the term "initial," the "Defendants intended for Goldman to retain its short position from the outset which was the very purpose for which they 'initiated' the Hudson CDOs." (Pls.' Opp. Mem. at 11.)

The Court is not persuaded on the summary judgment record before it that such allegations are enough to save Plaintiffs from dismissal of their claims. "[T]he mere existence of a scintilla of evidence supporting the non-movant's case is also insufficient to defeat summary judgment." In re Celestica, 2014 WL 4160216, at *4 (internal quotation marks and citations omitted).

It is clear from the summary judgment record, as well as the parties' submissions, that Goldman did seek to reduce its RMBS exposure, and the Hudson CDOs were part of its strategy to do so. However, the Court held in Dodona I that Plaintiffs' fraud-based claims could not proceed on an omissions theory for failure to disclose such internal strategy. See id. at 646. Nor does implementing such a strategy necessarily suggest that the Hudson CDOs were set up to fail. The record shows no indication that Goldman possessed material nonpublic information regarding the ROs or the RMBS market more generally. Defendants certainly had sophisticated information about the RMBS market; but that information was public, and could have been determined (and likely was, in fact, known) by Plaintiffs, who include sophisticated hedge funds and investment banks well versed in these markets. Such knowledge does not imply that Defendants structured the Hudson CDOs with the foresight that the price of RMBS would soon plummet.

-26-

Instead, the record shows only that Defendants sought to hedge and mitigate its own investment risk that Goldman faced from holding significant long positions on RMBS. Indeed, this is a strategy that plaintiff Dodona employed as well: holding both long and short positions on the underlying securities.[15]

As such, the Court now finds that Defendants have satisfied their burden of showing no genuine issue of material fact as to whether Defendants concealed material nonpublic information as to investment risk of the Hudson CDOs, or whether Goldman structured the Hudson CDOs with the (undisclosed) knowledge and purpose that the value of the underlying ROs would substantially decrease. Plaintiffs have not provided specific evidence showing that a genuine issue for trial exists on this point -- a showing that Plaintiffs would need to make to succeed on their fraud-based claims at trial. The Court noted at the motion to dismiss phase that "if the facts alleged were borne out at a trial, Goldman's conduct, viewed charitably, could be found not only reckless but bordering on cynical." Dodona I, 847 F. Supp. 2d at 641. But even with the benefit of extensive discovery, Plaintiffs

---

[15] In their Motion for Summary Judgment as to Certain Class Members, Defendants argue that three class members, including Dodona, actually profited from their short sales on RMBS.

-27-

have not adduced sufficient evidence that could support those allegations at trial.

Because the Court finds that there is no genuine issue of material fact to support a primary violation by Defendants of Plaintiffs' federal and New York fraud-based claims, the Plaintiffs' Section 20(a) and aiding and abetting fraud claims necessarily fail as well. See In re Moody's Corp. Sec. Litig., No. 07-CV-8375, 2013 WL 4516788, at *12 (S.D.N.Y. Aug. 23, 2013). Similarly, Plaintiffs' unjust enrichment claims also fail. Plaintiffs would not be able to show, in the absence of remaining fraud claims, that Defendants profited at Plaintiffs' expense or that "equity and good conscience require restitution." See Landesbank Baden-Wurttenberg v. Goldman, Sachs & Co., 821 F. Supp. 2d 616, 625 (S.D.N.Y. 2011), aff'd 478 F. App'x 679 (2d Cir. 2012).

As the Court, based on the summary judgment record, is now persuaded that no genuine issue of fact remains as to whether Defendants made material omissions, and thus dismisses all of Plaintiffs' claims on that basis, the Court will not decide the other issues raised by Defendants in the Main Motion, or decide the Ostrem and Herrick Motion or the Certain Class Members Motion.

## III. ORDER

For the reasons set forth above, it is hereby

**ORDERED** that the motion (Dkt. No. 193) of defendants Goldman, Sachs & Co., The Goldman Sachs Group, Inc. (together, with Goldman, Sachs & Co., the "Goldman Sachs Defendants"), and former Goldman Sachs employees Peter L. Ostrem ("Ostrem") and Derryl K. Herrick ("Herrick") (together with the Goldman Sachs Defendants, "Defendants"), for summary judgment, pursuant to Federal Rule of Civil Procedure 56 is **GRANTED**; and it is further

**ORDERED** that the supplemental motion (Dkt. No. 197) of Ostrem and Herrick for summary judgment, pursuant to Federal Rule of Civil Procedure 56 is **DENIED** without prejudice; and it is further

**ORDERED** that Defendants' motion (Dkt. No. 189) for summary judgment as to the claims of certain class members is **DENIED** without prejudice; and it is further

**ORDERED** that the parties are directed to inform the Court, within twenty (20) days of the date of this Order, regarding their contemplation in connection with the disposition or further proceedings as to Defendants' counterclaims.

The Clerk of Court is directed to terminate the motions for summary judgment (Dkt. Nos. 189, 193, 197).

**SO ORDERED.**

Dated:     New York, New York
           8 September 2015

                                            Victor Marrero
                                               U.S.D.J.